FILED
IN CLERKS OFFICE

2019 APR 12  AM 10: 55

U.S. DISTRICT COURT
DISTRICT OF MASS.

**UNITED STATES DISTRICT COURT**

**DISTRICT OF MASSACHUSETTS**

---------------------------------------------------------------X

JOHN DOE,

                  **Plaintiff,**

-against-

UNIVERSITY OF MASSACHUSETTS AT DARTMOUTH;
PEYTON R. HELM in individual and official capacity;
CYNTHIA CUMMINGS, in individual and official capacity;
DEBORAH MAJEWSKI, in individual and official capacity;
SCOTT WEBSTER, in individual and official capacity;
DAVID GOMES, in individual and official capacity
JOHN BUCK, in his individual and official capacity.

                  **Defendants.**

---------------------------------------------------------------X

Civil Action No.: _____

**COMPLAINT**
**JURY TRIAL DEMANDED**

*"Show me the man and I'll find you the crime"[1]*

Plaintiff John Doe[2] (hereinafter referred to as "John"), Pro Se, respectfully alleges as follows:

## THE NATURE OF THIS ACTION

1.  John challenges the proposition that a public state university – in attempting to baselessly compel a graduate student to withdraw from his academic program – would first willfully institute a bogus misconduct allegation, and when that failed, institute a similar witch-hunt sexual misconduct investigation and adjudication, and with carte blanche discard its own policies, or act arbitrarily, maliciously, or otherwise in bad faith. As set out below, each of these terms aptly describes UMass Dartmouth's decision to railroad John into a campus proceeding that could result in him being suspended or even expelled.

---

[1] "I don't like criminal investigations to start on hoping that you have the target, maybe we'll find the crime, maybe we'll find the statute – and if we can't find the statute, we'll stretch the statute to fit the person…" "That sounds like Lavrentiy Beria [Joseph Stalin's secret police chief] and Joseph Stalin!...'Show me the man and I'll find you the crime.' I don't want to ever see that come to America." - Harvard Law School Professor Emeritus Alan Dershowitz on Special Counsel Mueller's investigation of President Donald Trump -  May 26, 2017.

[2] John herewith files a Motion to proceed pseudonymously.

2.      This case arises out of the actions taken and procedures employed by Defendants UNIVERSITY OF MASSACHUSETTS AT DARTMOUTH (UMASSD), Peyton Helm, Cynthia Cummings, Deborah Majewski, Scott Webster, and John Buck  (Collectively as "Defendants") in carrying out a procedurally flawed and biased investigation process against John, a graduate student at UMASSD, as the result of an unwarranted sua sponte investigation seeking any potential misconduct of John, which could be used to expel him.

3.      It is no secret that over the past few years, various courts including this one, have seen a substantial increase in litigation brought by male students against universities alleging a mishandling of sexual misconduct allegations and biased proceedings leading to unwarranted sanctions.

4.      However, unlike the multitude of cases pending before various District Courts, this case is not the typical Title IX suit in which a sanctioned male student, who was  found responsible of sexual assault or sexual misconduct, seeks relief from the court.  Instead this case surrounds egregious concerted actions of Defendants, who endeavored to "correct an admissions error" unrelated to Title IX. Specifically Defendants concluded they should take "whatever necessary" actions to expel or intimidate a properly matriculated male graduate student with a conviction into withdrawing, despite his having gone through a rigorous admissions vetting process.

5.      Cummings, with assistance of Defendant Deborah A. Majewski, attempted to criminally extort John into withdrawing from school at a Conduct Conference on May 4, 2016. Specifically, John was threatened that if he refused to withdraw from school by the end of the meeting, then Majewski and Cummings's would disseminate his educational record information, accuse him of a crime and destroy his reputation with his colleagues and advisors both within UMass Dartmouth and with outside research opportunities. When they failed to compel his resignation, they conducted a sham Title IX investigation that sought to recruit unsolicited testimony in hopes of generating baseless misconduct charges that could warrant John's expulsion. Inter alia, the investigator eventually accused John of creating a hostile learning environment by telling others that he missed his children, and complained about not obtaining a desk in the new graduate student area. With these and similar accusations, UMASSD travailed to expel John or compel his "voluntary" withdrawal.

6.      For four months he was banned from campus, issued a "Do Not Contact" order denying him communication with anyone associated with UMass Dartmouth and suspended. During that time, John participated in the Special Examiner's Process under protest, because each step of the Special Examiner's Process denied John his due process rights under the XIV Amendment to the U.S. Constitution, Title IX, and repeatedly breached terms of explicit and implicit contracts.

7.      John neither had the opportunity to learn the identity of his supposed accuser, see any shred of evidence against him, confront the accuser, question the witnesses, nor present a defense at a hearing.

Because there is no hearing, the accused never knows accuser's identity, what the accuser (or the accuser's witnesses) actually have said, but only knows what the Special Examiner chooses to tell him. In John's case, he was neither told orally nor in writing the factual bases for the charges against him at any time before or during the four months of the Special Examiner's investigation; instead, he had to try to piece together what in particular he was accused of doing from the questions posed to him by the Special Examiner.

**8.**      When it was obvious that UMASSD officials could neither compel John's resignation through extortion threats, nor find him responsible in a male biased witch-hunt Title IX investigation, Cummings maliciously defamed John. Consequently, his associates, advisors, and colleagues in his chosen research field would neither communicate nor collaborate with John again after UMASSD officials intentionally and maliciously spread John's confidential student records protected under FERPA and innuendo regarding his Title IX proceeding.

**9.**      Not surprisingly, John was found not responsible for any allegation, a finding which by due process and fundamental fairness must end all further disciplinary action and allow a student to continue his education program unfettered. Instead and unhappy with the complete lack of evidence to support a finding of responsible for the nonexistent misconduct in John's case, Majewski and Cummings in direct violation of every policy imaginable,   still sanctioned John with a warning and directed the Dean of SMAST to implement 'appropriate intervention.'

**10.**      'Appropriate interventions' censored John from engaging other students, confined him to a workspace adjacent to the Dean's office, and kept John from his normal routine in benefitting from his educational experience. The 'appropriate intervention' proscribed by John's contract, school policy, and any sense of fair play violated John's rights under his 1st and 14th Amendment rights and Title IX.  Then Defendants amended his academic program without his consent from a Master's Thesis Program/Fastrack to Ph.D. to Master's Non-Thesis, destroying his ability to pursue his research interest.

**11.**      UMass Dartmouth leadership was cognizant of, acquiesced to and allowed malicious school officials to hijack the University's disciplinary processes for their own illegitimate purposes, and aided and abetted their abuse of process in acquiescing to the coercion of outside and internal pressures to prosecute male students. Defendants usurped the oversight procedures of the three person panel, which would have shed light on their malfeasance and efforts to rid John of UMass Dartmouth.  John found the harassing environment on campus so hostile and toxic that he was compelled to seek a leave of absence and seek his education options, which in the end none existed. UMASSD constructively expelled John from an education program in his chosen field, and University he had previously loved, but which had betrayed his trust.

**12.**      For these reasons, John  brings this action to obtain equitable and declaratory relief and legal damages based on causes of action inter alia for violations of Title IX of the Education Amendments of

1972, breach of contract, breach of the covenant of good faith and fair dealing, estoppel and reliance, defamation, invasion of privacy, and intentional and negligent infliction of emotional distress, Violation of 1st Amendment Right to Speech, and denial of due process.

## THE PARTIES

13.     John, a Caucasian male, is a natural person, citizen of the United States, and resident of the state of Rhode Island. During the events described herein, he has been a student at UMASSD School of Marine Science and Technology (SMAST), and commuted to and from his classes on the main campus of UMASSD and the two campuses for SMAST. He maintained two workstations: at the AT&T Building SMAST campus, and at the electrical engineering lab of John Buck on main campus.

14.     Defendant UNIVERSITY OF MASSACHUSETTS AT DARTMOUTH (UMASSD) is a public body corporate and politic established, organized and authorized under and pursuant to the laws of Massachusetts, with the authority to sue, and be sued, and was at all times relevant herein, operating within the course and scope of its authority under color of state law and in receipt of federal funding under Title IX, 20 U.S.C. §§ 1681-1688. At all times material hereto, UMASSD acted by and through its agents, servants, employees, and representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion of UMASSD business, mission and/or affairs.

15.     Upon information and belief, Defendant Peyton Helm (Herein as Helm) was the Interim Chancellor of UMASSD at all relevant times herein, and is a resident of Maine. He is being sued in his individual and official capacity.

16.     Upon information and belief, Defendant Cynthia Cummings (Herein as Cummings) was the Assistant Vice Chancellor for Student Affairs at all relevant times herein, and is a resident of the Commonwealth of Massachusetts. She is being sued in her individual and official capacity.

17.     Upon information and belief, Defendant Deborah A. Majewski (Herein as Majewski) was the Associate Vice Chancellor, Title IX Coordinator, ADA and 504 Coordinator, Office of Diversity, Equity and Inclusion at all relevant times herein and is a resident of the Commonwealth of Massachusetts. She is being sued in her individual and official capacity.

18.     Upon information and belief, Defendant Scott Webster (Herein as Webster) was the Director Graduate Studies & Admissions at all relevant times herein, and is a resident of the Commonwealth of Massachusetts. He is being sued in her individual and official capacity.

19.     Upon information and belief Defendant David Gomes (herein as Gomes), was the Deputy Director / Senior Investigator of Diversity, Equity & Inclusion at all relevant times herein, and is a resident of the Commonwealth of Massachusetts. He is being sued in his individual and official capacity.

20.     Defendant John Buck (Herein as Buck), was John's graduate advisor and a tenured professor at UMASS Dartmouth at all relevant times herein and is a resident of the Commonwealth of Massachusetts. He is being sued in his individual and official capacity.

## JURISDICTION AND VENUE

21.     This Court has diversity, federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. 28 U.S.C. § 1367 because: (i) John and each Defendant are citizens of different states and the amount in controversy exceeds $75,000, exclusive of costs and interest; (ii) the claims herein arise under federal law under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq.; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

22.     This Court has personal jurisdiction over Defendant UMASS Dartmouth on the grounds that Defendant UMASS Dartmouth is conducting business with the Commonwealth of Massachusetts.

23.     This Court has personal jurisdiction over Defendants Cummings, Majewski, Webster, Buck, and Gomes on the grounds that they conduct business within the Commonwealth of Massachusetts and were employed by UMASS Dartmouth at all times relevant herein.

24.     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim(s) occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.      John's Efforts to Apply to UMASS Dartmouth

25.     John is a graduate of the United States Military Academy with a 3.5 GPA; upon graduation he served with distinction as a decorated veteran having served as an Airborne Ranger Infantry Officer in the U.S. Army.

26.     As the result of his physical and mental health service connected disability, Veterans Affairs offered him a full scholarship with stipend under Chapter 31, which authorized John 5 years of academic funding support to pursue a Ph.D. in Oceanography.

27.     As of January 2016, John was the only matriculated student, of two applicants to UMass Dartmouth graduate school, with a felony conviction. For five years prior to matriculation, John travailed to rehabilitate his personal and professional life.

28.     John experienced the tribulations of unnecessary disclosure of his felony conviction. In March 2015, John applied to enroll in the University of Rhode Island's Ph.D. program in Ocean Policy. He met with the Dean, and he and a Ph.D. advisor agreed on a dissertation regarding the economic impact of Cape Cod related to the increase of Great White sharks in local waters. Both the Dean and his potential advisor indicated that matriculation was certain. However, when John disclosed he had a criminal conviction, all

communications with his potential advisor ceased. John's application to the Ocean Policy non-Thesis Master's program was denied, despite John's glowing letters of recommendation, his superior GPA from a reputable school, and his GRE score much higher than the program's norm requirements.

29.     In April of 2015 John met with Webster to discuss his interest in applying to UMass Dartmouth graduate school. John openly disclosed that he had been convicted of a felony in 2005 related to domestic discord. He requested the opportunity to disclose the nature of his convictions, and receive a decision on whether his convictions would preclude a successful application. Throughout the period from April 2015 to his official acceptance on January 20, 2016, John corresponded and met with graduate admissions, specifically to openly disclose his criminal history and disclosure of same required for admission. He specifically shared his experience at URI and stated he needed assurances it would not happen at UMass Dartmouth.

30.     In April of 2015, John took a graduate level acoustics class and accepted a summer internship with Professor James Miller at the University of Rhode Island (URI), in which John conducted acoustic analysis of the pile driving from the Block Island Wind Farm.

31.     On June 1, 2015, John met with Buck to discuss whether Buck would serve as his Ph.D. advisor. By July 1, 2015 Buck promised to sponsor John as his Ph.D. advisor in John's academic pursuit of a Ph.D. in Oceanography/Bioacoustics. Buck stated that together they would develop research projects that would lead to publications that would serve as chapters in John's Ph.D. dissertation. Buck further promised to introduce John to specific scientists that he knew, who would corroborate with him and John, and who had wanted to corroborate with Buck for considerable time. From June 1, 2015 to May 4, 2016, Buck and John exchanged over 150 texts and emails regarding John's Ph.D. pursuit and development of his committee, consulted weekly in Buck's office, and Buck provided John a workspace cubicle in Buck's EE lab. Buck served officially and contractually as John's advisor, and had a fiduciary responsibility to John.

32.     At great personal expense, John attended the 170th Meeting of the Acoustical Society of America in Jacksonville, FL from November 2 to 6, 2015. He attended specifically so Buck could introduce John to Douglas Nowacek, Ph.D., Duke Nicholas School of the Environment, and Jennifer L. Miksis-Olds, Ph.D., Director, Center for Marine Science & Technology, at The Pennsylvania State University. Both met with John for several hours, discussed scientific corroboration and agreed to serve on John's academic graduate committee.

33.     Solely based on Webster's promise to ensure John's confidentiality of the information in his disclosure statement, and Buck's promise to advise John in his Ph.D. pursuit, over all other programs under consideration, John decided to apply his scholarship to UMASSD.

34.     In the fall of 2015, John took three classes at UMASSD in preparation of and to promote his application for matriculation to UMass Dartmouth graduate school. Professors of each fall class and Buck wrote John's letters of recommendation.

## II.     John's Performance at UMASSD and Development of Research Interest

35.     John's research interest consisted of using drones to collect "whale blow" as baleen whales surfaced as a modality to collect and analyze a non-invasive tissue sample to determine whether the whale experienced a stress hormone response to anthropogenic noise.

36.     The parochial academic community, related to John's research interest, consisted of bioacoustics scientists, who used drones to assess stress on baleen whales including those from the Boston Aquarium, Woods Hole Oceanographic Institute (WHOI), URI, Duke Marine Lab, and Miksis-Olds' lab.

37.     On December 31, 2015, John met with Senior Scientist Michael Moore, Ph.D., Director of Marine Mammal Center at WHOI. Moore discussed John's research interest which was in line with Moore's recent research, and both expressed an earnest desire to and agreed to collaborate with Buck. On January 20, 2016 Moore assigned and agreed to advise and supervise John on a whale research project that would continue through the summer of 2016[3].

38.     In February 2016, Buck arranged for Miksis-Olds to accept John in a prestigious bioacoustics program scheduled for June 5-10, 2016, called SeaBASS, a biannual training program that recruited the best international talent in bioacoustics.[4]

39.     Throughout the Spring of 2016, Professor Nowacek recruited John to apply to Duke Marine Lab graduate program, and spoke on his behalf for acceptance into the 2016 summer classes[5] and internship program at Duke Marine Lab.

40.     Leading in to the Spring of 2016, John had labored successfully to develop a viable graduate program, with the world's leading scientists in the realm of his academic and career pursuit and maintained a 4.0 in all graduate courses.

## III.    Representations, Agreements, Covenants and Warranties Between John and UMASSD

41.     In meetings with Webster from April 2019 through John's matriculation, John expressed that he would not put his academic career and VA scholarship in jeopardy if the graduate admissions office could

---

[3] In March, Moore underwent a kidney replacement and John could not be reached until his recovery was complete.
[4] SeaBASS provides the opportunity for graduate students interested in pursuing careers in marine bioacoustics to develop a strong foundation of both marine animal biology and acoustics from distinguished lecturers in the field. The goals of SeaBASS are to discuss important topics in marine bioacoustics, foster technical communication across disciplines, and promote mentoring and collaboration. SeaBASS gives students an opportunity to learn from experts who will discuss a suite of topics not often offered at any one university.
[5] Environment 376LA. (Marine Mammal Biology) and Environment 335LA. (Unoccupied Aircraft Systems in Scientific Research).

not guarantee absolute confidentiality of the disclosed criminal conviction. John foresaw and Webster agreed that if John's convictions were disclosed to UMASSD academic departments, SMAST and others in the community of John's research, then he would be "blackballed" with an academic scarlet letter destroying his ability to pursue any interest in Oceanography. Multiple times Webster made unambiguous promises that he, his staff and UMASSD staff would prevent any and all leaking of any confidential information related to John. He further stated that FERPA would prevent unauthorized disclosure of the information. But for this assurance, upon which John relied to his detriment, he would have chosen matriculation elsewhere.

42.     Buck likewise unambiguously promised that, as a term to John's matriculating to UMass Dartmouth SMAST, he would serve as John's advisor through his dissertation completion.

43.     From when John enrolled in classes in September 2015, and which was amended when on January 20, 2016 John was accepted to the UMASSD SMAST thesis Master's Degree program[6], a contractual relationship existed between John and UMass Dartmouth bound by the terms of school online policies including: 1) UMASSD 2015-2016 Student Handbook (Handbook),[7] which includes Student Conduct Policies and Procedures, (Policies)[8]; 2) FERPA policy, and 2015 Sexual Violence Protocol (Protocol) (Exhibit A), and any and all statements of procedure or policy on UMass Dartmouth official websites at the times relevant.

44.     UMass Dartmouth Handbook states:[9] "The Student Handbook is the University's official notification of UMass Dartmouth resources, policies, regulations, and community standards. Students are responsible for the information contained in this Handbook. The information contained in this web version of the Student Handbook will be considered to be the official version of all documents."

45.     Policies state the student conduct system's purpose is to provide due process and to ensure that any student…, accused of a violation for which discipline has been recommended, is afforded the opportunity to have the matter reviewed and the right to appeal the outcome.

46.     Policies state the conduct process for students of UMass Dartmouth gives to the Board of Trustees the ultimate and final authority to govern the University. Authority possessed by the various student conduct entities set forth in this document comes from the power of the Board of Trustees to so delegate such authority.

---

[6] John had applied to the Ph.D. program; John, Buck and Steve Cadrin (Admissions Director of SMAST) agreed that John would be considered on the FastTrack program for acceptance into the Ph.D. program once John wrote a research proposal.

[7] https://www.umassd.edu/studentaffairs/studenthandbook/

[8] https://www.umassd.edu/studentaffairs/departments/student-conduct-and-dispute-resolution/policies/

[9] https://www.umassd.edu/studentaffairs/studenthandbook/

**University of Massachusetts Dartmouth Sexual Violence Protocol – 2015 (Herein as Protocol)**

<u>**Title IX Investigation/Student Conduct Process/Grievance Procedure**</u>

**47.** In August 2015, UMASSD implemented University of Massachusetts Dartmouth Sexual Violence Protocol and Title procedures, under the direction of Office of Diversity, Equity and Inclusion, and Student Affairs, which were tailored to conform to guidelines in the Federal Dear Colleague Letter of 2011.

**48.** The sexual violence protocol, which were to govern sexual misconduct cases going forward, in fact competed and paralleled with the Conduct Policies as related to sexual misconduct.

**49.** The OIEC Process and Procedures were made available to University students, including John, online. The 2015-2016 Sexual Violence Protocol, which the Office of Diversity, Equity and Inclusion, and Student Affairs wrongfully applied in John's case provides, in relevant part states:

**50.** <u>**Definition of Sexual Harassment**</u>

*"Sexual harassment is unwelcome conduct of a sexual nature. It includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature. Sexual violence is a form of sexual harassment prohibited by Title IX. When a student is sexually harassed by a member of the University community, the harassing conduct creates a hostile environment if the conduct is sufficiently serious that it interferes with or limits a student's ability to participate in or benefit from the school's program. The more severe the conduct, the less need there is to show a repetitive series of incidents to prove a hostile environment, particularly if the harassment is physical. Indeed, a single or isolated incident of sexual harassment may create a hostile environment if the incident is sufficiently egregious."*

**51.** UMass Dartmouth utilizes an <u>**Investigative Model**</u>[10] for the resolution of complaints of sexual violence … The investigator is neutral in the process."[11]

**52.** Per Protocol when notified of an incident of sexual violence, the Title IX Coordinator in the Office of Diversity, Equity and Inclusion <u>will review the available information and if necessary,</u> appoint an a Title IX Investigator. Title IX Investigators receive annual training for this role.

**53.** Per Protocol Investigations in which a student is the accused/respondent the investigation will normally include the following: (1)Review of the rights of the reporting party; (2)Interview with the reporting party; (3) Notice of charge in writing to the respondent (alleged responsible party) via UMass Dartmouth email account; (4) Review of the rights of respondent; (5) Interview with alleged respondent; (6) Interviews with witnesses; (7) Review of law enforcement investigation documents if available; (8) Review of student files, and (9) Examination of relevant documents and evidence.

---

[10] https://columbialawreview.org/content/the-old-college-trial-evaluating-the-investigative-model-for-adjudicating-claims-of-sexual-misconduct/
[11]

**54. Following Investigation:**

- When the investigation is completed, the investigator will present his/her findings to the Title IX Coordinator. Upon approval of the Title IX Coordinator, the investigator will present his/her findings in writing via UMass Dartmouth email account to the reporting party, the respondent and the Coordinator of Student Conduct and Dispute Resolution. Both will be asked to submit in writing a response to the finding to the Coordinator of Student Conduct and Dispute Resolution .

- The finding and written responses from the reporting party and respondent will be reviewed by an administrative review panel of two faculty/staff. The administrative review panel will make a decision whether to support to the finding of the investigation and if so, to determine appropriate sanctions.

- The administrative review panel will present their decision in writing to the reporting party and respondent via UMass Dartmouth email account. The decision letter will include information about submitting an appeal.

- Both the reporting party and respondent may submit a letter of appeal within 5 business days of receiving the administrative review panel's decision to the Associate Vice Chancellor for Student Affairs. The appeal is based on the grounds for appeal as allowed in the appeal process. Grounds for appeal include: (1) the basic tenets of due process provided by this document were omitted, ignored, or violated or (2) new evidence exists that is relevant and that was unobtainable at the time of the original decision. It is important to note that sanctions imposed by the administrative review panel will be in effect while an appeal is pending.

- The Associate Vice Chancellor for Student Affairs (or his/her designee) will normally make a decision in the appeal and will send appeal decision to both reporting party and respondent via UMass Dartmouth email. The appeal decision is final.

**55. Procedure in relevant part included:**

- All complaints of sexual violence will be investigated promptly, thoroughly and impartially by a trained Title IX Investigator. The University will inform and get the consent of the reporting party before proceeding with the complaint.

- Equitable rights will be provided to both the reporting party and respondent throughout the investigation process,

- The University uses the standard of the <u>Preponderance of the Evidence</u> also called More Likely Than Not when weighing evidence presented in a hearing.

- Both the reporting party and the respondent may appeal the outcome of a student conduct hearing if they attended the hearing. Possible grounds for appeal are allegations that: (1) the basic tenets of due process provided by this document were omitted, ignored, or violated or (2) new evidence exists that is relevant and that was unobtainable at the time of the original decision.

- <u>Both the respondent and reporting party have a right to an advisor of their choice throughout the process.</u> Furthermore both have the right to an advocate. For the reporting party the advocate is usually the Director of the Center for Women, Gender, and Sexuality or Victim Advocate/Educator. For the respondent, information about an advocate can be obtained by contacting the Office of Student Affairs.

**56. Information for and rights of the respondent (accused student):**

- The respondent may seek assistance in the Office of Student Affairs.
- When becoming aware of a complaint of sexual violence the University may take interim measures including but not limited to <u>restriction of communication with named individuals</u>, Interim Suspension from

the University, ... and restriction from participating in a particular class or in campus activities. Violation of any interim measure is likely to result in immediate interim suspension from the University.

• The respondent may be accompanied by an advisor and an advocate to any meeting or proceeding involving this complaint. The respondent may also be accompanied by legal counsel.

• The respondent may request an assessment of interim restrictions with the Associate Vice Chancellor of Student Affairs or designee

• The University may proceed with the investigation/student conduct/grievance process regardless of the status of any criminal proceedings for the same incident

• The respondent has a right to the support services of the University including counseling.

• <u>The respondent will be informed in writing of charges of violations of the code of conduct via UMass Dartmouth email account prior to meeting with a Title IX Investigator</u>. If an investigation is ongoing, the accused student will be kept apprised of the status of the investigation by the Title IX Investigator.

**57.** Using a single investigative model UMASSD Protocol deprives an accused of a hearing before an impartial panel and instead permits one unlicensed individual within the Title IX office, with undisclosed qualifications, potential conflicts of interests and experience to act as detective, prosecutor, judge and jury.

**58.** This convergence of roles creates substantial conflicts of interest that allow a single individual to direct the ultimate outcome of the matter based his/her presumptions about the veracity of the allegations and influenced by innate beliefs about the roles of males and females in sexual situations, compounded by the preconceived notions of any male with a felony conviction.

**59.** Moreover this investigative model deprives an accused student of a full and meaningful opportunity to be heard as he is denied the opportunity to present his defense before an impartial panel of decision makers, to cross examine his accuser (whether or not the reporting party is the alleged victim) and to challenge the evidence or witnesses who, per the Title IX Office, offered adverse testimony against him.

**60.** Further, upon information and belief, UMASSD uses the trauma informed investigation model when investigating complaints, which teaches that trauma causes responses in victims that may be counterintuitive; for instance, continued contact with the perpetrator, delayed response to trauma, flat affect, or use of humor. It discusses that "survivors" do not act in any one way but responses can vary as there are a variety of coping mechanisms. Consequently, statements denying that any trauma occurred could be construed as a direct response to the trauma suffered.

**61.** Upon information and belief Investigator Gomes, Cummings and Majewski failed to receive proper training on the implementation of either Policies and/or Protocol and on proper training on the scope, definition and application on what constitutes sexual harassment and hostile learning environment sufficient to warrant a Title IX investigation. Evidence suggests that Gomes, Majewski and Cummings believe that John's statement – of  simply conveying emotion about missing his children - equates to a hostile learning environment that warrants an interim suspension. Additionally Majewski confused the start of disciplinary matters that instituted the investigation from the May 4th Conduct Conference.

**UMASSD Faced Intense Federal, UMASS, Local and Student Pressure to Comply with Title IX**

**62.**   On April 4, 2011, the Office for Civil Rights ("OCR") of the United States Department of Education issued a guidance letter to colleges and universities in the United States in receipt of federal funding which became widely known as the "Dear Colleague Letter" (the "DCL" or "2011 Dear Colleague Letter"). The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.*and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects."

**63.**   The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its       lax response       to       what       the       report characterized       as       a       social       problem of criticalimportance. *See*http://www.npr.org/templates/story/story.php?storyId=124001493.   The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (*e.g.* that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sex aggressor role.

**64.**   The DCL, further, relied on faulty statistics in sounding a "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault     while     in college." DCL, at p. 2. The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number     as     a     baseline…when     discussing     our     country's     problem with     rape     and     sexual assault." http://time.com/3633903/campus-rape-1-in-5-sexual-assault- Relying on the these faulty numbers, the DCL minimized due process protections for the accused by, among other things, eschewing any presumption of innocence, mandating a preponderance of the evidence standard, limiting cross-examination, and forbidding certain forms of alternate resolution.

**65.**   For UMass Dartmouth specifically there has been financial gain to open TitleIX investigations and find against the accused. October 2013, UMass Dartmouth's Center for Women, Gender, and Sexuality (CWGS) received a three year, $300,000 grant from the U.S. Department of Justice's Office on Violence against Women ("OVW"). to "Reduce Sexual Assault, Domestic Violence, Dating Violence and Stalking on Campus, which the maximum amount ($300,000) which could be awarded to an individual institution.

**66.**   The federal description for the OVW grant, which was authorized by the Violence Against Women Act, 42 U.S.C. § 14045b, states "the Campus Program encourages a comprehensive coordinated community approach that enhances victim safety, provides servicesfor victims and supports efforts to hold offenders

accountable. The funding supports activities that develop and strengthen victim services and strategies to prevent, investigate, respond to and prosecute these crimes... Colleges and universities should demonstrate to every student that these crimes will not be tolerated, that perpetrators will face serious consequences, and that holistic services are available for victims." Upon information and belief, Fairfield was awarded a $300,000 OVW federal grant based upon their application supporting the foregoing criteria. (emphasis supplied)

67.    On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled: *Questions and Answers on Title IX and Sexual Violence*

> *("Q&A") which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve com plaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." Q&A, at p. 12. The Q&A advised schools to adopt a trauma informed approach, advis ing, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." Id. at p. 31.*

68.    In April 2014, the White House issued a report entitled "*Not Alone[12]*". Like the 2011 Dear Colleague Letter, relied upon the faulty "1 in 5" statistic and focused on  protecting women from          sexual assault, "engaging men" and "if you see it happening, help her, don't blame her, speak up." *Id.* at p.2. The report also suggested that college and universities undergo "trauma informed training" because "victim's often blame themselves; the associated trauma can leave their memories fragmented; and insensitive or judgmental questions can compound a victim's distress." The report added "[w]hen survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable." The report included a warning that if the OCR found that a Title IX violation occurred, the "school risk[ed] losing federal funds" and that the DOJ shared authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools. Further, if a voluntary resolution could not be reached, the DOJ could initiate litigation. The report contained no recommendation with respect to ensuring that the investigation and adjudication of sexual assault complaints be fair and impartial or that any resources be provided to males accused of sexual assault.

69.    On May 1, 2014, the DOE issued a press release naming University of Massachusetts as one of the initial 55 colleges and universities being investigated for violating Title IX. Then Assistant Secretary of Education Catherine Llhamon ("Llhamon") stated that the schools were being named "in an effort to bring more transparency to our enforcement work and to foster better public awareness of civil rights." Per the press release, "[r]eleasing this list advances a key goal of President Obama's White House Task Force to Prevent Students from Sexual Assault.... The Obama Administration is committed to putting an end to

---

[12] http://changingourcampus.org/about-us/not-alone/

sexual violence particularly on college campuses." "All universities…receiving federal funds must comply with Title IX. Schools that violate the law and refuse to address the problems identified by OCR can lose federal funding or be referred to the U.S. Department of Justice for further action.

**70.**     University of Massachusetts System, maintains multiple campuses, is governed by a single 22-member Board of Trustees that represents various interests of the public at large, and functions as a legislative body dealing mainly with general policies governing the University.  The events at one campus that threatens the Federal funding under Title IX influences the decisions of the University of Massachusetts System at large, especially when those events occur at the headquarters campus at Amherst.

**71.**     Precipitating events that caused changes at Umass Amherst, which 1st District Courts have ruled created a male bias in disciplinary decisions there, then influenced the decisions and policy of officials at all campuses (including UMass Dartmouth) as reported in The Boston Globe on May 3, 2014,  which described the experience of Dana Bolger that garnered national attention.[13]

**72.**     That same day, UMass Amherst's Title IX Office announced it adopted a "survivor-centered" approach to misconduct investigations and hearings, under which all members of the University community are exhorted to "BELIEVE" and are instructed, "Don't Question. Don't Judge…Just Believe and Support."

**73.**     Shortly thereafter, the University created and funded The Men's and Masculinities Center, which claims that  men who adhere to "more traditional constructions of masculinity" are "more inclined to engage in a range of unhealthy and risky behaviors including …sexual violence."

**74.**     Leaving no doubt it was bowing to outside pressure, UMass Amherst issued a public statement explaining that its "student conduct code has been revised…We've been very concerned with this; its an issue here and across the Country." UMass Dartmouth officials,  in responding to press reports regarding sexual violence against women, cited verbatim those very concerns as those of UMass Amherst officials.

**75.**     In June 2014, Llhamon testified before the United States Senate that if OCR could not secure voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice.

**76.**     In July 2014, local news publications reported that the US Dept. of Education's Office of Civil Rights was investigating UMass Dartmouth's handling of sex abuse cases.[14]

*"UMass Dartmouth officials said they're not taking the investigation lightly…" "It's an important issue. We're going to do what we need to do to comply with the request," said David Milstone, UMass Dartmouth's Vice Chancellor for Student Affairs. "We're obviously going to do our best to strengthen our program." "Over the past several years, we have been proactive in enhancing our response to Title IX*

---

[13] https://www.google.com/amp/s/www.bostonglobe.com/metro/2014/05/02/student-activism-white-house-pressure-elevated-sexual-assault-college-campuses-national-concern/JiMUJDdai4ub1mTuEREPaL/amp.html

[14] https://cohasset.wickedlocal.com/article/20140730/NEWS/140739503

*issues, and will approach this inquiry as an opportunity to further strengthen our policies and practices," UMass Dartmouth spokesman John Hoey said in a statement. Milstone said, "UMass Dartmouth averages about four reported cases each year" and said that, "based on what we know about sexual violence," there is a discrepancy between the number of incidents of sexual violence that actually happen on campuses versus those that ultimately get reported. "Any time there is a complaint…, we have two responsibilities. One is to ensure safety of victim. The other is to make sure the community has a separation from the alleged perpetrator in this case," Milstone said. "We want to be careful to support the victim… We want to assume accuracy in what the victim is saying…"*

**77.**     Circa August 2014, UMASSD acknowledged the DCL on the UMass Dartmouth Title IX website, and incorporated the guidance into Title IX Investigative Procedures:

> On April 4, 2011, the U.S. Department of Education Office of Civil Rights released a *Dear Colleague Letter* providing guidance and reminding colleges and universities that accept federal funds of their responsibilities under Title IX of the Education Amendments of 1972 to address sexual harassment and assault. The Dear Colleague Letter is based on the OCR interpretation of the 2001 Revised Sexual Harassment Guidance and provides institutions with practical examples of how postsecondary institutions should comply with Title IX by proactive education and by taking action to end harassment, prevent recurrence and remedy the effects.

**78.**     In August 2014 UMass Dartmouth was ordered to pay nearly $1.2 million after appealing ruling discrimination complaint.[15] Any potential Title IX complaint would be considered a similar suit and UMASSD was thus hypersensitized to potential discrimination suits.

**79.**     In August 2014 local news publications continued pressuring Umass Dartmouth to increase steps to protect women from men.[16]

> **"While victims' advocates are heartened by colleges' efforts to educate students on rights and accurately report incidents, many say campuses should take more action**." "Take the University of Massachusetts Dartmouth as an example. According to the U.S. Department of Education's Office of Postsecondary Education, the number of sexual assaults reported by students between 2010-12 was 11. ***But David Milstone, the school's Vice Chancellor for Student Affairs, said he would guess if all crimes against women were reported, the number could be closer to 200 over the same span.*** Milstone is one of many officials on college campuses looking at how to address the ongoing problem on campuses nationwide. The issue has recently been placed under the microscope by President Barack Obama's administration — which, earlier in the year, appointed a task force to look into crimes against women — and the Department of Education, which recently announced changes to the Clery Act and what crimes will be reported that will go into effect as soon as November of this year. "When she sought help from college officials, Bolger said, they refused to pursue disciplinary action the perpetrator or offer her support. One dean advised her "to take a semester off, get a job at Starbucks ... come back after he graduated." "This is not just an Amherst situation," she said. "Survivors are encouraged to take time off, while perpetrators are supported."

---

[15] https://www.heraldnews.com/article/20140805/NEWS/140808391

[16] https://www.metrowestdailynews.com/article/20140705/NEWS/140708394,
https://newburyport.wickedlocal.com/article/20140705/NEWS/140708394

"As a result of such campaigns, as well as increased pressure from Washington to improve the resources offered to survivors, campuses are changing. In addition to an expanded Clery Act, the Department of Education's Office of Civil Rights is using Title IX to look at how colleges respond to reports of on-campus sexual assaults. As of June 19, the office was investigating 64 college campuses over how they handled the reports. Seven of those 64 campuses are in Massachusetts: Amherst College, the University of Massachusetts Amherst, Boston University, Emerson College, Berklee College of Music, Harvard College and Harvard University Law School." "At UMass Dartmouth, students are learning about bystander intervention during the same orientation at which they learn about campus life and how to register for courses, Milstone said. The school has also hired a victims advocate." "Survivors like *Bolger say they are encouraged by the policy changes but that those changes need to be accompanied by action, such as campus officials issuing no-contact orders against perpetrators.*" In Dartmouth, Milstone called the changes "an incredibly positive thing. "*Milstone noted...sexual assaults are perpetrated by men.*" "*The first thing we do when we get a report, we let the person who's accused know and put them on interim suspension status immediately so we can investigate,*" "Milstone said. "*In most of the cases that have been brought forward, perpetrators have been found responsible and separated from campus. Research shows victims very seldom file a false claim. Why would somebody put themselves through that?*" So it's up to colleges to provide options and let survivors know, 'You're not alone. This shouldn't have happened.'"*

80.     On September 1, 2014 the Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014.

81.     In November 2014 local news publications reported that the U.S. Department of Education's Office of Civil Rights had opened and closed three investigations into the University of Massachusetts Dartmouth's handling of on-campus sexual assault complaints in recent years. "A fourth investigation into another complaint opened July 16 (2014) and is ongoing, according to a list of open investigations released Wednesday by the Department of Education." UMass Dartmouth spokesman John Hoey stated, "sexual assault, including those occurring on college campuses, is still under-reported by victims."

82.     In October 2015 UMass Dartmouth announced campus Diversity & Inclusion Council - co-chaired by Assistant Vice Chancellor for Student Affairs Cynthia Cummings – the new panel would report directly

to Chancellor Grossman and make recommendations related to campus climate.[17] The council had a call to action stating: Growing diversity requires not tolerating bigotry, discrimination, violence, or intimidation of any kind.  Defending diversity requires acknowledging and working against oppression and violence.

**83.**    On August 31, 2015, UMASSD implemented Protocol 2015 in response to pressure stated herein, and in response to fear of retaliation from OCR if measures were not stiffened to comply with DOE's DCL. Protocol broadened investigatory authority while removing the need to offer due process rights to male perpetrators, making it less burdensome to prosecute offenders.

**84.**    A recent study by the Nation Bureau of Economic Research found that opening more Title IX investigations benefits the school in both its application submission rate and donations. "We find no evidence federal Title IX investigations reduce students' interest in a university. Instead, we find evidence that these investigations increase freshman applications and enrollment, for both female and male students. Federal Title IX investigations appear to have no effect on student retention, as the enrollment of continuing students is unaffected. We also find no effects on rates of degree completion. Our analysis of VSES data suggests that federal Title IX investigations have no detectable effects on donations. Interestingly, these same data indicate that institutions respond to these investigations by soliciting donations from more alumni." Jason M. Lindo, Dave E. Marcotte, Jane E. Palmer, & Isaac D. Swensen, Any Press is Good Press? The Unanticipated Effect of Title IX Investigations on University Outcomes, 2018 Nation Bureau of Economic Research ,http://www.nber.org/papers/w24852

**85.**    For the month of April 2015, UMass Dartmouth's Center for Women, Gender & Sexuality (CWGS) organized a series of events in recognition of Sexual Assault Awareness Month. The goal of Sexual Assault Awareness Month "was to raise public awareness about sexual violence". In actuality the effect from the events pressured UMass Dartmouth to take any actions to protect females from male perpetrators and created a frenzy of paranoia regarding sexual assault on campus. Juli Parker, Ph.D., Assistant Dean of Students is the Director of CWGS and in sponsoring these events, she and the University engendered male bias in the Title IX process. Events included:

- **April 1** - Taking Down Rape Culture with keynote speaker: Laci Green. Green is an activist youtube celebrity who sensationalizes the acceptance of Rape Culture by universities nationwide, who refuse to investigate male perpetrators. "Victims don't cause rape — rapists do." "Green talked about the tolerance of rape culture. She gave many examples of universities which try to demean the issue, politicians who blame the victims and news broadcasters who trivialize the issue." Sponsored by CWGS.
- **April 2** -Take Back the Night - 7 pm Campus Center Quad – Consisted of a female only march throughout campus to symbolize women's individual walk through darkness and to demonstrate that women united can resist fear and violence. The effect was stressing the UMass Dartmouth perspective that only woman are victims and males are perpetrators. Sponsored by CWGS

---

[17] https://www.umassd.edu/news/2015/diversitycouncil.html

- **April 6, 13, 20, 22** -R.A.D. (Rape Aggression Defense) - Self-Defense Class for Women only to defend against male perpetrators– Again adding to bias that women are the sole victims of sexual harassment and violence and males are sole perpetrators.
- **April 7** - 5 (Dirty, Little) Secrets from the Science of Women's Sexuality: Keynote speaker: Emily Nagoski. Nagoski spoke on the sexual response of a woman's body when they are raped. Sponsored by CWGS;  LOVE wtf  Keynote speaker: Emily Nagoski. Nagoski spoke on when a male boyfriend sexually attacks a woman in a relationship, depicting men as unpredictable violent predators. Sponsored by CWGS.
- **April 8** - Safe Zone Training
- **April 9** - Human Trafficking: Victims & Perpetrators: Keynote speaker: Donna Hughes. Hughes discussed women trafficked as sex slaves with perpetrators as men who stalk and lure women mostly from others countries into the sex trafficking trade, but also discussed male predators on American campuses. Sponsored by Women & Gender Studies Department
- **April 15** - The Hunting Ground Film Screening - Sponsored by CWGS, Department of Women's and Gender Studies. Reviews of this movies are widespread[18] but the movie depicts in graphic detail that 1 in 5 woman who attend college will be raped, that serial rapist mostly commit the rapes, and implies men as predators on campus seeking to assault and rape women. The clear implication from the film is that Winston (one of the rapist depicted in the film) is a monster frequently preys on his victims by drugging them and was ultimately able to elude justice because Harvard does not take victims seriously, and by implication in the film, all Universities do not take rape seriously.
- **April 16** - Safe Zone Training
- **April 22** - Walk to Class in Her Shoes (all day)and Relay in Her Shoes
- **April 29** -Denim Day: Wear denim in solidarity for the Italian Supreme Court case where a rape conviction was overturned.

86.     'The Torch' published in its April 14-21, 2016  edition an opinion written by Chancellor Helm: Getting Real about Sexual Assault on Campus. In his opinion he attempted to depict neutrality, but male bias was evident, and he acknowledged the pressure UMass Dartmouth felt under the Obama's Title IX demands to retain Federal funding, and from student pressures. "*The Obama administration and some student activists are castigating colleges for not preventing sexual assault and not following up appropriately when it occurs...*"

87.     On March 15, 2016 Defendant Helm took up his duties at Interim Chancellor at UMASSD, where he was tasked with responsibilities inter alia compliance with the directives consistent with the DCL of 2011and ensuring UMASSD retained its Federal funding.

88.     Upon information and belief Cummings, as Diversity & Inclusion Council chair, briefed Helm on her position that John should be removed from school as the result of being a male with a felony conviction. Upon further belief email communications exist between Helm and Cummings or Majewski related to the

---

[18] (https://slate.com/human-interest/2015/02/the-hunting-ground-a-campus-rape-documentary-that-fails-to-provide-a-full-picture.html) (https://www.nytimes.com/2015/02/27/movies/review-the-hunting-ground-documentary-a-searing-look-at-campus-rape.html) (https://www.huffingtonpost.com/elizabeth-nicholas/why-critiques-of-the-camp_b_8607618.html)(https://reason.com/blog/2015/11/20/how-the-hunting-ground-spreads-lies-abou)

improper removal of John, and the acquiescing of Helm as interim Chancellor to the pressures of Cummings.

**89.**    For the month of April 2016, CWGS organized a series of events in recognition of Sexual Assault Awareness Month.  Events included:

- Marge Piercy Poetry Reading - April 5 - Piercy's poetry tends to be highly personal free verse and often addresses the same concern with feminist and social issues.
- Expressive Arts Therapy Workshop for Survivors of Sexual Violence with Ellen Landis – April 6
- Expressive Arts Therapy Workshop for Survivors of Sexual Violence with Megan O'Toole – LMHC, ATR - April 12
- Expressive Arts Therapy Workshop for Survivors of Sexual Violence with Maria Curran – Ph.D., LPCS - April 14
- Sexual Violence Survivor Art Show Opening *Speak Out* - April 21
- Expressive Arts Therapy Workshop for Survivors of Sexual Violence with The Women's Center, Inc. - April 26
- Denim Day April 27; Sexual Violence Survivor Art Show Closing - April 28

**90.**  Just three weeks before John's Conduct Conference of May 4th, - on Thursday, April 13th -Umass Dartmouth highlighted Sexual Assault Awareness Month with keynote speaker Wagatwe Wanjuki, with her speech on '*The Power of Storytelling: Speaking Our Truth to End Rape Culture[19]*,

> *Wanjuki is a feminist, social media strategist, vocal activist against campus sexual violence and spokesperson for new media activism. She spoke on her personal assault where the school took no action. She described her successful efforts to lobby the Obama administration with 180,000 signatures, calling for greater political pressure on local universities. She incited female students to rally and demand Umass Dartmouth to crack down on male rapists. "If I can influence the President of the United States, anyone can do anything," Wanjuki said. Wanjuki told the crowd that everyone can do their part to stop rape culture by debunking harmful myths about rape, speaking against harmful policies that further victimize survivors, and villainizing the rapists, not the victims. She recommended that female students, if they are not getting the support guaranteed by the Title, then they should file complaints with the Department of Education.*

**91.**    This call to action, sponsored by UMass Dartmouth officials, to villainize male students, to put pressure on UMass Dartmouth to prosecute male perpetrators, and if all else fails file complaints with Dept of Education (which could jeopardize Federal funding), engendered male bias temporally connected to the investigation of John.

**92.**    Encouraged by the aggressive stance by the Obama Administration against sexual violence, from 2013 through the conclusion of the UMass Dartmouth's investigation of John and later,  various activist "survivor groups" and their members demanded that UMass Dartmouth and the UMass System in general aggressively prosecute more male perpetrators including: Every Voice (http://www.everyvoicema.org/our-

---

[19] https://dartmouth.theweektoday.com/node/22166?source=rss

coalition.html); Jane Doe Inc. (https://nnedv.org/meet-jane-doe-inc-massachusetts-coalition-sexual-assault-domestic-violence/); Bay Area Rape Crisis Center (https://barcc.org); End Rape on Campus (https://endrapeoncampus.org); Surv Justice (https://survjustice.org); and KnowyourIX (https://www.knowyourix.org).

### **Cummings Maintains History of Bias Against Men, Especially Those Accused of Crimes**
### **Cummings offered an unprecedented bounty on male perpetrator's capture and prosecution**

**93.**     On Nov. 2, 2006 Cynthia Cummings, then University of Delaware (UD) Associate Vice President for Campus Life, set a $10,000 bounty on the head of a male perpetrator to reward anyone who provides information leading to the arrest of the (male) perpetrator. Cummings said the University must address the growing fear that the area has become unsafe. "*It is very important that we all acknowledge that people's perceptions are their reality…If we have a perception that our campus is not safe, then in the reality of our students our campus is therefore not safe. We must acknowledge that, and we must address it and **do everything we can to try to rectify the situations that we're facing right now**.*"

**94.**     Cummings' bounty of $10,000 is an outlier of a normal response for a school official and instead indicates a personal male bias and ill-will against a male alleged of violence against women.[20] A reasonable person could plausibly infer, that Cummings meant, she would take any and all actions whatsoever to respond to the external and internal pressures, including wrongfully prosecuting any accused male perpetrator ,to change the perception that her campus was not safe.

### **Cummings capriciously violated UD male's 1st Amendment right and with male bias refused to comply with the very terms she created for his return.**

**95.**     On April 20, 2007, Cummings suspended a male UD student (Mr. Murakowski) in relation to alleged improper use of University computer resources for non-academic purposes. He allegedly created a "post graphic in nature, violent, derogatory, hostile and disturbing." Cummings charged Mr. Murakowski through the University's judicial system, and suspended him. On April 24th, 2007 Mr. Murkowski delivered a doctor's letter to Cummings, which stated in relevant part: "Upon my review of his writings and his responses to me during the clinical assessment, I do not believe that this young man is a threat to himself or others."[21] Despite meeting Cummings's explicitly stated requirements to return to his classes and dormitory room, Cummings denied the request, stating *"I don't care what that letter says, you may not return to class until I say so."*

**96.**     On September 5th, 2008 The Federal District Court of Delaware ruled that Cummings had capriciously  violated Murakoski's 1st Amendment right. Cummings departed UD within weeks of the

---

[20] Despite John exhaustive google search, he could not find one other example of a University offering a reward to catch and prosecute a male perpetrator.
[21] Murakowski v. University of Delaware, Case 1:07-cv-00475-MPT.

Court's decision. Pursuant to John's discussion with Mr. Murakoswki, and based on belief and knowledge, Cummings was terminated for capriciously violating Mr. Murakoski's 1st Amendment right and implementing discipline against him with male bias.

**Cummings was Raised in Violence against her Family Perpetrated by Male Violence**

97.     On June 1, 2016, Cummings described herself in an article entitled "I BELIEVE IN CAMPUS ACTIVISM" for the online magazine of UMASSD[22]. In the article she described herself as a protester and activist, who saw great violence in her upbringing brought upon her family by white males. *"We saw dogs and fire hoses turned on black people who marched for basic rights such as access to public facilities and voting rights."* The frustration, anger, and sadness she developed as a youth, which continues as an adult, was caused by "being in an oppressed group controlled" by white males. *"While a student, I discovered feminism and worked for women's and gay rights. I joined the Lesbian Liberation Organization...I protested at events that objectified and demeaned women."*

98.     Cummings remains emotionally damaged as an adult by the scars of her childhood, and unconsciously or intentionally seeks to settle scores with men, who in her opinion have harmed women. For decades Cummings has championed only women's causes that have been victimized by men. A school official, like Cummings, who has final decision authority over a disciplinary system that almost exclusively sanctions men, and who advocates for the exclusive benefit of one gender or sexual orientation at the complete exclusion of the male gender, carries an inherent bias against men for whom her efforts are bereft of support in a zero sum game related to bias. Cummings has a defined conflict of interest in her roles.

99. In the YWCA 2018 Spring Newsletter, Cynthia Cummings was discussed:

> *As Assistant Vice Chancellor for Student Affairs, Cynthia supervises a number of departments and functions, including those focused on diversity, equity, and inclusion, such as the Frederick Douglass Unity House, the Center for Women, Gender, and Sexuality...manages the Endeavor Leadership Scholars Program for women and students of color, serves as the Title IX Deputy Coordinator, and chairs the University's Diversity and Inclusion Council. Cynthia has dedicated her life to eliminating racism and empowering women, particularly those who identify as lesbian. For forty years, she has been an outspoken activist for feminism and LGBT rights. For six years, as chair of UMass Dartmouth's Diversity and Inclusion Council, Cynthia has led efforts to improve the campus climate for students of color, women, and members of the LGBT community. Cynthia lives in Dartmouth with her wife of 39 years, Mary Ann Hunsche.*

---

[22] https://umassdbelieves.com/2016/06/01/campus-activism-cynthia-cummings-student-affairs/

## DEFENDANT'S CONTROVERSIAL IMPLEMENTATION OF CONDUCT POLICY AND PROTOCOL PROCESS

### Initiation of Disciplinary Proceedings – Notification of Alleged Violation

**100.** On Tuesday, May 3, 2016 at 5:28:10 PM, Cummings sent John an email with a subject of "meeting" that was a de facto Notification of Alleged Violation[23] to his student's UMass Dartmouth email address stating:

> *It has come to the attention of the UMass Dartmouth administration that you have a more extensive criminal history than you disclosed prior to being admitted to the Master's program in Marine Science.[24] It is necessary that you meet with me to discuss this matter. Please report to the Foster Administration Building Room 323 (on the main campus) tomorrow, May 4th, at 3:00pm to meet with me and Ms. Deborah Majewski, Associate Vice Chancellor for Diversity Equity and Inclusion.*

**101.** Cummings's email, provided John 21 hours' notice, constructively accusing John of Disorderly Conduct, section 3.2[25] with a sanction intended to revoke his admission[26], which triggered the Handbook and Conduct Policies disciplinary contractual procedure with a guised "Notification of Alleged Violation"[27].

**102.** Based on the email, John had no notice that the meeting was related to Title IX procedures or potential sex related charges, nor had time to speak to an advisor or Webster. Per the Handbook, Friday was the soonest that any Conduct Conference contractually could have occurred. John Doe's Due Process rights and/or Title IX rights were violated in part by providing inadequate notice. The Notice of Alleged Violation did not advise John Doe of his right to have an attorney or advisor present at the Procedural Review. *Id.* In so doing, UMASSD and/or State Defendants violated John's due process rights and/or rights under Title IX Protocol.

**103.** By procedure Cummings named herself as the "Conduct Conference Facilitator.[28]" As Facilitator Cummings oversaw the disciplinary proceedings in general regarding John.

---

[23] A student shall be notified, via email to the student's UMass Dartmouth email address in a Conduct Conference Notification that the student is alleged to have violated the Code of Conduct.

[24] Herein known as "Admissions Misconduct."

[25] "Falsifying information submitted to any University officer or agency; offering a false statement in any University conduct proceeding."

[26] Section 13 – Sanctions: Revocation of Admission or Degree may be revoked for fraud, misrepresentation, or another violation of the Code of Conduct in the admissions process or in obtaining the degree or for other serious violations committed by a student after admission or prior to graduation.

[27] "Communication and Scheduling Procedures: Student conduct related notifications are generally made to the UMass Dartmouth email account. Confirmation of delivery by the University's email server will be considered the confirmed delivery date and time of notification."

[28] "This notice will be sent by a Conduct Conference Facilitator".

**104.** If complaints of sexual misconduct had been alleged, as Majewski and Cummings eventually accuse John of committing as the investigation continued, a conduct conference was by contract the wrong venue to discuss the allegations.[29]

**105.** Based on information and belief, Cummings communicated with Webster and discerned that John fully disclosed his criminal history as required by UMass Dartmouth Graduate School Application procedures, and that Webster had investigated the veracity of John's disclosure versus his relevant criminal history.

**106.** Based on information and belief, Webster informed Cummings that he and thus UMASSD guaranteed John that such information would be held strictly confidential and would not be disclosed to other University personnel, especially the staff, faculty and students at SMAST.[30]

**107.** Based on information and belief, Cummings, Majewski and other UMass Dartmouth exchanged emails stating that John should not have matriculated and the admissions error needed to be corrected.

**108.** Pursuant to Policies, "ALL complaints...of student misconduct will be referred to the Dept. of Public Safety, and the Office of Housing and Residential Education, or the Office of Student Conduct and Dispute Resolution (OSCDR)..." Cummings' and Majewski's in a continued effort to conceal their efforts failed to refer the matter as directed under Policies.

## Conduct Conference[31] In Office of Defendant Majewski with Defendant Cummings Present

**109.** On Wednesday, May 4, 2016, at 3 PM, John attended the "meeting" with Majewski and Cummings. He believed the meeting was solely to address the confusion created to alleged "Admissions Misconduct."

**110.** Immediately upon John's entering Foster Administration Building, Room 323, Cummings identified herself as Assistant Vice Chancellor for Student Affairs, and demanded John's resignation from UMass Dartmouth as the result of his "fraudulently disclosing his criminal history in his application.". Cummings was hostile and dispositive in her judgment of John's guilt.

**111.** John explained that he fully disclosed his criminal convictions verbally to Webster and in writing as required per the graduate school admissions process, and that several attorneys familiar with his history reviewed and edited the disclosure letter for accuracy and legal transparency. John explained that Webster accepted his application only after vetting John's disclosure.

---

[29] All allegations of sexual misconduct including sexual harassment, sexual assault, rape, dating violence, domestic violence, and stalking are immediately forwarded to a Title IX Investigator as required by federal law. (Conduct Procedures section VIII)

[30] Webster also mentioned the information would be protected under FERPA.

[31] Conduct Conference Procedures: At the Conduct Conference, the student has the opportunity to discuss the incident, review any reports regarding the matter, and review her options for resolution of the complaint. If the student wishes to take responsibility for the alleged violation(s), the student is able to resolve the incident with the Conduct Conference Facilitator.. The Conduct Conference Facilitator may present a recommendation for resolution based exclusively on the student's statement at the Conduct Conference and the written report. If the student does not take responsibility for the violation(s), the matter would be forwarded to an investigator for a full investigation.

112.    Majewski explained that the purpose of the meeting was to inform John that he was being accused of violating the student code of conduct, and some reported that he created a hostile learning environment.[32]

113.    John stated that Webster guaranteed him that the academic Department at SMAST would NEVER learn of John's convictions, which would inevitably create unbearable bias and preclude John from pursuing his research interest in Oceanography. John detailed his fear that his research interests would likely end if scientists in the field learned of his convictions. John admitted he was considering transferring to Duke Marine Lab under Professor Douglas Nowacek, and would be taking summer classes at Duke.

114.    Cummings laughed at John's statement, "Do you think you'll get accepted anywhere else? Cummings stated that other universities - URI and Woods Hole[33]- now knew of John's criminal history. John inferred that Cummings shared the confidential information that was included in the disclosure statement in his admission application.

115.    Based on knowledge and belief, John's criminal history remained confidential prior to Cummings actions, inasmuch as to persons associated with SMAST and UMASSD, fellow students, colleagues, and his academic advisors.

116.    Majewski stated that multiple and independent people – students and faculty - had recently filed formal complaints regarding John's misconduct, and they were considering a Title IX investigation.

117.    John had no knowledge of the meaning, scope or significance of a Title IX investigation, but John inferred that Cummings had determined his guilt already and sought to have him expelled however possible.

118.    John was incredulous! He requested to know the specific allegations and the identities of his accusers, and when the allegations were made.

119.    Majewski and Cummings refused to offer either. In so doing, UMASSD and/or Defendants violated John's due process rights and/or rights under Title IX Protocol.

120.    Cummings stated that some accusers had come forward as early as December 2015, but most were recent.

121.    John asked, "People came forward with accusations of misconduct against me six months ago, and you are just now informing me of them[34]?" Cummings confirmed the reports of 6 months past.

122.    John believed that "Plan A" for the two school officials was to intimidate him and immediately force his departure from UMASSD related to the "insufficient" declaration of his criminal history, and when that failed, conduct "Plan B" which was a baseless "witch hunt" investigation of him in hopes they would unearth something, anything, somewhere.

---

[32] Violations of the Code of Conduct are supposedly processed under Policies and violations of sexual violence under Protocol 2015.
[33] Woods Hole Oceanographic Institute
[34] All allegations of sexual misconduct including sexual harassment, sexual assault, rape, dating violence, domestic violence, and stalking are immediately forwarded to a Title IX Investigator as required by federal law.

123.    John protested claiming  no one had filed any complaints, that the two officials were solely taking this action because he was a male student with a felony conviction, and they wanted him out.

124.    Neither Cummings nor Majewski denied Plaintiff's accusation, and as such offered a tacit confession as to their male bias, wherein under the circumstances an innocent person would have denied it.

125.    In filing his verbal objections to disciplinary discrimination on sexual gender, he provided UMass Dartmouth officials adequate notice of his own Title IX complaint as a person under a protected status.

126.    John was asked, "Are you refusing to leave the school voluntarily?"

127.    John said, "Yes, Absolutely." John again requested the list and nature of the allegations and identities of his accusers, so he could defend himself.

128.    Majewski told John to read the Handbook, to look to the possible accusations that could trigger a code of conduct investigation, but offered nothing more as to the factual basis of the allegations.

129.    Majewski asked, "Have you ever caused someone to feel uncomfortable at school?

130.    Incredulously, John stated that the only time he confronted students was to criticize ongoing cheating rings in Biological Oceanography, a course which had just completed with a final exam a few days earlier, and for which he intended to report the academic misconduct. He described the cheating in detail, named four students and asked Cummings to investigate it.

131.    Without identification of the alleged complainants against him, John asked to file detailed complaints of ageism against certain students, and to report incidents of female students, who continued sharing explicit sex stories concerning both their undergraduate experiences and in current relationships.

132.    Cummings refused to hear any complaint, stating that if John intended to pursue the filing of any complaint whatsoever that she would consider it retaliation, and retaliation would constitute a separate offense of misconduct and another Title IX violation.

133.    John asked, "How can I retaliate against anyone when I have no clue as to my accuser's identity?

134.    John asked, "If I was a female making a complaint against a male student wouldn't you investigate the claim?"

135.    Cummings noticeably did not reply, as such offered a tacit confession affirming her male bias.

136.    UMASSD and/or Defendants violated John Due Process rights and/or rights under Title IX in part because it applied Protocol 2015 and Policies in a gender biased fashion.  In denying John's complaint of violations of both Policies and Protocol and even threatening retaliation to chill his filing ANY complaint – because he was a male – Majewski and Cummings discriminated against John in pursuit of expelling him.

137.    Prior to the meeting, Cummings prepared a signed letter dated May 4, 2016, which she allowed John to read. It stated in relevant part:

   *It has come to the attention of the UMass Dartmouth administration that you have a more extensive*
   *criminal history than you disclosed prior to being admitted to the Master's  program in Marine*

*Science[35]. In addition, members of the University community have expressed concerns about your behavior that is considered aggressive and hostile...Due to the serious nature of this matter, I am writing to inform you that, effective immediately, you are suspended from UMass Dartmouth, pending the resolution of the Title IX investigation for allegations of creating a hostile learning environment. During the period of suspension, you may not attend classes or be present on any of the UMass Dartmouth Campuses, including the two SMAST facilities, without my permission and without the escort of a Public Safety Officer...Additionally, you may not contact any UMass Dartmouth students or faculty/staff members, unless you have been instructed to do so as part of the Title IX investigation. No contact includes,, but is not limited to, the following forms of communication: in person , through a third party, by phone, by text, through social media or other electronic means...Any personal belongings that you have left at the SMAST facility in Fairhaven will be packed and mailed to you at the address above[36].*

138.   Cummings copied Emil Fioravanti, the Chief of University Police; Tesfay Meressi, the Associate Provost for Graduate Studies, and Steve Lorenz, the Dean of SMAST.  Prior to promulgation of this letter, none of these individuals knew that John had a criminal past, and in such disclosure breached the agreement between Webster and John.

139.   After the subject letter was disseminated, John never heard again of accusations related to his "Admissions Misconduct" which showed Cummings had no probable cause to initiate the Conduct Conference related to student misconduct, nor pursued it further once the damage of promulgation was complete.

140.   Cummings issued a "NOTICE NOT TO TRESPASS[37]," which she required John to sign. Cummings stressed that if John stepped on UMass Dartmouth property then he would be criminally prosecuted. John inferred her statement was more of a threat than a notice of fact.

141.   Cummings told John that if he agreed to withdraw from school then he would not undergo a Title IX investigation, that  no one would learn of his criminal history, and that she could likely ensure John received excellent letters of recommendation to seek an education elsewhere.

142.   Cummings demanded John's resignation a second time; John refused, but stated he would have to consider his options.  It became immediately apparent to John that Cummings and Majewski having learned that an enrolled male had a criminal conviction, so they were pursuing unprofessional procedures to expel him from school however possible.

---

[35] Cummings and Majewski secured John's conviction disclosure statement in his admissions application, which is included in his student educational record.

[36] John's items were never returned to him.

[37] In accordance with Gen Laws of the Commonwealth of Massachusetts, Chapter 266 Section 120, you "JOHN", ...are hereby notified that you are forbidden to enter any lands or buildings owned or controlled by the Commonwealth of Massachusetts...This notice shall remain in effect...until 5/4/17...Any violation of this notice is a criminal offense and will be subject you to arrest at the time of violating this order.

**143.**     In realizing John would not leave UMASSD on his own accord, Cummings stated, "If you won't leave, I'll get your kind with a Title IX investigation."

**144.**     John felt intimidated; he inferred Cummings' coercion, that if he refused to withdraw from school, then she would ruin his ability to finish his degree at UMass Dartmouth, destroy his reputation, deny his ability speak to anyone at UMass Dartmouth, and suspend him from school, an act that would likely destroy his ability to continue and pursue an Oceanography career elsewhere.

**145.**     John objected to the terms in both documents and argued they were baseless, that with both in place he could not effect a defense or question anyone, that he believed it was a sham investigation because he was a male student with a felony conviction, that he wanted to be able to speak to and choose as his advisor Professor John Buck, because John wanted to personally disclose his criminal history, explain matters, and seek his advice on how to proceed[38].

**146.**     Cummings refused John's request and choice as an advisor. Cummings informed John that each incidence of communicating with anyone, associated with UMass Dartmouth in violation of her letter, would constitute a separate charge of student misconduct, and a trespass would constitute a separate criminal charge.

**147.**     John inquired into the confidential nature of an investigation[39]. Majewski assured John that no one would know of the Title IX proceeding or investigation, except the few who are vitally part of the investigation. Majewski directed John not to discuss the investigation with anyone except his advisor. John

---

[38] Right to an Advisor: A student, party to a matter of student conduct, may elect to be accompanied at all formal proceedings by an advisor of his choice. The advisor must be a member of the faculty, staff or student body of the University except that legal counsel may accompany a student, at the student's discretion, when a criminal charge arising from the matter is pending or is considered likely. Absence of a pending criminal charge or the bona fide likelihood thereof, the advisor must be drawn from within the University community. In matters involving a Title IX Investigation for Sexual Misconduct, both the accused student and the reporting party may have an advisor of their choice. If a student would like to have an advisor accompany her at their formal proceeding, but does not have someone in mind, the Director for Student Conduct and Dispute Resolution may be contacted to provide the name and contact information of volunteer advisors. Advisors are students, faculty, and staff who are well versed and trained in student conduct proceedings.

[39] **Policy** states section XI. **Student Conduct Records** The Office of Student Affairs shall maintain the following records pertaining to each disciplinary case: The original complaint; All documents, correspondence, forms, statements, etc., pertaining to the matter; A record of the decision including any finding, sanction, and any action recommended or taken…All case records and materials pertaining to a student conduct proceeding shall be kept secure away from public view. Except where confidentiality is further restricted by law, access to such case records or materials shall be limited to the accused student, and Administrative Officers of the University having direct involvement with the case. Access to student conduct case records by anyone other than those expressly named shall be by written authorization of the student in whose name the file is kept… **Protocol** explicitly states: **Responsibility of Confidentiality:** When a report of sexual assault is made, both the accused and the accuser, and all identified witnesses who are named in the investigation, will be notified of the university's expectation of confidentiality. Breaches of confidentiality or retaliation against: the person bringing the complaint; any person assisting with the investigation; or the person or individuals being charged with the complaint; will result in disciplinary review. The university will make all reasonable efforts to maintain the confidentiality of parties involved in sexual assault investigations.

left the meeting with neither any sense of the charges against him nor of the identities of his accusers, despite his multiple requests for same.

**148.** Only at the conclusion of the Conduct Conference is the investigator supposed to be appointed to conduct a full investigation of the facts. Yet Majewski and Cummings had already prejudged John's absolute guilt prior to the investigator's appointment. Defendant Gomes was unable to prevent personal bias against John since he worked directly subordinate to Majewski and was highly influenced by Cummings in daily operations; he depended upon both for future promotion prospects in the joint organizational department. As proof of said influence and loyalty, Gomes has since been promoted to Director of *Diversity Equity and Inclusion.*

**149.** Cummings twice commanded John's withdrawal (constructive expulsion) from school, as the sole resolution option in the Conduct Conference; as such Cummings and Majewski illustrated their bias toward John's predetermined guilt of whatever charge that could pend, since they both had de facto already convicted him in their minds of whatever charge that could warrant permanent expulsion.

**150.** In assigning such prejudice to the process, Cummings, Majewski and Gomes infected all further proceedings with bias; all should have been disqualified from further participation in the disciplinary process since their participation denied John an unbiased decision maker, and thus violated his due process.

**151.** Contractually the Conduct Conference, as initiated and conducted in this case, continued the disciplinary process under Policies, under which John was afforded rights, but was endlessly denied. Majewski and Cummings hereafter would choose carte blanche which procedures of each policy (Protocol and Policies) – that engendered their cause to expel John. Investigator Gomes's purpose was to simply fulfill and endorse the decision of his superiors to eliminate John from the University.

**152.** Pursuant to Policies section IX, Cummings, who had charged and sanctioned John for his "Admissions Misconduct" was required to appoint a trained investigator (not Special Title IX investigator) to review facts surrounding Cummings allegations of John's "Admissions Misconduct."

**153.** No investigator was ever assigned to review facts of the "Admissions Misconduct."

**154.** Upon conclusion of the Conduct Conference, John had not been accused of sexual misconduct and believed that the Conduct Conference was the beginning of the Title IX investigation, which he believed was the school normal disciplinary process. Majewski initiated the Title IX investigation of John without regard to gender nor sex discrimination, which is contraindicative of the purpose of a Title IX investigation.

**155.** Per Protocol 2015 sexual harassment is defined in part as *"Sexual harassment is unwelcome conduct of a sexual nature. It includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature."* At no time during the entire investigation are any allegations against John related to these descriptions of any type, and thus application of Title IX procedures based on creating a hostile environment from sexual harassment was discriminatory and capricious at its outset.

**SMAST Conducted an "All Hands Meeting" to Exile John**

**156.**     In direct violation of its obligations with respect to John's privacy and confidentiality in the Title IX process, Cummings and Majewski directed Steve Lorenz (within a few days of the Conduct Conference ) to hold an all hands meeting with compulsory attendance regarding John. Attendees were informed that UMASSD had initiated a Title IX investigation against John, John was enjoined from speaking to any student, faculty or staff associated with UMass Dartmouth, and John was issued a "Do Not Trespass" order, denying him access to UMass Dartmouth property.

**157.**     Students, faculty and/or staff were directed to report directly to Cummings when/if any sightings of John were made on UMASSD property and/or if any contact was made by John or by his proxy.

**158.**     Within a week of the Conduct Conference students, faculty, and staff at SMAST knew that John had a criminal history as the result of the all hands meeting and leaks from the Title IX investigation.

**159.**     Cummings via Lorenz did not qualify her specific directive at the all hands meeting, leaving the staff, faculty and students to conclude that they could not speak to John.  Moreover, the message implicated that John was dangerous and unsafe.

**160.**     In light of Lorenz's and Cummings authority at UMass Dartmouth, this directive had the effect of a gag order that deterred potential communications between John and possible witnesses, impeded John from learning pertinent factual information, and hindered John's preparation of his defense at a potential hearing.

**161.**     Upon information and belief, the leaks by Cummings and the Title IX investigation were intentional to interfere with John's ability to return to his program of studies and research interest. In contrast the confidentiality and privacy of the supposed female victim(s) were diligently protected.

**UMASSD and Individual Defendants Interfered with Outside Educational Pursuits**

**162.**     On May 9, 2016 John received a letter attached to an email from Tom Schultz, Ph.D., Director, Marine Conservation Molecular Facility, Director of Undergraduate Studies, Duke University Marine Lab. It read: *Dear John, Thank you for your application to the Duke University Marine Lab's summer program Unfortunately we are not able to offer you a space in our program this year.  We appreciate your interest in the Duke University Marine Laboratory and we wish you all the best.*

**163.**     As a graduate student with a 4.0, and with the strong recommendation of fully tenured Professor Douglas Nowacek, John's application to take undergraduate summer classes should have been a certainty. John spoke to Tom Schulz telephonically on or about May 9, 2016, seeking an explanation to his rationale.

**164.**     Schulz referred to John's Title IX investigation at UMASSD; he stated, "I can't allow you on the island. We have to keep our people safe. You should have informed Doug you had a felony

conviction." When John asked him if the UMass Dartmouth staff informed him of his criminal conviction and Title IX investigation, he stated, "What do you think?"

**UMass Dartmouth, Cummings and Majewski imposed punitive interim restrictions**

165.    UMASSD, Cummings and Majewski's imposition of "interim restrictions" also violated John's due process rights and Title IX and caused tremendous suffering to John.  In suspending John for the summer term it must be considered a long term suspension; John was barred from participating in any UMass Dartmouth sponsored activities for the spring and summer that buttressed the start of the Fall semester. John's tuition in part was devoted to such events and restricting him from participating in those activities without notice or proper hearing deprived John of a property interest without due process.[40]

166.    Defendants violated Plaintiff's due process in that John's interim suspension and banning from school was in part or in whole related to his alleged violations of Protocol 2015; he was given no notice of same in Cummings' email of May 3, 2016.

167.    Furthermore any consideration given to the "Meeting" of May 4th as to due process must be removed since Majewski and Cummings had effected fait accompli already imposed the interim suspension, the do not contact persons associated with UMASSD directive, and the Do Not Trespass Notice prior to the meeting at 3 PM on May 4th.  The interim sanctions, instituted without notice or opportunity to be heard, capriciously violated not only John's civil rights under the U.S. and Massachusetts Constitution, but also UMass Dartmouth's policy on freedom of speech and freedom to associate[41].

---

[40] Students facing temporary suspension have interests qualifying for protection of the Due Process Clause, and due process requires, in connection with a suspension of 10 days or less, that the student be given oral or written notice of the charges against him and, if he denies them, an explanation of the evidence the authorities have and an opportunity to present his side of the story. The Clause requires at least these rudimentary precautions against unfair or mistaken findings of misconduct and arbitrary exclusion from school. Goss *v.* Lopez, 419 U.S. 565 (1975).

[41] • *Freedom of Association Students are free to organize and join associations to promote their common interests. Freedom of Inquiry and Expression Subject to the University's right to regulate time, place, and manner, students and student organizations will be free to examine and discuss all questions of interest to them, and to express opinions publicly and privately. In addition, subject to the same limitations, students will be allowed to invite and hear any person of their own choosing. Freedom of Assembly The University of Massachusetts recognizes the rights of members of the University community to freedom of assembly and speech, and strongly believes in fostering discourse and the free exchange of ideas at the University. Freedom of Speech The University recognizes the need for all members of the University community, administrators, faculty, staff, and students to reaffirm formally their profound commitment to freedom of speech and to clarify the implications of that commitment. In this context, freedom of speech encompasses all forms of communication as well as the freedom to listen, watch, protest, or otherwise participate in such communication. We believe it is our responsibility to espouse an atmosphere of free speech and free inquiry and to advocate for the timely discussion of a wide variety of issues. We believe, further, that vital intellectual discourse is essential to democracy and to ensuring a just society. -- Believing speech to be false, deleterious, or in any other way odious cannot be cause for its suppression except for speech as specified under allowable exemptions below. Preventing speech from occurring by disruptive protest also constitutes an attack on freedom of speech.-- Ensuring the rights of free speech and expression for protests is a concomitant responsibility for upholding First Amendment prescriptions while acknowledging allowable exemptions for: speech that poses a clear and present danger of serious harm; obscenity; some forms of libel; sexual exploitation and other abuses of children; fighting words or face-to-face insults that are likely to bring disputants to blows; time, place and manner.*

**168.**   Handbook section XII states:

> *In cases of discipline arising from extraordinary or emergency conditions, the Chancellor or his/her designee may invoke the action of interim suspension of a student… who act, or refuse to act, if the result of said conduct is to interfere with the rights of others and is non-peaceful or is disruptive or said conduct constitutes a clear and present danger to the health, safety, or property of others.*

**169.**   There was no basis for any such finding here as confirmed by the complete rebuttal of the "Admissions Misconduct," and moreover by the questions that Gomes posed on July 15th.

**170.**   John's complaints about his interim restrictions were never addressed, thereby denying him his right to request an assessment.   At no time did Majewski, Cummings or UMASDD review the status of the interim suspension to explain the sanction as "necessary and effective," thereby denying due process.

**171.**   Protocol explicitly states "When becoming aware of a complaint of sexual violence the University may take interim measures including but not limited to restriction of communication with named individuals, not the entire population of UMass Dartmouth.  The purpose of a "Do Not Contact" (DNC) is to protect the victim, and at best prevent identified witnesses from being unduly influenced or retaliated against. In issuing a DNC as issued in this case, it shows capricious and deliberate indifference to John's due process and Title IX rights and to his well-being. The DNC implies the investigation had no basis and UMASSD casted a wide net seeking any incriminatory evidence possible without John's intervention.

**172.**   Interim restrictions are imposed to ensure equal access to educational programs and activities and protect the complainant as necessary. UMASS and Defendants, however, showed bias by never attempting to show that the interim restrictions placed on John were necessary to protect the complainant or to ensure her equal access to educational programs and activities. Defendants' deprivation of John's rights through the interim restrictions was wholly intentional, and effectively barred him from participating in all school sponsored activities for 4 months, and denied him any ability to defend himself, or protect his reputation.

**173.**   Despite the fact that John lacked any prior disciplinary history John was escorted off campus on May 4th, 2016.

**174.**   This "interim suspension" was a *de facto temporary* expulsion in that John was excluded from all classes, seminars and university programs, was not permitted any involvement with organized school functions, was banned from all University sponsored activities, and was banned from all UMASSD facilities which prevented him from receiving the medical treatment and rehabilitative care necessary for the recovery and preparation for his hip replacement surgery performed on June 6, 2016.

**The Special Examiner's Closed-Door Investigation and Judgment of John's Case.**

**175.**   On May 4, 2014, and for weeks thereafter, John and his attorney repeatedly asked University officials to inform him of the allegations and factual bases for any charges against him. He had not been

provided with anything more than *"members of the University community have expressed concerns about your behavior that is considered aggressive and hostile ."*

**176.**    On May 9, 2016 at 3:11 PM John emailed Majewski stating: "I am not prepared to withdraw at this time. At your earliest convenience I would appreciate receiving a copy of any allegations so I may prepare my defense." Having seen that Cummings and Majewski intended on fulfilling their continuous threat - if John did not sacrifice his contract with UMass Dartmouth - he was forced to consider acquiescing to Cummings' coercion and withdrawing from UMass Dartmouth.

**177.**    On May 9, 2016 at 4:50 PM Majewski emailed John acknowledging:

> *John's decision not to resign; that the University will begin the Title IX investigation immediately, that The Office of Diversity, Equity and Inclusion will contact John as soon as possible to schedule an interview as part of UMass Dartmouth's investigation into allegations that he may have engaged in misconduct, in violation of the University's Policies on Equal Opportunity, Discrimination, Harassment and Sexual Violence; that a face-to-face interview will be conducted with John; the location of the interview, that David Gomes, the University's Equal Opportunity Specialist/Investigator will also be participating in the interview; that John has the right to have an advocate present during the investigatory interview session; that participation in this interview is voluntary; that in the event John declined to participate in this interview, the University will proceed with its investigation and will draw whatever reasonable inferences are necessary based on the evidence produced in case John does not participate; that John will be asked to provide information and respond to questions asked; that John will be permitted to ask questions of the interviewer. Majewski added: <u>UMass Dartmouth's resolution process is confidential, and we request your discretion in minimizing the sharing of information so as to respect the sensitivity of this matter for all parties, and that John should be advised that he was still under the University's directive to have no contact with UMass Dartmouth students, faculty, or staff members while this complaint is being investigated. As such, you should have no communication with any students, faculty or staff members in person, through a third party, or by any electronic means, including telephone, e-mail, text, social media, etc.</u>*

**178.**    Majewski's email was the first notification of John's rights in the process, but absent was any list of allegations upon which the investigation was based. UMASSD's directive, to have no contact with UMass Dartmouth students, faculty, or staff members, denied John his choice of advisor and forced John to retain private counsel.[42]

**179.**    In allowing David Gomes to serve as investigator, prosecutor, judge and jury of John, UMASSD and/or Defendants violated Due Process concerns issued by U.S. Department of Justice's ("DOJ") Office in its May 9, 2013 findings in which state: ". . . the dual role of [a university employee] in investigating [University of Montana] complaints and presenting the case on behalf of the University to the University Court creates a potential conflict that can deprive . . . an adequate, reliable, and impartial investigation. . . [therefore prohibiting] the same official playing these dual roles of investigator and 'prosecutor' . . . will

---

[42] William Gens Law Firm, Boston, MA.

ensure that individuals who play a role in . . . processing student complaints . . . do not have any actual or perceived conflicts of interest in the process."

180.    On May 20, 2016 Attorney Baysan emailed Majewski announcing his retention to represent John.

> *My office has been retained to represent (John). As a threshold matter, it is our understanding that "John" attended a meeting with you on May 4 to discuss the pending allegations against him. In accordance with Titles VII and VIII of University of Massachusetts Dartmouth's (hereinafter "UMass Dartmouth") <u>Student Conduct Policies and Procedures, a student who is facing any allegations is entitled to a conduct conference during which he is given "... the opportunity to discuss the incident, review any reports regarding the matter, and review his/her options for resolution of the complaint." It has come to our attention that during the conduct conference, "John" was not and has not been afforded these rights and thus far he neither knows nor has a reason to know the basis of these allegations.</u>*
>
> *Additionally, the letter of May 4, 2016 references John's disclosures regarding "the extent of his criminal history." Upon our review of his graduate school application questions and his responses, it is clear that "John" was asked only about criminal <u>convictions</u> and that he provided a detailed explanation of the charges that were brought against him ... for which he was convicted. Therefore, <u>John does not and cannot understand and determine the basis of these additional claims of non-disclosure that were referenced in the letter...</u>*

181.    On May 24, 2016 Majewski emailed Attorney Baysan detailing the rights of John in prior cover, specifically *"John" was advised that his advocate and/or private counsel are there to provide advice and counsel and are not otherwise permitted to interfere with or restrain the University's effort to conduct a legitimate investigation.*

182.    On May 25, 2016 Attorney Mehmet Baysan emailed Majewski seeking details of the allegations requesting: *"Also, please kindly share with us any and all documents that are relevant to the underlying allegations so that "John" understands and properly prepares for the interview and for the Title IX Investigation all together. As I mentioned in my previous email, he is entitled to this information and he should have been provided with the same during the Conduct Conference under Titles VII and VIII of UMass Dartmouth's Student Conduct Policies and Procedures.*

183.    In Majewski's response on May 27, 2016, she implied that the Student Conduct Procedure had not begun, and the Conduct Conference had not occurred on May 4, 2016. Pursuant to Majewski's repeated advisements, she was apparently conducting an investigation outside Policies, because a Title IX investigation warranted certain rights pursuant to Policies which Majewski either was ignorant of or with deliberate indifference ignored. Additionally she stated that John may have engaged in behaviors that violate any potential misconduct code whatsoever without offering specific allegations. She wrote:

> *In response to your second request, please understand that at this point in time the University is conducting a Title IX investigation based on allegations that "John" may have engaged in behaviors that <u>violate the student code of conduct and/or the University's Policies on Equal Opportunity, Discrimination, Harassment and Sexual Violence</u> (see attached).  <u>"John" will not be provided with any additional information prior to the Investigatory Interview.</u>*

*Also, please understand that at this time the Office of Diversity Equity and Inclusion is conducting a fact-finding review, and no decision has been made to initiate the Student Conduct Process. Therefore, we are not at the point of a Conduct Conference. The purpose of the Investigatory Interview with "John" is to provide him with an opportunity to respond to the allegations, to provide us with witnesses he believes we should speak with pertaining to this matter, and or any documentation he may have to substantiate his responses.*

**184.**    Pursuant to Policies, Protocol and DCL, Title IX Coordinators and investigators were required to receive annual training on the procedures and requirements of Title IX.  Majewski in her responses to John illustrated her lack of training and confusion as to the beginning of the disciplinary process under Protocol and Policies.

**185.**    Further it becomes abundantly clear that the ambiguous definition of "hostile learning environment," as it relates to Protocol, was misunderstood and wrongly applied from inadequate training.

**186.**    On June 2, 2016 Attorney Baysan emailed Majewski to offer John's signed release and  to renew his objections and concerns regarding the ever changing landscape of potential allegations facing John.

*In your last email, for the first time, you mentioned that the underlying allegations for the Title IX investigation may arise out of acts that violated your institution's policy against sexual violence . As you can understand, this comes as a complete surprise to us as the sexual nature of these allegations has not been previously shared with us or "John" much less mentioned in either the initial suspension letter or in any other correspondence that originated from your institution thus far. This once again underlines my concerns regarding the lack of any substantive basis for these allegations, which is in direct violation of your institution's own rules and regulations.*

*My reading of Title VIII of the Student Conduct Policies and Procedures in conjunction with Titles VII and IX contemplates giving any student who is accused of any violation of the student code "an opportunity to discuss the incident, review and reports regarding the matter, and review her options for resolution of the complaint." Considering your face to face meeting with "John" on May 4 and your request for his voluntary withdrawal from your institution during this meeting, I am disappointed to see that "John" is not receiving the full benefits of these rules that are designed to offer an accused student an opportunity to make an educated decision with regards to his/her position based upon his/her review of the evidence, or at the very least, the allegations that are pending against him/her.*

*On the contrary, your institution's position has been mainly committed to making vague and broad allegations that seem to expand in every correspondence. This is clearly evident in your latest email as it referenced the following categories under which "John" may have violated the school's policies: Equal opportunity, discrimination, harassment and sexual violence and code of conduct violations. These chapters would encompass most if not all of the violations that may be committed by a student. This not only places "John" in a very difficult position but also directly contradicts UMass Dartmouth's own written policies. This holds true even if we assume, for the sake of analysis, that the allegations are of sexual nature, as alleging sexual violence does not take these proceedings outside the realm of these rules and regulations*

*With regards to the investigatory interview referenced in your latest email: The only procedural mechanism that allows your institution to proceed with such an interview before holding a conduct conference would be under Title VII provided that the allegations are of*

*sexual nature. Even if we assume that to be true, the student would still be afforded an opportunity to review the reports and allegations during this interview. However, on the contrary, your email describes this interview as an opportunity for "John" to respond to the allegations, to provide the school with witnesses, and or any documentation he may have to substantiate his responses. This, then, begs the following question: How can "John" or anyone else who is accused of violating the rules at UMass Dartmouth be expected to prepare his/her defense, find witnesses, locate documents, gather exculpatory evidence, and dispute inculpatory evidence without knowing what the allegations are?*

*As you can understand, my client is growing impatient as he has already been penalized with the most serious sanction of immediate suspension from UMass Dartmouth without even being afforded an opportunity to understand the nature and the substance of these allegations. On that note, I would like to once again share with you our sincere dedication to cooperate with your institution in an attempt to amicably resolve this matter. However, I cannot advise my client to open himself to unknowns and allegations against which he cannot properly defend himself.*

*Therefore, in light of the absence of any allegations of sexual violence in any of your or your institution's prior written or oral communications in this matter, and in review of the broad nature of your latest email, I would like to once again renew my request to have your institution afford "John" an opportunity to review the allegations against him outlined in Title VII of the Student Conduct Policies and Procedures.*

**187.**   On June 7, 2016, Majewski emailed John and his attorneys informing him of the general allegations of violations of the SCOC and the University's Policies on Equal Opportunity, Discrimination, Harassment and Sexual Violence.

*Specifically, it has been alleged that you have engaged in behavior that has created an uncomfortable learning and work environment...I remind you that these are merely allegations at this time, and the University wishes to afford you the opportunity to respond to these allegations.[43]*

**188.**   The terms *"created an uncomfortable learning and work environment"* has been deemed unconstitutionally vague, [44] and provided no basis of charges, which  precluded John's ability to be heard.

**189.**   In Attorney Baysan's July 13, 2016 email to Majewski, he detailed UMASSD's violations of their own policies, and again demanded details of allegations or the investigative report.

*With regards to your reference to bringing documents and information in support of John's position to the July 15 meeting: As I have been reiterating since my first engagement in this matter, "John" is not in a position to prepare for his defense as he has not been provided with any information regarding the underlying allegations. In my previous emails, I have diligently outlined our position and relayed to you that your office's actions have been in violation of your own school code. In case my points have been forgotten or neglected: Although you and other members of your office met with "John" in person shortly after the notice of violation (in which you suggested that he should withdraw on his volition), during that meeting he was not provided with any information regarding these allegations. Nor was*

---

[43] Pursuant to SCP&P section IX the investigator will review all written materials and will interview both the student who is alleged to have violated the COC and the reporting party.

[44] *DeJohn v. Temple University*, 537 F.3d 301 (3d Cir. 2008)

*he provided with any documents, records, or any other items that would disclose to him the basis of these proceedings. This was in direct violation of Titles VII and IX of the Student Conduct Policies and Procedures. Secondly, each and every response to my requests for the disclosure of such information has been met with either vague statements or references to title headings that contain almost every possible conduct violation. This was evidenced by your reference to the section that governs harassment and sexual violence for the very first time in your June 7 email.*

*We have always made it clear that "John" is ready, able, and willing to cooperate with your office at his utmost for the amicable resolution of this matter. As such, we have always been in cooperation with your office and, within the boundaries of your institution's own rules and regulations, made numerous good faith attempts to learn the very basis of these allegations to properly and intelligently prepare our defense. However, thus far we have received nothing of that sort and, now, we are asked to bring documents and information that would either explain or dispute these allegations.*

*As I mentioned in my prior emails, we have agreed to come to your office to learn about the underlying allegations for the first time. Therefore, please be advised that "John" cannot be expected to dispute these allegations during this meeting let alone comment on them without properly hearing the facts and reviewing the documents in their support. I truly hope to accomplish these goals pursuant to your institution's own rules and regulations and not in direct violation of them.*

## INVESTIGATIVE INTERVIEW

**190.**   On July 15, 2016 at 4 PM, John and his Attorneys met with Cummings, Majewski and Gomes to conduct the investigative interview of John  pursuant to Conduct Procedure section V and IX.

**191.**   During the interview Gomes asked John approximately 15-20 questions. The investigator refused John's request to get a copy of the questions. John was told to take notes.  Gomes asked questions, which at best implicated innocuous behavior or in fact established motive for the supposed victims to prevaricate their version of the truth. Any questions related to potentially improper behavior were general in nature without specific example or time and place as to occurrence.

**192.**   Based on the questions asked, John was unable to discern the true nature of the allegations, which denied John the opportunity to be heard in the process.

**193.**   The investigator asked if John had brought documents to support John's testimony. John replied that he had no idea what documents to bring because Majewski refused to give him the nature of the accusations or the identity of the accusers. "Behavior that has created an uncomfortable learning and work environment" is grossly undefined.

**194.**   John agreed to forward documents supporting John's testimony once he narrowed down the allegations, which remained too general in nature to defend.

**195.**   The investigator was unable to provide John a single specific example or timeframe  or even month or location of a specific event, but instead referred to general, undefined, and baseless allegations. "Did you ever tell someone you missed your children?" or "Did you ever deny helping someone with their homework?"

**196.**     Gomes asked John "Why do you think someone would make these allegations?"

**197.**     John replied in incredulity as to the legitimacy of the investigation and alleged he had been prosecuted solely because he was a male with a conviction. John asked whether his statement regarding missing his children and similar accusations were actually allegations worthy of this proceeding and worthy of destroying an academic career. John mentioned he thought the investigation was bogus from the beginning because he is male with a conviction. John complained that he hadn't been provided one actual example of misconduct he could address, and he still lacked the identity of his accusers. John stated he didn't think anyone stepped forward to make the allegations. John stated he believed there was nothing to the allegations, to this investigation and the Title IX officials knew it. He asked if officials investigated the cheating scandals he reported or the ageism complaint or sexual harassment complaint he wanted to file?

**198.**     John requested a copy of the investigative file, which was denied. John has never seen heretofore any document, notes, investigative summary, witness statements nor anything whatsoever related to the Title IX investigation or the investigation related to John's "admissions misconduct.".

**199.**     John requested but was denied the following at the investigative interview: identities of his accusers; opportunity to question his accusers; and a more defined sense of the specific allegations as to when, where, how or who.

**200.**     John provided a list of witness that he wanted interviewed, including the teachers he had in class at all times relevant, including Geoffrey Cowles, Miles Sundermyer, and Richard Connor. Gomes failed to interview any of John's witnesses during the investigation, and made no effort to obtain potentially exculpatory evidence, including highly relevant text messages between supposed complainants, or information about the reported and ubiquitous cheating scandals at SMAST, which John reported and which gave several students motive to prevaricate.

**201.**     Upon information and belief the investigator interviewed every female student in classes John took seeking corroboration of general allegations or sought information for a new charge, which UMASSD could use against John.

**202.**     John was informed that if he was found responsible for creating a hostile learning environment, sanctions ranged from a warning to expulsion.

**203.**     On July 29, 2016, John via Counsel provided nearly 50 pages of friendly texts, emails and Facebook messages indicating a friendly and cordial relationship with all students in his classes.

**INVESTIGATION COMPLETION**

**204.**     Student Conduct Procedures, Section IX states:

> *"Once the investigation is completed, the investigator will write a report of the findings including 1) a summary of the facts 2) a finding of responsible or not responsible for each alleged violation with a rationale using the More Likely Than Not standard; 3)*

*recommendations for sanctions where applicable. The report will be completed within 5 business days of the completion of the investigation and will be sent to the accused student and in cases of violence and/or sexual misconduct, to anyone victimized in the incident."*

**205.**   Protocol states:

*When the investigation is completed, the investigator will present his/her findings to the Title IX Coordinator. Upon approval of the Title IX Coordinator, the investigator will present his/her findings in writing via UMass Dartmouth email account to the reporting party, the respondent and the Coordinator of Student Conduct and Dispute Resolution. Both will be asked to submit in writing a response to the finding to the Coordinator of Student Conduct and Dispute Resolution .*

**206.**   Upon information and belief, supposed victims were not provided a copy of the findings by the investigator and were not given the opportunity to appeal in Majewski's and Cummings's and UMASSD's attempt to conceal the nature of and prosecution of the investigation.

**207.**   Regardless of the procedure used (Policies or Protocol), and clearly both seem to have been used whenever convenient to Cummings and Majewski, John never received a copy of the report from the investigator (nor Coordinator of Student Conduct and Dispute Resolution) per Policies, nor opportunity to respond in writing to the findings within 5 days, nor did he receive Gomes findings to his email account per Protocol, nor was he offered the opportunity to submit in writing a response to the findings.[45]

**208.**   An Administrative Review Panel never reviewed the findings.[46]   Because there was never an Administrative Review Panel, John never received a letter within 3 business days by the Director of Student Conduct and Dispute Resolution, and thereby John was never offered the opportunity to appeal.[47]

**209.**   A student who receives a sanction has the right to an appeal under certain criteria. John was denied any appeal though he received multiple sanctions.

**210.**   Majewski unilaterally determined John's fate after receiving Gomes' squalid investigation results. Moreover, Majewski and Cummings sheltered any decision away from prying eyes in her disappointed conclusion that regardless of her witch hunt, of her violation of both school policies

---

[45] Student Conduct Procedures, Section IX states: *Upon receipt of the investigator's findings, the accused student, and in cases of violence and/or sexual misconduct, the reporting party, and anyone victimized may within 5 business days submit a written response to the investigator's report to be included in the review of the findings by the Administrative Review Panel.*

[46] Student Conduct Procedures, Section IX states: *The investigator's report and any written responses will be reviewed within 5 business days by an Administrative Review Panel*

[47] Student Conduct Procedures, Section IX states: *Following the review of the findings by the Administrative Review Panel, the accused student, the reporting party, and anyone victimized in this incident will be sent a decision letter within 3 business days by the Director of Student Conduct and Dispute Resolution or designee. The accused student and in case of violence and/or sexual violence, the presenting party, and anyone victimized may accept the decision or submit an appeal if they feel that they can meet grounds for appeal as outlined in the appeal process.*

(Protocol and Policies) and of John's due process rights, she and Cummings could not scour any evidence of legitimate misconduct that was actually sanctionable under Policies nor Protocol.

**The University's Decision and Sanction**

**211.**   Circa August 30, 2016 Majewski met with and informed John and Attorney Baysan of the findings of the Title IX Proceeding.

**212.**   John was told that he was found not responsible for violating Protocol nor Policies, that he was being sanctioned with a warning in writing, that similar behavior would likely yield harsh penalties, that he was directed to remain away from his accusers, and that Steve Lorenz needed to discuss with John the changes in his academic program as a result of the Title IX investigation.

**213.**   John requested a copy of the investigative file/report and all documents used in the investigation. John objected to any sanctions if he was found not responsible, that the process was a sham based on his gender with a conviction, that he hadn't been informed of the identities of his accusers so how could he possibly stay away from them, that his program had been damaged enough by the investigation and that if he was found not responsible then he should be able to return to his academic program without restraint of any kind.

**214.**   John was told there was no appeal rights and that the matter was considered now closed.

**215.**   John was provided the decision of the Title IX proceeding in a letter dated August 30, 2016 (Exhibit B). The relevant points of the decision included:

   **a.**  There was insufficient information to conclude that John engaged in behavior which violated the University's Policies on Equal Opportunity. (This conclusion is inconsistent and at odds with the only two available conclusions of "responsible" or "not responsible")

   **b.**  Despite the conclusion, he was formally sanctioned with a warning[48] as though he was found responsible for violating University Title IX Policies and thus the Code of Conduct.

   **c.**  UMASSD recommended 'appropriate intervention' with Dean Steven Lorenz and Asst. Dean Michael Marino, SMAST, to "work with John to complete his degree program, and to ensure the interactions in the academic environment are consistent with policies and expectations of the University."

   **d.**  Without notifying John of persons' identities who participated in the Title IX procedure, UMASSD threatened John with retaliation charges if it appeared that he was retaliatory towards anyone he believed may have been involved in the investigatory process.

---

[48] Student Conduct Procedures, Section 13, Sanctions, states: "Warning by the student conduct process, normally in writing, is intended to make the student aware of the possible consequences of individual or group actions."
   Sexual Violence Protocol, Possible Outcome section states: "Warning by a student conduct entity, normally in writing, is intended to make the student aware of the possible consequences of his/her actions. This sanction may be considered with prejudice by a student conduct entity in future action only when the Warning is presented to the student in writing. This sanction shall be for any time period specified and shall remain a part of the student's record until graduation or termination of his/her association with the University, at which time the notations shall be removed.

**216.** Pursuant to Student Code of Conduct[49], Student Conduct Procedure sections X and XI, a student can only be sanctioned if he was found responsible for having committed the misconduct.

**217.** Per Policies, "Once the investigation is completed, the investigator will write a report of the findings including 1) a summary of the facts 2) a finding of responsible or not responsible for each alleged violation with a rationale using the More Likely Than Not standard…"

**218.** Instead in John's case the findings on John was that "there was insufficient evidence to conclude that you engaged in behavior which violated the University's policies…" The finding violated the binary option of "responsible" or "not responsible" and was intentionally effected in violation to Protocol and Policies to engender a home remedy of punishment.

**219.** Upon information and belief, UMASSD has never sanctioned a female student in either a misconduct or Title IX proceeding after finding her not responsible for the misconduct, nor conducted a sham Title IX investigation against a female student, nor changed the nature and scope of female student's matriculated academic program after a finding of "not responsible" in any disciplinary proceeding, nor maliciously disseminated confidential educational and misconduct records as part of a Title Investigation against a female student.

### "Appropriate Interventions" Issued by Cummings and Majewski

**220.** John met with Steve Lorenz in early September 2016 to discuss his graduate program. Lorenz told John that as a result of the investigation, John lost his thesis advisor John Buck, who refused to return John's calls, emails and texts; that Lorenz could act only as his administrative advisor, and that the school could now only offer him a non-thesis degree.

**221.** John objected to any "appropriate intervention," that he had been found innocent of any charges, and that he believed he was singled out because he a male student with a conviction. In response Lorenz nearly quoted portions[50] of Majewski's letter signed August 30, 2016 in violation of confidentiality procedures defined in Policies, FERPA, and Protocol.

**222.** In implementing the 'appropriate intervention,' as directed by UMass Dartmouth executive authority, Lorenz informed John that he would be confined to a work space beside Lorentz office, that he was not to enter the work area of other students at nor use school assets at the AT&T building where John prior had a work space and spent most of his time, and that he shouldn't engage and speak to other students in the program.

---

[49] Students found responsible for unacceptable conduct will be subject to the complete range of sanctions and penalties provided in the Student Conduct Policies and Procedures.

[50] References to getting too close to people during discussions, to "in your face behavior" and to overly personalized content in discussions.

223.    In recommending "appropriate intervention", Majewski and Cummings sanctioned John further with loss of privilege[51] and no contact[52] with students at SMAST. John considered the sanctions and changes in his program as mandated directives of UMASSD, and any noncompliance would lead to new charges of code of conduct violations.

224.    Based on information and belief, Defendants never imposed "appropriate intervention" on a female student found not responsible for misconduct but imposed such sanction on John because he was a male student.

**Consequences and Actions Subsequent to Title IX Investigation**

225.    Buck, Michael Moore, James Miller and all of John's contacts at Duke Marine Lab ceased future communications (until March 2019) with John following the appointment of the investigator on May 4th, 2016.

226.    As a proximate result of the sham investigation and unauthorized disclosures by Cummings, Majewski, and Gomes, and  from the leaks of information in the Title IX investigation, no student attempted to nor spoke to nor had any academic or personal interactions with John, and only Professor Geoffrey Cowles, Miles Sundermyer, and Steven Lorenz had any discussion with John.

227.    In August 2016, John's emotional distress stemming from these matters resulted in panic attacks, headaches, insomnia, grinding of teeth and excessive wear that caused two molars to crack in half requiring removal, PTSD flashbacks and symptomology from wrongfully being prosecuted, extreme depression, excessive alopecia, and his hair turned pure white.

228.    John enrolled in classes, in the Fall of 2016 but he was labelled and treated as an outcast, a social pariah.

229.    Student Handbook and Sexual Violence Protocol's definitions of sexual harassment or sexual violence remained vague.  The nature and wording of the warning sanction was all encompassing, leaving John a sense that any action he took or words he spoke could have been twisted and used against him.  John believed the policies and warning sanction as written would allow selective enforcement and provide UMASSD another opportunity to attempt expelling him.

---

[51] **Loss of Privilege** allows a student conduct entity to restrict the activity of the student while she is on the University campus. The student may be prohibited from participating in non-academic or extra-curricular activities and/or from visiting certain specified areas of the University campus and/or from coming into contact with specified individuals while on campus. Loss of Privilege should be related to the offense, or serve to correct the result of the offense, or compensate in some relevant way the offended party(ies).

[52] **No contact** with a specific student, faculty, staff, or community ember, where all direct or indirect (via a third party on his behalf and with his/her knowledge) verbal, physical, and electronic forms of contact are prohibited.

230.   Given that UMASSD attempted to expel him for innocuous general behavior, inter alia missing his children, the policies as written were grossly ambiguous, which oppressed and chilled his speech that substantially interfered with John's educational performance and opportunity to benefit from school services.

231.   Without interaction and communication with faculty and other students, John could neither collaborate, seek guidance, nor benefit from his educational experience nor benefit from the educational services of his program contracted with UMass Dartmouth.

232.   John withdrew from his Oceanography Policy class, because the class required classroom deliberation with other students.

233.   John's depression became overwhelming with regard to energy depletion and the time commitment with appointments to his psychologist and psychiatrist, which  made it difficult to maintain his workload. It was repeatedly recommended that John should become hospitalized for his emotional distress. His depression worsened through December 2018 unabated.

234.   John completed classes that semester, but because his graduate program had been constructively destroyed by capricious and malicious efforts of UMASSD, and because of the psychological and emotional trauma John suffered, he requested and received a Leave of Absence request with UMASSD based on treatment provided between May 4, 2016 through December 2016 by a licensed psychologist Ph.D. John continues to receive treatment for psychological and emotional trauma related to Defendants' conduct in his home state of Rhode Island.

235.   John was constructively expelled by the actions of UMASSD, Gomes, Cummings and Majewski, and as the result of being a male, he was excluded from participation in, and denied the benefits of, and subjected to discrimination during his graduate education program, any education program, or activity receiving Federal financial assistance.

236.   In John's despair he moved away from family and friends and lived in solitude for 8 months ashamed of being exiled from UMass Dartmouth.

237.   In early March 2019, John spoke with Jane Doe and Salley Smith[53]. Based on the questions asked of John at his interview, they were possible alleged accusers.

238.    Salley Smith stated that she had not filed a formal complaint against John nor reported concerns, but only responded to requests to specific questions from the "Title IX office" – questions such as did "John" ever do anything to cause you to feel uncomfortable. Salley Smith was requested to file a formal complaint which she refused.

---

[53] Two female students, who will remain anonymous until needed in subsequent proceedings

**239.**    Jane Doe was asked by "Title IX people" to explain her relationship with John and develop a list of any actions by John that could have possibly made her uncomfortable. She told the Title IX office people that she had nothing to tell them, nor was she interested in participating, that she wanted to be left alone. Instead, Jane Doe was asked to file a formal complaint, but she refused.

**240.**    Both stated that neither of them, nor anyone they knew, who were interviewed (regarding the Title IX investigation), filed a formal complaint nor reported John of misconduct. They were told that they were being interviewed because an "admissions error had been made", there were safety concerns from John's criminal past, and that UMASSD hoped to correct it through the Title IX.

**241.**    UMASSD Title IX officials intentionally asked alleged complainants, who were in fact not complainants, to file bogus and false Title IX formal complaints against John to buttress UMASSD's effort to expel John. At the time of these requests, Title IX officials knew that John's conduct could not raise to the level of a finding of "responsibility." This effort served as biased retaliation against John as part of his participation in a Title IX investigation.

**242.**    In March 2019, John also spoke with Professor Laela Sayigh, Ph.D., Michael Moore, Ph.D., and James Miller, Ph.D., who told him that Cummings told them that UMASSD (Cummings) and stated that a Title IX investigation was being conducted regarding John, that because an "admissions error had been made", that there were safety concerns from John's criminal past, that John lied on his application regarding his convictions, and that UMass Dartmouth hoped to correct it.

**243.**    In early March 2019 John filed Freedom of Information Act requests with UMASSD[54]. UMASSD has denied same in violation of MGL Ch 66, which implies cause for secrecy and bias.

**244.**    On March 26, 2019 John attempted to file a criminal complaint with UMASSD Police against Majewski and Cummings; John had recently been advised that their coercive conduct on May 4, 2016 constituted extortion. Illustrating the ubiquitous bias against John, in any matter concerning UMASSD, Emil R. Fioravanti, Chief of Police – a sworn Mass Sate Police Officer - refused to take John's statement, and recused his entire department from assisting John. Fioravanti justified his inability to conduct a fair and impartial investigation against the officials because they were his

---

[54] John sought inter alia: (1) A listing of all Title IX complaints investigated at UmassD, the nature of the complaint, detailed by gender of complaint and accused, and the outcomes of same from 2012 to December 2017; (2) Any and all documents related to the Title IX or misconduct investigation of John during the spring and summer of 2016 to include but not limited to: interoffice emails and other communications between Cynthia Cummings, Deborah Majewski, Scott Webster and Graduate Admissions Staff, David Gomes, Campus Security, the staff at School of Marine Science and Technology; investigative reports/summaries/ and interviews, and any other documents thereby related; (3) Any communications or documents related to Dept of Education OCR investigations from 2012 to December 2017; (4) All letters, documents and communications related to TITLE IX procedures that changed as the response of the Dept of Education Dear Colleague Letter of 2011, and policy created by Umass Dartmouth Employees therefrom including hiring or organizational changes related to TITLE IX procedures since 2012, and (5) David Gomes', Cynthia Cummings' and Deborah Majewski's resume and training records as an investigator related to Title IX investigation from Jan 2012 to September 2016 inclusive.

colleagues. Upon information and belief, UMASSD Police Dept. has never recused itself when a female student or female citizen attempted to file a criminal complaint.

**245.** On April 3, 2019, John received highly redacted police documents related to his enrollment at and association with UMASSD. A UMASSD Police detective filed a report on May 17, 2016, stating that a professor alleged that "somehow" John logged into his computer a few days prior, which would have constituted a violation of John's "Do Not Trespass Notice," and other crimes. Chief Fioravanti conducted an extensive and prosecutorial investigation, ordered the computer confiscated for forensic evidence and provided it to Associate Director of Enterprise Systems.

**246.** No evidence of John's presence on UMASSD or SMAST property existed, including but not limited to the fact that: no student, faculty member or staff saw John enter SMAST or any UMASSD property; building internal or external video surveillance failed to record his presence; John's swipe card required for entrance to SMAST buildings failed to record his entrance; John did not have the code to bypass the building's security upon entrance after hours; no evidence existed of forced entering into the professors office, and no forensic computer evidence existed as to John's computer trespass. John never stepped foot on UMASSD property from May 4 to early September 2016 unless escorted by UMASSD Police to meet Majewski and Cummings.

**247.** Despite no evidence of John's guilt – other than the implausible accusation that John "somehow" logged onto a Professor's computer during a "No Trespass" period - Chief Fioravanti hunted any potential evidence to warrant John's arrest and criminal prosecution. In glaring contrast, Chief Fioravanti refused to even accept John's statement and recused his entire department in direct violation of his oath to impartially uphold the laws of Massachusetts and the United States.

**248.** Upon information and belief, UMASSD emails and communication exist that indicate that Cummings and/or Majewski concerted with the unnamed professor to falsely accuse John of a crime that would engender his expulsion from school.

**249.** Upon information and belief, UMASSD officials and UMASSD Police concerted to deny John's ability to file a complaint against Majewski and Cummings.

**250.** Cummings presently faces a scheduled magistrate's hearing on May 6, 2019 to adjudicate whether probable cause exists to charge Cummings with criminal felony extortion (Mass G. L. c. 265, Section 25) for her actions on May 4, 2016. Also upon knowledge and belief, Cummings is under investigation by the Massachusetts Office of Attorney General, Criminal Division, for her actions related to John.

**UMassD Committed Numerous Material Breaches of Its Contractual Obligations to John**

**Material Breaches Related to Protocol**

**251.**   1st per Protocol officials can issue interim "restriction of communication with named individuals." In John's case UMASSD and Cummings per his DNC restricted John's communication with every single person associated with UMass Dartmouth during his interim restriction.

**252.**   2nd per Protocol, "Upon approval of the Title IX Coordinator, the investigator will present his/her findings in writing via UMass Dartmouth email account to the reporting party, the respondent and the Coordinator of Student Conduct and Dispute Resolution. Both will be asked to submit in writing a response to the finding to the Coordinator of Student Conduct and Dispute Resolution." In John's case, Gomes failed to present his findings via John's email account or whatsoever, or to anyone else's email account. John was never afforded the opportunity to submit a written response to the Coordinator of Student Conduct and Dispute Resolution.

**253.**   3rd per Protocol, "The finding and written responses from the reporting party and respondent will be reviewed by an administrative review panel of two faculty/staff. The administrative review panel will make a decision whether to support to the finding of the investigation and if so, to determine appropriate sanctions." In John's case neither finding nor responses were reviewed by an administrative panel. Nor did a panel decide whether to support to the finding nor determine sanctions.

**254.**   4th per Protocol, "The administrative review panel will present their decision in writing to the reporting party and respondent via UMass Dartmouth email account. The decision letter will include information about submitting an appeal. In John's case, John did not receive their decision in writing, nor receive information about submitting an appeal. UMASSD violated its own procedures requiring a 2-member panel to review the Special Investigator's findings and recommend to the final decision maker whether to accept or reject the findings. Instead UMASSD allowed the final decision maker to be the sole reviewer of the Special Examiner's findings, thereby eliminating a layer of independent oversight that might have prevented John from suffering sanctions despite being found not responsible of misconduct.

**255.**   5th per Protocol, "Both the reporting party and respondent may submit a letter of appeal within 5 business days of receiving the administrative review panel's decision to the Associate Vice Chancellor for Student Affairs." In John's case, Majewski foreclosed his right to appeal.

**256.**   6th per Protocol, "All complaints of sexual violence will be investigated promptly, thoroughly and impartially by a trained Title IX Investigator." In John's case the investigation was infected with bias, partiality and with a forgone conclusion from the moment Cummings demanded John's withdrawal on May 4th. Per Protocol, "Equitable rights will be provided to both the reporting party

45

and respondent throughout the investigation process." In John's case John's rights were repeatedly sacrificed in favor of victim's rights.

**257.**    7th per Protocol, "Both the respondent and reporting party have a right to an advisor of their choice throughout the process." In John's case was issued a DNC and denied his choice of advisor.

**258.**    8th per Protocol, "The respondent may request an assessment of interim restrictions with the Associate Vice Chancellor of Student Affairs or designee." John was denied any opportunity to request an assessment.

**259.**    9th per Protocol states reasonable  efforts will be made to maintain the confidentiality of parties involved in sexual assault investigations. In John's case, UMASSD directed SMAST staff to hold an all hands meeting where they announced John was under investigation for a Title IX investigation for creating a hostile learning environment, that he was suspended, that he had been issued a Do Not Trespass Notice, and that he was directed not to speak to anyone associated with UMASSD. In publicizing John's investigation, UMASSD grossly violated John's right to reasonable confidentiality. In addition in ensuring "appropriate intervention" as a sanction, UMASSD distributed copies of the findings letter, in violation to policy.

**Material Breaches Related to Policies**

**260.**    10th in conducting a witch hunt with a sua sponte investigation, UMASSD violated express and implied covenants that UMass Dartmouth would not seek to reverse John's matriculation  with a baseless investigation for potential complainants that could assist UMASSD correct its admission decision.

**261.**    11th per Policies, section VII,  The Notification of Alleged Violation "shall include a request that the student attend a  Conduct Conference, to be held no sooner than three (3) consecutive business days following date of the original notice." In John's case he was afforded 21 hours' notice following the delivery confirmation to attend a Conduct Conference entitled "Meeting" in the subject section of the email.

**262.**    12th Policies state: "At the Conduct Conference, the student has the opportunity to discuss the incident, review any reports regarding the matter, and review her options for resolution of the complaint." In John's case, on May 4th, he was refused his requests to review any reports regarding the matter, and for that matter has never seen any documents related to his case except for the final finding report.

**263.**    13th under Policies, section IX, "The investigator will make all reasonable attempts to gather all relevant information… The accused student and the reporting party may submit questions to the investigator to be asked of others who may be interviewed.  In John's case he provided Gomes the names of witnesses, who were never interviewed. John at no time was allowed nor offered the opportunity to submit questions who to others who may be interviewed.

**264.** 14th Policies section V states: "A student, party to a matter of student conduct, may elect to be accompanied at all formal proceedings by an advisor of his choice. The advisor must be a member of the faculty, staff or student body of the University except that legal counsel may accompany a student, at the student's discretion, when a criminal charge arising from the matter is pending or is considered likely." In John's case, he was denied his choice of advisor of John Buck; at no time was there ever concern that this matter could possibly become criminal in nature.

**265.** 15th Per policies, section XII[55], UMASSD subjected John to "emergency suspension immediately upon conclusion of the Conduct Conference on May 4th, even though by John's demonstrable conduct, there was not the slightest indication that John was a danger to the student body of UMASSD community, or intended to be disruptive in any form, especially given the specific innocuous nature of the questions posed to John in his investigative interview.

**266.** 16th Because there was never an Administrative Review Panel, John never received a letter within 3 business days by the Director of Student Conduct and Dispute Resolution, and thereby John was never offered the opportunity to appeal,[56] regardless of the decision which included the explicit and implicit sanctions of the decision.

**267.** 17th John requested a copy of the investigative file or report and all documents used in the investigation[57]. Majewski denied same, and John repeatedly has been denied a copy of the student conduct records related to the Title IX and misconduct investigation of him. Additionally the records were disseminated in violation to the stated policy.

**268.** 18th Policies guarantees the confidentiality of student disciplinary records; in John's case Majewski and Cummings disseminated the information maliciously.

**269.** 19th, John was given a sanction of a warning despite being found not responsible. Additionally the "appropriate intervention" mentioned increased additional sanctions of lossed privileges and of not to

---

[55] Handbook section XII states: *In cases of discipline arising from extraordinary or emergency conditions, the Chancellor or his/her designee may invoke the action of interim suspension of a student... who act, or refuse to act, if the result of said conduct is to interfere with the rights of others and is non-peaceful or is disruptive or said conduct constitutes a clear and present danger to the health, safety, or property of others.*

[56] Student Conduct Procedures, Section IX states: *Following the review of the findings by the Administrative Review Panel, the accused student, the reporting party, and anyone victimized in this incident will be sent a decision letter within 3 business days by the Director of Student Conduct and Dispute Resolution or designee. The accused student and in case of violence and/or sexual violence, the presenting party, and anyone victimized may accept the decision or submit an appeal if they feel that they can meet grounds for appeal as outlined in the appeal process.*

[57] **Student Conduct Records** section explicitly states: *"The Office of Student Affairs shall maintain the following records pertaining to each disciplinary case: The original complaint; All documents, correspondence, forms, statements, etc., pertaining to the matter, and a record of the decision including any finding, sanction, and any action recommended or taken. All case records and materials pertaining to a student conduct proceeding shall be kept secure away from public view. Except where confidentiality is further restricted by law, access to such case records or materials shall be limited to the accused student, and Administrative Officers of the University having direct involvement with the case."*

47

contact nearly everyone at SMAST. In sanctioning John after a finding him not responsible, UMASSD violated its Student Code of Conduct[58], sections X and XI, which state a student can only be sanctioned if he was found responsible for having committed the allegations against him.

270.   20th, UMass Dartmouth FERPA policy strictly prohibits unauthorized release or sharing of student educational records.   The policy states that university officials with an education purpose can access records, but once they have the information, they cannot share that information with a third party who did not (if they had authority to access), or worse could not access the information themselves. Cummings and Majeski violated John's right of confidentiality when they promulgated the letter of May 4th and August 30th and verbally discussed his academic records with unauthorized personnel.

271.   21st, John matriculated in the Master's Thesis Program, but after the Title IX proceeding UMASSD amended his offering to a Master's Non-thesis degree without his consent.

## CAUSES OF ACTION

## COUNT I

### Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*.
### As to Defendant UMASSD

272.   John  incorporates by reference each of the above paragraphs as if fully set forth herein.

273.   Title IX prohibits discrimination based on sex in education programs and activities receiving Federal financial assistance. 20 U.S.C. § 1681, *et seq*. "Discrimination" means "differential treatment" or "less favorable treatment." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174-75 (2005).

274.   Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities. UMass Dartmouth is a recipient of federal funds and, therefore, is bound by Title IX and its regulations.

275.   Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to 'bar the imposition of university discipline where gender is a motivating factor in the decision to discipline.'

276.   Students attending public universities such as UMass Dartmouth, who have been accused of sexual misconduct, have a right to due process under Title IX. *See* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 22 (the "2001 OCR Guidance"); April 2011 Dear Colleague Letter at 12.

---

[58] Students found responsible for unacceptable conduct will be subject to the complete range of sanctions and penalties provided in the Student Conduct Policies and Procedures.

277.    Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student... complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.

278.   The "prompt and equitable" procedures that a school must implement include, at a minimum:

    i.   "Notice . . . of the procedure, including where complaints may be f iled";
    ii.   "Application of the procedure to complaints alleging [sexual] harassment...";
    iii.   "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";
    iv.   "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and
    v.   "Notice to the parties of the outcome of the complaint....id at 20

279.   Title IX Coordinators should not have a conflict of interest. "For example, serving as Title IX coordinator and a disciplinary hearing board member may create a conflict of interest." April 2011 Dear Colleague Letter at 7; August 2015 Dear Colleague Letter at 2-3.

280.    A school also has an obligation under Title IX to ensure that all employees involved in the investigation and adjudication process have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'"

281.   A complaint under Title IX, alleging that John was subjected to discrimination on account of sex in the imposition of university discipline, is sufficient with respect to the element of discriminatory intent, like a complaint under Title VII, if it pleads specific facts that support a minimal plausible inference of such discrimination. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a); Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

### TITLE IX VIOLATIONS – ERRONEOUS OUTCOME AS TO DEFENDANT UMASSD

282.   John  incorporates by reference each of the above paragraphs as if fully set forth herein.

283.   To make an adequate erroneous outcome claim, John must allege (1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding and (2) a particularized causal connection between the flawed outcome and gender bias. John may show the first element, articulable doubt, by: (1) alleging particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses; (2) particularized strengths of the defense; or (3) alleging particular procedural flaws affecting the proof. *Yusuf*, 35 F.3d at 715. *Norris v. Univ. of Colo., Boulder*, Civil Case No. 1:18-cv-02243-LTB, at *15 (D. Colo. Feb. 21, 2019).

284.    In order to survive a motion to dismiss on this claim, John must also allege facts showing "a 'particularized ... causal connection between the flawed outcome and gender bias.'" *Cummins*, 662 F.

49

App'x at 452 (quoting *Yusuf*, 35 F.3d at 715). "Such allegations might include, inter alia, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Yusuf*, 35 F.3d at 715.

**285.** UMass Dartmouth discriminated against John and deprived him of the benefits of its education program on the basis of sex through its discriminatory, gender-biased Policies and Title IX Protocol, which intentionally subject male students like John to "less favorable" treatment than their female accusers.

**286.** John was found "not responsible," but conclusions that caused him to receive a warning sanction and 'appropriate intervention' were erroneous and contrary to the weight of the evidence with gender bias as a motivating factor.

**287.** Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose sanctions upon John, despite a finding of 'not responsible.' These circumstances include, without limitation:

  i. Beginning in 2014 and through the time when supposed complaints were investigated, UMASSD was subject to immense federal local and campus pressures to take measures to protect female victims of sexual assault, adopt a trauma-informed approach to investigating sexual misconduct complaints; tip the procedure in favor of women and against men and issue more severe sanctions to those found responsible and not responsible for sexual misconduct. Such pressure included the previous OCR investigations, student outcry regarding compliance with the White House's *Not Alone report, and* the Public announcement of the OCR was investigating UMASSD for non-compliance with Title IX.

  ii. UMass Dartmouth faced stinging media criticism for handling of female students' sexual complaints and highlighted the pressure from OCR's investigation of UMass Dartmouth and the potential consequences of lost Federal funding.[59]

  iii. In response to the pressure from OCR investigations, university officials, specifically David Milstone, John Hoey, and Interim Chancellor Helm were sensitive to and acknowledged the pressure from OCR, and committed to meeting the demands of the Dept. of Education's DCL[60]. UMass Dartmouth responded to the pressures with organizational and procedural changes to offer the perception of compliance with OCR and meet the demands of media and students.

  iv. Newly appointed Interim Chancellor Helm suffered great pressure to satisfy pressures of OCR past and future potential investigations into Title IX compliance as directed in DCL.

  v. University officials responded to media complaints of UMass Dartmouth, to the inadequate handling of female complaints, by agreeing with the complaining female students and labelling

---

[59] "While victims' advocates are heartened by colleges' efforts to educate students on rights and accurately report incidents, many say campuses should take more action."…"."encouraged by the policy changes but that those changes need to be accompanied by action, such as campus officials issuing no-contact orders against perpetrators."

[60] "UMass Dartmouth officials said they're not taking the investigation lightly…" "It's an important issue. We're going to do what we need to do to comply with the request," said David Milstone, UMass Dartmouth's Vice Chancellor for Student Affairs. "We're obviously going to do our best to strengthen our program." "Over the past several years, we have been proactive in enhancing our response to Title IX issues, and will approach this inquiry as an opportunity to further strengthen our policies and practices,"

males as predators.. David Milstone, UMass Dartmouth's Vice Chancellor for Student Affairs, who has ultimate appeal authority in disciplinary matters, and John Hoey, Associate Vice Chancellor for Public Affairs, espoused specific indications of male bias in Title IX procedures: Both claimed that sexual assaults against females were under-reported implying that the school must explore increase in prosecutions of male students.[61] Milstone specifically excluded the possibility that male students could be included as victims in the statistic of 11 sexual assaults, thereby implying all perpetrators are males.[62] After he implied that only women were victims, he claims women victims must be protected, and the student community must be protected from the male perpetrator.[63] Supporting (female) victims equates to the assumption that female accusers speak truthfully and male perpetrators are presumed guilty, which is inconsistent with a fair and impartial investigation.[64] By Milstone's automatically placing every male perpetrator on suspension, the school inherently places every male student at a disadvantage in the investigation proceedings over the female student, and violates specific directives under Policies, which states that interim suspensions should only occur under emergency conditions.[65]

vi.   UMass Dartmouth acquiesced to federal government pressures to take a hard stance on sexual assault on campus and limit procedural protections, when in August 2015, UMASSD changed their Title IX investigation procedures in line with protocols detailed in the DCL, which severely restricted due process rights of predominately male students.

vii.  UMass Dartmouth's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual assault. UMASSD had taken this position because it was "heavily invested in protecting female accusers," "to avoid further scrutiny from OCR," and because it was "afraid of a further investigation from OCR and/or a Title IX lawsuit from DOJ."

viii. UMass Dartmouth's policies and procedures are based on unfair and archaic gender stereotypes and assumptions that female complainants are invariably fragile "victims" and "survivors" deserving of support regardless of their credibility or the veracity of their claims, and accused male students are "hegemonic male[s]" prone to violence who are not deserving of comparable support.

---

[61] "UMass Dartmouth averages about four reported cases each year"... "based on what we know about sexual violence," there is a discrepancy between the number of incidents of sexual violence that actually happen on campuses versus those that ultimately get reported... John Hoey stated, "sexual assault, including those occurring on college campuses, is still under-reported by victims."

[62] "Take the University of Massachusetts Dartmouth as an example. According to the U.S. Department of Education's Office of Postsecondary Education, the number of sexual assaults reported by students between 2010-12 was 11. But David Milstone... said **he would guess if all crimes against women were reported**, the number could be closer to 200 over the same span.

[63] "Any time there is a complaint..., we have two responsibilities. One is to ensure safety of (implied female) victim. The other is to make sure the community has a separation from the alleged (implied male) perpetrator in this case,"

[64] In Dartmouth, Milstone called the changes "an incredibly positive thing." Milstone said, "In most of the cases that have been brought forward, perpetrators have been found responsible and separated from campus. Research shows victims very seldom file a false claim. Why would somebody put themselves through that?"" So it's up to colleges to provide options and let survivors know, 'You're not alone. This shouldn't have happened.'" John Hoey stated, "sexual assault, including those occurring on college campuses, is still under-reported by victims."

[65] "The first thing we do when we get a report, we let the person who's accused know and put them on interim suspension status immediately so we can investigate"

ix. Pursuant to UMASSD custom in matters related to Title IX investigations, and in violation to Protocol and Policies, all male perpetrators, including John was automatically banned and issued an interim suspension without evaluation as to the merits of same.

x. Upon information and belief UMass Dartmouth treats female complainants differently than male respondents based on its outdated attitudes about females and overbroad generalizations and stereotypes about male and female sexual traits and behaviors – *i.e.*, male students are perceived as aggressors and perpetrators and female students are perceived as victims and survivors.

xi. Throughout the proceeding UMass Dartmouth was on notice of, and remained deliberately indifferent to, the serious flaws in the investigation, the lack of equity and fairness, and the gender bias that infuses the process.

xii. Upon information and belief Investigator Gomes received "trauma-informed investigation" training which perpetuated the idea that female victims of sexual assault and harassment should never be questioned, that trauma excuses all memory lapses and credibility issues and that complainants always tell the truth. This approach caused Gomes to overlook profound inconsistencies regrading motive and caused him to ignore victim(s) motive to prevaricate and to fabricate credibility issues in any victims account.

xiii. Investigator Gomes was not an independent investigator inasmuch as he worked for and was dependent on Majewski and Cummings for future professional advancement and his performance reviews. Investigator Gomes failed to discover victim(s) motive to prevaricate, i.e. fabricate to protect themselves from the misconduct charges of an academic cheating scandal.

xiv. Majewski has a conflict of interest in her role because part of her responsibilities as Associate Vice Chancellor, Title IX Coordinator, ADA and 504 Coordinator, Office of Diversity, Equity and Inclusion was to ensure UMASSD compliance with Title IX, and filed reports with the Chancellor ensuring overall compliance with OCR directives.

xv. Majewski has a further conflict of interest in that she aided and abetted Cummings' extortion of John in her office on May 4th when both attempted to coerce John into withdrawing or face destruction of his reputation and publicly be accused of a crime. Majewski illustrated her conflict in refusing to provide John details of the allegations which precluded John from receiving an impartial investigation and opportunity to be heard.

xvi. UMASSD grossly violated John's protected confidentiality on three different occasions as an effort to blight his reputation in the midst of the investigation while supposed victims privacy was secured.

xvii. UMASSD presumed John guilty from the outset when it prepared and signed a letter for an imposed interim suspension, prior to meeting or speaking with him, which precluded him from attending classes or participate in UMASSD activities, legally banned him from UMASSD property, and issued a John a DNC denying his ability to communicate with all persons associated with UMASSD, whereas victims were allowed to discuss the matter with whomever without punishment.

xviii. Upon information and belief, males invariably lose when charged with sexual harassment at UMass Dartmouth and when found "not responsible" male students still suffer some type of sanction proscribed by school policy.

xix. UMASSD officials presumed John guilty from the outset when it decided to pursue an investigation against him after it could not compel his resignation through extortion. Majewski and Cummings directed an investigation calculated to lead to the foregone conclusion that John was guilty of the misconduct alleged.

xx. Majewski and Cummings utilized intimidation tactics and the threat of additional institutional action against both John and other students to prevent them from speaking with each other, speaking with potential witnesses, or speaking about this matter in any capacity, thus depriving John of a full and fair opportunity to defend himself.

xxi. UMASSD officials refused to conduct an equitable investigation based on John's complaints of academic misconduct, ageism discrimination, and sexual harassment; meanwhile UMASSD encouraged supposed victims to file false Title IX complaints related to John.

xxii. Organizationally Cummings is directly subordinate to David Milstone, who espoused his male bias regarding Title IX above. Cummings male bias is indicated by (1) her history in placing a bounty on a male perpetrator's head; (2) in refusing to adhere to the very requirements she made for male student's return at UD; (3) in her lifetime advocacions for female causes at the exclusion of and in opposition to male interests; (4) in demanding John's withdrawal from school then stating she would get "his kind" in a Title IX investigation; (5) in threatening a retaliation claim against John instead of looking into his complaints, which he stated at the Conduct Conference; (6) in participating in John's sanction after he was found "not responsible;" (7) in encouraging supposed complainants to file false Title IX complaints; (8) in using the Title IX process for the purpose of correcting a supposed admissions error; (9) in improperly using John's educational record to defame him, (10) in maliciously defaming him and purposely interfering with educational opportunities outside of UMass Dartmouth, (11) in "serving as the University's public voice against sexual assault" and (12) as stated publicly supporting women's advocacy groups during the timeframe in which accusations of John were investigated.

xxiii. UMASSD deprived John of a meaningful opportunity to be heard when it refused to provide him a factual basis to the allegations of sexual harassment, or the identities of his accusers.

xxiv. UMASSD deprived John the opportunity to an impartial adjudication and opportunity to be heard when he was never provided a copy of the investigator's file nor was allowed to view any evidence used to consider his guilt or innocence; he was not allowed to ask or send victim(s) questions;

xxv. UMASSD did not attempt to contact or interview witnesses identified interviewed by John whereas all female students who attended John's classes were questioned as to John's potential behavior to cause a hostile learning environment.

xxvi. UMASSD showed bias against John by failing to follow disciplinary proceedings of both Protocol and Policies, and instead used the procedures of either that benefitted the investigation at the sacrifice of John's due process rights designed to protect accused students; such actions caused John disadvantages in disciplinary proceedings as compared to the alleged victim(s).

xxvii. UMASSD initiated and conducted an investigation informed by archaic stereotypes and innate biases that a male with any conviction, including John, is predisposed to be aggressive, violent and hypermasculine, and deserves assumption of guilt despite no evidence.

xxviii. UMASSD sanctioned John despite a finding of not responsible, which is contrary to Policies and Protocol or any sense of fairness at proceeding conclusion. Meanwhile any/all supposed victims were allowed to proceed without restraint or imposition to their academic programs.

xxix. In April of 2015 and 2016 UMass Dartmouth sponsored a student created hysteria around the issue of male rape culture, sexual assault and sexual harassment. Leading up to and at the precise time of John's alleged harassment of students, UMass Dartmouth faced substantial criticism for

allegedly looking the other way when female students complained of sexual assault as well as not actively prosecuting alleged male perpetrators.

xxx.　UMASSD officials and UMASSD Police displayed bias against John, a male student previously convicted of a crime, in both knowingly and falsely accusing John of a crime and investigating bogus allegations against John, while refusing to even consider accepting John's statement related to potential criminal charges against University officials.

**288.**　Given the fact that John was found not responsible - despite Cummings's and Majewski's biases in predetermining John's guilt - illustrates the illegitimacy of the investigation and of the process used in the witch-hunt to find some complaint worthy of John's expulsion.

**289.**　As a direct and proximate cause of the above conduct, John sustained damages including, without limitation, emotional distress, physical and psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

## TITLE IX VIOLATION - SELECTIVE ENFORCEMENT
### As to Defendant UMASSD

**290.**　John  incorporates by reference each of the above paragraphs as if fully set forth herein.

**291.**　As described above, the Title IX selective enforcement theory asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

**292.**　As detailed herein, UMASSD violated Title IX's prohibition against selectively enforcing its policies on the basis of gender.

**293.**　John has shown that a similarly-situated member of the opposite sex, in this case the unnamed victims and other female students facing disciplinary action or Title IX were treated more favorably than John due to his gender.

**294.**　The foregoing, and the following show inferences of gender bias related to selective reinforcement, including without limitation the following:

a. Upon information and belief, No female student - found not responsible - has ever been sanctioned or received negative consequences related to an investigation. In John's case sanctions issued after a finding of not responsible denied him access to and enjoyment of his educational contract with UMass Dartmouth.
b. UMASSD protected victims' confidentiality but publicized John's confidential information.
c. UMASSD has never conducted a sham investigation on a female student to correct an admissions error or remove her for a matter unrelated to the Title IX purpose.
d. Female students are not automatically issued an interim suspension with a "Do Not Trespass Notice" and universal DNC.
e. John was denied his advisor of his choice and forced to retain private counsel, whereas female victims were granted the opportunity to choose their advisor.
f. In contrast to female student witnesses, John's witnesses were never interviewed.
g. John was warned that any complaint filed by him would face a retaliation misconduct charge, whereas, female students were intentionally encouraged to file false allegations against John.

**295.** University's conduct is so severe, pervasive, and objectively offensive that it is denying John equal access to education that Title IX is designed to protect.

**296.** Upon information and belief, internal emails exist, which predetermined that John was guilty of some misconduct, and given the depth of an investigation the misconduct could be identified.

**297.** Upon information and belief, UMASSD possesses communications and documents evidencing a predisposition to favor female students accused of Title IX violations.

**298.** Upon information and belief, Defendant UMASSD's mishandling of supposed victim's Spring 2016 allegation was informed by institutional, media and student pressures as well as external pressure from the U.S. Department of Education, under the threat of rescission of federal funds.

**299.** Based on the foregoing, John was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male responsible for sexual misconduct and punished severely.

**300.** As a direct and proximate cause of the above conduct, John sustained damages including, without limitation, emotional distress, physical and psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

## TITLE IX VIOLATION – DELIBERATE INDIFFERENCE / HOSTILE ENVIRONMENT
### As to Defendant UMASSD

**301.** Though deliberate indifference claims usually relate to sexual harassment, Courts have allowed claims of harassment based on gender discrimination in Title IX disciplinary actions.

**302.** John incorporates by reference each of the above paragraphs as if fully set forth herein.

**303.** The harassment of John in the disciplinary process – outside the scope of normal reasonable disciplinary procedures - was so severe, pervasive or objectively offensive that it could be said to deprive John of access to the educational opportunities or benefits provided by the school.

**304.** John was intentionally subjected to unfounded allegations and an unfair process due in part to OCR and his status as a male student with a criminal history.

**305.** UMASSD had actual notice of the harassment. John filed multiple complaints with UMASSD officials claiming the investigation was instituted solely because he was a male student with a criminal conviction.

**306.** UMASSD was deliberately indifferent to the harassment. Not only was UMASSD indifferent but since May 4th, when Cummings' and Majewski's efforts ranged from attempting to extort John into withdrawing, to the repeated defamations, to the "all-hands meeting" at SMAST, to John's punitive interim suspension, to false criminal allegations by UMASSD, to John's final sanctions despite a finding of not responsible, UMASSD increased its pressure to compel John's withdrawal from school by creating a hostile

learning environment with 'reasonable intervention' whereby no reasonable person could endure the ongoing pervasive environment, which denied John's ability to pursue his academic career.

307.    Plaintiff's educational experience was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions of the victim's" educational environment.

308.  As a direct and proximate cause of the above conduct, John sustained damages including, without limitation, emotional distress, physical and psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

309.    As a result of UMASSD's violations of Title IX, which resulted in an unduly severe and unwarranted sanction, which continues to injure John's reputation and right to continue his education, an injunction should issue directing UMASSD to (1) reverse the outcome and findings regarding the complaint; (2) expunge John's disciplinary record; (3) remove any negative sanction or action in John's education record; (4) permanently destroy any record related to the complaint against John; and (5) allow John to return to UMASSD at a time of his choosing in order to complete the remaining credits remaining for receiving his degree without the imposition of any conditions for readmission to the university.

310.  As a result of the foregoing, John is entitled to damages in the amount to be determined at trial plus prejudgment interest, attorneys fees, expenses, costs and disbursements.

## COUNT II

### 42 U.S.C. § 1983 Title IX: Retaliation for Opposing Title IX Process

### (ALL DEFENDANTS in Individual and Official Capacities pursuant to Ex Parte Young)

311.  John incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety without duplication.

312.  A private right of action exists to remedy retaliation against an individual who complains about sex discrimination under Title IX.

313.  Title IX contains broad language prohibiting a funding recipient from intentionally subjecting any person to "discrimination" "on the basis of sex."

314.  Retaliation is, by definition, an intentional act and a form of "discrimination" because the complainant is subjected to differential treatment "on the basis of sex" in response to having made an allegation of sex discrimination.

315.  John has the burden of proving a prima facie case of retaliation, including that 1) John engaged in protected activity; 2) defendant knew John engaged in protected activity; 3) John was subjected to a materially adverse action, and 4) a causal connection exists between the protected activity and adverse action. Wade v. Knoxville Utilities Bd., 259 F.3d 452, 463 (6th Cir. 2001).

**316.** John engaged in the protected activity of participating in and protesting a Title IX investigation, during which he asserted multiple complaints regarding the unfairness of UMASSD's prosecution of John because of his gender.

**317.** Specifically on May 4th, July 15th, August 30th, and circa September 7th John complained that the Title IX investigation was initiated and conducted solely to pressure John into withdrawing because he was a male student with a felony conviction.

**318.** On May 4th John complained regarding being issued a Do Not Trespass Notice, a DNC directive and being suspended unnecessarily. Additionally through his attorney, John complained that he was being denied basic fairness and his due process rights in the prosecution of the Title IX investigation because of his gender.

**319.** On August 30, 2016 and circa September 7, 2016, John protested the issued unwarranted sanctions related to the Title IX investigation, stating that having been found not responsible for any misconduct, he should not be restricted or denied benefits or services related to his academic program. Additionally he complained regarding losing his advisor resulting from the Title IX investigation.

**320.** Defendants knew John was engaged in protected activity since Defendants conducted the Title IX investigation of John, and school officials received the complaints regarding John's belief that it was a witch hunt to compel him to withdraw solely because he was a male student with a conviction.

**321.** UMASSD and individual Defendants thereafter subjected John to adverse action, treatment or conditions because of his complaints of sexual discrimination regarding Title IX procedures. John suffered multiple "material adverse actions" subsequent to his complaints regarding sexual discrimination in the implementation of Protocol against him including, without limitation, the following:

    i.   John was forced to sign a "Do Not Trespass Notice" denying him access to UMass Dartmouth under penalty of criminal arrest.

    ii.   John's property was unlawfully seized at SMAST AT&T building inasmuch as he was denied an opportunity to retrieve his property on May 4th and the property was never returned to him.

    iii.   UMASSD issued John an interim suspension from UMass Dartmouth from May 4th to August 30.th

    iv.   UMASSD issued John a "do not contact" directive on May 4th, denying him communication with all persons associated with UMASSD.

    v.   UMASSD repeatedly and intentionally violated John's confidentiality of his educational and disciplinary records protected under FERPA, Policy and Protocol, in an attempted smear campaign, causing him to suffer a hostile learning environment, and causing him to receive treatment as a pariah precluding any opportunity for research collaboration.

    vi.   UMASSD defamed John to outside Universities, which destroyed his ability to corroborate with scientists at those locations.

    vii.   UMASSD sanctioned John and instituted "appropriate intervention" with SMAST staff, which denied John benefit from his educational contract with UMASSD, even though John was found not responsible for the alleged misconduct.

viii.   John's graduate advisor – John Buck - withdrew without reason nor explanation connected to John's Title IX investigation.

ix.   John's academic program was downgraded to a non-thesis Master's.

**322.** Though Defendants actions do not constitute typical sexual harassment under hostile environment or deliberate indifferent claims of Title IX violations, the actions of Defendants actions served to harass John because of his gender.

**323.** The harassing conduct of Defendants created a hostile environment sufficiently serious that it interfered with or limited  John's ability to participate in or benefit from his graduate school program. In UMASSD's retaliation, it purposely created a hostile learning environment so severe and perverse that neither John nor a reasonable person could expect to endure under the circumstances, which constructively expelled John, compelling him to seek a leave of absence.

**324.** UMASSD had actual knowledge of the harassment based on John's gender since they conducted the investigation, received notice of complaints, and instigated the continuous harassing actions that interfered with and altered John's graduate program.

**325.** UMASSD was deliberately indifferent or failed to take adequate remedial action; instead UMASSD increased pressure to compel John to withdraw from his graduate program.

**326.** The "materially adverse actions" or retaliatory actions were motivated in all or in part by John's speech to remedy the baseless investigation and failures to comply with state and federal law, including but not limited to, John's reports of individual harassment in UMASSD's attempt to compel him to withdraw from school using Title IX procedures - solely because he was a male student with a felony conviction.

**327.** Retaliatory actions were causally related to the protected activity in time with no delay, substance, purpose, and the foregoing malice shown John by UMASSD and its agents.

**328.** Based on the foregoing UMASSD intentionally and maliciously retaliated against John in response to his engaging in protected activity under Title IX, which caused John approximate damages.

**329.** John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages .

**330.** As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

**COUNT III**

**42 U.S.C. § 1983 – Denial of Due Process Under Fourteenth Amendment**

**(ALL DEFENDANTS in their Individual and Official Capacities pursuant to Ex Parte Young)**

**331.**   John incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety without duplication.

**332.**   Defendants violated Plaintiff's rights under the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment.

**333.**   The Due Process Clause of Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Questions of due process are considered using two steps: (1) whether there exists a liberty or property interest which has been interfered with by the state; and (2) "whether the procedures attendant upon that deprivation were constitutionally sufficient." A similar right is stated in the Fifth Amendment to the U.S. Constitution.

**334.**   Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation or custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress...

**335.**   Pursuant to the Fourteenth Amendment to the United States Constitution, John enjoyed a property interest in his contractual status as a student at the UMASSD[66] and in his pursuit of the education free of arbitrary and bad faith restrictions thereon that he had undertaken to receive, as well as a liberty and property interest in his reputation.

**336.**   A person has a protected liberty and property interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

**337.**   Prior to his discipline, John was a student in good standing at UMass Dartmouth. His constitutionally protected liberty and property interest in his continued enrollment and good standing at UMass Dartmouth and to be free from arbitrary discipline and reputational harm arises from the policies, courses of conduct, practices and understandings, established by UMass Dartmouth.

**338.**   John's constitutionally protected property interest further arises from the express and implied contractual relationship between UMass Dartmouth and John. A student who has been admitted to a

---

[66] Gorman v. Univ. of R.I., 837 F.2d 7, 12 (1st Cir. 1988) (stating "a student's interest in pursuing an education is included within the fourteenth amendment's protection of liberty and property")

university, and who has paid tuition to that university, has a protected property interest in continuing his education at that university until he has completed his course of study.

339.  Pursuant to the Fourteenth Amendment, John also enjoyed a right to equal protection of the laws, i,e, to be treated like all persons to whom he is similarly situated.

340.  Consequently, when John faced disciplinary action that included the possibility of suspension or dismissal if found responsible, then UMass Dartmouth was required to provide him with Due Process as established by the Fourteenth Amendment to the United States Constitution and Massachusetts law.

341.  Chancellor Helm was UMASSD's official charged with ensuring that student education records, including transcripts, are disclosed to third-party requesters. Upon information and belief, Chancellor Helm was also the UMASSD official responsible for the conferral of degrees to UMASSD students. Chancellor Helm was responsible for implementing the Student Conduct Code and Title IX Policies and Procedures at issue in John's case.

342.  Chancellor Helm was responsible for ensuring compliance with Title IX procedures as it was required under OCR's investigations, and spoke regularly with Majewski and Cummings with regard to the climate of the campus and on Title IX matters, including the matter of John.

343.  In the course of UMass Dartmouth's investigation and adjudication, it flagrantly violated clearly established rights under the Due Process clause of the Fourteenth Amendment through its repeated acts of a gender biased tribunal and process that deprived John of the minimal requirements of procedural fairness by, without limitation:

    i.    On May 4th John was issued a "Do Not Trespass Notice without providing him a meaningful hearing or adequate notice nor establishing that he constituted an "imminent threat" that would warrant such an interim restriction;

    ii.    On May 4th John was directed not to speak to anyone associated with UMass Dartmouth precluding an opportunity to be heard and defend himself;

    iii.    John was given inadequate notice; On May 4th John was required to attend a Conduct Conference within 21 hours of receiving the Notice of Investigation or conclusions would be drawn.

    iv.    Gomes, Majewski, and Walker failed to question victim(s) credibility and motivations to prevaricate regarding a graduate course cheating scandal reported by John;

    v.    Defendants failed to provide John with notice of the charges before the interview with Gomes in violation of due process and Protocol 2015.

    vi.    John was denied the opportunity to be heard in that John was not entitled to know the details of the charges nor the identity of the complainants (at the conduct conference or at the investigative review of John; Gomes/Majewski/Cummings refused to provide him with the specific factual conduct alleged to have given rise to the charges.

    vii.    John was provided no form of hearing.

    viii.    John was not permitted to challenge the credibility or ask any questions of the supposed complainant(s) or any other witnesses, even though credibility determinations were critical to the Investigators' findings; Students accused of violations other than sexual misconduct were permitted to submit written questions to be asked of complainant and at times had a hearing.

ix. John was denied an opportunity to record the interview, and no record of the investigative interview was maintained.[67]

x. Impairment of right to call witnesses and present evidence; though John submitted a list of exculpatory witnesses; none were interviewed; John was asked to provide evidence in defense but was denied the facts of the allegations or basis of the complaints.

xi. Applying the preponderance of the evidence standard, rather than the clear and convincing evidence standard, despite the serious nature of the allegations and severe consequences that could result, including lifelong damage to John's reputation;

xii. John was not entitled to an advisor of his choice per Protocol or Policies;

xiii. Special Examiner prepared a detailed report, which John was never permitted to see despite multiple requests.

xiv. Special Examiner's decision as to the "not responsible" (that is, supposedly of "not guilty") of John's actions was essentially final, with no appellate review—among other things, the decision that included sanctions - typical of a responsible finding - could not be overturned on any ground.

xv. Lowered burden of proof to the "preponderance of the evidence"(the lowering of the standard appears to have been a deliberate choice by the university to make cases of sexual misconduct easier to prove . . . .)

xvi. John was denied ANY and ALL access to evidence or see witness statements;

xvii. Failure to provide an impartial adjudicator at any stage of the proceedings; Majewski, Gomes, and Cummings all maintained conflicts of interest creating bias in the process.

xviii. Majewski and Cummings predetermined John's guilt on May 4, 2016 as to any potential misconduct prior to assigning their employed investigator;

xix. A school employed investigator was entrusted with responsibilities of detective, prosecutor, judge and jury in one person[68];

xx. John, despite being found not responsible, was sanctioned as though he was found responsible.

xxi. The purpose of the process itself was used to explore and find an action that could warrant expulsion instead of adjudicating self-reported allegations of sexual misconduct from actual victims.

xxii. Defendants' conduct evidenced arbitrary and/or irrational behavior which was not justified by any governmental interest

xxiii. Defendants violated John's Due Process rights in part because Defendants' conduct was motivated by ill will, bad faith, and/or an intent to injure John.

xxiv. Defendants were improperly trained on sexual harassment and disciplinary implementation.

xxv. No right to effective appeal

344.    In the course of such investigation and adjudication, Defendants flagrantly violated John's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its deprivation of the minimum requirements of procedural and substantive fairness, including, but not limited to, his right to

---

[67] Slaughter v. Brigham Young Univ., 514 F.2d 622, 625 (10th Cir.1975)
[68] Doe v. Brandeis, 177 F. Supp. 3d 561 (D. Mass 2016)

a fair investigation free of bias, his right to be heard by an impartial factfinder, and his right to cross examine witnesses and challenge witnesses, and his right to secure his property at his workstation.

**345.**   Under both federal and state law, John was entitled to due process including proper notice and a meaningful opportunity to be heard, which were denied at various steps of the procedure.

**346.**   Defendants Cummings, Majewski, Gomes, and Helm violated John's right to due process: when they willfully failed to give him adequate notice of the charges simply saying, *"John" may have engaged in behaviors that violate the student code of conduct and/or the University's Policies on Equal Opportunity, Discrimination, Harassment and Sexual Violence"* or *"engaged in behavior that has created an uncomfortable learning and work environment"[69];* when they imposed interim sanctions and when they issued a finding of what must be determined as "not responsible" but still imposed sanctions of warnings and "appropriate intervention"; when despite the fact that there appears to be no reporting party or "victim", there was no opportunity for him to question the witnesses against him including the non-percipient third-party reporter, or the supposed complainant; when he was afforded no formal hearing before an impartial panel of decision makers; when he was provided no opportunity to challenge the participation of any person involved in the process, and there was no attempt to collect exculpatory evidence or give due consideration to the alleged "reporting party" who if it were AW or LS maintained John did not engage in any conduct violative of UMASSD's policies.

**347.**   The Investigators prosecuted John under a presumption of guilt, and conducted an investigation designed to fit their narrative of what they believed a male with a conviction could do, despite clear evidence to the contrary.

**348.**   John had obeyed all institutional rules when he was wrongly interim suspended and ultimately constructively expelled from UMASSD.

**349.**   John was entitled to process commensurate with the seriousness of the allegations and the potential discipline, sanctions and repercussions he was facing. The allegations in this case resulted in a sanction that will have lifelong ramifications for John.

**350.**   In their bias treatment of John, Defendants made a distinction which "burdened a fundamental right, targeted a suspect class, or intentionally treated one differently from others similarly situated without any rational basis for the difference." That such different treatment he received was based on "purposeful or intentional" gender discrimination. The facts supporting bias in the Title IX claims above buttress John's 1983 claim.

**351.**   Defendants treated John differently from others similarly situated when they instituted "appropriate intervention," failed to conduct equitable investigations against female students, and intentionally and

---

[69] Sterrett v. Cowan, 85 F. Supp. 3d 916 (E.D. Mich. 2015).

egregiously violated John's privacy of confidential information while securing the supposed victim(s)' privacy in the disciplinary proceeding and in general.

**352.** Defendants, as well as other agents, representatives, and employees of UMASSD, were acting under color of state law when they showed intentional, reckless, and outrageous disregard for John's constitutional rights. Defendants Helm, Cummings, Majewski, and Gomes deprived John of his liberty and property interests without affording him basic due process without good faith and thus is not afforded qualified immunity for their actions. Defendants all agreed to, approved and ratified this unconstitutional conduct.

**353.** Defendants violated the substantive component of the Due Process Clause because Defendants engaged in the arbitrary abuse of executive power so egregious that shocks the conscience of the public, and that it did not comport with traditional ideas of fair play and decency.

**354.** Defendants violated the substantive component when they: intentionally violated John's confidentiality; issued a DNC with anyone associated with UMASSD; extorted John into withdrawing; intentionally defamed John to blight his reputation during the investigation; interfered with his educational opportunities outside of UMASSD, and sanctioned him after a finding of not responsible.

**355.** As recently articulated by the Sixth Circuit in *Doe v. Baum*, a university disciplinary proceeding that may result in a sanction of expulsion or suspension must: (1) afford an accused student "some sort of hearing" and (2) "when the university's determination turns on the credibility of the accuser, the accused, or witnesses, that hearing must include an opportunity for cross-examination." *Doe v. Baum* (6th Cir. Sept. 7, 2018) 903 F.3d 575, 581.

**356.** UMass Dartmouth deprived John of the requisite due process because the University had a pecuniary interest in the outcome of the adjudication, and had decided that an admissions of a male with a prior conviction must be corrected through a sham disciplinary proceeding.

**357.** Defendants had actual or constructive knowledge that they were engaging in conduct creating a pervasive and unreasonable risk of deprivation of John Doe's rights under the Fourteenth Amendments to the United States Constitution.

**358.** Based on the foregoing, UMass Dartmouth and Defendants violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of the Spring/Summer 2016 allegation. Accordingly, Defendants are liable under 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

**359.** As a direct and proximate result of the above conduct, John sustained damages, including, without limitation, reputational damage, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

**360.** John further seeks punitive damages against Defendants Cummings, Majewski, Gomes and Helm in their individual capacities for violations of John's well established fundamental rights.

**361.** As a result of the foregoing, John is entitled to damages in the amount to be determined at trial plus prejudgment interest, attorneys fees, expenses, costs and disbursements.

**362.** John is entitled to compensatory damages, prospective injunctive relief expunging John's disciplinary record; removing any record of John's interim suspension from his education file; destroying any and all records pertaining to the Title IX investigation of John; and allow John to return to UMASSD at a time of his choosing in order to complete the remaining credits remaining for receiving his degree without the imposition of any conditions for readmission to the university.

<u>COUNT IV</u>

**42 U.S.C. § 1983 – Denial of First Amendment Rights/Free Speech Retaliation as to (Defendants UMASSD, Cummings and Majewski in Individual/ Official Capacities pursuant to Ex Parte Young)**

**363.** John incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety without duplication.

**364.** First Amendment to the U.S. Constitution states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

**365.** Pursuant to the First Amendment to the United States Constitution and UMASSD Rights of Students, John enjoyed the right to speak freely to students in his graduate program prior to the initiation of disciplinary proceedings, to complain to UMASSD officials as to their discriminatory Title IX disciplinary practices, to speak to fellow students and freely associate regarding what he considered discriminatory and unfair treatment by the University.

**366.** UMASSD neither accused John of using speech that could be considered true threats,[70] nor lewd[71] nor were shown to cause a material disruption to the university or was likely to do so.

**367.** "In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 511 (1969).

**368.** The Supreme Court has recognized that students enjoy First Amendment rights of speech and association on a campus and the "denial ... of use of campus facilities for meetings and other appropriate purposes" are subject to the level of scrutiny appropriate to any form of prior restraint.[72]

---

[70] Watts v. United States, 394 U.S. 705 (1969).
[71] Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 685 (1986).
[72] Healy v. James, 408 U.S. 169, 181 (1972).

369.   Pursuant to the questions posed in the investigative interview, UMASSD, and individual Defendants were loathed with such speech as John's stating that he missed his children, that he was disgruntled by not having a desk in the new area of graduate student cubicles, and he confronted students involved in a perennial cheating scandal of two core courses required for graduation.

370.   Moreover since John's speech failed to "materially and substantially disrupt the work and discipline of the school,"[73] John's 1st Amendment right to speak to members of UMass Dartmouth was violated via censorship in both his interim and final sanction, which forbid him to speak to anyone associated with UMASSD as to the former, and to students at SMAST as to the latter.

371.   To plead a prima facie case of free speech retaliation, John must show that (1) that John was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused John to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity, and (3) that the adverse action was motivated at least in part as a response to the exercise of John's constitutional rights. Paige v. Coyner, 614 F.3d 273,

372.   John undoubtedly engaged in protected speech activities – namely (1) John engaged academic and personal discussions with peers and instructors in the university setting and (2) all of John's reports of gender discrimination related to his Title IX investigation, made to Gomes, Lorentz, Cummings and Majewski directly and through his attorney.

373.   The second element of free speech retaliation, whether the "defendant's adverse action caused John to suffer an injury - that would likely "chill a person of ordinary firmness from continuing to engage in that activity" - is not in dispute here.

374.   Defendants chilled and otherwise restricted John's right to free speech by issuing a gag order not to speak to any person associated with UMASSD, directly or by proxy, under penalty of potential expulsion from May 4th, 2016 to August 30, 2016, and then not to speak to SMAST Students after circa September 10th, 2016. Also John was banned from UMASSD property and given an interim suspension. UMASSD officials intentionally violated John's privacy regards to Title IX and educational records confidentiality. He lost his advisor and suffered sanctions of "appropriate interventions" despite being found not responsible for misconduct and speaking to his colleagues and professors.

375.   In regards to the third element, John has come forth with facts sufficient to support his theory that the "materially adverse actions" or retaliatory actions were motivated in all or in part by John's speech to address and remedy the baseless investigation and failures to comply with state and federal law, including but not limited to, John's actions to report and address individual harassment in UMASSD's attempt to

---

[73] Tinker v. Des Moines Independent School District, 393 U.S. 503, 506 (1969).

compel him to withdraw from school using Title IX procedures solely because he was a male student with a felony conviction.

**376.** Retaliatory actions were causally related to the protected activity in time with no delay, substance, purpose, and the foregoing malice shown against John by UMASSD and its agents.

**377.** Based on the foregoing UMASSD and individual Defendants intentionally and maliciously retaliated against John in response to his engaging in constitutionally protected speech, which caused John approximate damages.

**378.** Based on the foregoing, UMass Dartmouth and Defendants violated the rights and guarantees set forth in the First Amendment of the United States Constitution during the investigation and adjudication of the supposed Spring/Summer 2016 allegation.

**379.** Accordingly, Defendants are liable under 42 U.S.C. § 1983 for violations of John's rights under the First Amendment of free speech and association, and for all damages arising therefrom.

**380.** As a direct and proximate result of the above conduct, John sustained damages, including, without limitation, reputational damage, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

**381.** John further seeks punitive damages against Defendants Cummings, Majewski, Gomes and Helm in their individual capacities for intentional and egregious violations of John's well established fundamental rights.

**382.** As a result of the foregoing, John is entitled to damages in the amount to be determined at trial plus prejudgment interest, attorneys fees, expenses, costs and disbursements.

**COUNT V**

**Protocol 2015 and Policies are Unconstitutionally Overbroad As to Defendant UMASSD**

**383.** John incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety without duplication.

**384.** UMass Dartmouth as a state college is legally bound to respect the constitutional rights of its students.

**385.** UMASSD investigated John under procedures under Protocol and Policies with allegations that he created a hostile learning environment. John was found not responsible for misconduct under Policies nor Protocol, but UMASSD still sanctioned him with warning and reduced privileges.

**386.** Because of the sexual harassment policy and the definitions of sexual harassment and similar for a hostile learning environment, and the manner in which UMASSD attempted to enforce it for innocuous behavior, John subsequently felt inhibited in expressing his opinions in class concerning women, or even speaking to women in general.

**387.**     Subsequent to the investigation John enrolled in an Ocean Policy class, mostly with women requiring classroom deliberation. John found every area of possible communication was implicated by the policy in Protocol, and if a female student disagreed with his opinion, then it could have been considered a hostile learning environment.

**388.**     That, in turn, caused him to be concerned that discussing his social, cultural, political, and/or religious views regarding these issues might be sanctionable by the University. As such John suffered a chilling effect on his ability to exercise his constitutionally protected rights.

**389.**     John was compelled to withdraw from the class resulting from his inability to discuss matters that had been susceptible to selective application amounting to content-based or viewpoint discrimination,

**390.**     Protocol 2015 and Policies used in 2016 were unconstitutionally vague and overbroad as they address questions of sexual harassment.

**391.**     Like the regulation at issue in *DeJohn v. Temple University*, 537 F.3d 301 (3d Cir. 2008) and in Saxe v. State Coll. Area School Dist., 240 F.3d 200 (3d Cir. 2001), the policy as to definitions of sexual misconduct and sexual harassment in Protocol and Policies at UMass Dartmouth is facially overbroad.

**392.**     Protocol should be found unconstitutionally "overbroad" since there is a likelihood that the statute's very existence will inhibit free expression to a substantial extent.

**393.**     As a result of the foregoing, John seeks declaratory judgment that Protocol 2015 as written is unconstitutionally vague.

**Count VI**

**Defamation (Libel and Slander) as to Defendant Cummings and Majewski**

**(in their Individual and Official Capacities pursuant to Ex Parte Young)**

**394.**     John hereby incorporates and adopts each and every foregoing allegations set forth herein

**395.**     Immediately following John's Conduct Conference, Cummings contacted staff at Duke Marine Lab, including, Tom Schultz and verbally advised them to reject John's application, that John was a threat to school safety under a Title IX investigation, that he had an extensive criminal history and lied on his application to UMass Dartmouth and he would be expelled from UMass Dartmouth.

**396.**     Circa late April 2016 Cummings contacted staff at Marine Mammal Center at Woods Hole Oceanographic Institute, including, Michael Moore and verbally advised him to discontinue his collaboration with John, that John was a threat, that he had an extensive criminal history and lied on his application to UMass Dartmouth and he would be expelled from UMass Dartmouth.

**397.**     Circa late April 2016 Cummings contacted staff at University of Rhode Island Graduate School of Oceanography, including, James Miller and verbally advised him to discontinue his collaboration with John, that John was a threat under Title IX investigation, that he had an extensive criminal history and lied on his application to UMass Dartmouth and he would be expelled from UMass Dartmouth.

**398.**    On May 4, 2016, Cummings and Majewski promulgated the above written letter concerning John. The letter began with, "It has come to the attention of the UMass Dartmouth administration that you have a more extensive criminal history than you disclosed prior to being admitted to the Master's program in Marine Science."

**399.**    Cummings and Majewski published false information accusing John of fraudulently disclosing his criminal history on his application.

**400.**    Cummings and Majewski published the false and defamatory material with "'actual malice[74]' --that is, with knowledge that it was false or with reckless disregard of whether it was false or not, and acted with a "high degree of awareness of [its] probable falsity" or, in other words, "entertained serious doubts as to the truth of his publication."

**401.**    Based on her communication with Webster prior to, and with John at his Conduct Conference, Cummings knew the information was false; should have known the information was false; should have taken reasonable steps to verify the veracity, and had no justifiable reason nor legitimate educational purpose to believe that John had failed to fully disclose his criminal history as required in his application, which John signed as true and accurate, that if he intentionally withheld information with deceitful intent, he would be liable for criminal perjury.

**402.**    Cummings constructively and factually accused John of violating Mass Gen Law Chapter 268, Section 1, perjury, by alleging he falsified and signed his school application under which John swore under penalty of perjury. Additionally her letter indicates that John was involved in behavior incompatible with the proper conduct of his business, trade or profession, which is also slander per se. Additionally Cummings accused John in "a more criminal history" of committing a host of unidentified crimes left to the imagine of the audience, thereby accusing him of a vast array of crimes, which is defamatory per se.

**403.**    Cummings and Majewski's verbal and written statements were defamatory in that they "may reasonably be read as discrediting John in the minds of any considerable and respectable class of the community."

**404.**    That such accusation was false and defamatory per se which requires no proof of economic loss.

**405.**    Cummings and Majewski were acting within and outside the scope of her school responsibility in a "frolic and detour" on their own when defaming John to Miller, Moore and Schultz and in publishing the subject letter.

**406.**    Defendants had no legitimate purpose to cause John to lose his advantageous relationships with each, nor to promulgate the letter.

---

[74] Noonan v. Staples, Inc., 556 F.3d 20 (1st Cir., 2009) (citing Mass. Gen. Laws ch. 231, § 92).

**407.** Cummings has ill-will toward men who she believes commits violence against women, and ill-will against John specifically. Their spite toward John is illustrated: in Cummings' and Majewski's baseless and sua sponte witch hunt to find any misconduct whatsoever which she could use to establish their predetermined conclusion that John must be expelled from UMass Dartmouth; in Cumming's statement that John would never find an institution that would accept him in Oceanography again, a result which her defamation made a fait accompli. Additionally Cumming's illustrated her actual malice by illegally and willfully disclosing confidential information disclosed that was part of John's protected educational record secured by FERPA.

**408.** As a direct and proximate result of the above conduct, John sustained damages, including, without limitation, reputational damage, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

**409.** John further seeks punitive damages against Defendants Cummings, and Majewski, in their individual capacities.

**410.** As a result of the foregoing, John is entitled to damages in the amount to be determined at trial plus prejudgment interest, attorneys fees, expenses, costs and disbursements.

<u>**Count VII**</u>

**Violation of Massachusetts Civil Rights Act (MCRA)**

**As to Defendant Cummings in her Individual and Official Capacities pursuant to Ex Parte Young**

**411.** The foregoing allegations are incorporated herein by reference

**412.** Cummings was acting within the scope of her school responsibility and agent authority when violating John's Massachusetts Civil Rights.[75] As an alternative John pleads Cummings was acting outside the scope of her school responsibility and agent authority.

**413.** To establish a claim under MCRA, a John must prove that  1) That the [alleged victim] was exercising a right or privilege protected by the Constitution or laws of the Commonwealth of Massachusetts or of the United States; 2) That the defendant either injured, intimidated, interfered with, oppressed or threatened the exercise or enjoyment of that legally protected right by [alleged victim] , or <u>attempted to do so</u>; 3) That the defendant did so by such interference was by threats, intimidation, or coercion[76],[77] and that the defendant did so willfully.[78]

---

[75] Massachusetts Civil Rights Act, G. L. c. 12, s. s. 11H, 11I.

[76] Coercion: the use of express or implied threats of violence or reprisal or other intimidating behavior that puts a person in immediate fear of the consequences in order to compel that person to act against his or her will.

[77] *Glovsky v. Roche Bros. Supermarkets, Inc.*, 469 Mass. 752, 17 N.E.3d 1026, 1035 (2014) (quoting *Currier v. Nat'l Bd. of Med. Examiners*, 462 Mass. 1, 965 N.E.2d 829, 837–38 (2012).).

[78] Restatement (Second) of Torts § 8A (1965) indicates that "intentional" is used in the tort sense to mean "that the actor desires to cause the consequences of his act, or that he believes that the consequences are substantially certain to result from it."

**414.**    John had and enjoyed rights: secured by Title IX, to an education free of discrimination based on gender; secured by the Vth & XIVth Amendments to the US Constitution and by Articles I & X of the Massachusetts Declaration of Rights to continue enjoying his property right of his education at UMass Dartmouth and use of his Veterans Affairs scholarship under Chapter 31; property and liberty right to enjoy his personal and academic reputation; liberty interest to continue relationships and speak with colleagues and come and go at UMass Dartmouth, and liberty interest to pursue his profession as an Oceanographer or University Professor.

**415.**    Civil rights asserted under MCRA are secured by the Constitutions of the Commonwealth[79] and United States against individual as well as State action. A John need not allege "State action" in order to make out a claim for relief against a private person under the civil rights statute, G. L. c. 12, Section 11I.

**416.**    Massachusetts courts have "recognized that coercion may take various forms," including economic coercion, which can potentially "be found where one party deprives another of rights due under a contract."[80] In order for the breach of a contract to be coercive for purposes of the MCRA, the party breaching the contract must not simply deprive a John of a secured right, but must also be trying to interfere with John's own exercise of a secured right.[81]

**417.**    John's scholarship contract with Veteran's Affairs under Chapter 31, in part, requires a John to comply with the student Code of Conduct, and if John was expelled for disciplinary reasons then he would be required to reimburse Veteran's Affairs for all expenses. However, if he withdrew and transferred elsewhere, then he would not face reimbursement.

**418.**    Upon information and belief, Cummings knew John was on a VA Scholarship  when she made her threats and commanded John to withdraw or face expulsion.

**419.**    On May 4, 2016, Cummings twice demanded John forego his education at UMass Dartmouth. John refused twice.  In between Cummings's demands, she showed John the letter of May 4th, and a forced him to sign a Do Not Trespass Notice.

**420.**    Additionally, Cummings implied and John inferred that she would disseminate the fact that John had a criminal history and would accuse him of the crime of perjury, and ruin his reputation.

**421.**    Cumming's threat of criminal prosecution of trespassing, and threat of accusing him of a crime, commanded John's attention, since any criminal charge or violation of the good conduct clause of his unsupervised probation would cause a revocation warrant.

**422.**    Upon information and belief, Cummings knew John was on unsupervised probation and used such information to leverage her coercion and intimidation.

---

[79] https://malegislature.gov/Laws/Constitution
[80] *Redgrave v. Bos. Symph. Orch., Inc.*, 399 Mass. 93, 502 N.E.2d 1375 (1987).
[81] *See Goddard v. Kelley*, 629 F.Supp.2d 115, 128 (D. Mass. 2009)

**423.**    Cummings told John that if he agreed to withdraw from school then he would not undergo a Title IX investigation and no one would learn of his criminal history or illegally signing his application.

**424.**    Cummings did, and attempted to intentionally and willfully coerce and intimidate John to sacrifice his civil rights guaranteed under MCRA.

**425.**    Though Massachusetts has no civil remedy for extortion, Cummings actions stood squarely in the center of Massachusetts criminal statute of extortion.[82] Cummings constructively threatened to ruin John's reputation[83] to other schools and to his advisors if he did not withdraw from UMass Dartmouth, which would deny his ability to apply in other Universities or pursue his intended profession in Oceanography. Not only did Cummings threaten such action but followed through with her threats.

**426.**    Based on the foregoing Cummings maliciously violated John's civil rights under MCRA using coercion and intimidation.

**427.**    John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**428.**    John's damages were the direct and proximate cause of Defendants' actions.

**429.**    Pursuant to M.G.L. c. 12 Mass. Civil Rights Act § 11I, John seeks award of compensatory money damages, punitive damages, costs of the litigation and reasonable attorneys' fees.

**Count VIII**

**Aiding and Abetting of Violation of Massachusetts Civil Rights Act (MCRA)**

**As to Defendant Majewski in her Individual and Official Capacities pursuant to Ex Parte Young**

**430.**    The foregoing allegations are incorporated herein by reference.

**431.**    Based on the foregoing Defendant Cummings violated his civil rights under MCRA.

**432.**    Majewski was generally aware of her role of an overall illegal or tortious activity at the time she provided Cummings assistance in violating his rights under MCRA.

---

[82] Mass G. L. c. 265, Section 25 - Whoever, verbally or by a written or printed communication, maliciously threatens to accuse another of a crime or offence, or by a verbal or written or printed communication maliciously threatens an injury to the person or property of another, or any police officer or person having the powers of a police officer, or any officer, or employee of any licensing authority who verbally or by written or printed communication maliciously and unlawfully uses or threatens to use against another the power or authority vested in him, with intent thereby to extort money or any pecuniary advantage, or with intent to compel any person to do any act against his will, shall be punished by imprisonment in the state prison...

[83] *Commonwealth vs. Miller., 385 Mass. 521, 1982*

**433.** Majewski witnessed Cummings twice command John's withdrawal from school. In between, Cummings offered John documents to read which implicated definite threats to compel John to commit actions against his will to wit to sacrifice his property and liberty rights under MCRA.

**434.** Majewski knowingly and substantially assisted Cummings in violating John's civil rights under MCRA.

**435.** With regard to MCRA, Majewski participated in Cummings' efforts to pressure John into withdrawing from school against his will. Majewski assisted Cummings by providing Cummings the physical venue (her office) in which Cummings attempted extorting John into withdrawing from school. Additionally Majewski assisted Cummings in applying pressure on John to withdraw from school that day. Majewski directed John to inform her within a couple days as to whether he would withdraw from school. Majewski also applied coercion by stating that if he would not withdraw that day he would undergo a Title IX investigation.

**436.** In providing Cummings her office and having preplanned the meeting in which Cummings would attempt to extort John into leaving UMASSD, Majewski did encourage and provide advice to Cummings in how to proceed to coerce John into leaving UMASSD.

**437.** Cummings and Majewski shared a common intention to cause John to withdraw from school. Both had worked together for years implying the quality and extent of their relationship influenced the amount of aid provided by Majewski to Cummings, and affords evidence of the defendant's state of mind.

**438.** In aiding-abetting, the extent of liability is that a person (Majewski) who assists a tortious act of Cummings may be liable for other reasonably foreseeable acts done in connection with it, and is liable for damages caused by the main perpetrator.

**439.** John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**440.** John's damages were the direct and proximate cause of Defendants' actions.

**441.** Pursuant to M.G.L. c. 12 Mass. Civil Rights Act § 11I, John seeks award of compensatory money damages, punitive damages, costs of the litigation and reasonable attorneys' fees.

**COUNT IX**

**Intentional Interference with Advantageous Relations**

**Defendants Cummings and Majewski in their Individual/Official Capacities per Ex Parte Young**

**442.** The foregoing allegations are incorporated herein by reference.

**443.** Under Massachusetts law, to prevail on a claim of tortious interference with advantageous relations,

a John must establish that: (1) he had advantageous with a third party; (2) defendant knowingly induced the third party to break the advantageous relations; (3) defendant's interference, in addition to being intentional, was improper in motive or means; and (4) John was harmed by defendant's actions.

444.    John had advantageous relations with advisors and scientists with whom he had developed relationships of a definite type and agreements to corroborate on scientific research including with: Michael Moore, Ph.D. and Woods Hole Oceanographic Institute; Douglas Nowacek, Ph.D. and Duke Marine Lab; John Buck, Ph.D; Jennifer L. Miksis-Olds, Ph.D., Director, Center for Marine Science & Technology at The Pennsylvania State University; and James Miller, Ph.D. and U.R.I.

445.    Majewski and Cummings knew of the advantageous relationships which John had with various scientists and Universities and the past, present and future corroborations, and John's continued expectancy for advantageous relationships that would engender his research and career growth.

446.    In their official capacity Majewski and Cummings, acted with actual malice, or with a spiteful, malignant purpose, unrelated to legitimate corporate interest of UMASSD, and knowingly induced John's advantageous relationships to end.

447.    Among other specific examples, Majewski and Cummings displayed actual malice unrelated to legitimate corporate interests by the following:

    i.   In an effort to "correct an admissions error" Defendants concerted to compel John's withdrawal from UMASSD through extortion.

    ii.   Defendants concerted and individually violated John's privacy of statutory confidential information on more than three occasions.

    iii.   Defendants concerted and individually contacted persons and institutions, outside of and unrelated to John's matriculation with UMASSD, and maliciously defamed him and spread innuendo regarding his Title IX investigation.

    iv.   Defendants instituted and maintained two disciplinary proceedings with knowledge that neither had merit nor probable cause in an effort to coerce John to withdraw from school because he was a male with a conviction.

    v.   Defendants gathered John's educational records, which contained his admissions disclosure statement, then twisted the contents therein to cast him in a false light of negative publicity.

    vi.   Defendants sanctioned John despite having found him not responsible with the intent to exile him from SMAST.

448.   Based on the foregoing, and in their individual capacity, Majewski and Cummings, with intentional improper motive or means, knowingly induced John's advantageous relationships to end.

449.   As the result of Defendants improper and malicious actions, all of John's aforementioned advantageous relationships terminated. Each institution and person refused to respond to John's attempts at communication in writing, texts and calls.

**450.** As a direct and proximate result of the above conduct, John sustained damages, including, without limitation, reputational damage, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

**451.** John further seeks punitive damages against Defendants Cummings, and Majewski, in their individual capacities.

**452.** As a result of the foregoing, John is entitled to damages in the amount to be determined at trial plus prejudgment interest, attorneys fees, expenses, costs and disbursements.

## COUNT X

### Negligence In Disclosing Confidential Information As to Defendants UMASSD, Cummings, and Majewski in their Individual and Official Capacities pursuant to Ex Parte Young

**453.** The foregoing allegations are incorporated herein by reference.

**454.** Family Educational Rights and Privacy Act of 1976: FERPA guarantees the privacy of a student's educational records.

**455.** FERPA policy and guidelines at UMass Dartmouth for all times relevant was controlled by policy number STU-012 (**https://www.umassd.edu/policies/active-policy-list/students/family-educational-rights--privacy-act/**). UMass Dartmouth FERPA Policy Statement states:

> *The Family Educational Rights and Privacy Act (Part 99 of Title 34 of the Code of Federal Regulations) allows present of former students at educational institutions access to educational records kept on them, as well as establishing basic protections of privacy of their records. The law applies to educational records, which are defined as those records that are directly related to a student and maintained by an educational agency or institution.*

**456.** Definitions: For the purposes of this policy, the University uses the following definitions of terms: Student: A student is defined as any person who attends or has attended the University. Educational records: An education record is defined as any record (in handwriting, print, tapes, film, or other medium) maintained by the University or an agent of the University that is directly related to a student.

**457.** Disclosure of Educational Records to Others: FERPA restricts significantly the right of others to view a student's educational records. The following are categories of individuals who by federal law and the procedures established for the university may view or receive a student's educational records in relevant part:

    *a.* The student him or herself (except materials to which the student has waived the right of access, such as confidential letters of recommendation).

    *b.* Individuals who are "officials" of the campus and university and who have a "legitimate educational interest" in the record or a "need to know" information in the record. At the

University, "officials" includes: Persons employed or contracted by the University in an administrative, supervisory, teaching, research, or support staff position (in some cases including hired as support staff); Officers of the University of Massachusetts central administration; Students or others serving on committees where legitimate "need to know" exists (examples are persons serving on a committee that recommends award of scholarships or serving on the board of an honor society).

**458.** Such officials have a "legitimate educational interest" or "need to know" if performing a task that includes each of the following in relevant part:

    *a.* It falls within the context of their assigned institutional duties or responsibilities;

    *b.* It relates to the functioning of the office, position, or committee involved;

    *c.* It relates to the education of the disciplining of the student; and

    *d.* It is consistent with the purposes for which the information is kept.


**459.** Persons authorized to view or retain a student's educational records, as above, "may in no case transmit, share, or disclose the information to any third party." All third-party requests for information should be addressed to the Office of University Records.

**460.** Under Massachusetts law, a duty finds its 'source in existing social values and customs' or where a defendant has voluntarily assumed a duty.

**461.** In Connecticut the test for the existence of a legal duty of care entails (1) a determination of whether an ordinary person in the defendant's position, knowing what the defendant knew or should have known, would anticipate that harm of the general nature of that suffered was likely to result, and (2) a determination, on the basis of a public policy analysis, of whether the defendant's responsibility for its negligent conduct should extend to the particular consequences or particular John in the case.[84] The Connecticut Supreme court rejected the proposition that the common law duty of care "disappear[s] when the negligent conduct occurs in an educational setting.

**462.** Liability may be properly imposed on defendants if, and only if, doing so would serve a "legitimate objective of the law."

**463.** An important function of the tort system is the "prophylactic' factor of preventing future harm. Under Massachusetts law "[a] basic principle of negligence law is that ordinarily everyone has a duty to refrain from affirmative acts that unreasonably expose others to a risk of harm.

**464.** Unauthorized release of confidential and sensitive information protected under FERPA, which by law is contraindicated, is legally similar to unauthorized disclosures of confidential medical information in the realm of duty of confidentiality under HIPPA.

---

[84] RK Constructors v. Fusco Corp., 231 Conn.381, 386-87 (1994).

**465.** A cause of action based on a breach of physician-patient confidentiality has been recognized by a majority of jurisdictions. Under Massachusetts law[85] a physician owes to a patient a duty not to disclose, without the patient's consent, confidential medical information about the patient obtained as a result of the physician-patient relationship, except to meet a serious danger to the patient or to others, and a violation of that duty, resulting in damages, gives rise to a cause of action against the physician.

**466.** "When a physician discloses confidential information without authority, he invades two distinct interests of the patient: (1) the patient's interest in the security of the confidential relationship and his corresponding expectation of secrecy; and (2) the patient's specific interest in avoiding whatever injuries will result from circulation of the information."[86] Invasion of the first interest will most likely affect the patient's willingness to disclose confidential information in the future and invasion of the second interest could result in a variety of injuries to the patient.

**467.** When a patient divulges embarrassing, intimate, or even incriminating information to a therapist he or she expects that such disclosures will remain confidential. Since confidentiality is essential to the adequate functioning of a patient-therapist relationship, the legal protection of these confidences is necessary to promote the relationship that is beneficial to society.

**468.** Similarly prospective students to graduate school filet their personal and academic history on their applications, and expect confidentiality of that information. The protection of these confidences is necessary, especially with graduate students, to engender trust of colleagues and the free flowing process of exchanging ideas in research that is beneficial to society.

**469.** For this reason, "the duty of confidentiality is not meant to protect against one specific type of injury to the patient, but instead discourages any injury that might result from a physician's unauthorized disclosure of information."

**470.** Similarly the duty of confidentiality under FERPA is meant to discourage any injury that might from the University's unauthorized disclosure of student information. Just as society has an interest in protecting the confidential nature of the physician-patient relationship, so too does society have an interest in protecting confidential and sensitive student information guaranteed under FERPA.

**471.** Finally a duty should be imposed because Universities and school officials, who obtain student information under authority of "legitimate educational interest," are in the best position to prevent this kind of unauthorized disclosure of student information in the future.

**472.** The same substantive rationale for this tort duty extends to cases in which a customer has entrusted her intangible, confidential information to another in the course of a business transaction, thereby obligating the possessor to exercise reasonable care in protecting that valuable property.

---

[85] Alberts v. Devine, 3.95 Mass. 59, 479 N.E.2d 113 (1985)
[86] Bullion v. Gadaleto, 872 F.Supp. 303, 306 (W.D.Va.1995)

**473.** UMass Dartmouth and its officers have a general duty to UMass Dartmouth students to protect student information under FERPA since the source of the duty exists in furthering existing social values and customs' and UMass Dartmouth voluntarily assumed a duty by accepting funds under a program administered by the U.S. Department of Education.

**474.** UMASSD, Cummings and Majewski specifically owed John a duty of reasonable care not to disclose sensitive and confidential records to third parties in violation to FERPA and STU-012.

**475.** Cummings and Majewski accessed John's educational records "under a legitimate educational interest" in conjunction with a disciplinary proceeding per policy STU-012. Inter alia they accessed John's admissions application and criminal disclosure statement.

**476.** Cummings, Majewski and UMASSD breached that duty of care in carelessly disseminating John's student information to third parties, and knowing what the Defendants knew or should have known with foreseeability, would anticipate that harm of the general nature of that suffered was likely to result.

**477.** John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages .

**478.** John's damages were the direct and proximate cause of Defendants' actions.

**479.** As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

<u>**Count XI**</u>

**Negligence as to Establishing Reasonable Disciplinary Policy**

**As to Defendant UMASSD**

**480.**     UMASSD had a duty to "establish reasonable policies and guidelines to ensure that school officials could implement[87] and enforce uniformly, and students could clearly understand the school's disciplinary process in either Protocol or Handbook, to ensure John was not repeatedly harassed, embarrassed, defamed, coerced, and denied due process of law by the school officials.

**481.**     UMASSD breached that duty in failing to establish two parallel and competing policies, which as stated in Protocol and Handbook were ambiguous, conflicting, inadequate, and confusing.

**482.**     The grossly inadequate policies allowed school officials to hijack the disciplinary process by picking and choosing carte blanche, whichever parts of the Protocol and Handbook, that fit the need of a capricious investigation in their attempt to rid John from UMass Dartmouth.

---

[87] Johnson v. Schmitz, 119 F. Supp. 2d 90 (D. Conn. 2000);

**483.**   For example, On May 3rd John received a poorly worded Notification of Alleged Violation. On May 4th, 2016 Cummings and Majewski clearly held a Conduct Conference, accused John of violating both misconduct per Protocol and Handbook, and offered him a resolution option of constructive expulsion, and in not resolving the matter at the Conduct Conference they appointed a special investigator. These actions detail the procedures for a Conduct Conference and subsequent investigation in Handbook (Policies).

**484.**   The confusion in both the school officials and John/his attorney was illustrated in their communications throughout the investigation of John.

**485.**   Majewski continued claiming that the process was not yet at the Conduct Conference stage, which in her mind justified not providing John the rights owed to him from the Conduct Conference.

**486.**   If UMass Dartmouth rules for protecting its students in competing disciplinary processes were inadequate or if UMASSD failed to understand how to enforce them adequately to protect them, it is foreseeable that one of its graduate students could suffer emotional distress and economic harm.

**487.**   John's damages were the direct and proximate cause of UMASSD's actions.

**488.**   John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages .

**489.**   As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT XII

### Breach Of Fiduciary In Disclosing Information Under FERPA / Protocol / Policies

### As To Defendants UMASSD, Cummings And Majewski in their Individual and Official Capacities pursuant to Ex Parte Young

**490.**   The foregoing allegations are incorporated herein by reference.

**491.**   Under Massachusetts Law, "A fiduciary relationship arises when one reposes faith, confidence, and trust in another's judgment and advice. Where a confidence has been betrayed by the party in the position of influence, this betrayal is actionable, and the origin of the confidence is immaterial.

**492.**   John placed trust, faith and confidence in UMass Dartmouth, its officers and staff to protect his sensitive and confidential student information secured under FERPA / Protocol / Policies. John had an established fiduciary relationship with UMass Dartmouth and its officers regarding the protection and proper handling of his confidential educational records.   As fiduciaries UMASSD, Cummings and Majewski owed John a duty of not to betray his confidences by disclosing and widely disseminating his student information to third parties in violation to FERPA and STU-012 / Protocol / Policies

**493.** Cummings and Majewski accessed John's records "under a legitimate educational interest" in conjunction with a disciplinary proceeding, and were responsible for securing disciplinary records.

**494.** Cummings, Majewski and UMASSD breached their fiduciary duty in violating John's trust by carelessly and/or intentionally disseminating John's student information to third parties.

**495.** John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**496.** John's damages were the direct and proximate cause of Defendants' actions.

**497.** As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

<u>**COUNT XIII**</u>

**Invasion of Privacy[88] As to Defendants UMASSD, Cummings and Majewski in their Individual and Official Capacities pursuant to Ex Parte Young**

**498.** The foregoing allegations are incorporated herein by reference

**499.** Defendants made a public disclosure of John's confidential private educational records to students, faculty, and staff inside and outside of UMass Dartmouth in that John was required to submit a disclosure letter explaining his criminal conviction, and he was under a Title IX investigation when there was no justification.

**500.** John's application and the disclosures thereon were part of a private matter and part of a contract between UMass Dartmouth and John, and any information regarding his application or Title IX investigation was held confidential.

**501.** Defendants with such dissemination communicated to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.

**502.** The wrongful intrusion into John's private activities was in such a manner as to outrage or to cause mental suffering, shame or humiliation to a person of ordinary sensibilities, since release of sensitive and compromising information protected under FERPA is similar to the release of confidences in the doctor patient relationship protected under HIPPA.

---

[88] Mass G.L. Chapter 214, Section 1B states: A person shall have a right against unreasonable, substantial or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages.

**503.** The facts publicized related to John's application and subsequent admission served no concern of the public.

**504.** A reasonable person would find the disclosure "highly offensive or highly objectionable."

**505.** Defendants published the facts with actual malice.

**506.** John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**507.** John's damages were the direct and proximate cause of Defendants' actions.

**508.** As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

**COUNT XIV**

**Malicious Prosecution And Abuse of Process as to UMASSD, Cummings and Majewski in their Individual and Official Capacities pursuant to Ex Parte Young**

**509.** A Title IX disciplinary proceeding is an administrative quasi-judicial civil proceeding.

**510.** The foregoing allegations are incorporated herein by reference

**511.** Massachusetts Law allows claims of malicious prosecution and abuse of process related to a civil matters.

**512.** Cummings and Majewski initiated process of a disciplinary proceeding on May 3, 2016 when Cummings emailed John per procedures in Handbook.

**513.** Cummings and Majewski actively participated in a disciplinary process per Handbook without probable cause having known that John had adequately disclosed his criminal convictions in his disclosure statement. Additionally, Cummings and Majewski could not have reasonably believed that there was a chance that their claim may be held valid upon adjudication, or find John responsible for his misconduct.

**514.** Only upon learning that their claim, related to John's insufficient disclosure statement had no merit, did they institute a Title IX claim under Protocol – as Plan B - to rid him from UMass Dartmouth.

**515.** Likewise Defendants had no probable cause as to their Title IX allegations, and lacked belief that John could be found "responsible" for misconduct.

**516.** As proof to lack of probable cause and malice, Cummings stated that she would use the Title IX to cause John to withdraw if he refused to voluntarily withdraw from school.

**517.** Also Defendants encouraged students to file false Title IX charges against John when it was obvious no potential claims could succeed.

**518.** Cummings and Majewski initiated the process for an ulterior or illegitimate purpose.

**519.** Defendants prosecuted the investigation with malice by using the process to first coerce John into withdrawing from UMass Dartmouth, then using the basis of the claim (perjuring on his school admissions application) to defame John.

**520.** Defendants used their special privilege to access John's educational records protected under FERPA and UMass Dartmouth explicit policy, then distorted the truth of the information in the confidential records to defame John.

**521.** Defendants acted primarily for a purpose other than succeeding on the merits of the claim; specifically Defendants sought to coerce John into withdrawing, or cause those associated with SMAST to constructively exile him with the improper publicity of the investigation when same was by contract deemed confidential.

**522.** David Gomes conducted an independent investigation.

**523.** The original actions terminated in John's favor in the finding of "not responsible."

**524.** John suffered special damages when Defendants denied him his contractual right to name his unpaid school advisor, and but for the improper "No Contact" order that Cummings issued against John, he would not have retained private counsel at great financial cost.

**525.** John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**526.** John's damages were the direct and proximate cause of Defendants' actions.

**527.** As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT XV
### Breach of Contract As to Defendant UMASSD

**528.** John incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety without duplication.

**529.** At all times relevant herein John developed and maintained a contract with UMASSD.

**530.** UMass Dartmouth's obligations are explicitly set forth in its contract with John, and are further informed by Massachusetts case law infusing every contract with a "reasonable expectations" requirement and mandating that college and university disciplinary proceedings cannot be "arbitrary or capricious."

**531.** For all the reasons set forth above, UMASSD has materially breached its contracts with John by failing to comply with its obligations, standards, policies, and procedures set forth in the policies and

procedures noted above in the course of the Special Examiner's Process against John, and by subjecting him to a blatantly arbitrary and capricious disciplinary proceeding.

**532.**   As a direct, proximate, and foreseeable consequence of UMASSD's numerous material breaches, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**533.**   As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

### COUNT XVI

**Breach of the Implied Covenant of Good Faith and Fair Dealing As to Defendant UMASSD**

**534.**   The foregoing allegations are incorporated herein by reference

**535.**   Implicit in the implied contract between a university and its student under Massachusetts law is the requirement that the institution act in good faith in its dealing with its students; at the same time, the student must fulfill his end of the bargain by satisfying the university's academic requirements and complying with its procedures.[89]

**536.**   In addition to these contractual breaches, the Special Examiner's Process lacks the most essential elements of due process to safeguard the rights of the accused, and is systemically inequitable. Although the accuser knows his or her story before the investigation even begins, the accused is left in the dark concerning the facts, never knowing what the accuser and witnesses actually have said except as filtered through the Special Examiner. The accused is subjected to a secret investigation process that in John's case was handled by the Special Examiner like a police interrogation of a suspect rather than an independent, impartial investigation.   Despite the fact that John meticulously documented UMASSD officials these contractual breaches, as well as the fundamental unfairness of the process and irrationality and capriciousness of the decisions, inter alia to punish John with extreme interim sanctions, UMASSD did nothing to correct this flawed and unfair process and outcome.

**537.**   Instead of proceeding to a hearing at which both sides hear all of the evidence and have an equal opportunity to present their claims and defenses before an impartial tribunal, the Special Examiner's Process effectively ends with the interrogation, completely short circuiting due process by allowing the Interrogator to decide issues of credibility and serve as the de facto prosecutor, judge and jury.

**538.**   In John's case, the University compounded the systemic lack of due process by failing to follow its own procedures, choosing which rights to deny John based on which  procedure in either Handbook or

---

[89] Doe v. Brandeis, 177 F. Supp. 3d 561 (D. Mass 2016)

Protocol that officials chose at the moment. In the end UMASSD officials complied with the stated procedures of neither.

**539.** The confusion and gaps in the two disciplinary procedures allowed UMASSD officials to usurp either, and in the end disciplined John despite the fact he was found "not responsible" for any misconduct which goes against the basis of jurisprudence.

**540.** UMASSD and Majewski based the improper sanctions on the credibility attributed to statements of supposed complainants; hence John's inability to face his accusers to contest such credibility is unfair and in bad faith.

**541.** Since John's case, UMass Dartmouth has changed several (but not all) of its deeply flawed procedures in the Special Examiner's Process.

**542.** As a direct, proximate, and foreseeable consequence of UMASSD's breach of the implied covenant of good faith and fair dealing, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**543.** As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT XVII

### Promissory Estoppel as to Defendants UMASSD, Buck and Webster in their Individual and Official Capacities pursuant to Ex Parte Young

**544.** Defendant Buck made a clear and unambiguous promise that he would serve as John's sponsor and continue providing him guidance, corroboration and direction in completing his degree and pursuing his research interest.

**545.** Defendant Webster made a clear and unambiguous promise that the details of John's disclosure statement would not be released, and neither the students, staff, nor faculty at SMAST would learn of the contents or nature of the subject matter included in his disclosure statement.

**546.** Both promisors made a promise which they individually should reasonably expect to induce action or forbearance of a definite and substantial character on the part of John.

**547.** Both promises individually and jointly did induce such action or forbearance, in that John sacrificed all other options and chose to apply his VA scholarship and matriculate at UMass Dartmouth. But for the promises John would have chosen an alternative educational program.

**548.** Buck breached his promise when he abruptly terminated all communication with John and ceased any action in assisting John pursue his career. As a proximate result John can no longer pursue his research interests and the opportunity to apply his VA scholarship in this endeavor is destroyed.

**549.** Webster breached his promise when he either shared educational information of John, or allowed Cummings to disseminate information without acting to protect John which has proximately caused John damages.

**550.** Injustice can be avoided only by enforcement of the promise.

**551.** As a direct, proximate, and foreseeable consequence of Buck's and Webster's failure to honor their promises, John's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**552.** As a result of the foregoing, John is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

**COUNT XVIII**

**Intentional Infliction of Emotional Distress**

**As to Defendants Majewski, Cummings, and Helm in their Individual and Official Capacities pursuant to Ex Parte Young**

**553.** John repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

**554.** During the investigation and adjudication process, Defendants exhibited extreme and outrageous conduct, beyond all possible bounds of decency, including but not limited to the following:

    i.    Defendants instituted bogus disciplinary proceedings and criminal investigations of John to correct an "admissions error" and baselessly remove John from UMASSD because Defendants contended his conviction disqualified his matriculation.

    ii.    Defendants criminally extorted John, threatening to accuse him of crimes and threatening to destroy his reputation with colleagues, advisors, and faculty if he refused to withdraw from UMASSD on May 4th or soon thereafter.

    iii.    Defendants repeatedly and maliciously defamed John accusing him of crimes and other defamatory conduct within UMASSD and outside UMASSD with whom John had advantageous relations in their successful effort to deny John's ability to pursue those educational opportunities.

    iv.    UMASSD maliciously and repeatedly disseminated John's confidential educational and disciplinary records related to Title IX in their effort to destroy John's pursuit of his graduate academic program while protecting privacy of all others involved.

v. Defendants imposed an interim suspension, without justification, banning him from campus, issuing him a DNC denying communication with anyone associated with UMASSD, and suspending him prior to meeting or speaking with John, which precluded him from attending classes during his summer semester at UMASSD, and prevented him from receiving rehabilitative care for his hip surgery.

vi. Defendants publicly escorted John off campus, prohibiting him from even clearing out his workspace or obtaining his property therein prior to any investigation being performed, despite the absence of any disciplinary history.

vii. Defendants treated John as an adversary and prosecuted him criminally and administratively under a presumption of guilt, based on innate biases against male students with a conviction.

viii. Defendants pursued an investigation against John despite the alleged "victim's" repeated declarations that he had not engaged in any prohibited conduct.

ix. Defendants refused to conduct equitable criminal and administrative investigations into John's complaints while encouraging supposed victims and professors to file false reports.

x. Defendants utilized intimidation tactics and the threats of additional institutional action to prevent John from speaking with anyone thus depriving John of a full and fair opportunity to defend himself.

xi. The week of May 4th, Defendants directed SMAST staff to hold an all hands meetings and publicly disclose the nature and content of John's interim suspension and Title IX investigation.

xii. Defendants' investigation far exceeded the scope of the alleged violations when they sought to elicit information wholly irrelevant to the conduct at issue for the sole purpose of embarrassment and to impugn John character and reputation.

xiii. Defendants' failed to conduct a prompt and timely investigation, and the nature of the questions asked and their leading manner contributed to ongoing rumors, gossip, and ridicule directed at John.

xiv. Defendants intentionally leaked the contents of John's disclosure statement on his graduate school application.

xv. Defendants punished John despite finding him not responsible for the alleged conduct, and in implementing "'appropriate interventions,' censored John from speaking to other students, confined him to a workspace adjacent to the Dean's office, and kept John from his normal routine in benefitting from his educational experience.

xvi. Defendants initiated baseless and false criminal complaints knowing John was innocent.

**555.** Such extreme and outrageous conduct was either intentional or in reckless disregard that such conduct would in fact cause emotional distress to John

**556.** As a direct result of the foregoing, John has in fact suffered severe emotional distress with physical impact including panic attacks, headaches, insomnia, grinding of teeth and excessive wear that caused two molars to crack in half requiring removal, insomnia, weight loss, loss of appetite, PTSD flashbacks and symptomology from wrongfully being prosecuted, extreme depression, excessive alopecia, and his hair turned pure white.

**557.** Defendants' actions in attempting to compel John's withdrawal from UMASSD by investigating and adjudicating the false allegations against John were the actual and proximate cause of such distress.

**558.** Based on the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

## COUNT XIX

### Negligent Infliction of Emotional Distress as to Defendants UMASSD, Majewski, Cummings, and Helm in their Individual and Official Capacities pursuant to Ex Parte Young

**559.** John repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

**560.** Based on the foregoing, Defendants have been liable of negligence toward John during the initiation and prosecution of the disciplinary proceedings under Policies and Protocol as stated above.

**561.** John has suffered severe emotional distress.

**562.** Defendants negligence has been the proximate and direct cause of John's emotional distress.

**563.** John has suffered physical harm manifested by objective symptomology for which he received and continues receiving treatment.

**564.** As a direct result of the foregoing, John has in fact suffered severe emotional distress with physical impact including panic attacks, headaches, insomnia, grinding of teeth and excessive wear that caused two molars to crack in half requiring removal, insomnia, weight loss, loss of appetite, PTSD flashbacks and symptomology from wrongfully being prosecuted, extreme depression, excessive alopecia, and his hair turned pure white.

**565.** A reasonable person would have suffered emotional distress under the circumstances of the case.

**566.** Defendants' actions in attempting to compel John's withdrawal from UMASSD by investigating and adjudicating the false allegations against John were the actual and proximate cause of such distress.

**567.** Based on the foregoing, John is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

## JURY DEMAND

John herein demands a trial by jury of all triable issues in the present matter.

## PRAYER FOR RELIEF

WHEREFORE, for the foregoing reasons, Plaintiff John Doe demands judgment against Defendants, jointly and severally, as follows:

John requests that this Court enter judgment against Defendants jointly and severally on all counts of this complaint as described below in each count. John further requests that this Court:

A. Retain jurisdiction of this matter for the purpose of enforcing this Court's order.

B. Award to John compensatory damages in an amount to be determined at trial.

C. Award John the reasonable costs and expenses of this action, including attorney's fees, in accordance with 42 U.S.C. § 1988.

D. Grant such other and further relief as this Court deems equitable and just under the circumstances.

(i) on the first cause of action, against UMASSD, for **Violation of Title IX of the Education Amendments of 1972**, awarding John damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against UMASSD as a result of UMASSD's violation of Title IX, which resulted in an unduly severe and unwarranted sanction which continues to injure John's reputation and right to continue his education, an injunction should issue directing UMASSD to: (i) reverse the outcome and findings regarding unnamed complainant's complaint; (ii) expunge John's disciplinary record; (iii) remove any record of John's suspension from his education file; (iv) permanently destroy any record of any complaint; and (v) confer John's degree by applying existing credit to the six credit hours remaining for receiving his degree or, in the alternative, allow John to return to UMASSD at a time of his choosing in order to complete his degree without any conditions for readmission to the University;

(ii) on the second cause of action against all Defendants for **Retaliation related to Title IX under under 42 U.S.C. § 1983**, awarding John damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and punitive damages against Defendants Majewski and Cummings.

(iii) on the third cause of action against all Defendants for **Violation of Constitutional Due Process under 42 U.S.C. § 1983**, awarding John damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements and an injunction against UMASSD as a result of UMASSD's violation of Title IX, which resulted in an unduly severe and unwarranted sanction which continues to injure John's reputation and right to continue his education, an injunction should issue directing UMASSD to: (i) reverse the outcome and findings regarding unnamed complainant's complaint; (ii) expunge John's disciplinary record; (iii) remove any record of John's suspension from his education file; (iv) permanently destroy any record of any complaint; and (v) confer John's degree by applying existing credit to the six credit hours remaining for receiving his degree or, in the alternative, allow John to return to UMASSD at a time of his choosing in order to complete his degree without any conditions for readmission to the University; and punitive damages against Defendants Majewski and Cummings.

(iv)     on the fourth cause of action against all Defendants for **42 U.S.C. § 1983 – Denial of First Amendment Rights/ First Amendment Free Speech Retaliation** awarding John damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and punitive damages against Defendants Majewski and Cummings.

(v)      on the fifth cause of action against UMASDD for **Protocol 2015 and Policies that are Unconstitutionally Overbroad,** a judgment declaring both policies unconstitutionally vague .

(vi)     on the sixth cause of action against Defendant Cummings for **Defamation** awarding John damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and punitive damages against Defendant Cummings.

(vii)    on the seventh cause of action against Defendant Cummings for **Violation of Massachusetts Civil Rights Act (MCRA)** awarding John damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and punitive damages against Defendant Cummings.

(viii)   on the eighth cause of action against Defendant Majewski for **aiding and abetting Violation of Massachusetts Civil Rights Act (MCRA)** awarding John damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and punitive damages against Defendant Majewski.

(ix)     on the ninth cause of action against Defendants Majewski and Cummings for **Intentional Interference with Advantageous Relations** awarding John damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and punitive damages against Defendant Majewski and Cummings

(x)      on the tenth cause of action against Defendants UMASSD, Majewski and Cummings for **Negligence In Disclosing Confidential Information** awarding John damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements

(xi)  on the eleventh cause of action against UMASSD for **Negligence as to Establishing Reasonable Disciplinary Policy**, awarding John damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements

(xii)  on the twelfth cause of action against Defendants UMASSD, Majewski and Cummings for **Breach Of Fiduciary** awarding John damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements

(xiii)  on the thirteenth cause of action against Defendants UMASSD, Majewski and Cummings for **Invasion of Privacy/Disclosure Of Private Facts** awarding John damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements

(xiv)  on the fourteenth cause of action against Defendants UMASSD, Majewski and Cummings for **Malicious Prosecution And Abuse of Process** awarding John damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

(xv)  on the fifteenth cause of action against Defendants UMASSD, Majewski and Cummings for **Breach of Contract** awarding John damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

(xvi)  on the sixteenth cause of action against UMASSD for **Breach of the Implied Covenant of Good Faith and Fair Dealing** awarding John damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

(xvii)  on the seventeenth cause of action against Defendants UMASSD, Buck and Webster for **Promissory Estoppel** awarding John damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements.

(xviii) on the eighteenth cause of action against Defendants Majewski, Cummings, and Helm for **Intentional Infliction of Emotional Distress**, a judgment awarding Johns damages in the amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damage, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursement;

(xix) on the nineteenth cause of action against Defendants UMASSD, Majewski, Cummings, and Helm for **Negligent Infliction of Emotional Distress**, a judgment awarding Johns damages in the amount to be determined at trial, including without limitation, damages to physical well-being, emotional and psychological damage, plus prejudgment interest, attorneys' fees, expenses, costs, and disbursement.

## **Certification and Closing**

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.

I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date: April 11, 2019

Respectfully Submitted:        John Doe, Pro Se

By: _/s/ John Doe_

53 Child Street, Unit 669
Warren, RI 02885
doe.john.123199@gmail.com