# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

------------------------------------------------------------------------X

**JOHN HARNOIS,**

                      **Plaintiff,**

**-against-**

**UNIVERSITY OF MASSACHUSETTS AT DARTMOUTH;**
**PEYTON R. HELM in individual and official capacity;**
**CYNTHIA CUMMINGS, in individual and official capacity;**
**DEBORAH MAJEWSKI, in individual and official capacity;**
**SCOTT WEBSTER, in individual and official capacity;**
**DAVID GOMES, in individual and official capacity;**
**JOHN BUCK, in his individual and official capacity;**
**EMIL FIORAVANTI, in his individual and official capacity;**
**UNNAMED PROFESSOR, in his individual and official capacity;**
                      **Defendants.**

------------------------------------------------------------------------X

**Civil Action No: 1:19-CV-10705**

**2nd AMENDED COMPLAINT**
**Per Order of April 25, 2019**

*"Show me the man and I'll find you the crime"*[1]

Plaintiff John Harnois (hereinafter referred to as "Plaintiff"), Pro Se, respectfully alleges:

## THE NATURE OF THIS ACTION

1.      The facts, procedures used, and denial of due process in this case mirror those in *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561 (D. Mass. 2016).  What is different is that Defendants UNIVERSITY OF MASSACHUSETTS AT DARTMOUTH (UMASSD), Peyton Helm, Cynthia Cummings, Deborah Majewski, Emil Fioravanti, and Unnamed Professor (together known as "Defendants") carried out their procedurally flawed and biased investigation process against Plaintiff through conducting an unwarranted sua sponte investigation, filing false criminal complaints, and seeking or fabricating any potential misconduct of Plaintiff to expel him however possible.  The other germane difference is that Plaintiff was found not responsible, yet was still sanctioned as if found responsible.

---

[1] "I don't like criminal investigations to start on hoping that you have the target, maybe we'll find the crime, maybe we'll find the statute – and if we can't find the statute, we'll stretch the statute to fit the person…"  "That sounds like Lavrentiy Beria [Joseph Stalin's secret police chief] and Joseph Stalin!...'Show me the man and I'll find you the crime.' I don't want to ever see that come to America." - Harvard Law School Professor Emeritus Alan Dershowitz on Special Counsel Mueller's investigation of President Donald Trump -  May 26, 2017.

1

2.      Unlike the multitude of typical Title IX suits pending before various District Courts, this case does not include a sanctioned male student, who was found responsible of sexual misconduct, seeking relief from unwarranted sanctions.   Instead this case surrounds egregious concerted actions of Defendants, who concluded they should take "whatever necessary" actions to expel or intimidate into withdrawing a properly matriculated male graduate student with a prior, properly disclosed conviction, which was  rigorously vetted in the admissions process.

3.      Based on facts gleaned, in late April 2016 Defendants Cummings and Majewski learned that Plaintiff had disclosed a conviction in his admissions application; as detailed below both decided to remove him from UMASSD through whatever means possible. Over the next four months they recruited other university officials to assist them in accomplishing their concerted goals.

4.      Initially Defendant Cummings, with assistance of Defendant Majewski, attempted to criminally extort Plaintiff into withdrawing from school at a Conduct Conference on May 4, 2016. Plaintiff was threatened that if he refused to withdraw from school by the end of the meeting or soon thereafter, then Majewski and Cummings's would disseminate his confidential educational record information, accuse him of a crime and destroy his reputation with his colleagues and advisors both within UMASSD and with outside research opportunities.

5.      Plaintiff refused to acquiesce to Defendants' threats. At the conclusion of the conduct conference Majewski and Cummings banned Plaintiff from campus with a DO NOT TRESSPASS ORDER, issued a "Do Not Contact" order denying him communication with **anyone** associated with UMASSD, suspended him, and promulgated a letter in which they falsely accused Plaintiff of perjury. During the four months of the investigation, Plaintiff participated in the Special Examiner's Process under protest, because each step of the process denied Plaintiff his due process rights under the XIV Amendment to the U.S. Constitution and Title IX,  and repeatedly breached terms of explicit and implicit contracts.

6.      Within a week Cummings and/or Majewski directed the Dean of School of Marine Science and Technology (SMAST) to conduct an all-hands meeting during which all personnel and students of SMAST were informed of the Title IX investigation, the sanctions imposed, and other confidential matters regarding Plaintiff thereby intentionally violating Plaintiff's privacy protected under FERPA and school policies.

7.      Circa May 15, 2016 Defendants continued fulfilling their threats by filing false criminal complaints against Plaintiff, to wit Defendants accused Plaintiff of allegedly trespassing on UMASSD property, breaking into an academic building and professor's office, and somehow logging into an "unnamed" professor's computer.  After UMASSD Police conducted an extensive investigation, not a scintilla of evidence (other than the false allegation) placed Plaintiff on UMASS property or for that matter even in the Commonwealth of Massachusetts connected to the false criminal complaint.

**8.**     When Defendants failed to compel Plaintiff's resignation or convict him with false criminal allegations, Defendants conducted a sham Title IX investigation that sought to recruit unsolicited testimony in hopes of generating baseless misconduct charges that could warrant Plaintiff's expulsion. But in the end, the investigator could only accuse Plaintiff of creating a hostile learning environment, by inter alia, telling other students that he missed his children, and expressed concerns on not obtaining a work station in the new student area. With such accusations, UMASSD travailed to expel Plaintiff or compel his withdrawal.

**9.**     Throughout the disciplinary process (similar to the facts in *Doe v. Brandeis Univ.*) replete with errors, Plaintiff was presumed guilty from the start, and subjected to gender-biased unfair treatment leading to an erroneous outcome unsupported by the facts, any school policy or basic fairness. By way of examples, without limitation were Defendants': (i) failure to provide Plaintiff with proper, adequate and timely notice of the charges against him and the potential sanctions for such charges; (ii) deliberate refusal to honor Plaintiff's right to have an advisor at his Conduct Conference or choice of his advisor at any time; (iii) failure to conduct a fair, thorough, and impartial investigation; (iv) failure to properly address Plaintiff's repeated complaints reported (himself and through his attorney) to Defendants detailing violations of Plaintiff's due process, violations of school policies, and of sexual discrimination in the disciplinary process; (v) failure to adhere to UMASSD's own policies; (vi) abuse of discretion in the issuance of an unwarranted interim and final sanction after Plaintiff was found not responsible; (vii) failure to provide the identity of any supposed accuser(s); (viii) failure to provide any shred of evidence against him; (ix) failure to provide any opportunity to confront the accuser, question the witnesses, present witnesses, or present a defense at a hearing, or opportunity to be heard; (x) failure to provide the Special Examiner's report to Plaintiff; (xi) making findings of responsibility, imposing sanctions without justification, causing Plaintiff to suffer a hostile learning environment, and summarily denying Plaintiff an appeal without ever providing a sufficient explanation or rationale to those decisions.

**10.**     Similar to *Doe v. Brandeis Univ*ersity, because there was no hearing, Plaintiff never knew his accuser's identity, what the accuser (or the accuser's witnesses) actually had said, but only knew what the Special Examiner chose to tell him. Similarly in Plaintiff's case, he was neither told orally nor in writing the factual bases for the charges against him at any time before or during the four months of the Special Examiner's investigation; instead, he had to try to piece together what in particular he was accused of doing from the questions posed to him by the Special Examiner.

**11.**     When UMASSD officials could neither compel Plaintiff's resignation through extortion threats nor bogus criminal allegations, nor find him responsible in a sham Title IX investigation, Defendants defamed Plaintiff with malignant animus. Proximately his associates, advisors, and colleagues in his chosen research field would neither communicate nor collaborate with Plaintiff again after UMASSD officials intentionally

and maliciously spread Plaintiff's confidential student records protected under FERPA and innuendo regarding his Title IX proceeding.

**12.** Plaintiff was found not responsible for any alleged misconduct, a finding which by due process and fundamental fairness must end all further disciplinary action and allow a student to continue his education program unfettered. Instead, Defendants still sanctioned Plaintiff with a warning and directed the Dean of SMAST to implement 'appropriate interventions.' Defendants' illegitimate sanctions censored Plaintiff from engaging other students, confined him to an isolated workspace adjacent to the Dean's office, and denied Plaintiff's access to his normal routine in the graduate student work area, all which denied his benefitting from his educational experience. Each was proscribed by Plaintiff's contract, school policy, and any sense of fair play, and violated Plaintiff's rights under his 1st and 14th Amendment rights and Title IX. Then Defendants amended his academic program without his consent from a Master's Thesis Program/Fastrack to Ph.D. to Master's Non-Thesis, destroying his ability to pursue his research interest.

**13.** UMASSD Interim Chancellor was cognizant of, acquiesced to and allowed malicious school officials to hijack the University's disciplinary processes for their own illegitimate purposes, and aided and abetted their abuse of process in acquiescing to the coercion of outside and internal pressures to prosecute male students. Defendants usurped the oversight procedures of the three person panel, which would have shed light on their malfeasance and efforts to rid Plaintiff of UMASSD. Plaintiff found the harassing environment on campus so hostile and toxic that he was compelled to seek a leave of absence and consider his education options, which in the end none existed. UMASSD constructively expelled Plaintiff from his education program, and caused him to lose 5 years of funding in pursuit of a Ph.D. in his chosen field.

**14.** For these reasons, Plaintiff brings this action to obtain equitable, declaratory relief and legal damages, inter alia, for violations of Title IX of the Education Amendments of 1972, breach of contract and covenant of good faith/fair dealing, defamation, invasion of privacy, and intentional/negligent infliction of emotional distress, civil conspiracy, Violation of 1st Amendment Right to Speech, and denial of due process.

## THE PARTIES

**15.** Plaintiff is a natural person, citizen of the United States, and resident of Rhode Island. During the events described herein, he has been a student at UMASSD (SMAST).

**16.** Defendant UNIVERSITY OF MASSACHUSETTS AT DARTMOUTH (UMASSD) is a public body corporate and politic established, organized and authorized under and pursuant to the laws of Massachusetts, with the authority to sue, and be sued, and was at all times relevant herein, operating within the course and scope of its authority under color of state law and in receipt of federal funding under Title IX, 20 U.S.C. §§ 1681-1688. At all times material hereto, UMASSD acted by and through its agents,

employees, and representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion of UMASSD business, mission and/or affairs, under the color of law.

**17.**     Upon information and belief, Defendant Peyton Helm (Herein as Helm) was the Interim Chancellor of UMASSD at all relevant times herein, and is a resident of Oregon.

**18.**     Upon information and belief, Defendant Cynthia Cummings (Herein as Cummings) was the Asst. Vice Chancellor for Student Affairs at all relevant times herein, and is a resident of Massachusetts.

**19.**     Upon information and belief, Defendant Deborah A. Majewski (Herein as Majewski) was the Associate Vice Chancellor, Title IX Coordinator, ADA and 504 Coordinator, Office of Diversity, Equity and Inclusion at all relevant times herein and is a resident of the Commonwealth of Massachusetts.

**20.**     Upon information and belief, Defendant Scott Webster (Herein as Webster) was the Director Graduate Studies & Admissions at all relevant times herein, and is a resident of Massachusetts.

**21.**      Upon information and belief Defendant David Gomes (herein as Gomes) was the Deputy Director / Senior Investigator of Diversity, Equity & Inclusion at all relevant times herein, and is a resident of the Commonwealth of Massachusetts.

**22.**     Defendant John Buck (Herein as Buck), was Plaintiff's graduate advisor and a tenured professor at UMASSD at all relevant times herein and is a resident of the Commonwealth of Massachusetts.

**23.**     Upon information and belief Unnamed Professor Doe (herein as Professor) was a professor at UMASSD at all relevant times herein and is a resident of the Commonwealth of Massachusetts.

**24.**     Upon information and belief, Defendant Emil Fioravanti (herein as Fioravanti) was the UMASSD Police Chief at all times relevant and is a resident of the Commonwealth of Massachusetts.

**25.**     All individual Defendants are being sued in their individual and official capacity.

## JURISDICTION AND VENUE

**26.**     This Court has diversity, federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. 28 U.S.C. § 1367 because: (i) Plaintiff and each Defendant are citizens of different states and the amount in controversy exceeds $75,000, exclusive of costs and interest; (ii) the claims herein arise under federal law under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq.; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under  Article III of the U.S. Constitution.

**27.**     This Court has personal jurisdiction over Defendants UMASSD, Helm, Cummings, Majewski, Webster, Buck, and Gomes since that they conducted business within Massachusetts at all times relevant.

**28.**     Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim(s) occurred in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

### I.   Plaintiff's Efforts to Apply to UMASSD

**29.**     Plaintiff is a disabled veteran, who attended UMASSD under 38 U.S.C. section 3101, which authorized him 5 years of academic funding to pursue a Ph.D. in Oceanography.

**30.**     Throughout the period from April 2015 - to his official acceptance on January 20, 2016 - Plaintiff met with Webster and his staff and fully disclosed the facts surrounding a conviction a decade prior.

**31.**     In April of 2015, Plaintiff took a graduate acoustics class and accepted a summer internship with Professor James Miller at (URI) related to underwater acoustics of the Block Island Wind Farm.

**32.**     On June 1, 2015, Plaintiff requested  Buck serve as his Ph.D. advisor.  By July 1, 2015 Buck promised to sponsor Plaintiff's academic pursuit of a Ph.D. in Oceanography/Bioacoustics, and help develop research projects for Plaintiff's Ph.D. dissertation. Buck further promised to introduce Plaintiff to specific scientists for Plaintiff's committee. From June 1, 2015 to May 4, 2016, Buck and Plaintiff exchanged over 150 texts, calls and emails regarding Plaintiff's Ph.D. pursuit and development of his committee, consulted weekly in Buck's office, and Buck provided Plaintiff a workspace in Buck's EE lab. Buck served officially and contractually as Plaintiff's  advisor, and had a fiduciary responsibility with him.

**33.**     Plaintiff attended the 170th Meeting of the Acoustical Society of America in Jacksonville, FL from November 2 to 6, 2015, so Buck could introduce Plaintiff to Douglas Nowacek, Ph.D., Duke Nicholas School of the Environment, and Jennifer L. Miksis-Olds, Ph.D., Director, Center for Marine Science & Technology,  at The Pennsylvania State University. Both met with Plaintiff, discussed scientific corroboration and agreed to serve on Plaintiff's academic graduate committee.

**34.**     In the fall (September) of 2015, Plaintiff took three classes at UMASSD in preparation of and to promote his application for matriculation to UMASSD graduate school.  Professors of each fall class and Buck wrote Plaintiff's letters of recommendation.

### II.   Plaintiff's Performance at UMASSD and Development of Research Interest

**35.**     The parochial academic community of Plaintiff's research interest consisted of bioacoustics scientists, who used drones to assess stress on baleen whales, including those from the Boston Aquarium, Woods Hole Oceanographic Institute (WHOI), URI, Duke Marine Lab, and Miksis-Olds' lab.

**36.**     From December 31, 2015 to January 20, 2016,  Plaintiff and Senior Scientist Michael Moore, Ph.D., Director of Marine Mammal Center at WHOI developed a joint whale research project with Buck that would continue through the summer of 2016.

**37.**     In February 2016, Buck arranged for Miksis-Olds to accept Plaintiff in a prestigious bioacoustics program scheduled for June 5-10, 2016, called SeaBASS, a biannual training program that recruited the best international talent in bioacoustics.  Students accepted often leverage attendance into additional invitations to collaboration on research projects and grants.

**38.**     Throughout the Spring of 2016, Professor Nowacek recruited Plaintiff to apply to the Nicholas School of Marine Science at Duke, and lobbied for Plaintiff's acceptance into the 2016 summer classes[2] and internship program at Duke Marine Lab.

**39.**     Leading into the Spring of 2016, Plaintiff had labored successfully to develop a viable graduate program, with the world's leading scientists in the realm of his academic and career pursuit and maintained a 4.0 GPA in all graduate courses.

**III.     Representations, Agreements, Covenants and Warranties Between Plaintiff and UMASSD**

**40.**     Plaintiff told Webster he would not put his academic career and VA scholarship in jeopardy if the graduate admissions office could not guarantee absolute confidentiality of the disclosed conviction. Multiple times Webster made unambiguous promises that he, his staff and UMASSD staff would secure Plaintiff's confidential information in addition to restrictions under FERPA.

**41.**     Buck likewise unambiguously promised that, as a term to Plaintiff's matriculating to UMASSD SMAST, he would serve as Plaintiff's advisor through his dissertation completion.

**42.**     Solely based on Webster's promise to ensure Plaintiff's confidentiality of the information in his disclosure statement, and based on Buck's promise to advise Plaintiff in his Ph.D. pursuit, Plaintiff decided to apply his scholarship to and matriculate at UMASSD over all other programs under consideration to his detriment. But for these assurances, Plaintiff would have chosen matriculation elsewhere.

**43.**     From when Plaintiff enrolled in classes in September 2015, to Plaintiff's matriculation to the UMASSD SMAST thesis Master's Degree program[3], a contractual relationship existed between Plaintiff and UMASSD bound by the terms of school online policies including: 1) UMASSD 2015-2016 Student Handbook (Handbook),[4] which includes Student Conduct Policies and Procedures, (Policies)[5]; 2) FERPA policy, and 2015 Sexual Violence Protocol (herein as "Protocol"), and any and all statements of procedure or policy on UMASSD official websites at the times relevant.

**44.**     UMASSD Handbook states:[6] "The Student Handbook is the University's official notification of UMASSD resources, policies, regulations, and community standards.

---

[2] Environment 376LA. (Marine Mammal Biology) and Environment 335LA. (Unoccupied Aircraft Systems in Scientific Research).
[3] Plaintiff had applied to the Ph.D. program; Plaintiff, Buck and Steve Cadrin (Admissions Director of SMAST) agreed that Plaintiff would be considered on the FastTrack program for acceptance into the Ph.D. program once Plaintiff wrote a research proposal.
[4] https://www.umassd.edu/studentaffairs/studenthandbook/
[5] https://www.umassd.edu/studentaffairs/departments/student-conduct-and-dispute-resolution/policies/
[6] https://www.umassd.edu/studentaffairs/studenthandbook/

**University of Massachusetts Dartmouth Sexual Violence Protocol – 2015 (Herein as Protocol)**

**45.**   In August 2015, UMASSD implemented Protocol under the Office of Diversity, Equity and Inclusion, and Student Affairs, which was tailored in belief to conform to guidelines in the Federal Dear Colleague Letter of 2011.[7]

**46.**   Protocol, which was to govern sexual misconduct cases going forward, in fact competed and paralleled with Policies as related to sexual misconduct.

**47.**   UMASSD utilizes an <u>Investigative Model</u>[8] for the resolution of complaints of sexual violence.

**48.**   Per Protocol when notified of an incident of sexual violence, the Title IX Coordinator in the Office of Diversity, Equity and Inclusion <u>will review the available information and if necessary</u>, appoint a Title IX Investigator. Title IX Investigators receive annual training for this role.

**49.**   Using a single investigative model UMASSD Protocol deprives an accused of a hearing before an impartial panel and instead permits one unlicensed individual within the Title IX office, with undisclosed qualifications, potential conflicts of interests and experience to act as detective, prosecutor, judge and jury.

**50.**   This convergence of roles creates substantial conflicts of interest that allow a single individual to direct the ultimate outcome of the matter based his/her presumptions about the veracity of the allegations and influenced by innate beliefs about the roles of males and females in sexual situations, compounded by the preconceived notions of any male with a conviction.

**51.**   Moreover this investigative model deprives an accused student of a full and meaningful opportunity to be heard as he is denied the opportunity to present his defense before an impartial panel of decision makers, to cross examine his accuser (whether or not the reporting party is the alleged victim) and to challenge the evidence or witnesses who, per the Title IX Office, offered adverse testimony against him.

**52.**   Further, upon information and belief, UMASSD uses the trauma informed investigation model when investigating complaints, which teaches that trauma causes responses in victims that may be counterintuitive; for instance, continued contact with the perpetrator, delayed response to trauma, flat affect, or use of humor. It discusses that "survivors" do not act in any one way but responses can vary as there are a variety of coping mechanisms. Consequently, statements denying that any trauma occurred could be construed as a direct response to the trauma suffered.

**53.**   Like the regulation at issue in *DeJohn v. Temple University*, 537 F.3d 301 (3d Cir. 2008) and in *Saxe v. State Coll. Area School Dist.*, 240 F.3d 200 (3d Cir. 2001), definitions of sexual misconduct, sexual harassment, hostile environment, etc.. in Protocol and Policies at UMASSD are facially overbroad and constitutionally vague and thus deny adequate notice and opportunity to be heard in referencing them.[9]

---

[7] Definitions and procedures of Protocol directly mirror those "recommended" by OCR.
[8] https://columbialawreview.org/content/the-old-college-trial-evaluating-the-investigative-model-for-adjudicating-claims-of-sexual-misconduct/
[9] *Grayned v. City of Rockford*, 408 U.S. 104 (1972); *Dambrot v. Central Michigan Univ.*, 55 F.3d 1177 (6th Cir. 1995)

54.   Upon information and belief Investigator Gomes, Cummings and Majewski failed to receive proper training on the implementation of either Policies and/or Protocol and on proper training on the scope, definition and application on what constitutes sexual harassment and hostile learning environment sufficient to warrant a Title IX investigation.

55.   Evidence suggests that Gomes, Majewski and Cummings incredibly hold that Plaintiff's statement – of simply conveying emotion about missing his children - equates to a hostile learning environment that warrants an interim suspension wildly different than the standard issued by the Supreme Court in *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999).[10]

56.   Additionally Majewski confused the start of disciplinary matters that instituted the investigation from the May 4th Conduct Conference.

### IV. UMASSD Faced Intense Federal, UMASS, Local and Student Pressure to Comply with Title IX

57.   On April 4, 2011, the Office for Civil Rights ("OCR") of the United States Department of Education issued a guidance letter to colleges and universities in the United States in receipt of federal funding which became widely known as the "Dear Colleague Letter" (the "DCL" or "2011 Dear Colleague Letter"). The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.* and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects."

58.   The DCL responded, in part, to a special investigative report published by National Public Radio and the Center for Public Integrity, which proclaimed a campus rape epidemic and criticized the OCR for its lax response to what the report characterized as a social problem of critical importance. *See* http://www.npr.org/templates/story/story.php?storyId=124001493. The report described in detail the obstacles faced by sexual assault victims in obtaining redress though college disciplinary proceedings and how victims who did engage in the college disciplinary process suffered additional trauma as a result. Much of the report focused on underreporting, re-traumatization of victims, rape myth adherence on college campuses (*e.g.* that women invite rape, that rapes are just drunk hook-ups, and that women routinely lie), and young men's cultural adherence to the sex aggressor role.

59.   The DCL, further, relied on faulty statistics in sounding a "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL, at p. 2. The researchers behind this study subsequently invalidated that statistic as a

---

[10] "Moreover, we conclude that such an action will lie only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit."

misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline…when discussing our country's problem with rape and sexual assault." http://time.com/3633903/campus-rape-1-in-5-sexual-assault- Relying on the these faulty numbers, the DCL minimized due process protections for the accused by, among other things, eschewing any presumption of innocence, mandating a preponderance of the evidence standard, limiting cross-examination, and forbidding certain forms of alternate resolution.

**60.**    For UMASSD specifically there has been financial gain to open Title IX investigations and find against the accused. UMASSD's Center for Women, Gender, and Sexuality  (CWGS) received a three year, $300,000 grant from the U.S. Department of Justice's Office on Violence against Women ("OVW"). to "Reduce Sexual Assault, Domestic Violence, Dating Violence and Stalking on Campus, which the maximum amount ($300,000) which could be awarded to an individual institution.

**61.**    The federal description for the OVW grant, which was authorized by the Violence Against Women Act, 42 U.S.C. § 14045b, states "the Campus Program encourages a comprehensive coordinated community approach that enhances victim safety, provides services for victims and supports efforts to hold offenders accountable. The funding supports activities that develop and strengthen victim services and strategies to prevent, investigate, respond to and prosecute these crimes… Colleges and universities should demonstrate to every student that these crimes will not be tolerated, that perpetrators will face serious consequences, and that holistic services are available for victims." Upon information and belief, UMASSD was awarded a $300,000 OVW federal grant based upon their application supporting the foregoing criteria. (emphasis supplied)

**62.**    On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled: *Questions and Answers on Title IX and Sexual Violence*

> *("Q&A") which was aimed at addressing campus sexual misconduct policies, including the  procedures colleges and universities "must" employ "to prevent sexual violence and resolve com plaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." Q&A, at p. 12. The Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." Id. at p. 31.*

**63.**    In April 2014, the White House issued a report entitled "*Not Alone[11]*".  Like the 2011 Dear Colleague Letter, relied upon the faulty "1 in 5" statistic and focused on  protecting women from                 sexual assault, "engaging men" and "if you see it happening, help her, don't blame her, speak up." *Id.* at p.2. The report also suggested that college and universities undergo "trauma informed training" because "victim's often blame themselves; the associated trauma can leave their memories fragmented; and insensitive or

---

[11] http://changingourcampus.org/about-us/not-alone/

judgmental questions can compound a victim's distress." The report added "[w]hen survivors are treated with care and wisdom, they start trusting the system, and the strength of their accounts can better hold offenders accountable." The report included a warning that if the OCR found that a Title IX violation occurred, the "school risk[ed] losing federal funds" and that the DOJ shared authority with OCR for enforcing Title IX and may initiate an investigation or compliance review of schools. Further, if a voluntary resolution could not be reached, the DOJ could initiate litigation. The report contained no recommendation with respect to ensuring that the investigation and adjudication of sexual assault complaints be fair and impartial or that any resources be provided to males accused of sexual assault.

64.     On May 1, 2014, the DOE issued a press release naming University of Massachusetts as one of the initial 55 colleges and universities being investigated for violating Title IX. Then Assistant Secretary of Education Catherine Llhamon ("Llhamon") stated that the schools were being named "in an effort to bring more transparency to our enforcement work and to foster better public awareness of civil rights." Per the press release, "All universities…receiving federal funds must comply with Title IX. Schools that violate the law and refuse to address the problems identified by OCR can lose federal funding or be referred to the U.S. Department of Justice for further action.

65.     University of Massachusetts System, maintains multiple campuses, is governed by a single 22-member Board of Trustees that represents various interests of the public at large, and functions as a legislative body dealing mainly with general policies governing the University.  The events at one campus that threatens the Federal funding under Title IX influences the decisions of the University of Massachusetts System at large, especially when those events occur at the headquarters campus at Amherst.

66.     The Boston Globe on May 3, 2014 described the experience of Dana Bolger that garnered national attention. [12] Similar precipitating events caused policy changes at UMass Amherst, which influenced the decisions and policy of officials at all campuses (including UMASSD), and for which 1st District Courts have ruled created a male bias in disciplinary decisions.

67.     That same day, UMass Amherst's Title IX Office announced it adopted a "survivor-centered" approach to misconduct investigations and hearings, under which all members of the University community are exhorted to "BELIEVE" and are instructed, "Don't Question. Don't Judge…Just Believe and Support."

68.     Shortly thereafter, the University created and funded The Men's and Masculinities Center, which claims that  men who adhere to "more traditional constructions of masculinity" are "more inclined to engage in a range of unhealthy and risky behaviors including …sexual violence."

69.     Leaving no doubt it was bowing to outside pressure, UMass Amherst issued a public statement explaining that its "student conduct code has been revised…We've been very concerned with this; it's an

---

[12] https://www.google.com/amp/s/www.bostonglobe.com/metro/2014/05/02/student-activism-white-house-pressure-elevated-sexual-assault-college-campuses-national-concern/JiMUJDdai4ub1mTuEREPaL/amp.html

issue here and across the Country." UMASSD officials,  in responding to press reports regarding sexual violence against women, cited verbatim those very concerns as those of UMass Amherst officials.

**70.**     In June 2014, Llhamon testified before the United States Senate that if OCR could not secure voluntary compliance with the DCL from a college or university, it could elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice.

**71.**     In July 2014, local news publications reported that the US Dept. of Education's Office of Civil Rights was investigating UMASSD's mishandling of sex abuse cases.[13], [14]

**72.**     Circa August 2014, UMASSD acknowledged the DCL on the UMASSD Title IX website, and incorporated the guidance into Title IX Investigative Procedures.[15]

**73.**     In August 2014 UMASSD was ordered to pay nearly $1.2 million after appealing ruling discrimination complaint,[16] causing UMASSD to become hypersensitized to potentially similar suits.

**74.**     In August 2014 local news publications continued pressuring UMASSD to increase steps to protect women from men,[17] in which UMASSD officials illustrated clear bias against males.[18]

---

[13] https://cohasset.wickedlocal.com/article/20140730/NEWS/140739503

[14] *"UMass Dartmouth officials said they're not taking the investigation lightly…" "It's an important issue. We're going to do what we need to do to comply with the request," said David Milstone, UMass Dartmouth's Vice Chancellor for Student Affairs. "We're obviously going to do our best to strengthen our program." "Over the past several years, we have been proactive in enhancing our response to Title IX issues, and will approach this inquiry as an opportunity to further strengthen our policies and practices," UMass Dartmouth spokesman Plaintiff Hoey said in a statement. Milstone said, "UMass Dartmouth averages about four reported cases each year" and said that, "based on what we know about sexual violence," there is a discrepancy between the number of incidents of sexual violence that actually happen on campuses versus those that ultimately get reported. "Any time there is a complaint…, we have two responsibilities. One is to ensure safety of victim. The other is to make sure the community has a separation from the alleged perpetrator in this case," Milstone said. "We want to be careful to support the victim… We want to assume accuracy in what the victim is saying…"*

[15]     On April 4, 2011, the U.S. Department of Education Office of Civil Rights released a *Dear Colleague Letter* providing guidance and reminding colleges and universities that accept federal funds of their responsibilities under Title IX of the Education Amendments of 1972 to address sexual harassment and assault. The Dear Colleague Letter is based on the OCR interpretation of the 2001 Revised Sexual Harassment Guidance and provides institutions with practical examples of how postsecondary institutions should comply with Title IX by proactive education and by taking action to end harassment, prevent recurrence and remedy the effects.

[16] https://www.heraldnews.com/article/20140805/NEWS/140808391

[17] https://www.metrowestdailynews.com/article/20140705/NEWS/140708394, https://newburyport.wickedlocal.com/article/20140705/NEWS/140708394

[18]     "While victims' advocates are heartened by colleges' efforts to educate students on rights and accurately report incidents, many say campuses should take more action." "Take the University of Massachusetts Dartmouth as an example. According to the U.S. Department of Education's Office of Postsecondary Education, the number of sexual assaults reported by students between 2010-12 was 11. *But David Milstone, the school's Vice Chancellor for Student Affairs, said he would guess if all crimes against women were reported, the number could be closer to 200 over the same span.* Milstone is one of many officials on college campuses looking at how to address the ongoing problem on campuses nationwide. The issue has recently been placed under the microscope by President Barack Obama's administration — which, earlier in the year, appointed a task force to look into crimes against women — and the Department of Education, which recently announced changes to the Clery Act and what crimes will be reported that will go into effect as soon as November of this year. "When she sought help from college officials, Bolger said, they refused to pursue disciplinary action the perpetrator or offer her support. One dean advised her "to take a semester off, get a job at Starbucks ... come back after he graduated." "This is not just an Amherst situation," she said. "Survivors are encouraged to take time off, while perpetrators are supported." "As a result of such campaigns, as well as increased pressure from Washington to improve the resources offered to survivors, campuses are changing. In addition to an expanded Clery Act, the Department of Education's Office of Civil Rights is using

75.     To support its enforcement of the DCL, the OCR hired hundreds of additional investigators. To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct. See Title IX: Tracking Sexual Assault Investigations, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited Dec. 18, 2018).

76.     The threat of revocation of federal funds—the ultimate penalty—was a powerful tool in motivating colleges, including Hofstra, to aggressively pursue and punish male students accused of sexual misconduct. In that regard, Anne Neal, of the American Council of Trustees and Alumni, observed: "There is a certain hysteria in the air on this topic, . . . . It's really a surreal situation, I think." See Tovia Smith, How Campus Sexual Assaults Came to Command NewAttention," National Public Radio (Aug. 12, 2014), https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-commandnew-attention. Neal explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead."

77.     On September 1, 2014 the Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014.

78.     Robert Dana, Dean of Students at the University of Maine, echoed the sentiment that a fear of governmental intervention and withdrawal of funds could lead colleges to rush to judgment against male students in disciplinary proceedings. See Tovia Smith, Some Accused of Sexual Assault on

---

Title IX to look at how colleges respond to reports of on-campus sexual assaults. As of June 19, the office was investigating 64 college campuses over how they handled the reports. Seven of those 64 campuses are in Massachusetts: Amherst College, the University of Massachusetts Amherst, Boston University, Emerson College, Berklee College of Music, Harvard College and Harvard University Law School." "At UMass Dartmouth, students are learning about bystander intervention during the same orientation at which they learn about campus life and how to register for courses, Milstone said. The school has also hired a victims advocate." "Survivors like *Bolger say they are encouraged by the policy changes but that those changes need to be accompanied by action, such as campus officials issuing no- contact orders against perpetrators."* In Dartmouth, Milstone called the changes "an incredibly positive thing." "*Milstone noted . . . . sexual assaults are perpetrated by men.*" "*The first thing we do when we get a report, we let the person who's accused know and put them on interim suspension status immediately so we can investigate,*" "Milstone said. *"In most of the cases that have been brought forward, perpetrators have been found responsible and separated from campus. Research shows victims very seldom file a false claim. Why would somebody put themselves through that?"" So it's up to colleges to provide options and let survivors know, 'You're not alone. This shouldn't have happened.'"*

Campus Say System Works Against Them, National Public Radio (Sept. 3, 2014), https://www.npr.org/2014/09/03/345312997/some-accused-of-campus-assault-say-the-systemworks-against-them. Dana told NPR, "[c]olleges and universities are getting very jittery about it."

**79.**     In November 2014 local news publications reported that the U.S. Department of Education's Office of Civil Rights had opened and closed three investigations into the University of Massachusetts Dartmouth's handling of on-campus sexual assault complaints in recent years. "A fourth investigation into another complaint opened July 16 (2014) and is ongoing, according to a list of open investigations released Wednesday by the Department of Education." UMASSD spokesman Plaintiff Hoey stated, "sexual assault, including those occurring on college campuses, is still under-reported by victims."

**80.**     In October 2015 UMASSD announced a campus Diversity & Inclusion Council - co-chaired by Assistant Vice Chancellor for Student Affairs Cynthia Cummings – the new panel would report directly to the Chancellor and make recommendations related to campus climate.[19] The council had a call to action stating: Growing diversity requires not tolerating bigotry, discrimination, violence, or intimidation of any kind.  Defending diversity requires acknowledging and working against oppression and violence.

**81.**     On August 31, 2015, UMASSD implemented an amended Protocol 2015 in direct response to pressure stated herein, and in response to and consistent with fear of retaliation from OCR if measures were not stiffened to comply with DOE's DCL. Protocol broadened investigatory authority while removing the need to offer due process rights to male perpetrators, making it less burdensome to prosecute offenders.

**82.**     A recent study by the Nation Bureau of Economic Research found that opening more Title IX investigations benefits the school in both its application submission rate and donations. "We find…evidence that these investigations increase freshman applications and enrollment, for both female and male students…these same data indicate that institutions respond to these investigations by soliciting donations from more alumni." Jason M. Lindo, Dave E. Marcotte, Jane E. Palmer, & Isaac D. Swensen, Any Press is Good Press? The Unanticipated Effect of Title IX Investigations on University Outcomes, 2018 Nation Bureau of Economic Research ,http://www.nber.org/papers/w24852

**83.**     For the month of April 2015, UMASSD's Center for Women, Gender & Sexuality (CWGS) organized a series of events in recognition of Sexual Assault Awareness Month. The goal of Sexual Assault Awareness Month "was to raise public awareness about sexual violence."  In actuality the effect from the events pressured UMASSD to take any actions to protect females from male perpetrators and created a frenzy of paranoia regarding sexual assault on campus. Juli Parker, Ph.D., Assistant Dean of Students is the

---

[19] https://www.umassd.edu/news/2015/diversitycouncil.html

Director of CWGS and in sponsoring these events, she and the University engendered male bias in the Title IX process.[20]

**84.** On April 15, 2015, <u>The Hunting Ground Film Screening</u> - sponsored by CWGS, and Department of Women's and Gender Studies - was shown to a packed crowd. Reviews of this movie are widespread[21] but the movie depicts in graphic detail that 1 in 5 woman who attend college will be raped, that serial rapist mostly commit the rapes, and implies men are serial predators on campus seeking to assault and rape women. The clear implication from the film is that Winston (one of the rapist depicted in the film) is a monster frequently preying on his victims by drugging them and was ultimately able to elude justice because Harvard does not take victims seriously; by implication in the film, all Universities do not take rape seriously.

**85.** 'The Torch' published in its April 14-21, 2016  edition an opinion written by Chancellor Helm: <u>Getting Real about Sexual Assault on Campus</u>. In his opinion he attempted to depict neutrality, but male bias was evident, and he acknowledged his sensitivity to and the pressure UMASSD felt under the Obama's Title IX demands to retain Federal funding, and from student pressures. "*The Obama administration and student activists are castigating colleges for not preventing sexual assault and not following up appropriately when it occurs...*"

**86.** On March 15, 2016 Defendant Helm took up his duties at Interim Chancellor at UMASSD, where he was tasked with responsibilities inter alia compliance with the directives consistent with the DCL of 2011and ensuring UMASSD retained its Federal funding.

---

[20]  Events included: **April 1** - Taking Down Rape Culture with keynote speaker: Laci Green. Green is an activist youtube celebrity who sensationalizes the acceptance of Rape Culture by universities nationwide, who refuse to investigate male perpetrators. "Victims don't cause rape — rapists do." "Green talked about the tolerance of rape culture. She gave many examples of universities which try to demean the issue, politicians who blame the victims and news broadcasters who trivialize the issue." Sponsored by CWGS; **April 2** -Take Back the Night - 7 pm Campus Center Quad – Consisted of a female only march throughout campus to symbolize women's individual walk through darkness and to demonstrate that women united can resist fear and violence. The effect was stressing the UMass Dartmouth perspective that only woman are victims and males are perpetrators. Sponsored by CWGS; **April 6, 13, 20, 22** -R.A.D. (Rape Aggression Defense) - Self-Defense Class for Women only to defend against male perpetrators– Again adding to bias that women are the sole victims of sexual harassment and violence and males are sole perpetrators; **April 7** - 5 (<u>Dirty, Little) Secrets from the Science of Women's Sexuality</u>: Keynote speaker: Emily Nagoski. Nagoski spoke on the sexual response of a woman's body when they are raped. Sponsored by CWGS;  <u>LOVE wtf</u>  Keynote speaker: Emily Nagoski. Nagoski spoke on when a male boyfriend sexually attacks a woman in a relationship, depicting men as unpredictable violent predators. Sponsored by CWGS; **April 8** - Safe Zone Training; **April 9** - <u>Human Trafficking</u>: Victims & Perpetrators: Keynote speaker: Donna Hughes. Hughes discussed women trafficked as sex slaves with perpetrators as men who stalk and lure women mostly from others countries into the sex trafficking trade, but also discussed male predators on American campuses. Sponsored by Women & Gender Studies Department; **April 16** - Safe Zone Training; **April 22**  - Walk to Class in Her Shoes (all day)and Relay in Her Shoes; **April 29** –Denim Day: Wear denim in solidarity for the Italian Supreme Court case where a rape conviction was overturned.

[21] (https://slate.com/human-interest/2015/02/the-hunting-ground-a-campus-rape-documentary-that-fails-to-provide-a-full-picture.html) (https://www.nytimes.com/2015/02/27/movies/review-the-hunting-ground-documentary-a-searing-look-at-campus-rape.html) (https://www.huffingtonpost.com/elizabeth-nicholas/why-critiques-of-the-camp_b_8607618.html)(https://reason.com/blog/2015/11/20/how-the-hunting-ground-spreads-lies-abou)

87.     Upon information and belief Cummings, as Diversity & Inclusion Council chair, briefed Helm on her position that Plaintiff should be removed from school as the result of being a male with a conviction. Upon further belief, email communications exist between Helm and Cummings or Majewski related to the improper removal of Plaintiff, and the acquiescing of Helm as interim Chancellor to the pressures of Cummings and from the DCL..

88.     For the month of April 2016, CWGS organized a series of events in recognition of Sexual Assault Awareness Month.[22]  On April 13, 2016, Keynote speaker Wagatwe Wanjuki gave her speech on '*The Power of Storytelling: Speaking Our Truth to End Rape Culture[23]*, [24] rallying students to protest UMASSD's Title IX efforts. This call to action, sponsored by UMASSD officials, put pressure on UMASSD to prosecute male perpetrators, and if all else fails file complaints with Dept of Education (which could jeopardize Federal funding), engendered male bias temporally connected to the investigation of Plaintiff.

89.     Encouraged by the aggressive stance by the Obama Administration against sexual violence, from 2013 through the conclusion of the UMASSD's investigation of Plaintiff and later,  various activist "survivor groups" and their members demanded that UMASSD and the UMass System in general aggressively prosecute more male perpetrators including: Every Voice (http://www.everyvoicema.org/our-coalition.html);   Jane  Doe  Inc.   (https://nnedv.org/meet-jane-doe-inc-massachusetts-coalition-sexual-assault-domestic-violence/);  Bay  Area  Rape  Crisis  Center  (https://barcc.org);  End Rape on Campus (https://endrapeoncampus.org);    Surv    Justice    (https://survjustice.org);    and    KnowyourIX (https://www.knowyourix.org).

90.     On September 22, 2017, the OCR rescinded the DCL and put in place interim guidance (the "2017 Q&A"), while the current administration reviews and revises its practices regarding the adjudication of complaints of sexual misconduct on college campuses. See Dep't of Ed., Q&A on Campus Sexual Misconduct (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

---

[22] Events included: April 5 - Marge Piercy Poetry Reading: Piercy's poetry tends to be highly personal free verse and often addresses the same concern with feminist and social issues; April 6 - Expressive Arts Therapy Workshop for Survivors of Sexual Violence with Ellen Landis; April 12 - Expressive Arts Therapy Workshop for Survivors of Sexual Violence with Megan O'Toole – LMHC, ATR; April 14 - Expressive Arts Therapy Workshop for Survivors of Sexual Violence with Maria Curran – Ph.D., LPCS; April 21 - Sexual Violence Survivor Art Show Opening *Speak Out*; April 26 - Expressive Arts Therapy Workshop for Survivors of Sexual Violence with The Women's Center, Inc.; April 27 - Denim Day; and April 28 - Sexual Violence Survivor Art Show Closing.

[23] https://dartmouth.theweektoday.com/node/22166?source=rss

[24]     *Wanjuki is a feminist, social media strategist, vocal activist against campus sexual violence and spokesperson for new media activism. She spoke on her personal assault where the school took no action. She described her successful efforts to lobby the Obama administration with 180,000 signatures, calling for greater political pressure on local universities. She incited female students to rally and demand Umass Dartmouth to crack down on male rapists. "If I can influence the President of the United States, anyone can do anything," Wanjuki said. Wanjuki told the crowd that everyone can do their part to stop rape culture by debunking harmful myths about rape, speaking against harmful policies that further victimize survivors, and villainizing the rapists, not the victims. She recommended that female students, if they are not getting the support guaranteed by the Title, then they should file complaints with the Department of Education.*

91.     The 2017 Q&A suggests that the policies and procedures in place at UMASSD at all times relevant to this lawsuit – which, on information and belief, were tailored in such a way as to comply with the 2011 DCL under threat of loss of federal funding – were unfair and, ultimately, out of step with the goal of gender equality in Title IX proceedings. Moreover, to the extent these policies did purport to provide a fair process to respondents, Defendants failed to honor them.

### V.   Cummings Maintains History of Bias Against Men, Especially Those Accused of Crimes

#### Cummings offered an unprecedented bounty on male perpetrator's capture and prosecution

92.     On Nov. 2, 2006 Cynthia Cummings, then University of Delaware (UD) Associate Vice President for Campus Life, set a $10,000 bounty on the head of a male perpetrator to reward anyone who provides information leading to the arrest of the (male) perpetrator. Cummings said the University must address the growing fear that the area has become unsafe. "*It is very important that we all acknowledge that people's perceptions are their reality…If we have a perception that our campus is not safe, then in the reality of our students our campus is therefore not safe. We must acknowledge that, and we must address it and do everything we can to try to rectify the situations that we're facing right now.*"[25]  Cummings' bounty of $10,000 is an outlier of a normal response for a school official and indicates a personal male bias and ill-will against a male alleged of violence against women.[26] A reasonable person could plausibly infer, that Cummings meant, she would take any and all actions whatsoever to respond to the external and internal pressures, including wrongfully prosecuting any accused male of a criminal charge.

#### Cummings capriciously violated UD male's 1st Amendment right

93.     On April 20, 2007, Cummings suspended a male UD student (Mr. Murakowski) in relation to alleged improper use of University computer resources. Cummings charged Mr. Murakowski through the University's judicial system, and suspended him. On April 24th, 2007 Mr. Murkowski delivered a doctor's letter to Cummings, which stated in relevant part: "*Upon my review of his writings and his responses to me during the clinical assessment, I do not believe that this young man is a threat to himself or others.*"[27] Despite meeting Cummings's explicit requirements to return to his classes and dormitory room, Cummings denied the request, stating *"I don't care what that letter says, you may not return to class until I say so."* On September 5th, 2008 The Federal District Court of Delaware ruled that Cummings had violated Murakoski's 1st Amendment right. Cummings departed UD within weeks of the Court's decision. Pursuant to Plaintiff's discussion with Mr. Murakoswki, and based on belief and knowledge, Cummings was terminated therefor.

---

[25] http://www1.udel.edu/PR/UDaily/2007/nov/reward110206.html
[26] Despite Plaintiff exhaustive google search, he could not find one other example of a University offering a reward to catch and prosecute a male perpetrator.
[27] Murakowski v. University of Delaware, Case 1:07-cv-00475-MPT.

**Cummings was Raised in Violence against her Family Perpetrated by Male Violence**

94.      On June 1, 2016, Cummings described herself in an article entitled "I BELIEVE IN CAMPUS ACTIVISM" for the online magazine of UMASSD[28].  In the article she described herself as a protester and activist, who saw great violence in her upbringing brought upon her family by white males. *"We saw dogs and fire hoses turned on black people who marched for basic rights such as access to public facilities and voting rights."* The frustration, anger, and sadness she developed as a youth, which continues as an adult, was caused by "being in an oppressed group controlled" by white males. *"While a student, I discovered feminism and worked for women's and gay rights. I joined the Lesbian Liberation Organization…I protested at events that objectified and demeaned women."*

95.      Cummings remains emotionally damaged as an adult by the scars of her childhood, and unconsciously or intentionally seeks to settle scores with men, who in her opinion have harmed women. For decades Cummings has championed only women's causes that have been victimized by men. A school official, like Cummings, who has final decision authority over a disciplinary system that almost exclusively sanctions men, and who advocates for the exclusive benefit of one gender or sexual orientation at the complete exclusion of the male gender, carries an inherent bias against men for whom her efforts are bereft of support in a zero sum game related to bias. Cummings has a defined conflict of interest in her roles. In the YWCA 2018 Spring Newsletter, Cynthia Cummings bias toward women was discussed.[29]

**VI.      Defendant's Controversial Implementation Of Conduct Policy And Protocol Process Initiation of Disciplinary Proceedings  – Notification of Alleged Violation**

96.      On Tuesday, May 3, 2016 at 5:28:10 PM, Cummings sent Plaintiff a confusing email (with a subject of "meeting") related to his disclosure statement on his admissions application[30]. He was directed to meet Cummings and Majewski at the Foster Admin Bldg. Room 323, May 4th, at 3:00 pm.[31]

97.      UMASSD, Majewski and/or Cummings violated Plaintiff's due process rights under the Fourteenth Amendment and/or rights under Policies and/or Protocol in part by providing inadequate notice.

---

[28] https://umassdbelieves.com/2016/06/01/campus-activism-cynthia-cummings-student-affairs/

[29]    *As Assistant Vice Chancellor for Student Affairs, Cynthia supervises a number of departments and functions, including those focused on diversity, equity, and inclusion, such as the Frederick Douglass Unity House, the Center for Women, Gender, and Sexuality…manages the Endeavor Leadership Scholars Program for women and students of color, serves as the Title IX Deputy Coordinator, and chairs the University's Diversity and Inclusion Council. Cynthia has dedicated her life to eliminating racism and empowering women, particularly those who identify as lesbian. For forty years, she has been an outspoken activist for feminism and LGBT rights. For six years, as chair of UMass Dartmouth's Diversity and Inclusion Council, Cynthia has led efforts to improve the campus climate for students of color, women, and members of the LGBT community. Cynthia lives in Dartmouth with her wife of 39 years, Mary Ann Hunsche.*

[30]    Herein known as "Admissions Misconduct."

[31]    Per Handbook, Notification of Alleged Violation - "A student shall be notified, via email to the student's UMass Dartmouth email address in a Conduct Conference Notification that the student is alleged to have violated the Code of Conduct.  This notice will be sent by a Conduct Conference Facilitator who may be  a Resident Director, the Assistant Director for  Residential Community Standards,  the Director for Student Conduct and Dispute Resolution or a

98.     Cummings' email gave Plaintiff only 21 hours' notice, failed to notice or allege that Plaintiff violated the Code of Conduct or violations named in Protocol, failed to advise Plaintiff of his right to have an attorney or advisor present at the Procedural Review, failed to advise Plaintiff of the basis for any allegation, and failed to inform Plaintiff of the seriousness of the meeting, which he was required to attend.

99.     Cummings's email, a de facto Notification of Alleged Violation, triggered the Handbook disciplinary contractual procedure, and by procedure Cummings named herself as the "Conduct Conference Facilitator[32]" with the general responsibility of overseeing Plaintiff's proceedings.

100.    If complaints of sexual violence misconduct had been alleged, as Defendants eventually later accuse Plaintiff of committing, a conduct conference was by contract,  statute, and DCL  the wrong venue.[33]

101.    Based on information and belief, Cummings communicated with Webster and discerned that Webster fully vetted Plaintiff's disclosure statement required by UMASSD's application, and Webster informed Cummings of his and UMASSD's guarantee to secure Plaintiff's confidential  information away from the staff, faculty and students at SMAST.

102.    Based on information and belief, Cummings, Majewski and other UMASSD exchanged emails stating that Plaintiff should not have matriculated and the admissions error needed to be corrected.

103.    Pursuant to Policies, "ALL complaints…of student misconduct <u>will</u> be referred to the Dept. of Public Safety, and the Office of Housing and Residential Education, or the Office of Student Conduct and Dispute Resolution (OSCDR)…" Cummings' and Majewski's in a continued effort to conceal their efforts, hijacked the process and failed to refer the matter as directed under Policies.

## Conduct Conference[34] In Office of Defendant Majewski with Defendant Cummings Present

104.    On Wednesday, May 4, 2016, at 3 PM, Plaintiff attended the "meeting" with Majewski and Cummings.  He believed the meeting was only to address the alleged "Admissions Misconduct."

---

Graduate Assistant, generally within 72 hours of the incident or complaint.  The notification shall include a request that the student attend a  Conduct Conference, to be <u>held no sooner than three (3) consecutive business days following date of the original notice,</u> unless he requests it to be at an earlier date, or in the case that an Interim Suspension from the University or Residence Halls has occurred.  The Conduct Conference generally occurs within two weeks of the incident… Confirmation of delivery by the University's email server will be considered the confirmed delivery date and time of notification" Friday, May 6, 2016 was the soonest that any Conduct Conference could have occurred.
[32]  "This notice will be sent by a Conduct Conference Facilitator".
[33] All allegations of sexual misconduct including sexual harassment, sexual assault, rape, dating violence, domestic violence, and stalking are immediately forwarded to a Title IX Investigator as required by federal law. (Conduct Procedures section VIII)
[34] Conduct Conference Procedures: At the Conduct Conference, the student has the opportunity to discuss the incident, <u>review any reports regarding the matter,</u> and review her options for resolution of the complaint.  If the student wishes to take responsibility for the alleged violation(s), the student is able to resolve the incident with the Conduct Conference Facilitator..  The Conduct Conference Facilitator may present a recommendation for resolution based exclusively on the student's statement at the Conduct Conference and the written report.  If the student does not take responsibility for the violation(s), the matter would be forwarded to an investigator for a full investigation.

105.     Immediately upon Plaintiff's entering Foster Administration Building,  Room 323, Cummings identified herself, and demanded Plaintiff's withdrawal from UMASSD as the result of his "fraudulently disclosing his history in his application." Cummings was hostile and dispositive in her judgment.

106.     Plaintiff explained that he fully disclosed his history to Webster as required per the graduate school admissions process, that attorneys reviewed and edited the disclosure statement for accuracy and legal transparency, and that Webster accepted his application only after vetting Plaintiff's disclosure.

107.     Majewski explained that the purpose of the meeting was to inform Plaintiff that he was being accused of violating the student code of conduct,  that multiple and independent people – students and faculty - had recently filed formal complaints regarding Plaintiff's misconduct, which created a hostile learning environment,[35]  and that they were considering a Title IX investigation.

108.     Plaintiff shared Webster's guarantee of confidentiality and that violation of it would inevitably create unbearable bias and would preclude Plaintiff from pursuing his research interest in Oceanography. Plaintiff detailed his fear that  his research  interests would likely end if scientists in his field unnecessarily learned of his disclosed history.  Plaintiff admitted he was considering transferring to Duke Marine Lab under Professor Douglas Nowacek, and would be taking summer classes at Duke.

109.     Based on knowledge and belief, Plaintiff's disclosed history remained confidential prior, inasmuch as to those with SMAST/UMASSD, students, colleagues, and his academic advisors.

110.     Cummings laughed at Plaintiff's statement, "Do you think you'll get accepted anywhere else? Cummings stated that other universities -  URI and Woods Hole[36]- now knew of Plaintiff's disclosed history, and others would soon learn of it. Plaintiff inferred that Cummings had intentionally shared the confidential information, and threatened to further disseminate Plaintiff's history inter alia to other schools.

111.     Plaintiff requested to know the specific allegations and the identities of his accusers, and when the allegations were made. Majewski and Cummings refused to offer either. In so doing, UMASSD and/or Defendants violated Plaintiff's rights under due process, Title IX Protocol, and Policies.

112.     Cummings stated that some accusers had come forward as early as December 2015, but most were recent.  Plaintiff asked, "People came forward with accusations of misconduct against me six months ago, and you are just now informing me of them[37]?" Cummings confirmed the reports of 6 months past.

113.     Given that UMASSD took no action on the 6-month old complaints, which per Protocol demanded immediate investigation, it is plausibly inferred UMASSD, Cummings and Majewski decided to investigate

---

[35] Violations of the Code of Conduct are supposedly processed under Policies and violations of sexual violence under Protocol 2015.
[36] Woods Hole Oceanographic Institute
[37] Per Protocol all allegations of sexual misconduct including sexual harassment, sexual assault, dating violence, domestic violence, and stalking are immediately forwarded to a Title IX Investigator as required by federal law.

Plaintiff only upon learning of the subject on his application disclosure statement, and was unrelated to any supposed complaints referred to on May 4th or an investigation would have begun months earlier.

114.    Plaintiff protested; he claimed  no one had filed any complaints, that the two officials were solely taking this action because he was a male student with a conviction, and they wanted him out.

115.    Neither Cummings nor Majewski denied Plaintiff's accusation, and as such both offered a tacit confession as to their male bias, wherein under the circumstances an innocent person would have denied it.

116.    In filing his verbal objections to disciplinary discrimination on sexual gender, he provided UMASSD officials adequate notice of his own Title IX complaint as a person under a protected status.

117.    Plaintiff was asked, "Are you refusing to leave the school voluntarily?"

118.    Plaintiff said, "Yes, Absolutely." Plaintiff again requested the list and nature of the allegations and identities of his accusers, so he could defend himself.

119.    Majewski told Plaintiff to read the Handbook, to look to the possible accusations that could trigger a code of conduct investigation, but offered nothing more as to the factual basis of the allegations.

120.    Majewski asked, "Have you ever caused someone to feel uncomfortable at school?

121.    Plaintiff stated that the only time he confronted students was to criticize ongoing and perennial cheating rings in Physical Oceanography and Biological Oceanography, the latter course which he had just completed with a final exam a few days earlier, and for which he intended to report the academic misconduct. He described the cheating in detail including how Professor Jefferson Turner allowed students to type their exams on their computers, which had answers prepared in advance to the perennial same questions, named four students and asked Cummings to investigate.

122.    Upon information and belief Cummings never investigated the reported ubiquitous cheating scandals at SMAST.

123.    Without identification of the alleged complainants against him, Plaintiff asked to file detailed complaints of ageism against certain students, and to report incidents of female students, who continued sharing explicit sex stories concerning both their undergraduate experiences and in current relationships.

124.    Cummings refused to hear any complaint, stating that if Plaintiff intended to pursue the filing of any complaint whatsoever that she would consider it retaliation, and retaliation would constitute a separate offense of misconduct and another Title IX violation.

125.    Plaintiff asked, "How can I retaliate against anyone when I have no clue as to my accuser's identity?"   "If I was a female making a complaint against a male student wouldn't you investigate?

126.    Cummings noticeably did not reply, as such offered a tacit confession affirming her male bias.

127.    UMASSD and/or Defendants violated Plaintiff Due Process rights and/or rights under Title IX in part because it applied Protocol 2015 and Policies in a gender biased fashion.  In denying Plaintiff's complaint of  violations of both Policies and Protocol and even threatening retaliation to chill his filing

ANY complaint – because he was a male – Majewski and Cummings discriminated against Plaintiff in pursuit of expelling him.

**128.**     Prior to the meeting, Cummings prepared a signed letter dated May 4, 2016, which she allowed Plaintiff to read.[38] The letter disclosed Plaintiff's confidential educational record, falsely accused him of a crime, issued a Do Not Trespass Notice and Do Not Contact (DNC) directive, suspended him from school, and gave him inadequate notice of any potential charges that might warrant suspension or investigation of charges that he might face.

**129.**     Cummings copied Emil Fioravanti, the Chief of University Police; Tesfay Meressi, the Associate Provost for Graduate Studies, and Steve Lorenz, the Dean of SMAST.  Prior to promulgation of this letter, none of these individuals knew that Plaintiff had a criminal past, and thus violated Plaintiff's confidentiality.

**130.**     After Cummings and Majewski disseminated the letter, accusations related to his "Admissions Misconduct" disappeared, which showed either had no probable cause to initiate the Conduct Conference related to student misconduct, nor pursued it further once the damage of promulgation was complete.

**131.**     Cummings issued Plaintiff a "NOTICE NOT TO TRESPASS[39]," which she required Plaintiff to sign. Cummings stressed that if Plaintiff stepped on UMASSD property then he would be criminally prosecuted. Plaintiff inferred her statement was more of a threat than a notice of fact.

**132.**     Plaintiff felt intimidated; he inferred Cummings' coercion, that if he refused to withdraw from school, then she would ruin his ability to finish his degree at UMASSD, destroy his reputation, deny his ability speak to anyone at UMASSD, and suspend him from school, an act that would likely destroy his ability to continue and pursue an Oceanography career elsewhere.

**133.**     Plaintiff objected to the terms in both documents and argued they were baseless, that with both in place he could not effect a defense or question anyone, that he believed it was a sham investigation because he was a male student with a conviction, that he wanted to be able to speak to and choose as his advisor

---

[38]   It stated in relevant part: "*It has come to the attention of the UMass Dartmouth administration that you have a more extensive...history than you disclosed prior to being admitted to the Master's program in Marine Science[38]. In addition, members of the University community have expressed concerns about your behavior that is considered aggressive and hostile...Due to the serious nature of this matter, I am writing to inform you that, effective immediately, you are suspended from UMass Dartmouth, pending the resolution of the Title IX investigation for allegations of creating a hostile learning environment.  During the period of suspension, you may not attend classes or be present on any of the UMass Dartmouth Campuses, including the two SMAST facilities, without my permission and without the escort of a Public Safety Officer...Additionally, you may not contact any UMass Dartmouth students or faculty/staff members, unless you have been instructed to do so as part of the Title IX investigation. No contact includes,, but is not limited to, the following forms of communication: in person , through a third party, by phone, by text, through social media or other electronic means...Any personal belongings that you have left at the SMAST facility in Fairhaven will be packed and mailed to you at the address above." (*Plaintiff's items were never returned to him.)

[39] In accordance with Gen Laws of the Commonwealth of Massachusetts, Chapter 266 Section 120, you "PLAINTIFF", ...are hereby notified that you are forbidden to enter any lands or buildings owned or controlled by the Commonwealth of Massachusetts...This notice shall remain in effect...until 5/4/17...Any violation of this notice is a criminal offense and will be subject you to arrest at the time of violating this order. The Trespass Notice was in effect prior to the meeting.

Professor Buck, because Plaintiff wanted to personally disclose his disclosed history, explain matters, and seek his advice on how to proceed[40].

134.    Cummings refused Plaintiff's choice as an advisor or any ability to have an advisor at the Conduct Conference. Plaintiff asked for a recommendation for an advisor. Cummings recommended a private attorney. Upon information and belief, the supposed female complainant(s)  received assistance in finding a free school advisor per Policy/Protocol.

135.    Cummings told Plaintiff that if he agreed to withdraw from school then he would not undergo a Title IX investigation, that  no one would learn of his disclosed history, and that she could likely ensure Plaintiff received excellent letters of recommendation to seek an education elsewhere.

136.    Cummings demanded Plaintiff's resignation a second time; Plaintiff refused.

137.    In realizing Plaintiff would not leave UMASSD on his own accord, Cummings stated, "If you won't leave, I'll get your kind with a Title IX investigation."

138.    A reasonable person could plausibly infer that Cummings meant "your kind" was a male with a disclosed history, and meant "get…with a Title IX investigation" related to taking whatever action necessary,  including malfeasance - similar to posting a $10,000 bounty on a male student at UD. (See ¶92.)

139.    Cummings informed Plaintiff that each incidence of communicating with anyone, associated with UMASSD, would constitute a separate charge of student misconduct, and a trespass would constitute a separate criminal charge.

140.    Plaintiff inquired into the confidential nature of an investigation[41]. Majewski assured Plaintiff that no one would know of the Title IX proceeding or investigation, except the few who are vital part of the

---

[40]   Right to an Advisor: A student, party to a matter of student conduct, may elect to be accompanied at all formal proceedings by an advisor of his choice. The advisor must be a member of the faculty, staff or student body of the University except that legal counsel may accompany a student, at the student's discretion, when a criminal charge arising from the matter is pending or is considered likely. Absence of a pending criminal charge or the bona fide likelihood thereof, the advisor must be drawn from within the University community. In matters involving a Title IX Investigation for Sexual Misconduct, both the accused student and the reporting party may have an advisor of their choice. If a student would like to have an advisor accompany her at their formal proceeding, but does not have someone in mind, the Director for Student Conduct and Dispute Resolution may be contacted to provide the name and contact information of volunteer advisors.  Advisors are students, faculty, and staff who are well versed and trained in student conduct proceedings.

[41]   **Policy** states section XI. **Student Conduct Records** The Office of Student Affairs shall maintain the following records pertaining to each disciplinary case: The original complaint; All documents, correspondence, forms, statements, etc., pertaining to the matter; A record of the decision including any finding, sanction, and any action recommended or taken…All case records and materials pertaining to a student conduct proceeding shall be kept secure away from public view. Except where confidentiality is further restricted by law, access to such case records or materials shall be limited to the accused student, and Administrative Officers of the University having direct involvement with the case. Access to student conduct case records by anyone other than those expressly named shall be by written authorization of the student in whose name the file is kept… **Protocol** explicitly states: **Responsibility of Confidentiality:** When a report of sexual assault is made, both the accused and the accuser, and all identified witnesses who are named in the investigation, will be notified of the university's expectation of confidentiality. Breaches of confidentiality or retaliation against: the person bringing the complaint; any person assisting with the investigation; or the

investigation. Majewski directed Plaintiff not to discuss the investigation with anyone except his advisor. Plaintiff left the meeting with neither any sense of the charges against him, nor of the identities of his accusers, despite his multiple requests for same.

**141.**    Majewski directed Plaintiff to inform her within the week if he decided to withdraw from UMASSD.  In doing so she continued the implied and expressed threats at the Conduct Conference.

**142.**    Majewski and Cummings had already prejudged Plaintiff's absolute guilt prior to the investigator's appointment. Defendant Gomes was unable to prevent personal bias against Plaintiff since he worked directly subordinate to Majewski and was highly influenced by Cummings in daily operations; he depended upon both for future promotion prospects in the joint organizational department. As proof of said influence and loyalty, Gomes has since been promoted to Director of *Diversity Equity and Inclusion.*

**143.**    Cummings twice commanded Plaintiff's withdrawal (constructive expulsion) from school as the extreme and unwarranted sole resolution option in the Conduct Conference; Cummings and Majewski showed bias toward Plaintiff (because he was a male) having convicted him in their minds of any charge that could warrant permanent expulsion.

**144.**    In assigning such prejudice, Cummings, Majewski and Gomes infected all further proceedings with bias; all should have been disqualified from further participation in the disciplinary process since their participation denied Plaintiff an unbiased decision maker, and thus violated his due process.

**145.**    Contractually the Conduct Conference, as initiated and conducted in this case, continued the disciplinary process under Policies, under which Plaintiff was afforded rights, but was endlessly denied. Majewski and Cummings hereafter would choose carte blanche which procedures of each policy (Protocol and Policies) – that engendered their cause to expel Plaintiff.  Investigator Gomes's role was to simply fulfill and endorse the decision of his superiors to eliminate Plaintiff from the University.

**146.**    Pursuant to Policies section IX, Cummings, who had charged and sanctioned Plaintiff for his "Admissions Misconduct" was required to appoint a trained investigator (not Special Title IX investigator) to review facts surrounding Cummings allegations of Plaintiff's "Admissions Misconduct."

**147.**    No investigator was ever assigned to review facts of the "Admissions Misconduct."

**148.**    Majewski initiated the Title IX investigation of Plaintiff without regard to sexual misconduct, which is contraindicative of the purpose of Protocol. Upon conclusion of the Conduct Conference, Plaintiff had not been accused of sexual misconduct and thus believed that the Conduct Conference was the beginning of the Title IX investigation, which he believed was  the school normal disciplinary process.

---

person or individuals being charged with the complaint; will result in disciplinary review. The university will make all reasonable efforts to maintain the confidentiality of parties involved in sexual assault investigations.

**149.**   Per Protocol 2015 "sexual harassment" is defined in part as "*unwelcome conduct of a sexual nature. It includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.*" At no time during the entire investigation are any stated or implied allegations against Plaintiff related to these descriptions of any type, and thus application of Title IX procedures based on creating a hostile environment from sexual harassment was discriminatory and capricious at its outset.

**150.**   Majewski and Cummings were required per Protocol to conduct a threshold determination, which under any reasonable standard, an investigation based on the facts could not justifiably ensue .

### SMAST Conducted an "All Hands Meeting" to Exile Plaintiff

**151.**   In direct violation of its obligations with respect to Plaintiff's privacy and confidentiality in the Title IX process, Cummings and Majewski directed Steve Lorenz (within a few days of the Conduct Conference) to hold an all hands meeting with compulsory attendance regarding Plaintiff. Attendees were informed that UMASSD had initiated a Title IX investigation against Plaintiff, he was enjoined from speaking to any student, faculty or staff associated with UMASSD,  Plaintiff was issued a "Do Not Trespass" order, denying him access to UMASSD property, and was suspended pending the investigation.

**152.**   Students, faculty and/or staff were directed to report to Cummings when/if any sightings of Plaintiff were made on UMASSD property and/or if any contact was made by Plaintiff or by his proxy.

**153.**   Within a week of the Conduct Conference students, faculty, and staff at SMAST knew that Plaintiff had a criminal history as the result of the all hands meeting and leaks from the Title IX investigation.

**154.**   Cummings via Lorenz did not qualify her specific directive at the all-hands meeting, leaving the staff, faculty and students to conclude that they could not speak to Plaintiff.   Moreover, the message implicated that Plaintiff was dangerous and unsafe.

**155.**   In light of Lorenz's and Cummings authority at UMASSD, this directive had the effect of a gag order that deterred potential communications between Plaintiff and possible witnesses, impeded Plaintiff from learning pertinent factual information, and hindered Plaintiff's preparation of his defense at a potential hearing.

**156.**   Upon information and belief, the leaks by Cummings and the Title IX investigation were intentional to interfere with Plaintiff's ability to return to his program of studies and research interest. In contrast the confidentiality and privacy of the supposed female victim(s) were diligently protected.

### UMASSD and Individual Defendants Willfully Interfered with Outside Educational Pursuits

**157.**   On May 9, 2016 Plaintiff received a letter attached to an email from Tom Schultz, Ph.D., Director, Marine Conservation Molecular Facility, Director of Undergraduate Studies, Duke University Marine Lab. It read: *Dear Plaintiff, Thank you for your application to the Duke University Marine Lab's summer*

*program Unfortunately we are not able to offer you a space in our program this year. We appreciate your interest in the Duke University Marine Laboratory and we wish you all the best.*

**158.** As a graduate student with a 4.0, and with the strong recommendation of fully tenured Professor Douglas Nowacek, Plaintiff's application to take undergraduate summer classes should have been a certainty. Plaintiff spoke to Tom Schulz telephonically on or about May 9, 2016, seeking an explanation to his rationale.

**159.** Schulz referred to Plaintiff's Title IX investigation at UMASSD; he stated, "I can't allow you on the island. We have to keep our people safe. You should have informed Doug you had a conviction." When Plaintiff asked him if the UMASSD staff informed him of his conviction and Title IX investigation, he stated, "What do you think?"

**Defendants Filed Bogus Criminal Complaints to Affect Investigation and Expel Plaintiff**

**160.** On March 26, 2019 Fioravanti - a sworn police officer - refused to take Plaintiff's statement, and recused his entire department from assisting Plaintiff seeking to file felony extortion charges against Cummings and Majewski. Fioravanti justified his inability to conduct a fair and impartial investigation against the officials, because Majewski and Cummings were his "colleagues and friends". Upon information and belief, UMASSD Police have never recused itself when a female student or female citizen attempted to file a criminal complaint.

**161.** That day Plaintiff submitted a FOIA with UMASSD Police for all reports related to him.

**162.** On April 3, 2019, Plaintiff received a response, which included a redacted police document. On May 17, 2016 UMASSD Police filed a report stating that a professor alleged that "somehow" Plaintiff logged into his computer a few days prior, which would have constituted a violation of Plaintiff's "Do Not Trespass Notice," and other crimes. Chief Fioravanti assigned a detective to conduct an extensive and prosecutorial investigation, ordered the computer confiscated for forensic evidence and provided it to Associate Director of Enterprise Systems.

**163.** The investigation concluded that no evidence existed of Plaintiff's presence on UMASSD or SMAST property, including but not limited to the fact that: (i) no student, faculty member nor staff saw Plaintiff enter SMAST or any UMASSD property; (ii) building internal and/or external video surveillance failed to record his presence; (iii) Plaintiff's swipe card required to enter SMAST buildings failed to record his entrance; (iv) Plaintiff did not have the code to bypass the building's security upon entrance after hours; (v) no evidence existed of forced entering into the professor's office, and (vi) no forensic computer evidence existed as to Plaintiff's computer trespass. Plaintiff never stepped foot on UMASSD property from May 4 to early September 2016 unless escorted by UMASSD Police to meet Majewski and Cummings.

**164.**     Without cause Chief Fioravanti has repeatedly denied Plaintiff's request for the identity of the professor, whose name was improperly redacted in the report.

**165.**     Upon information and belief, Defendants concerted to deny Plaintiff's ability to file a complaint against Majewski and Cummings, and to conceal the identity of the unnamed professor.

**166.**     Upon information and belief, UMASSD emails and communication exist that indicate that Cummings and/or Majewski concerted with the unnamed professor to falsely accuse Plaintiff of a crime that would engender Plaintiff's expulsion from school, his defamation through rumor and accusation of crimes, his inability to continue his academic program if he returned after reinstatement, and his culpability in the Title IX investigation.

### UMASSD/Cummings/Majewski imposed punitive interim restrictions without due process

**167.**     UMASSD, Cummings and Majewski's imposition of "interim restrictions" violated Plaintiff's due process rights and Title IX and caused tremendous suffering to Plaintiff.  In suspending Plaintiff for the spring/summer term it must be considered a long term suspension (a *de facto temporary explusion)*; Plaintiff was barred from all classes, seminars and university sponsored programs, from participating in any UMASSD sponsored activities for the spring and summer that buttressed the start of the Fall semester, and from all UMASSD facilities which prevented him from receiving the medical treatment and rehabilitative care necessary for the recovery and preparation for his hip replacement surgery performed on June 6, 2016.

**168.**     Plaintiff's tuition in part was devoted to such events and restricting him from participating in those activities without notice, opportunity to be heard or proper hearing deprived Plaintiff of a property interest without due process.[42]

**169.**     Defendants violated Plaintiff's due process in that Plaintiff's interim suspension and banning from school was in part or in whole related to his alleged violations of Protocol 2015; he was given no notice of same in Cummings' email of May 3, 2016.

**170.**     Any consideration given to the "Meeting" of May 4th as to due process must be removed since the Conduct Conference was a sham. Majewski and Cummings had effected "fait accompli" already deciding Plaintiff's fate, imposed the interim suspension, the do not contact persons associated with UMASSD directive, and the Do Not Trespass Notice prior[43] to the meeting at 3 PM on May 4th.  The interim sanctions, instituted without notice or opportunity to be heard, capriciously violated not only Plaintiff's civil rights under the U.S. and Massachusetts Constitution, but also UMASSD's  policy on freedom of speech and freedom to associate[44].

---

[42] Goss *v.* Lopez, 419 U.S. 565 (1975).
[43] The Do Not Trespass was processed 10:49 am on May 4th by UMASSD Police.
[44] Student's rights to **Freedom of Association,  Freedom of Inquiry and Expression**, **Freedom of Assembly**, **Freedom of Speech** as detailed under UMASSD Handbook 2015-2016.

**171.**     Handbook section XII states:

> *In cases of discipline arising from extraordinary or emergency conditions, the Chancellor or his/her designee may invoke the action of interim suspension of a student… who act, or refuse to act, if the result of said conduct is to interfere with the rights of others and is non-peaceful or is disruptive or said conduct constitutes a clear and present danger to the health, safety, or property of others.*

**172.**     There was no basis for any such finding here as confirmed by the complete rebuttal and disappearance of the "Admissions Misconduct," and moreover by the questions that Gomes posed July 15th.

**173.**     Plaintiff's complaints about his interim restrictions were never addressed, thereby denying him his right to request an assessment.  At no time did Majewski, Cummings or UMASDD review the status of the interim suspension to explain the sanction as "necessary and effective," thereby denying due process.

**174.**     Protocol explicitly states "When becoming aware of a complaint of sexual violence the University may take interim measures including but not limited to restriction of communication with named individuals - not the entire population of UMASSD.  The purpose of a "Do Not Contact" (DNC) is to protect the victim, and at best prevent identified witnesses from being unduly influenced or retaliated against. In issuing a DNC as issued in this case, it shows capricious and deliberate indifference to Plaintiff's due process and Title IX rights and to his well-being. The DNC implies the investigation had no basis and UMASSD casted a wide net seeking any incriminatory evidence possible without Plaintiff's intervention.

**175.**     Interim restrictions are imposed to ensure equal access to educational programs and activities and protect the complainant as necessary. UMASS and Defendants, however, showed bias by never attempting to show that the interim restrictions placed on Plaintiff were necessary to protect the complainant or to ensure her equal access to educational programs and activities. Defendants' deprivation of Plaintiff's rights through the interim restrictions was wholly intentional, and effectively barred him from participating in all school sponsored activities for 4 months, and denied him any ability to defend himself, or protect his reputation.

**176.**     Despite the fact that Plaintiff lacked any prior disciplinary history at UMASSD, Plaintiff was escorted off campus on May 4th, 2016.

**The Special Examiner's Closed-Door Investigation and Judgment of Plaintiff's Case.**

**177.**     On May 4, 2014, and for weeks thereafter, Plaintiff and his attorney repeatedly asked University officials to inform him of the allegations and factual bases for any charges against him. He had not been provided with anything more than "*members of the University community have expressed concerns about your behavior that is considered aggressive and hostile .*"

**178.** On May 9, 2016 at 3:11 PM Plaintiff emailed Majewski stating: "I am not prepared to withdraw at this time. At your earliest convenience I would appreciate receiving a copy of any allegations so I may prepare my defense."

**179.** On May 9, 2016 at 4:50 PM Majewski emailed Plaintiff acknowledging Plaintiff's decision not to resign and detailed Plaintiff's rights and matters regarding the Protocol process.[45]  Majewski's email was the first notification of Plaintiff's rights in the process, but denied Plaintiff allegations upon which the investigation was based. UMASSD's issued DNC denied Plaintiff his choice of advisor and forced retention of private counsel.[46]

**180.** In appointing David Gomes to serve as investigator, prosecutor, judge and jury of Plaintiff, UMASSD and/or Defendants violated Due Process concerns issued by U.S. Department of Justice's ("DOJ") Office in its May 9, 2013 findings[47]

**181.** On May 20, 2016 Attorney Baysan emailed Majewski announcing his retention by Plaintiff.[48]

---

[45]   *Plaintiff's decision not to resign; that the University will begin the Title IX investigation immediately, that The Office of Diversity, Equity and Inclusion will contact Plaintiff as soon as possible to schedule an interview as part of UMass Dartmouth's investigation into allegations that he may have engaged in misconduct, in violation of the University's Policies on Equal Opportunity, Discrimination, Harassment and Sexual Violence; that a face-to-face interview will be conducted with Plaintiff; the location of the interview, that David Gomes, the University's Equal Opportunity Specialist/Investigator will also be participating in the interview; that Plaintiff has the right to have an advocate present during the investigatory interview session; that participation in this interview is voluntary; that in the event Plaintiff declined to participate in this interview, the University will proceed with its investigation and will draw whatever reasonable inferences are necessary based on the evidence produced in case Plaintiff does not participate; that Plaintiff will be asked to provide information and respond to questions asked; that Plaintiff will be permitted to ask questions of the interviewer. Majewski added: UMass Dartmouth's resolution process is confidential, and we request your discretion in minimizing the sharing of information as to respect the sensitivity of this matter for all parties, and that Plaintiff should be advised that he was still under the University's directive to have no contact with UMass Dartmouth students, faculty, or staff members while this complaint is being investigated. As such, you should have no communication with any students, faculty or staff members in person, through a third party, or by any electronic means, including telephone, e-mail, text, social media, etc.*

[46]   William Gens Law Firm, Boston, MA.

[47] *". . . the dual role of [a university employee] in investigating [University of Montana] complaints and presenting the case on behalf of the University to the University Court creates a potential conflict that can deprive . . . an adequate, reliable, and impartial investigation. . . [therefore prohibiting] the same official playing these dual roles of investigator and 'prosecutor' . . . will ensure that individuals who play a role in . . . processing student complaints . . . do not have any actual or perceived conflicts of interest in the process."*

[48]   *"My office has been retained to represent (Plaintiff)... "Plaintiff" attended a meeting with you on May 4 to discuss the pending allegations against him. In accordance with Titles VII and VIII of University of Massachusetts Dartmouth's (hereinafter "UMass Dartmouth") Student Conduct Policies and Procedures, a student who is facing any allegations is entitled to a conduct conference during which he is given "... the opportunity to discuss the incident, review any reports regarding the matter, and review his/her options for resolution of the complaint." It has come to our attention that during the conduct conference, Mr. Harnois was not and has not been afforded these rights and thus far he neither knows nor has a reason to know the basis of these allegations. ...Additionally, the letter of May 4, 2016 references Mr. Harnois disclosures regarding "the extent of his..history." Upon our review of his graduate school application questions and his responses, it is clear that Mr. Harnois was asked about... convictions and that he provided a detailed explanation of the charges that were brought against him ... for which he was convicted. Therefore, Mr. Harnois does not and cannot understand and determine the basis of these additional claims of non-disclosure that were referenced in the letter..."*

**182.** On May 24, 2016 Majewski emailed Attorney Baysan detailing the rights of Plaintiff in prior cover.[49]

**183.** On May 25, 2016 Attorney Mehmet Baysan emailed Majewski seeking details of allegations.[50]

**184.** In Majewski's response on May 27, 2016, she implied that the Student Conduct Procedure had not begun on May 4, 2016. Additionally she stated that Plaintiff may have engaged in behaviors that violate any potential misconduct code whatsoever without offering specifics,[51] denying Plaintiff proper notice.

**185.** Policies, Protocol and DCL require Title IX Coordinators and investigators to receive annual training on the procedures and requirements of Title IX. Majewski's responses illustrated her lack of training and confusion as to disciplinary process under Protocol and Policies. Further Majewski, Gomes and Cummings misunderstood and wrongly applied (from inadequate training) the ambiguous definition of "hostile learning environment" and "sexual harassment" as it relates to Protocol and Policies.

**186.** On June 2, 2016 Attorney Baysan emailed Majewski to offer Plaintiff's signed release and to renew his objections and concerns regarding the ever changing landscape of potential allegations facing Plaintiff.[52]

---

[49]   *Mr. Harnois was advised that his advocate and/or private counsel are there to provide advice and counsel and are not otherwise permitted to interfere with or restrain the University's effort to conduct a legitimate investigation.*

[50]   *"Also, please kindly share with us any and all documents that are relevant to the underlying allegations so that Mr. Harnois understands and properly prepares for the interview and for the Title IX Investigation all together. As I mentioned in my previous email, he is entitled to this information and he should have been provided with the same during the Conduct Conference under Titles VII and VIII of UMass Dartmouth's Student Conduct Policies and Procedures."*

[51]   *"In response to your second request, please understand that at this point in time the University is conducting a Title IX investigation based on allegations that Mr. Harnois may have engaged in behaviors that <u>violate the student code of conduct and/or the University's Policies on Equal Opportunity, Discrimination, Harassment and Sexual Violence</u> (see attached). Mr. Harnois <u>will not be provided with any additional information prior to the Investigatory Interview</u>...Also, please understand that at this time the Office of Diversity Equity and Inclusion is conducting a fact-finding review, and no decision has been made to initiate the Student Conduct Process. Therefore, we are not at the point of a Conduct... Conference. The purpose of the Investigatory Interview with Mr. Harnois is to provide him with an opportunity to respond to the allegations, to provide us with witnesses he believes we should speak with pertaining to this matter, and or any documentation he may have to substantiate his responses."*

[52]   *In your last email, for the first time, you mentioned that the underlying allegations for the Title IX investigation may arise out of acts that violated your institution's policy against sexual violence...this comes as a complete surprise to us as the sexual nature of these allegations has not been previously shared with us or Mr. Harnois much less mentioned in either the initial suspension letter or in any other correspondence that originated from your institution thus far. This once again underlines my concerns regarding the lack of any substantive basis for these allegations, which is in direct violation of your institution's own rules and regulation. My reading of Title VIII of the Student Conduct Policies and Procedures in conjunction with Titles VII and IX contemplates giving any student who is accused of any violation of the student code "an opportunity to discuss the incident, review and reports regarding the matter, and review her options for resolution of the complaint." Considering your face to face meeting with Mr. Harnois on May 4 and your request for his voluntary withdrawal from your institution during this meeting, I am disappointed to see that Mr. Harnois is not receiving the full benefits of these rules that are designed to offer an accused student an opportunity to make an educated decision with regards to his/her position based upon his/her review of the evidence, or at the very least, the allegations that are pending against him/her. On the contrary, your institution's position has been mainly committed to making vague and broad allegations that seem to expand in every correspondence. This is clearly evident in your latest email as it referenced the following categories under which Mr. Harnois  may have violated the school's policies: Equal opportunity, discrimination, harassment and sexual violence and code of conduct violations. These chapters would encompass most if not all of the violations that may be committed by a student. This not only places Mr. Harnois in a very difficult position but also directly contradicts UMass Dartmouth's own written policies. This holds true even if we assume, for the sake of analysis, that the allegations are of sexual nature, as alleging sexual violence does not take these proceedings outside the realm of these rules and regulations. With regards to the investigatory interview referenced in your latest email: The only procedural*

**187.** On June 7, 2016, Majewski emailed Plaintiff and his attorneys informing him of the general allegations of violations of Policies and Protocol.[53] The terms "*created an uncomfortable learning and work environment*" have been deemed unconstitutionally vague,[54] provided no basis of charges, precluded Plaintiff's ability to be heard, and in part denied Plaintiff due process.

**188.** In Attorney Baysan's July 13, 2016 email to Majewski, he detailed UMASSD's violations of their own policies, and again requested details of allegations and/or the investigative report.[55]

**189.** In March 2019 (3 years after events), Plaintiff spoke with Ashley Weston ("Weston") and Liberty Schillp ("Schillp").[56] Weston stated that she had not filed a formal complaint against Plaintiff nor reported concerns, but only answered questions from the "Title IX office" – such as did Plaintiff ever cause you to

---

*mechanism that allows your institution to proceed with such an interview before holding a conduct conference would be under Title VII provided that the allegations are of sexual nature. Even if we assume that to be true, the student would still be afforded an opportunity to review the reports and allegations during this interview. However, on the contrary, your email describes this interview as an opportunity for Mr. Harnois to respond to the allegations, to provide the school with witnesses, and or any documentation he may have to substantiate his responses. This, then, begs the following question: How can Mr. Harnois or anyone else who is accused of violating the rules at UMass Dartmouth be expected to prepare his/her defense, find witnesses, locate documents, gather exculpatory evidence, and dispute inculpatory evidence without knowing what the allegations are? As you can understand, my client is growing impatient as he has already been penalized with the most serious sanction of immediate suspension from UMass Dartmouth without even being afforded an opportunity to understand the nature and the substance of these allegations. On that note, I would like to once again share with you our sincere dedication to cooperate with your institution in an attempt to amicably resolve this matter. However, I cannot advise my client to open himself to unknowns and allegations against which he cannot properly defend himself. Therefore, in light of the absence of any allegations of sexual violence in any of your or your institution's prior written or oral communications in this matter, and in review of the broad nature of your latest email, I would like to once again renew my request to have your institution afford Mr. Harnois an opportunity to review the allegations against him outlined in Title VII of the Student Conduct Policies and Procedures.*

[53] "*Specifically, it has been alleged that you have* <u>*engaged in behavior that has created an uncomfortable learning and work environment*</u>*…I remind you that these are merely allegations at this time, and the University wishes to afford you the opportunity to respond to these allegations*"

[54] *DeJohn v. Temple University*, 537 F.3d 301 (3d Cir. 2008)

[55] *With regards to your reference to bringing documents and information in support of Mr. Harnois's position to the July 15 meeting: As I have been reiterating since my first engagement in this matter, Mr. Harnois* <u>*is not in a position to prepare for his defense as he has not been provided with any information regarding the underlying allegations*</u>*. In my previous emails, I have diligently outlined our position and relayed to you that* <u>*your office's actions have been in violation of your own school code*</u>*. In case my points have been forgotten or neglected: Although you and other members of your office met with Mr. Harnois in person shortly after the notice of hearing* <u>*(in which you suggested that he should withdraw on his volition), during that meeting he was not provided with any information regarding these allegations. Nor was he provided with any documents, records, or any other items that would disclose to him the basis of these proceedings.*</u> *This was in direct violation of Titles VII and IX of the Student Conduct Policies and Procedures. Secondly, each and every response to my requests for the disclosure of such information has* <u>*been met with either vague statements or references to title headings that contain almost every possible conduct violation*</u>*. This was evidenced by your reference to the section that governs harassment and sexual violence for the very first time in your June 7 email. We have always made it clear that Mr. Harnois is ready, able, and willing to cooperate with your office at his utmost for the amicable resolution of this matter. As such, we have always been in cooperation with your office and, within the boundaries of your institution's own rules and regulations, made numerous good faith attempts to learn the very basis of these allegations to properly and intelligently prepare our defense. However, thus far we have received nothing of that sort and, now, we are asked to bring documents and information that would either explain or dispute these allegations. As I mentioned in my prior emails, we have agreed to come to your office to learn about the underlying allegations for the first time. Therefore, please be advised that Mr. Harnois* <u>*cannot be expected to dispute these allegations during this meeting let alone comment on them without properly hearing the facts and reviewing the documents in their support*</u>*. I truly hope to accomplish these goals pursuant to your institution's own rules and regulations and not in direct violation of them.*

[56] Based on the questions asked of Plaintiff at his interview, they were possible alleged accusers.

feel uncomfortable. Weston was requested to file a formal complaint which she refused. Schillp was asked by "Title IX people" to explain her relationship with Plaintiff and develop a list of any actions by Plaintiff that could have possibly made her uncomfortable. Schillp told the Title IX people that she had nothing to tell them, nor was she interested in participating, that she wanted to be left alone. Instead, Jane Doe was asked to file a formal complaint, but she refused.

190.    Both stated that neither of them, nor anyone they knew, who were interviewed (regarding the Title IX investigation), filed a formal complaint nor reported Plaintiff of misconduct.  They were told that they were being interviewed because an "admissions error had been made", that there were safety concerns from Plaintiff's past, and that UMASSD hoped to correct it through use of the Title IX investigation.

191.    UMASSD Title IX officials intentionally asked alleged complainants, who were in fact not complainants, to file bogus and false Title IX formal complaints against Plaintiff  to buttress UMASSD's effort to expel Plaintiff. At the time of these requests, Title IX officials knew that Plaintiff's conduct could not raise to the level of a finding of "responsibility." This effort to encourage bogus complaints served as biased retaliation against Plaintiff as part of his participation in a Title IX investigation.

## Investigative Interview of Plaintiff

192.    On July 15, 2016 at 4 PM, Plaintiff and his Attorneys met with Cummings, Majewski and Gomes to conduct the investigative interview of Plaintiff  pursuant to Conduct Procedure section V and IX.

193.    During the interview Gomes asked Plaintiff approximately 15-20 questions. The investigator refused Plaintiff's request to get a copy of the questions. Plaintiff was told to take notes.  Gomes asked questions, which at best implicated innocuous behavior or in fact established motive for the supposed victims to prevaricate their version of the truth. Any questions related to potentially improper behavior were general in nature without specific example or time and place as to occurrence.

194.    Based on the questions asked, Plaintiff was unable to discern the true nature of the allegations, which denied Plaintiff the opportunity to be heard in the process.

195.    The investigator asked if Plaintiff had brought documents to support Plaintiff's testimony. Plaintiff replied that he had no idea what documents to bring because Majewski refused to give him the nature of the accusations or the identity of the accusers. "Behavior that has created an uncomfortable learning and work environment" is grossly undefined.

196.    Plaintiff agreed to forward documents supporting Plaintiff's testimony once he narrowed down the allegations, which remained too general in nature to defend.

197.    The investigator was unable to provide Plaintiff a single specific example or timeframe  or even month or location of a specific event, but instead referred to general, undefined, and baseless allegations.

"Did you ever tell someone you missed your children?" or "Did you ever deny helping someone with their homework?"

**198.**    Gomes asked Plaintiff "Why do you think someone would make these allegations?"

**199.**    In response, Plaintiff expressed his incredulity as to the legitimacy of the investigation and alleged he had been prosecuted solely because he was a male with a conviction. Plaintiff asked whether his statement regarding missing his children and similar accusations were actually allegations worthy of this proceeding and worthy of destroying an academic career. Plaintiff complained that he hadn't been provided one actual example of misconduct he could address, and he still lacked the identity of his accusers. Plaintiff doubted anyone stepped forward to make the allegations.  Plaintiff asked if officials investigated the cheating scandals he reported or the ageism complaint or sexual harassment complaint he wanted to file?

**200.**    Neither Gomes, Majewski, nor Cummings denied Plaintiff's accusations that he was prosecuted because he was a male student with a prior conviction.

**201.**    Plaintiff requested a copy of the investigative file including witness statements, identities of his accusers, opportunity to question his accusers; and a more defined sense of the specific allegations as to when, where, how or who, all which were denied. Plaintiff has never seen heretofore any evidence whatsoever related to the Title IX investigation or the investigation related to Plaintiff's "admissions misconduct."

**202.**    Plaintiff provided a list of witness that he wanted interviewed, including his professors at all times relevant (Geoffrey Cowles, Miles Sundermyer, and Richard Connor). Gomes failed to interview any of Plaintiff's witnesses during the investigation, and made no effort to obtain potentially exculpatory evidence, including highly relevant text messages between supposed complainants, or information about the reported and ubiquitous cheating scandals at SMAST, which Plaintiff reported and  which gave any potential supposed victim motive to prevaricate.

**203.**    Upon information and belief the investigator interviewed every female student in classes Plaintiff took seeking corroboration of general allegations or sought information for a new charge, which UMASSD could use against Plaintiff.

**204.**    Plaintiff was informed that if he was found responsible for creating a hostile learning environment, sanctions ranged from a warning to expulsion.

**205.**    Having been refused his accuser's identity(ies), Plaintiff was forced to provide shotgun communications of every email, text, and Facebook with all students.  On July 29, 2016, Plaintiff via Counsel provided nearly 50 pages of friendly texts, emails and Facebook messages indicating a friendly and cordial relationship with all students in his graduate program and classes.

33

**Investigation Completion and Failure to Comply with Policies and Protocol**

**206.**   Per Protocol and Procedures, Plaintiff and the supposed accuser(s) were due facts, findings, and recommendations to their UMASSD email account within 5 days of investigation completion.[57]

**207.**   Regardless of the procedure used (Policies or Protocol), and clearly both seem to have been used whenever convenient to Cummings and Majewski, Plaintiff never received a copy of the report from the investigator nor Coordinator of Student Conduct and Dispute Resolution per Policies or Protocol, nor opportunity to respond in writing to the findings within 5 days.[58]

**208.**   An Administrative Review Panel never reviewed the findings.[59]  Because there was never an Administrative Review Panel, Plaintiff never received a letter within 3 business days by the Director of Student Conduct and Dispute Resolution, and thereby Plaintiff was never offered the opportunity to appeal.[60]

**209.**   A student who receives a sanction has the right to an appeal under certain criteria. Plaintiff was denied any appeal though he received multiple sanctions.

**210.**   Majewski unilaterally determined Plaintiff's fate after receiving Gomes' squalid investigation results.[61] Moreover, Majewski and Cummings sheltered any decision away from prying eyes in their disappointed conclusion that regardless of their witch hunt, of their violation of both school policies (Protocol and Policies) and of Plaintiff's due process rights, Majewski and Cummings could not scour any evidence of legitimate misconduct that was actually sanctionable under Policies nor Protocol.

---

[57] **Student Conduct Procedures, Section IX** states: *"Once the investigation is completed, the investigator will write a report of the findings including 1) a summary of the facts 2) a finding of responsible or not responsible for each alleged violation with a rationale using the More Likely Than Not standard; 3) recommendations for sanctions where applicable.  The report will be completed within 5 business days of the completion of the investigation and will be sent to the accused student and in cases of violence and/or sexual misconduct, to anyone victimized in the incident."* **Protocol** states: *"When the investigation is completed, the investigator will present his/her findings to the Title IX Coordinator. Upon approval of the Title IX Coordinator, the investigator will present his/her findings in writing via UMass Dartmouth email account to the reporting party, the respondent and the Coordinator of Student Conduct and Dispute Resolution. Both will be asked to submit in writing a response to the finding to the Coordinator of Student Conduct and Dispute Resolution."*

[58] Student Conduct Procedures, Section IX states*: Upon receipt of the investigator's findings, the accused student, and in cases of violence and/or sexual misconduct, the reporting party, and anyone victimized may within 5 business days submit a written response to the investigator's report to be included in the review of the findings by the Administrative Review Panel.*

[59] Student Conduct Procedures, Section IX states: *The investigator's report and any written responses will be reviewed within 5 business days by an Administrative Review Panel*

[60] Student Conduct Procedures, Section IX states: *Following the review of the findings by the Administrative Review Panel, the accused student, the reporting party, and anyone victimized in this incident will be sent a decision letter within 3 business days by the Director of Student Conduct and Dispute Resolution or designee.  The accused student and in case of violence and/or sexual violence, the presenting party, and anyone victimized may accept the decision or submit an appeal if they feel that they can meet grounds for appeal as outlined in the appeal process.*

[61] Plaintiff was never actually told how or who made the final decision and the basis of facts used in the rational.

**The University's Sanctions of Plaintiff Despite Decision of Not Responsible for Misconduct**

**211.**     Circa August 30, 2016 Majewski met with and informed Plaintiff and Attorney Baysan of the findings of the Title IX Proceeding.

**212.**     Plaintiff was told that he was found not responsible for violating Protocol or Policies, that he was being sanctioned with a warning in writing, that similar behavior would likely yield harsh penalties, that he was directed to remain away from his accusers, and that Steve Lorenz needed to discuss with Plaintiff the changes in his academic program as a result of the Title IX investigation.

**213.**     Plaintiff requested, but was denied a copy of the investigative file/report and all documents used in the investigation. Plaintiff objected to any sanctions if he was found not responsible, that the process was a sham based on his gender with a conviction, that he hadn't been informed of the identities of his accusers so how could he possibly stay away from them, that his program had been damaged enough by the investigation and that if he was found not responsible then he should be able to return to his academic program without restraint of any kind.

**214.**     Plaintiff was told there was no appeal rights and that the matter was considered now closed.

**215.**     Plaintiff was provided the decision of the Title IX proceeding in a letter dated August 30, 2016. The relevant points of the decision included:

    **a.**  There was insufficient information to conclude that Plaintiff engaged in behavior which violated the University's Policies on Equal Opportunity. (This conclusion is inconsistent and at odds with the only two available conclusions of "responsible" or "not responsible")

    **b.**  Despite the conclusion, he was formally sanctioned with a warning[62] as though he was found responsible for violating University Title IX Policies and thus the Code of Conduct.

    **c.**  UMASSD recommended 'appropriate intervention' with Dean Steven Lorenz and Asst. Dean Michael Marino, SMAST, to "work with Plaintiff to complete his degree program, and to ensure the interactions in the academic environment are consistent with policies and expectations of the University."

    **d.**  Without notifying Plaintiff of persons' identities who participated in the Title IX procedure, UMASSD threatened Plaintiff with retaliation charges if it appeared that he was retaliatory towards anyone he believed may have been involved in the investigatory process.

**216.**     Student Code of Conduct[63], and Student Conduct Procedure sections X and XI,  bar a student from being sanctioned unless he was found responsible for having committed the misconduct.

---

[62]     Student Conduct Procedures, Section 13, Sanctions,  states: "Warning by the student conduct process, normally in writing, is intended to make the student aware of the possible consequences of individual or group actions."
 Sexual Violence Protocol, Possible Outcome section states: "Warning by a student conduct entity, normally in writing, is intended to make the student aware of the possible consequences of his/her actions. This sanction may be considered with prejudice by a student conduct entity in future action only when the Warning is presented to the student in writing. This sanction shall be for any time period specified and shall remain a part of the student's record until graduation or termination of his/her association with the University, at which time the notations shall be removed.
[63]     Students found responsible for unacceptable conduct will be subject to the complete range of sanctions and penalties provided in the Student Conduct Policies and Procedures.

**217.** Per Policies, "Once the investigation is completed, the investigator will write a report of the findings including 1) a summary of the facts 2) a finding of responsible or not responsible for each alleged violation with a rationale using the More Likely Than Not standard…"

**218.** Instead, in Plaintiff's case, the findings on Plaintiff was that "there was insufficient evidence to conclude that you engaged in behavior which violated the University's policies…" The finding violated the binary option of "responsible" or "not responsible" and was intentionally effected in violation to Protocol and Policies to engender a home remedy of punishment.

**219.** Upon information and belief, UMASSD has never sanctioned a female student in either a misconduct or Title IX proceeding after finding her not responsible for the misconduct, nor conducted a sham Title IX investigation against a female student, nor changed the nature and scope of female student's matriculated academic program after a finding of "not responsible" in any disciplinary proceeding, nor maliciously disseminated confidential educational and misconduct records as part of a Title Investigation against a female student.

### Unwarranted  "Appropriate Interventions"  Issued by Cummings and Majewski

**220.** Plaintiff met with Steve Lorenz in early September 2016 to discuss his graduate program. Lorenz told Plaintiff that as a result of the investigation, Plaintiff lost his thesis advisor John Buck, who refused to return Plaintiff's calls, emails and texts; that Lorenz could act only as his administrative advisor, and that the school could now only offer him a non-thesis degree.

**221.** Plaintiff objected to any "appropriate intervention," that he had been found innocent of any charges, and that he believed he was singled out because he a male student with a conviction.  In response Lorenz nearly quoted portions[64] of Majewski's letter signed August 30, 2016 in violation of confidentiality procedures defined in Policies, FERPA, and Protocol.

**222.** In implementing the 'appropriate intervention,' as directed by UMASSD executive authority, Lorenz confined Plaintiff to a work space beside Lorentz's office, denied Plaintiff entrance to and use of the work area and school assets at the AT&T building where Plaintiff prior had a work space and spent most of his time, and directed Plaintiff not to engage and speak to other students in the program.

**223.** In recommending "appropriate intervention", Majewski and Cummings sanctioned Plaintiff further with loss of privilege[65] and no contact[66] with students at SMAST. Plaintiff considered the

---

[64] References to getting too close to people during discussions, to "in your face behavior" and to overly personalized content in discussions.

[65] **Loss of Privilege** allows a student conduct entity to restrict the activity of the student while she is on the University campus. The student may be prohibited from participating in non-academic or extra-curricular activities and/or from visiting certain specified areas of the University campus and/or from coming into contact with specified individuals while on campus. Loss of Privilege should be related to the offense, or serve to correct the result of the offense, or compensate in some relevant way the offended party(ies).

[66] **No contact** with a specific student, faculty, staff, or community ember, where all direct or indirect (via a third party on his behalf and with his/her knowledge) verbal, physical, and electronic forms of contact are prohibited.

sanctions and changes in his program as mandated directives of UMASSD, and any noncompliance would lead to new charges of code of conduct violations.

**224.**     Based on information and belief, Defendants never imposed any type of "appropriate intervention" or any homemade punishment on a female student found not responsible for misconduct, but imposed such sanction on Plaintiff because he was a male student.

## VII.     Consequences and Actions Subsequent to Title IX Investigation

**225.**     Buck, Michael Moore, James Miller, all of Plaintiff's contacts at Duke Marine Lab, and Jennifer Miksis-Olds ceased all future communications (until March 2019) with Plaintiff during and following the investigation.

**226.**     Plaintiff was unable to attend and benefit from SeaBass.

**227.**     As a proximate result of the sham investigation and unauthorized disclosures by Cummings, Majewski, and Gomes, and from the leaks of information in the Title IX investigation, no student attempted to nor spoke to nor had any academic or personal interactions with Plaintiff; only Professors Geoffrey Cowles, Miles Sundermyer spoke to Plaintiff outside of class.

**228.**     In August 2016, Plaintiff's emotional distress stemming from these matters resulted in panic attacks, headaches, insomnia, grinding of teeth and excessive wear that caused two molars to crack in half requiring removal, PTSD flashbacks and symptomology from wrongfully being prosecuted, extreme depression, excessive alopecia, and his hair turned pure white.

**229.**     Plaintiff enrolled in classes in the Fall of 2016, but he was exiled as a social outcast.

**230.**     Student Handbook and Sexual Violence Protocol's definitions of sexual harassment or sexual violence remained unconstitutionally vague.  The nature and wording of the warning sanction was all encompassing, leaving Plaintiff a sense that any action he took or words he spoke could have been twisted and used against him.  Plaintiff believed the policies and warning sanction as written would allow selective enforcement and provide UMASSD another opportunity to attempt expelling him.

**231.**     Given that UMASSD attempted to expel him for innocuous general behavior, inter alia missing his children, the policies as written were grossly ambiguous, which oppressed and chilled his speech that substantially interfered with Plaintiff's educational performance and opportunity to benefit from school services.

**232.**     Without interaction and communication with faculty and other students, Plaintiff could neither collaborate, seek guidance, nor benefit from his educational experience nor benefit from the educational services of his program contracted with UMASSD.

**233.**     Plaintiff withdrew from his Oceanography Policy class, because the class required classroom deliberation with other students.

**234.**     Plaintiff's depression became overwhelming with regard to energy depletion and the time commitment with appointments to his psychologist and psychiatrist, which  made it difficult to maintain his workload. It was repeatedly recommended that Plaintiff should become hospitalized for his emotional distress. His depression has worsened through date of filing unabated, and is presently scheduled to undergo Electroconvulsive Therapy.

**235.**     Plaintiff completed classes that semester, but because his graduate program had been constructively destroyed by capricious and malicious efforts of UMASSD, and because of the psychological and emotional trauma Plaintiff suffered, he requested and received a Leave of Absence based on treatment provided between May 4, 2016 through December 2016 by a licensed psychologist Ph.D. Plaintiff continues to receive treatment for psychological and emotional trauma related to Defendants' conduct in his home state of Rhode Island.

**236.**     Plaintiff was constructively expelled by the actions of UMASSD, Gomes, Buck, Unnamed Professor, Cummings, Helm and  Majewski, and as the result of being a male, he was excluded from participation in, and denied the benefits of, and subjected to discrimination during his graduate education program, any education program, or activity receiving Federal financial assistance.

**237.**     In Plaintiff's despair he moved away from family and friends and lived in solitude for 8 months ashamed of being exiled from UMASSD.

**238.**     In March 2019, Professor Laela Sayigh, Ph.D., Michael Moore, Ph.D., and James Miller, Ph.D., told Plaintiff that in 2016 Cummings told them that UMASSD had initiated a Title IX investigation because an admissions error had been made, that there were safety concerns from Plaintiff's criminal past, that Plaintiff lied on his application regarding his convictions, and that UMASSD hoped to correct it.

**239.**     In early March 2019 Plaintiff filed FOIA requests with UMASSD[67]. Without cause and in violation of FERPA's mandated release requirements, MGL Ch. 66 and UMASSD policy STU-012 (FERPA), UMASSD has denied everything requested implying cause for secrecy and cover-up.

---

[67] Plaintiff sought inter alia: (1) A listing of all Title IX complaints investigated at UmassD, the nature of the complaint, detailed by gender of complaint and accused, and the outcomes of same from 2012 to December 2017; (2) Any and all documents related to the Title IX or misconduct investigation of Plaintiff during the spring and summer of 2016 to include but not limited to: interoffice emails and other communications between Cynthia Cummings, Deborah Majewski, Scott Webster and Graduate Admissions Staff, David Gomes, Campus Security, the staff at School of Marine Science and Technology; investigative reports/summaries/ and interviews, and any other documents thereby  related; (3) Any communications or documents related to Dept of Education OCR investigations from 2012 to December 2017; (4) All letters, documents and communications related to TITLE IX procedures that changed as the response of the Dept of Education Dear Colleague Letter of 2011,  and policy created by Umass Dartmouth Employees therefrom  including hiring or organizational changes related to TITLE IX procedures since 2012, and (5) David Gomes', Cynthia Cummings' and

## VIII.   UMassD Committed Numerous Material Breaches of Its Contractual Obligations

## Material Breaches Related to Protocol

**240.**   1st per Protocol officials can issue interim "restriction of communication with named individuals." In Plaintiff's case UMASSD and Cummings restricted Plaintiff's communication with every single person associated with UMASSD during his interim restriction.

**241.**   2nd per Protocol, "Upon approval of the Title IX Coordinator, the investigator will present his/her findings in writing via UMass Dartmouth email account to the reporting party, the respondent and the Coordinator of Student Conduct and Dispute Resolution. Both will be asked to submit in writing a response to the finding to the Coordinator of Student Conduct and Dispute Resolution."  In Plaintiff's case, Gomes failed to present his findings via Plaintiff's email account or whatsoever, or to anyone else's email account. Plaintiff was never afforded the opportunity to submit a written response to the Coordinator of Student Conduct and Dispute Resolution.

**242.**   3rd per Protocol, "The finding and written responses from the reporting party and respondent will be reviewed by an administrative review panel of two faculty/staff. The administrative review panel will make a decision whether to support to the finding of the investigation and if so, to determine appropriate sanctions." In Plaintiff's case neither finding nor responses were reviewed by an administrative panel. Nor did a panel decide whether to support to the finding nor determine sanctions.

**243.**   4th per Protocol, "The administrative review panel will present their decision in writing to the reporting party and respondent via UMass Dartmouth email account. The decision letter will include information about submitting an appeal. In Plaintiff's case, Plaintiff did not receive their decision in writing, nor receive information about submitting an appeal. UMASSD violated its own procedures requiring a 2-member panel to review the Special Investigator's findings and recommend to the final decision maker whether to accept or reject the findings. Instead UMASSD allowed the final decision maker to be the sole reviewer of the Special Examiner's findings, thereby eliminating a layer of independent oversight that might have prevented Plaintiff from suffering sanctions despite being found not responsible of misconduct.

**244.**   5th per  Protocol, "Both the reporting party and respondent may submit a letter of appeal within 5 business days of receiving the administrative review panel's decision to the Associate Vice Chancellor for Student Affairs." In Plaintiff's case, Majewski foreclosed his right to appeal.

**245.**   6th per Protocol, "All complaints of sexual violence will be investigated promptly, thoroughly and impartially by a trained Title IX Investigator." In Plaintiff's case the investigation was infected with bias,

---

Deborah Majewski's resume and training records as an investigator related to Title IX investigation from Jan 2012 to September 2016 inclusive, and (6) Plaintiff's educational records and application documents.

partiality and with a forgone conclusion from the moment Cummings demanded Plaintiff's withdrawal on May 4th. Per Protocol, "Equitable rights will be provided to both the reporting party and respondent throughout the investigation process." In Plaintiff's case Plaintiff's rights were repeatedly sacrificed in favor of victim's rights.

**246.** 7th per Protocol, "Both the respondent and reporting party have a right to an advisor of their choice throughout the process." In Plaintiff's case he was issued a DNC and denied his choice of advisor.

**247.** 8th per Protocol, "The respondent may request an assessment of interim restrictions with the Associate Vice Chancellor of Student Affairs or designee." Plaintiff was denied any opportunity to request an assessment.

**248.** 9th per Protocol states reasonable efforts will be made to maintain the confidentiality of parties involved in sexual assault investigations. In Plaintiff's case, UMASSD repeatedly violated Plaintiff's privacy with the SMAST all-hands meeting and in ensuring "appropriate intervention" as a sanction.

**Material Breaches Related to Policies**

**249.** 10th in conducting a witch hunt with a sua sponte investigation, UMASSD violated express and implied covenants that UMASSD would not seek to reverse Plaintiff's matriculation with a baseless investigation.

**250.** 11th per Policies, section VII, The Notification of Alleged Violation "shall include a request that the student attend a Conduct Conference, to be held no sooner than three (3) consecutive business days following date of the original notice." In Plaintiff's case he was afforded 21 hours' notice following the delivery confirmation to attend a Conduct Conference.

**251.** 12th Policies state: "At the Conduct Conference, the student has the opportunity to discuss the incident, review any reports regarding the matter, and review her options for resolution of the complaint." In Plaintiff's case, on May 4th, he was refused his requests to review any reports and has never seen any documents related to his case except for the final finding report.

**252.** 13th under Policies, section IX, "The investigator will make all reasonable attempts to gather all relevant information…The accused student and the reporting party may submit questions to the investigator to be asked of others who may be interviewed. In Plaintiff's case Gomes neither interviewed Plaintiff's witnesses nor allowed nor offered Plaintiff the opportunity to submit questions to others

**253.** 14th Policies section V states: "A student, party to a matter of student conduct, may elect to be accompanied at all formal proceedings by an advisor of his choice. The advisor must be a member of the faculty, staff or student body of the University except that legal counsel may accompany a student, at the student's discretion, when a criminal charge arising from the matter is pending or is considered

likely." In Plaintiff's case, he was denied his choice of advisor of John Buck; at no time was there ever concern that this matter could possibly become criminal in nature.

**254.** 15th Per policies, section XII[68], UMASSD subjected Plaintiff to "emergency suspension immediately upon conclusion of the Conduct Conference on May 4th, even though by Plaintiff's demonstrable conduct, there was not the slightest indication that Plaintiff was a danger to the student body of UMASSD community, or intended to be disruptive in any form, especially given the specific innocuous nature of the questions posed to Plaintiff in his investigative interview.

**255.** 16th Because there was never an Administrative Review Panel, Plaintiff never received a letter within 3 business days by the Director of Student Conduct and Dispute Resolution, and thereby Plaintiff was never offered the opportunity to appeal,[69] regardless of the decision which included the explicit and implicit sanctions of the decision.

**256.** 17th Plaintiff requested a copy of the investigative file or report and all documents used in the investigation[70]. Majewski denied same, and Plaintiff repeatedly has been denied a copy of the student conduct records related to the Title IX and misconduct investigation of him.

**257.** 18,[th] Policies guarantees the confidentiality of student disciplinary records; in Plaintiff's case Majewski and Cummings disseminated the information maliciously.

**258.** 19th, Plaintiff was given a sanction inter alia of a warning despite being found not responsible. "Appropriate intervention" increased sanctions of lossed privileges and of not to contact nearly everyone at SMAST. In sanctioning Plaintiff after a finding him not responsible, UMASSD violated its Student Code of Conduct[71], sections X and XI, which state a student can only be sanctioned if he was found responsible for having committed the allegations against him.

---

[68] Handbook section XII states: *In cases of discipline arising from extraordinary or emergency conditions, the Chancellor or his/her designee may invoke the action of interim suspension of a student… who act, or refuse to act, if the result of said conduct is to interfere with the rights of others and is non-peaceful or is disruptive or said conduct constitutes a clear and present danger to the health, safety, or property of others.*

[69] Student Conduct Procedures, Section IX states: *Following the review of the findings by the Administrative Review Panel, the accused student, the reporting party, and anyone victimized in this incident will be sent a decision letter within 3 business days by the Director of Student Conduct and Dispute Resolution or designee. The accused student and in case of violence and/or sexual violence, the presenting party, and anyone victimized may accept the decision or submit an appeal if they feel that they can meet grounds for appeal as outlined in the appeal process.*

[70] **Student Conduct Records** section explicitly states: *"The Office of Student Affairs shall maintain the following records pertaining to each disciplinary case: The original complaint; All documents, correspondence, forms, statements, etc., pertaining to the matter, and a record of the decision including any finding, sanction, and any action recommended or taken. All case records and materials pertaining to a student conduct proceeding shall be kept secure away from public view. Except where confidentiality is further restricted by law, access to such case records or materials shall be limited to the accused student, and Administrative Officers of the University having direct involvement with the case."*

[71] Students found responsible for unacceptable conduct will be subject to the complete range of sanctions and penalties provided in the Student Conduct Policies and Procedures.

**259.**    20th , UMASSD FERPA policy strictly prohibits unauthorized release or sharing of student educational records.  The policy states that university officials with an education purpose can access records, but once they have the information, they cannot share that information with a third party who did not (if they had authority to access), or worse could not access the information themselves. Cummings and Majeski violated Plaintiff's right of confidentiality when they promulgated the letter of May 4th and August 30th and verbally discussed his academic records with unauthorized personnel.

**260.**    21st , Plaintiff matriculated in the Master's Thesis Program, but after the Title IX proceeding UMASSD amended his offering to a Master's Non-thesis degree without his consent.

## CAUSES OF ACTION

### COUNT I

### Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq*.

#### As to Defendant UMASSD

**261.**    Plaintiff  incorporates by reference each of the above paragraphs as if fully set forth herein.

**262.**    Title IX prohibits discrimination based on sex in education programs and activities receiving Federal financial assistance. 20 U.S.C. § 1681, *et seq*. "Discrimination" means "differential treatment" or "less favorable treatment." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174-75 (2005).

**263.**    Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities.[72]

**264.**    Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to 'bar  the imposition of university discipline where gender is a motivating factor in the decision to discipline.'

**265.**    Students attending public universities such as UMASSD, who have been accused of sexual misconduct, have a right to due process under Title IX. *See* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 22 (the "2001 OCR Guidance"); April 2011 Dear Colleague Letter at 12.

**266.**    Both the Department of Education and the Department of Justice have promulgated regulations under Title  IX  that  require  a  school  to  "adopt  and  publish  grievance procedures providing for the *prompt and equitable resolution* of  student  complaints  alleging  any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't

---

[72]    UMass Dartmouth is a recipient of federal funds and, therefore, is bound by Title IX and its regulations.

of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added*). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.

**267.** The "prompt and equitable" procedures that a school must implement include, at a minimum:

   i. "Notice . . . of the procedure, including where complaints may be filed";
   ii. "Application of the procedure to complaints alleging [sexual] harassment...";
   iii. "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";
   iv. "Designated and reasonably prompt timeframes for the major stages of the complaint process"; and
   v. "Notice to the parties of the outcome of the complaint....id at 20

**268.** Title IX Coordinators should not have a conflict of interest. "For example, serving as Title IX coordinator and a disciplinary hearing board member may create a conflict of interest." April 2011 Dear Colleague Letter at 7; August 2015 Dear Colleague Letter at 2-3.[73]

**269.** A school also has an obligation under Title IX to ensure that all employees involved in the investigation and adjudication process have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'"

**270.** A complaint under Title IX, alleging that Plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, is sufficient with respect to the element of discriminatory intent, like a complaint under Title VII, if it pleads specific facts that support a minimal plausible inference of such discrimination. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a); Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

### Title IX Violations – Erroneous Outcome As To Defendant UMASSD

**271.** Plaintiff incorporates by reference each of the above paragraphs as if fully set forth herein.

**272.** To make an adequate erroneous outcome claim, Plaintiff must allege (1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding and (2) a particularized causal connection between the flawed outcome and gender bias. Plaintiff may show the first element, articulable doubt, by: (1) alleging particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses; (2) particularized strengths of the defense; or (3) alleging particular procedural flaws affecting the proof. *Yusuf*, 35 F.3d at 715. *Norris v. Univ. of Colo., Boulder*, Civil Case No. 1:18-cv-02243-LTB, at *15 (D. Colo. Feb. 21, 2019).

**273.** In order to survive a motion to dismiss on this claim, Plaintiff must also allege facts showing "a 'particularized ... causal connection between the flawed outcome and gender bias.'" *Cummins*, 662 F. App'x at 452 (quoting *Yusuf*, 35 F.3d at 715). "Such allegations might include, inter alia, <u>statements by members</u>

---

[73] In Plaintiff's case, Majewski was Title IX coordinator and final authority since the independent panel was precluded.

of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Yusuf*, 35 F.3d at 715.

**274.**  UMASSD discriminated against Plaintiff and deprived him of the benefits of its education program on the basis of sex through its discriminatory, gender-biased Policies and Title IX Protocol, which intentionally subject male students like Plaintiff to "less favorable" treatment than their female accusers.

**275.**  Plaintiff was found "not responsible," but conclusions that caused him to receive a warning sanction and 'appropriate intervention' were erroneous and contrary to the weight of the evidence with gender bias as a motivating factor.

**276.**  Particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose sanctions upon Plaintiff, despite a finding of 'not responsible.' These circumstances include, without limitation:

i.  Beginning in 2014 and through the time when supposed complaints were investigated, UMASSD was subject to immense federal, local, media, and campus pressures to: take measures to protect female victims of sexual assault; to adopt a trauma-informed approach to investigating sexual misconduct complaints; to tip the procedure in favor of women and against men and issue more severe sanctions to those found responsible and not responsible for sexual misconduct. Such pressure included the previous  OCR  investigations, student outcry regarding compliance with the White House's *Not Alone report, and* the Public announcement that the OCR was investigating UMASSD for non-compliance with Title IX.

ii.  UMASSD faced stinging media criticism for handling of female students' sexual complaints and highlighted the pressure from OCR's investigation of UMASSD and the potential consequences of lost Federal funding.[74]

iii.  In response to the pressure from OCR investigations and media pressures, university officials, specifically David Milstone, Plaintiff Hoey, and Interim Chancellor Helm were sensitive to and acknowledged the pressure from OCR, and committed to meeting the demands of the Dept. of Education's DCL[75]. UMASSD responded to the pressures with organizational and procedural changes to offer the perception of compliance with OCR and meet the demands of media and students.

iv.  Newly appointed Interim Chancellor Helm suffered great pressure to satisfy OCR past and future potential investigations into Title IX compliance as directed in DCL.

v.  University officials responded to media complaints of UMASSD, to the inadequate handling of female complaints, by agreeing with the complaining female students and labelling males as predators. David Milstone, who has ultimate appeal authority in disciplinary matters, and John

---

[74] "While victims' advocates are heartened by colleges' efforts to educate students on rights and accurately report incidents, many say campuses should take more action."…","encouraged by the policy changes but that those changes need to be accompanied by action, such as campus officials issuing no-contact orders against perpetrators."

[75] "UMass Dartmouth officials said they're not taking the investigation lightly…" "It's an important issue. We're going to do what we need to do to comply with the request," said David Milstone, UMass Dartmouth's Vice Chancellor for Student Affairs. "We're obviously going to do our best to strengthen our program." "Over the past several years, we have been proactive in enhancing our response to Title IX issues, and will approach this inquiry as an opportunity to further strengthen our policies and practices,"

Hoey, espoused specific indications of male bias in Title IX procedures: Both claimed that sexual assaults against females were under-reported implying that the school must explore increased prosecutions of male students.[76] Milstone specifically excluded the possibility that male students could be included as victims in the statistic of 11 sexual assaults, thereby implying all perpetrators are males.[77] After he implied that women were always victims, he claims women victims must be protected, and the student community must be protected from the male perpetrator.[78] Supporting (female) victims equates to the assumption that female accusers speak truthfully and male perpetrators are presumed guilty, which is inconsistent with a fair and impartial investigation.[79] By Milstone's automatically placing every male perpetrator on suspension, the school inherently places every male student at a disadvantage in the investigation proceedings over the female student, and violates specific directives under Policies, which states that interim suspensions should only occur under emergency conditions.[80]

vi. UMASSD acquiesced to federal government pressures to take a hard stance on sexual assault on campus and limit procedural protections, when in August 2015, UMASSD changed their Title IX investigation procedures in line with protocols detailed in the DCL, which severely restricted due process rights of predominately male students.

vii. UMASSD's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual misconduct. UMASSD had taken this position because it was "heavily invested in protecting female accusers," "to avoid further scrutiny from OCR," and because it was "afraid of a further investigation from OCR and/or a Title IX lawsuit from DOJ."

viii. UMASSD's policies and procedures are based on unfair and archaic gender stereotypes and assumptions that female complainants are invariably fragile "victims" and "survivors" deserving of support regardless of their credibility or the veracity of their claims, and accused male students are "hegemonic male[s]" prone to violence who are not deserving of comparable support.

ix. Pursuant to UMASSD custom in matters related to Title IX investigations, and in violation to Protocol and Policies, all male perpetrators, including Plaintiff was automatically banned and issued an interim suspension without evaluation as to the merits of same.

---

[76] "UMass Dartmouth averages about four reported cases each year"... "based on what we know about sexual violence," there is a discrepancy between the number of incidents of sexual violence that actually happen on campuses versus those that ultimately get reported... John Hoey stated, "sexual assault, including those occurring on college campuses, is still under-reported by victims."

[77] "Take the University of Massachusetts Dartmouth as an example. According to the U.S. Department of Education's Office of Postsecondary Education, the number of sexual assaults reported by students between 2010-12 was 11. But David Milstone… said **he would guess if all crimes against women were reported**, the number could be closer to 200 over the same span.

[78] "Any time there is a complaint…, we have two responsibilities. One is to ensure safety of (implied female) victim. The other is to make sure the community has a separation from the alleged (implied male) perpetrator in this case,"

[79] In Dartmouth, Milstone called the changes "an incredibly positive thing." Milstone said, "In most of the cases that have been brought forward, perpetrators have been found responsible and separated from campus. Research shows victims very seldom file a false claim. Why would somebody put themselves through that?"" So it's up to colleges to provide options and let survivors know, 'You're not alone. This shouldn't have happened.'" John Hoey stated, "sexual assault, including those occurring on college campuses, is still under-reported by victims."

[80] "The first thing we do when we get a report, we let the person who's accused know and put them on interim suspension status immediately so we can investigate"

x.   Throughout the proceeding UMASSD was on notice of, and remained deliberately indifferent to, the serious flaws in the investigation, the lack of equity and fairness, and the gender bias that infuses the process.

xi.   Upon information and belief Investigator Gomes received "trauma-informed investigation" training which perpetuated the idea that female victims of sexual assault and harassment should never be questioned, that trauma excuses all memory lapses and credibility issues and that complainants always tell the truth. This approach caused Gomes to overlook profound inconsistencies regarding motive and caused him to ignore victim(s) motive to prevaricate and to fabricate credibility issues in any victims account.

xii.   Investigator Gomes was not an independent investigator inasmuch as he worked for and was dependent on Majewski and Cummings for future professional advancement and his performance reviews. Investigator Gomes failed to discover victim(s) motive to prevaricate, i.e. fabricate to protect themselves from the misconduct charges of an academic cheating scandal.

xiii.   Majewski has a conflict of interest in her role because part of her responsibilities was to ensure UMASSD compliance with Title IX, and filed reports with the Chancellor ensuring overall compliance with OCR directives.

xiv.   Majewski has a further conflict of interest in that she aided and abetted Cummings' extortion of Plaintiff in her office on May 4th when both attempted to coerce Plaintiff into withdrawing or face destruction of his reputation and publicly be accused of a crime.  Majewski illustrated her conflict in refusing to provide Plaintiff details of the allegations which precluded Plaintiff from receiving an impartial investigation and opportunity to be heard.

xv.   UMASSD grossly violated Plaintiff's protected confidentiality (because he was a male) on three different occasions as an effort to blight his reputation in the midst of the investigation while supposed victims privacy was secured. In contrast female student's privacy was protected.

xvi.   UMASSD presumed Plaintiff guilty from the outset when it prepared and signed a letter for an imposed interim suspension, prior to meeting or speaking with him, which precluded him from attending classes or participate in UMASSD activities, legally banned him from UMASSD property, and issued a Plaintiff a DNC denying his ability to communicate with all persons associated with UMASSD, whereas victims were allowed to discuss the matter with whomever without punishment.

xvii.   Upon information and belief, males invariably lose when charged with sexual harassment at UMASSD and when found "not responsible" male students still  suffer some type of sanction proscribed by school policy.

xviii.   UMASSD officials presumed Plaintiff guilty from the outset when it decided to pursue an investigation against him after it could not compel his resignation through extortion. Majewski and Cummings directed an investigation calculated to lead to the foregone conclusion that Plaintiff was guilty of the misconduct alleged.

xix.   Majewski and Cummings utilized intimidation tactics and the threat of additional institutional action against both Plaintiff and other students to prevent them from speaking with each other, speaking with potential witnesses, or speaking about this matter in any capacity, thus depriving Plaintiff of a full and fair opportunity to defend himself.

xx.   UMASSD officials refused to conduct an equitable investigation based on Plaintiff's complaints of academic misconduct, ageism discrimination, and sexual harassment; meanwhile UMASSD encouraged supposed victims to file false Title IX complaints related to Plaintiff.

xxi.   Organizationally Cummings is directly subordinate to David Milstone, who espoused his male bias regarding Title IX above.  Cummings' bias against males is indicated by (1) her history in placing a bounty on a male perpetrator's head; (2) in refusing to adhere to the very requirements she made for male student's return at UD; (3) in her lifetime advocations for female causes at the exclusion of and in opposition to male interests; (4) in demanding Plaintiff's withdrawal from school then stating she would get "his kind" in a Title IX investigation; (5) in threatening a retaliation claim against Plaintiff instead of looking into his complaints, which he stated at the Conduct Conference; (6) in participating in Plaintiff's sanction after he was found "not responsible;" (7) in encouraging supposed complainants to file false Title IX complaints; (8)  in using the Title IX process for the purpose of correcting a supposed admissions error; (9) in improperly using Plaintiff's  educational record to defame him, (10) in maliciously defaming him and purposely interfering with educational opportunities outside of UMASSD, (11) in "serving as the University's public voice against sexual assault" and (12) as stated publicly supporting women's advocacy groups during the timeframe in which accusations of Plaintiff were investigated.

xxii.   UMASSD deprived Plaintiff of a meaningful opportunity to be heard when it refused to provide him a factual basis to the allegations of sexual harassment, or the identities of his accusers.

xxiii.   UMASSD deprived Plaintiff the opportunity to an impartial adjudication and opportunity to be heard when he was never provided a copy of the investigator's file nor was allowed to view any evidence used to consider his guilt or innocence; he was not allowed to ask/send victim(s) questions;

xxiv.   UMASSD did not attempt to contact or interview witnesses identified by Plaintiff whereas all female students who attended Plaintiff's classes were questioned as to Plaintiff's potential behavior to cause a hostile learning environment.

xxv.   UMASSD showed bias against Plaintiff by failing to follow disciplinary proceedings of both Protocol and Policies, and instead used the procedures of either that benefitted the investigation at the sacrifice of Plaintiff's due process rights designed to protect accused students; such actions caused Plaintiff disadvantages in disciplinary proceedings as compared to the alleged victim(s).

xxvi.   UMASSD initiated and conducted an investigation informed by archaic stereotypes and innate biases that a male with any conviction, including Plaintiff, is predisposed to be aggressive, violent and hypermasculine, and deserves assumption of guilt despite no evidence.

xxvii.   UMASSD sanctioned Plaintiff despite a finding of not responsible, which is contrary to Policies and Protocol or any sense of fairness at proceeding conclusion. Meanwhile any/all supposed victims were allowed to proceed without restraint or imposition to their academic programs.

xxviii.   In April of 2015 and 2016 UMASSD sponsored a student created  hysteria around the issue of male rape culture, sexual assault and sexual harassment.  Leading up to and at the precise time of Plaintiff's alleged harassment of students, UMASSD  faced substantial criticism for allegedly looking the other way when female students complained of sexual assault as well as not actively prosecuting alleged male perpetrators.

xxix.   UMASSD officials and UMASSD Police displayed bias against Plaintiff, a male student previously convicted of a crime, in both knowingly and falsely accusing Plaintiff of a crime and

investigating bogus allegations against Plaintiff, while refusing to even consider accepting Plaintiff's statement related to potential criminal charges against University officials.

277.    The illegitimacy of the investigation to uncover some complaint worthy of Plaintiff's expulsion was evidenced in part when Plaintiff was found not responsible - despite Cummings's and Majewski's biases in predetermining Plaintiff's guilt.

278.    As a direct and proximate cause of the above conduct, Plaintiff sustained damages including, without limitation, emotional distress, physical and psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

### Title IX Violation - Selective Enforcement As to Defendant UMASSD

279.    Plaintiff  incorporates by reference each of the above paragraphs as if fully set forth herein.

280.    As described above, the Title IX selective enforcement theory asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

281.    As detailed herein, UMASSD violated Title IX's prohibition against selectively enforcing its policies on the basis of gender.

282.    Plaintiff has shown that a similarly-situated member of the opposite sex, in this case the unnamed victims and other female students facing disciplinary action or Title IX were treated more favorably than Plaintiff due to his gender.

283.    The foregoing, and the following show inferences of gender bias related to selective reinforcement, including without limitation the following:

    a.  Upon information and belief, No female student -  found not responsible -  has ever been sanctioned or received negative consequences related to an investigation. In Plaintiff's case sanctions issued after a finding of not responsible denied him access to and enjoyment of his educational contract with UMASSD.

    b.  UMASSD protected victims' confidentiality but publicized Plaintiff's confidential information.

    c.  UMASSD has never conducted a sham investigation on a female student to correct an admissions error or remove her for a matter unrelated to the Title IX purpose.

    d.  Female students are not automatically issued an interim suspension with a "Do Not Trespass Notice" and universal DNC.

    e.  Plaintiff was denied his advisor of his choice and forced to retain private counsel, whereas female victims were granted the opportunity to choose their advisor.

    f.  In contrast to female student witnesses, Plaintiff's witnesses were never interviewed.

    g.  Plaintiff was warned that any complaint filed by him would face a retaliation misconduct charge, whereas female students were intentionally encouraged to file false allegations against Plaintiff

    h.  Cummings, Majewski and Gomes could not deny Plaintiff's allegations that the investigation was based on his gender.

    i.  Cummings could not deny Plaintiff's allegation that if a female student attempted to file charges at a conduct hearing then they would have been investigated, whereas Cummings considered Plaintiff's attempted accusations as retaliation.

**284.**  University's conduct is so severe, pervasive, and objectively offensive that it is denying Plaintiff equal access to education that Title IX is designed to protect.

**285.**  Upon information and belief, internal emails exist, which predetermined that Plaintiff was guilty of some misconduct, and given the depth of an investigation the misconduct could be identified.

**286.**  Upon information and belief, UMASSD possesses communications and documents evidencing a predisposition to favor female students accused of Title IX violations.

**287.**  Upon information and belief, Defendant UMASSD's mishandling of supposed victim's Spring 2016 allegation was informed by institutional, media and student pressures as well as external pressure from the U.S. Department of Education, under the threat of rescission of federal funds.

**288.**  Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male responsible for sexual misconduct and punished severely.

**289.**  As a direct and proximate cause of the above conduct, Plaintiff sustained damages including, without limitation, emotional distress, physical and psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

### Title IX Violation – Deliberate Indifference / Hostile Environment - As to Defendant UMASSD

**290.**  Though deliberate indifference claims usually relate to sexual harassment, the 1st Circuit Court has allowed claim of harassment based on gender discrimination in Title IX disciplinary actions.

**291.**   Plaintiff  incorporates by reference each of the above paragraphs as if fully set forth herein.

**292.**  The harassment of Plaintiff in the disciplinary process – outside the scope of normal reasonable disciplinary procedures - was so severe, pervasive or objectively offensive that it could be said to deprive Plaintiff of access to the educational opportunities or benefits provided by the school.

**293.**  Plaintiff was intentionally subjected to unfounded allegations and an unfair process due in part to OCR and his status as a male student with a criminal history.

**294.**  UMASSD had actual notice of the harassment. Plaintiff filed multiple complaints with UMASSD officials claiming the investigation was instituted solely because he was a male student with a criminal conviction, and knowledgeable officials had authority to intervene.

**295.**  UMASSD was deliberately indifferent to the harassment.  Not only was UMASSD indifferent but since May 4th, when Cummings' and Majewski's efforts ranged from attempting to extort Plaintiff into withdrawing, to the repeated defamations, to the "all-hands meeting" at SMAST, to Plaintiff's punitive interim suspension, to false criminal allegations by UMASSD, to Plaintiff's final sanctions despite a finding of not responsible, UMASSD increased its pressure to compel Plaintiff's withdrawal from school by creating a hostile learning environment with 'reasonable intervention' whereby no reasonable person could endure the ongoing pervasive environment, which denied Plaintiff's ability to pursue his academic career.

**296.**    Plaintiff's educational experience was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions of the victim's educational environment.

**297.**  As a direct and proximate cause of the above conduct, Plaintiff sustained damages including, without limitation, emotional distress, physical and psychological damages, loss of educational and career opportunities, reputational damages, economic injuries and other direct and consequential damages.

**298.**    As a result of UMASSD's violations of Title IX, which resulted in an unduly severe and unwarranted sanction, which continues to injure Plaintiff's reputation and right to continue his education, an injunction should issue directing UMASSD to (1) reverse the outcome and findings regarding the complaint; (2) expunge Plaintiff's disciplinary record; (3) remove any negative sanction or action in Plaintiff's education record; (4) permanently destroy any record related to the complaint against Plaintiff; and (5) allow Plaintiff to return to UMASSD at a time of his choosing in order to complete the remaining credits remaining for receiving his degree without the imposition of tuition or any conditions for readmission to the university.

**299.**  As a result of the foregoing, Plaintiff is entitled to damages in the amount to be determined at trial plus prejudgment interest, attorneys fees, expenses, costs and disbursements.

<u>COUNT II</u>

**42 U.S.C. § 1983 Title IX: Retaliation for Opposing Title IX Process**

**(ALL DEFENDANTS in Individual and Official Capacities  )**

**300.**  Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety without duplication.

**301.**  A private right of action exists to remedy retaliation against an individual who complains about sex discrimination under Title IX. Title IX contains broad language prohibiting a funding recipient from intentionally subjecting any person to "discrimination" "on the basis of sex."

**302.**  Retaliation is, by definition, an intentional act and a form of "discrimination" because the complainant is subjected to differential treatment "on the basis of sex" in response to having made an allegation of sex discrimination.

**303.**  Plaintiff has the burden of proving a prima facie case of retaliation, including that 1) Plaintiff engaged in protected activity; 2) defendant knew Plaintiff engaged in protected activity; 3) Plaintiff was subjected to a materially adverse action, and 4) a causal connection exists between the protected activity and adverse action. Wade v. Knoxville Utilities Bd., 259 F.3d 452, 463 (6th Cir. 2001).

**304.**  Plaintiff engaged in the protected activity of participating in and protesting a  Title IX investigation, during which he asserted multiple complaints regarding the unfairness of UMASSD's prosecution of Plaintiff because of his gender.

**305.**  Specifically on May 4th, July 15th, August 30th, and circa September 7th Plaintiff complained that the Title IX investigation was initiated and conducted solely to pressure Plaintiff into withdrawing because he was a male student with a conviction.

**306.**  On May 4th Plaintiff complained about being issued a Do Not Trespass Notice, a DNC directive and being suspended unnecessarily. Additionally through his attorney, Plaintiff complained that he was being denied basic fairness and his due process rights in the prosecution of the Title IX investigation because of his gender.

**307.**  On August 30, 2016 and circa September 7, 2016, Plaintiff protested the unwarranted sanctions related to the Title IX investigation, stating that having been found not responsible for any misconduct, he should not be restricted or denied benefits or services related to his academic program.  Additionally he complained regarding losing his advisor resulting from the Title IX investigation.

**308.**  Defendants knew Plaintiff was engaged in protected activity since Defendants conducted the Title IX investigation of Plaintiff; school officials received the Plaintiff's complaints of Plaintiff's belief that it was a witch hunt to compel him to withdraw solely because he was a male student with a conviction.

**309.**  UMASSD  and individual Defendants thereafter subjected Plaintiff to adverse action, treatment or conditions because of his complaints of sexual discrimination in Title IX procedures including, without limitation, the following:

    i.   Plaintiff was forced to sign a "Do Not Trespass Notice" denying him access to UMASSD under penalty of criminal arrest.

    ii.   Plaintiff's property was unlawfully seized at SMAST AT&T building inasmuch as he was denied an opportunity to retrieve his property on May 4th and the property was never returned to him.

    iii.   UMASSD issued Plaintiff an interim suspension from UMASSD from May 4th to August 30th .

    iv.   UMASSD issued Plaintiff a "do not contact" directive on May 4th, denying him communication with all persons associated with UMASSD.

    v.   UMASSD repeatedly and intentionally violated Plaintiff's confidentiality of his educational and disciplinary records protected under FERPA, Policy and Protocol, in an attempted smear campaign, causing him to suffer a hostile learning environment, and causing him to receive treatment as a pariah precluding any opportunity for research collaboration.

    vi.   UMASSD defamed Plaintiff to outside Universities, which destroyed his ability to corroborate with scientists at those locations.

    vii.   UMASSD sanctioned Plaintiff and instituted "appropriate intervention" with SMAST staff, which denied Plaintiff benefit from his educational contract with UMASSD, even though Plaintiff was found not responsible for the alleged misconduct.

    viii.   Plaintiff's graduate advisor – John Buck - withdrew without cause connected to Plaintiff's Title IX investigation.

    ix.   Plaintiff's academic program was downgraded to a non-thesis Master's.

**310.** Though Defendants actions do not constitute typical sexual harassment under hostile environment or deliberate indifferent claims of Title IX violations, the actions of Defendants actions served to harass Plaintiff because of his gender.

**311.** The harassing conduct of Defendants created a hostile environment sufficiently serious that it interfered with or limited Plaintiff's ability to participate in or benefit from his graduate school program. In UMASSD's retaliation, it purposely created a hostile learning environment so severe and perverse that neither Plaintiff nor a reasonable person could expect to endure under the circumstances, which constructively expelled Plaintiff, compelling him to seek a leave of absence.

**312.** UMASSD had actual knowledge of the harassment based on Plaintiff's gender since they conducted the investigation, received notice of complaints, and instigated the continuous harassing actions that interfered with and altered Plaintiff's graduate program.

**313.** UMASSD was deliberately indifferent or failed to take adequate remedial action; instead UMASSD increased pressure to compel Plaintiff to withdraw from his graduate program.

**314.** The "materially adverse actions" were motivated in all or in part by Plaintiff's speech to remedy the baseless investigation and failures to comply with state and federal law, including but not limited to, Plaintiff's reports of harassment concerning UMASSD's attempt to compel his withdrawal using Title IX procedures - solely because he was a male student with a conviction.

**315.** Retaliatory actions were causally related to the protected activity by temporal nexus, in substance, in purpose, and in the foregoing malice shown Plaintiff by UMASSD and its agents.

**316.** Based on the foregoing UMASSD intentionally and maliciously retaliated against Plaintiff in response to his engaging in protected activity under Title IX, which caused Plaintiff approximate damages.

**317.** Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages .

**318.** As a result of the foregoing, Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

<u>**COUNT III**</u>

**42 U.S.C. § 1983 – Denial of Due Process Under Fourteenth Amendment**

**(ALL DEFENDANTS in their Individual and Official Capacities )**

**319.** Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety without duplication.

320.     Defendants violated Plaintiff's procedural and substantive rights under the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment.

321.     The Due Process Clause of Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Questions of due process are considered using two steps: (1) whether there exists a liberty or property interest which has been interfered with by the state; and (2) "whether the procedures attendant upon that deprivation were constitutionally sufficient." A similar right is stated in the Fifth Amendment to the U.S. Constitution.

322.  Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

> Every person who, under color of any statute, ordinance, regulation or custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…

323.     Pursuant to the Fourteenth Amendment to the United States Constitution, Plaintiff enjoyed a liberty and property interest in his contractual status as a student at the UMASSD[81] and in his pursuit of the education free of arbitrary and bad faith restrictions thereon that he had undertaken to receive.

324.    Plaintiff has a protected liberty and property interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

325.    Prior to his discipline, Plaintiff was a student in good standing at UMASSD. His constitutionally protected interests in his continued enrollment and good standing at UMASSD and to be free from arbitrary discipline and reputational harm arises from the policies, courses of conduct, practices and understandings, established by UMASSD and from the express and implied contractual relationship between UMASSD and Plaintiff. A student who has been admitted to a university, and who has paid tuition to that university, has a protected property interest in continuing his education at that university until he has completed his course of study in his matriculated and contracted degree program.

326.     Pursuant to the Fourteenth Amendment, Plaintiff also enjoyed a right to equal protection of the laws, i.e., to be treated like all persons to whom he is similarly situated.

327.     Consequently, when Plaintiff faced disciplinary action that included the possibility of suspension or dismissal if found responsible, UMASSD owed him Due Process as established by the Fourteenth Amendment to the United States Constitution and Massachusetts law.

---

[81] Gorman v. Univ. of R.I., 837 F.2d 7, 12 (1st Cir. 1988) (stating "a student's interest in pursuing an education is included within the fourteenth amendment's protection of liberty and property")

**328.** Chancellor Helm was UMASSD's official charged with protection of student education records, with implementing the Student Conduct Code and Title IX Policies and Procedures at issue in Plaintiff's case, and as it was required under OCR's investigations.

**329.** Majewski and Cummings updated Helm regarding Title IX matters, including the matter of Plaintiff.

**330.** In the course of UMASSD's investigation and adjudication, it flagrantly violated clearly established rights under the Due Process clause of the Fourteenth Amendment through its repeated acts of a gender biased tribunal and process that deprived Plaintiff of the minimal requirements of procedural fairness by, without limitation:

i. Plaintiff was given inadequate notice; On May 4th Plaintiff was required to attend a Conduct Conference within 21 hours of receiving the Notice of Investigation or conclusions would be drawn.

ii. The email of May 3rd failed to notice Plaintiff of potential sanctions or seriousness of the meeting or even if Plaintiff allegedly violated the code of conduct;

iii. On May 4th Plaintiff was issued a "Do Not Trespass Notice without providing him a meaningful hearing or adequate notice nor establishing that he constituted an "imminent threat" that would warrant such an interim restriction;

iv. On May 4th Plaintiff was directed not to speak to anyone associated with UMASSD precluding an opportunity to be heard and defend himself.

v. The May 4th "meeting" was a sham because Cummings' and Majewski's decision to issue interim sanctions had already been made as evidenced by the previously signed letter and prior filed Do Not Trespass with UMASSD Police. As such Plaintiff was denied an opportunity to be heard at the May 4th Conduct Conference.

vi. Gomes, Majewski, and Cummings failed to question victim(s) credibility and motivations to prevaricate regarding a graduate course cheating scandal reported by Plaintiff;

vii. Defendants failed to provide Plaintiff with notice of the charges before the interview with Gomes in violation of due process and Protocol 2015.

viii. Throughout the 4-month investigation, Plaintiff was continuously denied the opportunity to be heard in that **Gomes/Majewski/Cummings denied Plaintiff any details or basis of the charges or allegations or the identity of the complainants** (at the conduct conference or at the investigative review of Plaintiff) so he may be fully aware of the charges against him;

ix. Gomes/Majewski/Cummings failed to perform a thorough and impartial investigation of all evidence from all parties.

x. Plaintiff was provided no form of hearing.

xi. Plaintiff was <u>not permitted to challenge the credibility or ask any questions of the supposed complainant(s) or any other witnesses</u>, even though credibility determinations were critical to the Investigators' findings; Students accused of violations other than sexual misconduct were permitted to submit written questions to be asked of complainant and at times had a hearing.

xii. Plaintiff was denied an opportunity to record the interview or even see the questions of Gomes, and no record of the investigative interview was maintained.[82]

xiii. Impairment of right to call witnesses and present evidence; <u>though Plaintiff submitted a list of exculpatory witnesses, none were interviewed</u>; Plaintiff was asked to provide evidence in defense but was denied the facts of the allegations or basis of the complaints.

---

[82] Slaughter v. Brigham Young Univ., 514 F.2d 622, 625 (10th Cir.1975)

xiv.   Applying the preponderance of the evidence standard, rather than the clear and convincing evidence standard, despite the serious nature of the allegations and severe consequences that could result, including lifelong damage to Plaintiff's reputation;

xv.   Lowered burden of proof to the "preponderance of the evidence"(the lowering of the standard appears to have been a deliberate choice by the university to make cases of sexual misconduct easier to prove . . . .)

xvi.   Plaintiff was not entitled to an advisor of his choice per Protocol or Policies;

xvii.   Plaintiff was repeatedly denied access to the Special Examiner's report despite multiple requests.

xviii.   Special Examiner's and Majewski's decision as to sanction Plaintiff despite the "not responsible" (that is, supposedly of "not guilty") finding was essentially final, with no appellate review— among other things, the decision that included sanctions - typical of a responsible finding - could not be overturned on any ground.

**xix.   Majewski, Cummings, and Gomes denied Plaintiff ANY and ALL access to evidence or see witness statements;**

xx.   Failure to provide an impartial adjudicator at any stage of the proceedings; Majewski, Gomes, and Cummings all maintained conflicts of interest creating bias in the process.

xxi.   Majewski and Cummings predetermined Plaintiff's guilt on May 4, 2016 as to any potential misconduct prior to assigning their employed investigator;

xxii.   A school employed investigator was entrusted with responsibilities of detective, prosecutor, judge and jury in one person[83];

xxiii.   Plaintiff, despite being found not responsible, was sanctioned as though he was found responsible.

xxiv.   The purpose of the process itself was used to explore and find an action that could warrant expulsion instead of adjudicating self-reported allegations of sexual misconduct from actual victims.

xxv.   Defendants' conduct evidenced arbitrary and/or irrational behavior which was not justified by any governmental interest

xxvi.   Defendants violated Plaintiff's Due Process rights in part because Defendants' conduct was motivated by ill will, bad faith, and/or an intent to injure Plaintiff.

xxvii.   Defendants were improperly trained on sexual harassment and disciplinary implementation.

xxviii.   No right to appeal.

xxix.   UMASSD's constitutionally vague Protocol and Policies, related to sexual harassment and hostile environment, precluded Plaintiff from receiving proper notice and from opportunity to be heard.

**331.**   In the course of such investigation and adjudication, Defendants flagrantly  violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its deprivation of the minimum requirements of procedural and substantive fairness, including, but not limited to, his right to a fair investigation free of bias, his right to be heard by an impartial factfinder, and his right to cross examine witnesses and challenge witnesses.

**332.**   Under both federal and state law, Plaintiff was entitled to due process including proper notice and a meaningful opportunity to be heard, which were denied at various steps of the procedure. Defendants

---

[83] Doe v. Brandeis, 177 F. Supp. 3d 561 (D. Mass 2016)

Cummings, Majewski, Gomes, and Helm violated Plaintiff's right to due process: when they willfully failed to give him adequate notice of the charges simply saying, *"Plaintiff" may have engaged in behaviors that violate the student code of conduct and/or the University's Policies on Equal Opportunity, Discrimination, Harassment and Sexual Violence" or "engaged in behavior that has created an uncomfortable learning and work environment"*[84]*;* when they imposed interim sanctions and when they issued a finding of what must be determined as "not responsible" but still imposed sanctions of warnings and "appropriate intervention"; when despite the fact that there appears to be no reporting party or "victim", there was no opportunity for him to question the witnesses against him including the non-percipient third-party reporter, or the supposed complainant; when he was afforded no formal hearing before an impartial panel of decision makers; when he was provided no opportunity to challenge the participation of any person involved in the process, and there was no attempt to collect exculpatory evidence or give due consideration to the alleged "reporting party" who if it were AW or LS maintained Plaintiff did not engage in any conduct violative of UMASSD's policies.

**333.** The Investigators prosecuted Plaintiff under a presumption of guilt, and conducted an investigation designed to fit their narrative of what they believed a male with a conviction could do, despite clear evidence to the contrary.

**334.** Plaintiff had obeyed all institutional rules when he was wrongly interim suspended and ultimately constructively expelled from UMASSD.

**335.** Plaintiff was entitled to a process commensurate with the seriousness of the allegations and the potential discipline, sanctions and repercussions he was facing. The allegations in this case resulted in a sanction that will have lifelong ramifications for Plaintiff.

**336.** In their bias treatment of Plaintiff, Defendants made a distinction which "burdened a fundamental right, targeted a suspect class, or intentionally treated one differently from others similarly situated without any rational basis for the difference." That such different treatment he received was based on "purposeful or intentional" gender discrimination. The facts supporting bias in the Title IX claims above buttress Plaintiff's 1983 claim.

**337.** Defendants treated Plaintiff differently from others similarly situated when they instituted "appropriate intervention," failed to conduct equitable investigations against female students, and intentionally and egregiously violated Plaintiff's privacy of confidential information while securing the supposed victim(s)' privacy in the disciplinary proceeding and in general.

**338.** Defendants, as well as other agents, representatives, and employees of UMASSD, were acting under color of state law when they showed intentional, reckless, and outrageous disregard for Plaintiff's

---

[84] Sterrett v. Cowan, 85 F. Supp. 3d 916 (E.D. Mich. 2015).

constitutional rights. Defendants Helm, Cummings, Majewski, and Gomes deprived Plaintiff of his liberty and property interests without affording him basic due process without good faith and thus are not afforded qualified immunity for their actions. Defendants all agreed to, approved and ratified this unconstitutional conduct.

**339.** Defendants violated the substantive component of the Due Process Clause because Defendants, similar to the facts in *Bliss v. Sanguinet*, CIVIL ACTION NO. 12-10123-RWZ (D. Mass. Jun. 24, 2013), engaged in the arbitrary abuse of executive power so egregious that shocks the conscience of the public, and that it did not comport with traditional ideas of fair play and decency.

**340.** Defendants violated the substantive component when they: intentionally violated Plaintiff's confidentiality; issued a DNC with anyone associated with UMASSD; extorted Plaintiff into withdrawing; intentionally defamed Plaintiff to blight his reputation during the investigation; interfered with his educational opportunities outside of UMASSD; targeted him for personal and political reasons because of his conviction; brought unfounded charges of misconduct, conspiring with Unnamed Professor to concoct false criminal allegations against him, and sanctioned him after a finding of not responsible.

**341.** As recently articulated by the Sixth Circuit in *Doe v. Baum*, a university disciplinary proceeding that may result in a sanction of expulsion or suspension must: (1) afford an accused student "some sort of hearing" and (2) "when the university's determination turns on the credibility of the accuser, the accused, or witnesses, that hearing must include an opportunity for cross-examination." *Doe v. Baum* (6th Cir. Sept. 7, 2018) 903 F.3d 575, 581.

**342.** UMASSD deprived Plaintiff of the requisite due process because the University had a pecuniary interest in the outcome of the adjudication, and had decided that an admissions of a male with a prior conviction must be corrected through a sham disciplinary proceeding.

**343.** Defendants had actual or constructive knowledge that they were engaging in conduct creating a pervasive / unreasonable risk of deprivation of Plaintiff's rights under the Fourteenth Amendments to the United States Constitution.

**344.** Based on the foregoing, UMASSD and Defendants violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of the Spring/Summer 2016 allegation. Accordingly, Defendants are liable under 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

**345.** As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, reputational damage, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

**346.** Plaintiff further seeks punitive damages against Defendants Cummings, Majewski, Gomes and Helm in their individual capacities for violations of Plaintiff's well established fundamental rights.

**347.** As a result of the foregoing, Plaintiff is entitled to damages in the amount to be determined at trial plus prejudgment interest, attorneys fees, expenses, costs and disbursements.

**348.** Plaintiff is entitled to compensatory damages, prospective injunctive relief expunging Plaintiff's disciplinary record; removing any record of Plaintiff's interim suspension from his education file; destroying any and all records pertaining to the Title IX investigation of Plaintiff; and allow Plaintiff to return to UMASSD at a time of his choosing in order to complete the remaining credits remaining for receiving his degree without the imposition of any conditions for readmission to the university.

<u>**COUNT IV**</u>

**42 U.S.C. § 1983 – Denial of First Amendment Rights/Free Speech Retaliation**

**Defendants UMASSD, Helm, Cummings, Gomes, and Majewski in Individual/ Official Capacities**

**349.** Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety without duplication.

**350.** First Amendment to the U.S. Constitution states: "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."

**351.** Pursuant to the First Amendment to the United States Constitution and UMASSD Rights of Students, Plaintiff enjoyed the right to speak freely to students in his graduate program prior to the initiation of and during disciplinary proceedings, to complain to UMASSD officials as to their discriminatory Title IX disciplinary practices, and to speak to fellow students and freely associate regarding what he considered discriminatory and unfair treatment by the University.

**352.** UMASSD neither accused Plaintiff of using speech that could be considered true threats,[85] nor lewd[86] nor were shown to cause a material disruption to the university or was likely to do so.

**353.** "In the absence of a specific showing of constitutionally valid reasons to regulate their speech, students are entitled to freedom of expression of their views." Tinker v. Des Moines Indep. Community Sch. Dist., 393 U.S. 503, 511 (1969).

**354.** The Supreme Court has recognized that students enjoy First Amendment rights of speech and association on a campus and the "denial ... of use of campus facilities for meetings and other appropriate purposes" are subject to the level of scrutiny appropriate to any form of prior restraint.[87]

---

[85] Watts v. United States, 394 U.S. 705 (1969).
[86] Bethel School Dist. No. 403 v. Fraser, 478 U.S. 675, 685 (1986).
[87] Healy v. James, 408 U.S. 169, 181 (1972).

355.     Moreover since Plaintiff's speech failed to "materially and substantially disrupt the work and discipline of the school,"[88] Plaintiff's 1st Amendment right to speak to members of UMASSD was violated via censorship in both his overbroad interim and final sanction, which forbid him to speak to anyone associated with UMASSD as to the former, and to students at SMAST as to the latter.

356.     To plead a prima facie case of free speech retaliation, Plaintiff must show that (1) that Plaintiff was engaged in a constitutionally protected activity; (2) that the defendant's adverse action caused Plaintiff to suffer an injury that would likely chill a person of ordinary firmness from continuing to engage in that activity, and (3) that the adverse action was motivated at least in part as a response to the exercise of Plaintiff's constitutional rights. Paige v. Coyner, 614 F.3d 273,

357.     Plaintiff undoubtedly engaged in protected speech activities – namely (1) Plaintiff engaged academic and personal discussions with peers and instructors in the university setting and (2) all of Plaintiff's reports of gender discrimination related to his Title IX investigation, made to Gomes, Lorentz, Cummings and Majewski directly and through his attorney.

358.     The second element of free speech retaliation, whether the "defendant's adverse action caused Plaintiff to suffer an injury - that would likely "chill a person of ordinary firmness from continuing to engage in that activity" - is not in dispute here. Defendants chilled and otherwise restricted Plaintiff's right to free speech by issuing a gag order not to speak to any person associated with UMASSD, directly or by proxy, under penalty of potential expulsion from May 4th, 2016 to August 30, 2016, and then not to speak to SMAST Students after circa September 10th, 2016. Also Plaintiff was banned from UMASSD property and given an interim suspension. UMASSD officials intentionally violated Plaintiff's privacy regards to Title IX and educational records confidentiality. He lost his advisor and suffered sanctions of "appropriate interventions" despite being found not responsible for misconduct and speaking to his colleagues and professors.

359.     In regards to the third element, Plaintiff has come forth with facts sufficient to support his theory that the "materially adverse actions" or retaliatory actions were motivated in all or in part by Plaintiff's speech to address and remedy the baseless investigation and failures to comply with state and federal law, including but not limited to, Plaintiff's actions to report and address individual harassment in UMASSD's attempt to compel him to withdraw using Title IX procedures.

360.     Retaliatory actions were causally related to the protected activity in time with no delay, in substance, in purpose, and in the foregoing malice shown against Plaintiff by UMASSD and its agents.

---

[88] Tinker v. Des Moines Independent School District, 393 U.S. 503, 506 (1969).

**361.**   Based on the foregoing UMASSD and individual Defendants intentionally and maliciously retaliated against Plaintiff in response to his engaging in constitutionally protected speech, which caused Plaintiff approximate damages.

**362.**   Based on the foregoing, UMASSD and Defendants violated the rights and guarantees set forth in the First Amendment of the United States Constitution during the investigation and adjudication of the supposed Spring/Summer 2016 allegation.

**363.**   Accordingly, Defendants are liable under 42 U.S.C. § 1983 for violations of Plaintiff's rights under the First Amendment of free speech and association, and for all damages arising therefrom.

**364.**   As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, reputational damage, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

**365.**   As a result of the foregoing, Plaintiff is entitled to damages in the amount to be determined at trial plus prejudgment interest, attorneys fees, expenses, costs and disbursements, and seeks punitive damages against Defendants Cummings, Majewski, Gomes and Helm in their individual capacities.

## COUNT V

### Protocol 2015 and Policies are Unconstitutionally Overbroad As to Defendant UMASSD

**366.**   Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety without duplication.

**367.**   UMASSD as a state college is legally bound to respect the constitutional rights of its students.

**368.**   Because of the sexual harassment policy and the definitions of sexual harassment and similar for a hostile learning environment, and the manner in which UMASSD attempted to enforce it for innocuous behavior, Plaintiff subsequently felt inhibited in expressing his opinions in class concerning women, or even speaking to women in general.

**369.**   Subsequent to the investigation Plaintiff enrolled in an Ocean Policy class, mostly with women requiring classroom deliberation. Plaintiff found every area of possible communication was implicated by the policy in Protocol, and if a female student disagreed with his opinion, then it could have been considered a hostile learning environment.

**370.**   That, in turn, caused him to be concerned that discussing his social, cultural, political, and/or religious views regarding these issues might be sanctionable by the University. As such Plaintiff suffered a chilling effect on his ability to exercise his constitutionally protected rights, and enjoy his civil rights.

**371.**   Plaintiff was compelled to withdraw from the class resulting from his inability to discuss matters that had been susceptible to selective application amounting to content-based or viewpoint discrimination,

**372.**     Like the regulation at issue in *DeJohn v. Temple University*, 537 F.3d 301 (3d Cir. 2008)  and in Saxe v. State Coll. Area School Dist., 240 F.3d 200 (3d Cir. 2001), the policy as to definitions of sexual misconduct and sexual harassment in Protocol 2015 and Policies at UMASSD are facially overbroad.

**373.**     Protocol and Policies should be found unconstitutionally "overbroad" since there is a likelihood that the statute's very existence will inhibit free expression to a substantial extent, and deny a person notice and opportunity to be heard when having to reference them in a disciplinary proceeding.

**374.**     Based on foregoing, Plaintiff seeks declaratory judgment that Policies and Protocol 2015 as written are unconstitutionally vague and overbroad, and that under the circumstances, Majewski/Cummings/Gomes could not have justifiably initiated the investigation of Plaintiff, nor could Plaintiff have been given constitutionally sufficient notice nor opportunity to be heard given the vague nature of the governing policies.

<u>**Count VI**</u>

**Defamation (Libel and Slander) as to Defendants Cummings, Majewski, Unnamed Professor**
**(in their Individual and Official Capacities  )**

**375.**     Plaintiff hereby incorporates and adopts each and every foregoing allegations set forth herein

**376.**     Immediately following Plaintiff's Conduct Conference, Cummings contacted staff at Duke Marine Lab, including, Tom Schultz and verbally advised them to reject Plaintiff's application, that Plaintiff was a threat to school safety under a Title IX investigation, that he had an extensive criminal history and lied on his application to UMASSD, and he would likely be expelled from UMASSD.

**377.**     Circa late April 2016 Cummings contacted staff at Marine Mammal Center at Woods Hole Oceanographic Institute, including, Michael Moore and verbally advised him to discontinue his collaboration with Plaintiff, that Plaintiff was a threat, that he had an extensive criminal history, lied on his application to UMASSD and he would be expelled from UMASSD.

**378.**     Circa late April 2016 Cummings contacted staff at University of Rhode Island Graduate School of Oceanography, including, James Miller and verbally advised him to discontinue his collaboration with Plaintiff, that Plaintiff was a threat under Title IX investigation, that he had an extensive criminal history and lied on his application to UMASSD and he would likely be expelled from UMASSD.

**379.**     On May 4, 2016, Cummings and Majewski promulgated the above written letter concerning Plaintiff, therewith published false information accusing Plaintiff of fraudulently signing his application.

**380.**     Cummings and Majewski published the false and defamatory material with "'actual malice[89]" --that is, with knowledge that it was false or with reckless disregard of whether it was false or not, and acted with

---

[89] <u>Noonan v. Staples, Inc.</u>, 556 F.3d 20 (1st Cir., 2009) (citing Mass. Gen. Laws ch. 231, § 92).

a "high degree of awareness of [its] probable falsity" or, in other words, "entertained serious doubts as to the truth of the publication."

**381.**   Based on her communication with Webster prior to, and with Plaintiff at his Conduct Conference, Cummings knew the information was false; should have known the information was false; should have taken reasonable steps to verify the veracity, and had no justifiable reason nor legitimate educational purpose to believe that Plaintiff had failed to fully disclose his history as required in his application, which Plaintiff signed as true and accurate, that if he intentionally withheld information with deceitful intent, he would be liable for perjury.

**382.**   Cummings constructively and factually accused Plaintiff of violating Mass Gen Law Chapter 268, Section 1, perjury, by implying alleging he falsified and signed his school application under which Plaintiff swore under penalty of perjury.   Additionally her letter  indicates that  Plaintiff was involved in behavior incompatible with the proper conduct of his business, trade or profession, which is also slander per se. Additionally Cummings accused Plaintiff of committing a host of unidentified crimes left to the imagine of the audience, thereby accusing him of a vast array of crimes, which is defamatory per se.

**383.**   Persons who read the promulgated subject letter understood the allegations thereon meant that Plaintiff committed perjury on his application.

**384.**   Unnamed Professor's intentionally filed false criminal allegations against Plaintiff with actual malice.  News of the filing of the false criminal allegations spread throughout SMAST, which in part caused Plaintiff to be shunned upon his return after his reinstatement.

**385.**   Cummings', Unnamed Professor, and Majewski's verbal and written statements and filing of false criminal allegations were defamatory in that they "may reasonably be read as discrediting Plaintiff in the minds of any considerable and respectable class of the community."

**386.**   That such accusations were false and defamatory per se which requires no proof of economic loss.

**387.**   Cummings and Majewski were acting within and outside the scope of their school responsibility in a "frolic and detour" on their own when defaming Plaintiff to Miller, Moore and Schultz and in publishing the subject letter.

**388.**   Defendants had no legitimate purpose to cause Plaintiff to lose his advantageous relationships or destroy Plaintiff's good reputation at SMAST and UMASSD in general.

**389.**   Cummings has ill-will toward men who are convicted, and ill-will against Plaintiff specifically. Their spite toward Plaintiff is illustrated: in Cummings' and Majewski's baseless and sua sponte witch hunt to find any misconduct whatsoever which she could use to establish their predetermined conclusion that Plaintiff must be expelled from UMASSD; in Cumming's statement that Plaintiff would never find an institution that would accept him in Oceanography again, a result which her defamation made a fait accompli. Additionally Cumming's illustrated her actual malice by illegally and willfully disclosing

confidential information disclosed that was part of Plaintiff's protected educational record secured by FERPA, and by participating in false criminal accusations.

**390.**    Defendants' actions caused Plaintiff immediate outrage and severe emotional distress.

**391.**    As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, reputational damage, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

**392.**    As a result of the foregoing, Plaintiff is entitled to damages in the amount to be determined at trial plus prejudgment interest, attorneys fees, expenses, costs and disbursements. Plaintiff further seeks punitive damages against Defendants Cummings, and Majewski, in their individual capacities.

<u>**Count VII**</u>

**Violation of Massachusetts Civil Rights Act (MCRA)**

**As to Defendants Cummings in her Individual and Official Capacities**

**393.**    The foregoing allegations are incorporated herein by reference.

**394.**    To establish a claim under MCRA, a Plaintiff must prove 1) Plaintiff was exercising a right or privilege protected by the Constitution or laws of the Commonwealth of Massachusetts or of the United States; 2) That the defendant either injured, intimidated, interfered with, oppressed or threatened the exercise or enjoyment of that legally protected right by Plaintiff, or <u>attempted to do so</u>; 3) That the defendant did so by such interference was by threats, intimidation, or coercion.[90]

**395.**    Plaintiff had and enjoyed rights: secured by Title IX, to an education free of discrimination based on gender; secured by the Vth & XIVth Amendments to the US Constitution and by Articles I & X of the Massachusetts Declaration of Rights to continue enjoying his property right of his education at UMASSD and use of his Veterans Affairs scholarship under Chapter 31; property and liberty right to enjoy his personal and academic reputation; liberty interest to continue relationships and speak with colleagues and come and go at UMASSD; liberty interest to pursue his profession as an Oceanographer or University Professor.

**396.**    Civil rights asserted under MCRA are secured by the Constitutions of the Commonwealth[91] and United States against individual as well as State action. A Plaintiff need not allege "State action" in order to make out a claim for relief against a private person under the civil rights statute, G. L. c. 12, Section 11I.

---

[90] *Goddard v. Kelley*, 629 F. Supp. 2d 115, 127 (D. Mass. 2009) ("A "threat" means the "intentional exertion of pressure to make another fearful or apprehensive of injury or harm." *Planned Parenthood League of Massachusetts, Inc. v. Blake*, 417 Mass. 467, 474, 631 N.E.2d 985 (1994). "Intimidation" means putting a person in fear for the purpose of compelling or deterring his or her conduct. *Id.* "Coercion" means application of physical or moral force to another to constrain him to do against his will something he would not otherwise do. ")
[91] https://malegislature.gov/Laws/Constitution

397.    The facts in this case resemble those in *Wodinsky v. Kettenbach*, 22 N.E.3d 960 (Mass. App. Ct. 2015)[92]. The primary difference is that Crossen and the Kettenbachs coerced, intimidated, and threatened the Wodinskys in an effort to force them out of their home, whereas the facts herein contain ample evidence in totality, from which a reasonable person could plausibly infer that Defendants coerced, intimidated[93] and threatened Plaintiff in an effort to force Plaintiff to leave UMASSD outside of and in violation of normal disciplinary procedures with animus, and otherwise interfere with his enjoyment of his foregoing stated civil rights.

398.    By way of examples, without limitation were: (i) Cummings' and Majewski's instituting baseless misconduct and Title IX disciplinary proceedings in which procedures were not followed and Plaintiff's due process rights were intentionally violated; (ii) Cummings' and Majewski's attempts at extortion forcing his withdrawal; (iii) Cummings' and Majewski's repeated threats to and actual dissemination of confidential information in an effort to defame Plaintiff and thwart his ability to pursue his academic program at UMASSD; (iv) Unnamed Professor's filing of false criminal allegations of trespass; (v) Majewski's and Cummings forcing extreme and unwarranted interim sanctions on Plaintiff; and (vi) Cummings', Gomes, and Majewski's intentionally creating a hostile learning environment with "appropriate intervention" after finding him not responsible of any misconduct. The actions in total coerced his departure from UMASSD.

399.    Plaintiff's scholarship contract with Veteran's Affairs under Chapter 31, in part, requires a Plaintiff to comply with the student Code of Conduct, and if Plaintiff was expelled for disciplinary reasons then he would be required to reimburse Veteran's Affairs for all expenses. However, if he withdrew and transferred elsewhere, then he would not face reimbursement. Upon information and belief, Cummings knew Plaintiff was on a VA Scholarship with such terms when she made her threats and commanded Plaintiff to withdraw or face expulsion, and when Defendants coerced Plaintiff to withdraw.

400.    Cumming's threat of criminal prosecution of trespassing, and threat of accusing him of a crime, commanded Plaintiff's attention, since any criminal charge or violation of the good conduct clause of his unsupervised probation would cause a revocation warrant, and cause his immediate incarceration.  Upon information and belief, Cummings and other Defendants knew Plaintiff was on unsupervised probation and used such information to leverage their coercion and intimidation.

---

[92] *Reichenbach v. Haydock*, 90 N.E.3d 791, 798 (Mass. App. Ct. 2017) ("Wodinsky v. Kettenbach, 86 Mass. App. Ct. 825, 835–836, 22 N.E.3d 960 2015) (series of activities, including threats and physical inconveniences, aimed at forcing plaintiffs from condominium satisfied MCRA).")

[93] *Alcott v. U.S.*, CRIMINAL ACTION NO. 04-cr-10286-PBS, at *17 (D. Mass. Sep. 1, 2009) ("Commonwealth v. Miller, 385 Mass. 521, 525-28 (1982) (interpreting Mass. Gen. Laws ch. 265, § 25 and holding that a threat to harm another's reputation by exposing details of a sexual relationship constitutes an injury to "someone's person" under the extortion statute).")

**401.** Though Massachusetts has no civil remedy for extortion, Cummings threats to ruin Plaintiff's reputation[94] and accuse him of crimes stood squarely in the center of Massachusetts criminal statute of extortion. Not only did Cummings threaten such action but followed through with her threats as a form of coercion.

**402.** Defendants were acting within the scope of their school responsibility and agent authority when violating Plaintiff's Massachusetts Civil Rights.[95] As an alternative Plaintiff pleads Defendants were acting outside the scope of her school responsibility and agent authority.

**403.** Based on the foregoing, Defendants maliciously violated Plaintiff's civil rights under MCRA using threats, coercion and intimidation.

**404.** Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**405.** Plaintiff's damages were the direct and proximate cause of Defendants' actions.

**406.** Pursuant to M.G.L. c. 12 Mass. Civil Rights Act § 11I, Plaintiff seeks award of compensatory money damages, punitive damages, costs of the litigation and reasonable attorneys' fees.

<u>**Count VIII**</u>

**Aiding and Abetting of Violation of Massachusetts Civil Rights Act (MCRA)**

**As to Defendant Majewski in her Individual and Official Capacities**

**407.** The foregoing allegations are incorporated herein by reference.

**408.** Based on the foregoing at least Defendant Cummings violated his civil rights under MCRA.

**409.** Majewski was generally aware of her role of an overall illegal or tortious activity at the time she provided Cummings assistance in violating his rights under MCRA.

**410.** Majewski witnessed Cummings twice command Plaintiff's withdrawal from school. In between, Cummings offered Plaintiff documents to read which implicated definite threats to compel Plaintiff to commit actions against his will to wit to sacrifice his property and liberty rights under MCRA.

**411.** Majewski knowingly/substantially assisted Cummings in violating Plaintiff's civil rights under MCRA.

**412.** With regard to MCRA, Majewski participated in Cummings' efforts to pressure Plaintiff into withdrawing from school against his will.  Majewski assisted Cummings by providing Cummings the

---

[94] *Commonwealth vs. Miller., 385 Mass. 521, 1982*
[95] Massachusetts Civil Rights Act, G. L. c. 12, s. s. 11H, 11I.

physical venue (her office). Additionally Majewski assisted Cummings in applying pressure on Plaintiff to withdraw from school that day.  Majewski directed Plaintiff to inform her within a couple days as to whether he would withdraw from school.  Majewski also applied coercion by stating that if he would not withdraw that day he would undergo a Title IX investigation, and instituted "appropriate intervention.".

**413.**  In providing Cummings her office and having preplanned the meeting in which Cummings would attempt to extort Plaintiff into leaving UMASSD, Majewski did encourage and provide advice to Cummings in how to proceed to coerce Plaintiff into leaving UMASSD.

**414.**  Cummings and Majewski shared a common intention to cause Plaintiff to withdraw from school. Both had worked together for years implying the quality and extent of their relationship influenced the amount of aid provided by Majewski to Cummings, and  affords evidence of the defendant's state of mind.

**415.**  In aiding-abetting, the extent of liability is that a person (Majewski) who assists a tortious act of Cummings may be liable for other reasonably foreseeable acts done in connection with it, and is liable for damages caused by the main perpetrator.

**416.**  Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**417.**  Plaintiff's damages were the direct and proximate cause of Defendants' actions.

**418.**  Pursuant to M.G.L. c. 12 Mass. Civil Rights Act § 11I, Plaintiff seeks award of compensatory money damages, punitive damages, costs of the litigation and reasonable attorneys' fees.

## COUNT IX
### Intentional Interference with 3rd Party Advantageous Relations
### Defendants Cummings and Majewski in their Individual/Official Capacities

**419.**  The foregoing allegations are incorporated herein by reference.

**420.**   Under Massachusetts law, to prevail on a claim of tortious interference with advantageous relations, a Plaintiff must establish that: (1) he had advantageous relations with a third party; (2) defendant knowingly induced the third party to break the advantageous relations; (3) defendant's interference, in addition to being intentional, was improper in motive or means; and (4) Plaintiff was harmed by defendant's actions.

**421.**   Plaintiff had advantageous relations with advisors and scientists with whom he had developed relationships of a definite type and agreements to corroborate on scientific research and potentially join as a Ph.D. candidate including with: Michael Moore, Ph.D. and Woods Hole Oceanographic Institute; Douglas Nowacek, Ph.D. and Duke Marine Lab; John Buck, Ph.D; Jennifer L. Miksis-Olds, Ph.D., Director, Center for Marine Science & Technology at The Pennsylvania State University; and James Miller,

Ph.D. and U.R.I.

**422.**    The advantageous relations between an Ph.D. candidate and advisors are often considered a potential employment relationship since Ph.D. candidates receive stipends and grants under the academic advisor.    Additionally the pursuit of a Ph.D. under leading scientists has a likelihood of well-paid employment as a consultant or professor.

**423.**    Majewski and Cummings knew of the advantageous relationships which Plaintiff had with various scientists and Universities and the past, present and future corroborations, and Plaintiff's continued expectancy for advantageous relationships that would engender his research and career growth.

**424.**    In their official capacity Majewski and Cummings, acted with actual malice, spiteful, malignant purpose or personal animus, unrelated to legitimate corporate interest of UMASSD, and knowingly induced Plaintiff's advantageous relationships to end.

**425.**    Among other specific examples, Majewski and Cummings displayed actual malice unrelated to legitimate corporate interests by the following:

   i.    In an effort to believed "correct an admissions error" Defendants concerted to compel Plaintiff's withdrawal from UMASSD through extortion.
  ii.    Defendants concerted and individually violated Plaintiff's privacy of statutory confidential information on more than three occasions.
 iii.    Defendants concerted and individually contacted persons and institutions, outside of and unrelated to Plaintiff's matriculation with UMASSD, and maliciously defamed him spreading false allegations that Plaintiff fraudulently completing his applications and by spreading false innuendo regarding his Title IX investigation.
  iv.    Defendants instituted and maintained two disciplinary proceedings with knowledge that neither had merit nor probable cause in an effort to coerce Plaintiff to withdraw from school because he was a male with a conviction.
   v.    Defendants gathered Plaintiff's educational records, which contained his admissions disclosure statement, then twisted the contents therein to cast him in a false light of negative publicity.
  vi.    Defendants sanctioned Plaintiff despite having found him not responsible with the intent to exile him from SMAST.
 vii.    Defendants concerted to damage Plaintiff's reputation by having criminal false charges filed against him with UMASSD Police when he "somehow" logged onto a professor's computer.

**426.**  Based on the foregoing, and in their individual capacity, Majewski and Cummings, with intentional improper motive or means, knowingly induced Plaintiff's advantageous relationships to end.

**427.**  As the direct result of Defendants improper and malicious actions, all of Plaintiff's aforementioned advantageous relationships terminated. Each institution and person refused to respond to Plaintiff's attempts at communication in writing, texts and calls.

**428.**  As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, reputational damage, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

**429.**  Plaintiff further seeks punitive damages against Defendants Cummings, and Majewski, in their individual capacities.

**430.**   As a result of the foregoing, Plaintiff is entitled to damages in the amount to be determined at trial plus prejudgment interest, attorneys fees, expenses, costs and disbursements.

## <u>COUNT X</u>

### <u>Negligence In Disclosing Confidential Information As to Defendants UMASSD, Helm, Cummings, Gomes, Webster and Majewski in their Individual and Official Capacities</u>

**431.**   The foregoing allegations are incorporated herein by reference.

**432.**   Family Educational Rights and Privacy Act of 1976: FERPA guarantees the privacy of a student's educational records.

**433.**    FERPA policy and guidelines at UMASSD for all times relevant was controlled by policy number STU-012 (**https://www.umassd.edu/policies/active-policy-list/students/family-educational-rights--privacy-act/).** UMASSD FERPA Policy Statement states**:**

> *The Family Educational Rights and Privacy Act (Part 99 of Title 34 of the Code of Federal Regulations) allows present of former students at educational institutions access to educational records kept on them, as well as establishing basic protections of privacy of their records. The law applies to educational records, which are defined as those records that are directly related to a student and maintained by an educational agency or institution.*

**434.**  <u>Disclosure of Educational Records to Others</u>: FERPA restricts significantly the right of others to view a student's educational records. Exceptions include in relevant part:

   *a.*   The student him or herself (except materials to which the student has waived the right of access, such as confidential letters of recommendation).

   *b.*   Individuals who are "officials" of the campus and university and who have a "legitimate educational interest" in the record or a "need to know" information in the record.

**435.**  Such officials have a "legitimate educational interest" or "need to know" if performing a task that includes each of the following: (a) It falls within the context of their assigned institutional duties or responsibilities; (b) It relates to the functioning of the office, position, or committee involved; (c) It relates to the education of the disciplining of the student; and (d) It is consistent with the purposes for which the information is kept.

**436.**  Persons authorized to view or retain a student's educational records, as above, "<u>may in no case transmit, share, or disclose the information to any third party</u>." All third-party requests for information should be addressed to the Office of University Records.

**437.** Unauthorized release of confidential and sensitive information protected under FERPA and Handbook, which by law is contraindicated, is legally similar to unauthorized disclosures of confidential medical information in the realm of duty of confidentiality under HIPPA.

**438.** Prospective students to graduate school filet their personal and academic history on their applications, and expect confidentiality of that information. The protection of these confidences is necessary, especially with graduate students, to engender trust of colleagues and the free flowing process of exchanging ideas in research that is beneficial to society.

**439.** Similarly the duty of confidentiality under FERPA is meant to discourage any injury that might from the University's unauthorized disclosure of student information. Just as society has an interest in protecting the confidential nature of the physician-patient relationship, so too does society have an interest in protecting confidential and sensitive student information guaranteed under FERPA.

**440.** Finally a duty should be imposed because Universities and school officials, who obtain student information under authority of "legitimate educational interest," are in the best position to prevent this kind of unauthorized disclosure of student information in the future.

**441.** The same substantive rationale for this tort duty extends to cases in which a customer has entrusted her intangible, confidential information to another in the course of a business transaction, thereby obligating the possessor to exercise reasonable care in protecting that valuable property.

**442.** UMASSD and its officers have a general duty to UMASSD students to protect student information under FERPA since the source of the duty exists in furthering existing social values and customs' and UMASSD voluntarily assumed a duty by accepting funds under a program administered by the U.S. Department of Education.

**443.** UMASSD, Helm, Cummings and Majewski specifically owed Plaintiff a duty of reasonable care not to disclose sensitive and confidential records to third parties in violation to FERPA and STU-012.

**444.** Cummings and Majewski accessed Plaintiff's educational records "under a legitimate educational interest" in conjunction with a disciplinary proceeding per policy STU-012. Inter alia they accessed Plaintiff's admissions application and criminal disclosure statement.

**445.** Cummings, Majewski and UMASSD breached that duty of care in carelessly disseminating Plaintiff's student information to third parties, and knowing what the Defendants knew or should have known with foreseeability, would anticipate that harm of the general nature of that suffered was likely to result.

**446.** Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages .

**447.**  Plaintiff's damages were the direct and proximate cause of Defendants' actions.

**448.**  As a result of the foregoing, Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

<u>**Count XI**</u>

<u>**Negligence as to Establishing Reasonable Disciplinary Policy As to Defendant UMASSD**</u>

**449.**  UMASSD had a duty to "establish reasonable policies and guidelines to ensure that school officials could implement[96] and enforce uniformly, and students could clearly understand the school's disciplinary process in either Protocol or Handbook, to ensure Plaintiff was not repeatedly  harassed, embarrassed, defamed, coerced, and denied due process of law by the school officials.

**450.**  UMASSD breached that duty in failing to establish two parallel and competing policies, which  as stated in Protocol and Handbook  were ambiguous, conflicting, inadequate, and confusing.

**451.**  The grossly inadequate policies allowed school officials to hijack the disciplinary process by picking and choosing carte blanche, whichever parts of the Protocol and Handbook, that fit the need of a capricious investigation in their attempt to rid Plaintiff from UMASSD.

**452.**  For example, On May 3rd Plaintiff received a poorly worded Notification of Alleged Violation. On May 4th, 2016 Cummings and Majewski clearly held a Conduct Conference, accused Plaintiff of violating both misconduct per Protocol and Handbook, and offered him a resolution option of constructive expulsion, and in not resolving the matter at the Conduct Conference they appointed a special investigator. These actions detail the procedures for a Conduct Conference and subsequent investigation in Handbook (Policies).

**453.**  The confusion in both the school officials and Plaintiff/his attorney was illustrated in their communications throughout the investigation of Plaintiff.

**454.**  Majewski continued claiming that the process was not yet at the Conduct Conference stage, which in her mind justified not providing Plaintiff the rights owed to him from the Conduct Conference.

**455.**  If UMASSD rules for protecting its students in competing disciplinary processes were inadequate or if UMASSD failed to understand how to enforce them adequately to protect them, it is foreseeable that one of its graduate students could suffer emotional distress and economic harm.

**456.**  Plaintiff's damages were the direct and proximate cause of UMASSD's actions.

**457.**  Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages .

---

[96] Johnson v. Schmitz, 119 F. Supp. 2d 90 (D. Conn. 2000);

**458.**    As a result of the foregoing, Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT XII

### Breach Of Fiduciary In Disclosing Information Under FERPA / Protocol / Policies
### As To Defendants UMASSD, Helm, Cummings Gomes And Majewski
### in their Individual and Official Capacities

**459.**    The foregoing allegations are incorporated herein by reference.

**460.**    Under Massachusetts Law, "A fiduciary relationship arises when one reposes faith, confidence, and trust in another's judgment and advice. Where a confidence has been betrayed by the party in the position of influence, this betrayal is actionable, and the origin of the confidence is immaterial.

**461.**    Plaintiff placed trust, faith and confidence in UMASSD, its officers and staff to protect his sensitive and confidential student information secured under FERPA / Protocol / Policies. Plaintiff had an established fiduciary relationship with UMASSD and its officers regarding the protection and proper handling of his confidential educational records.  As fiduciaries UMASSD, Cummings and Majewski owed Plaintiff a duty of not to betray his confidences by disclosing and widely disseminating his student information to third parties in violation to FERPA and STU-012 / Protocol / Policies.

**462.**    Cummings and Majewski accessed Plaintiff's records "under a legitimate educational interest" in conjunction with a disciplinary proceeding, and were responsible for securing disciplinary records.

**463.**    Cummings, Majewski and UMASSD breached their fiduciary duty in violating Plaintiff's trust by carelessly and/or intentionally disseminating Plaintiff's student information to third parties.

**464.**    Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**465.**    Plaintiff's damages were the direct and proximate cause of Defendants' actions.

**466.**    As a result of the foregoing, Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT XIII

### Invasion of Privacy[97] As to Defendants UMASSD, Helm, Gomes, Cummings and Majewski in their Individual and Official Capacities

**467.**   The foregoing allegations are incorporated herein by reference

**468.**   Defendants, without cause or institutional / corporate purpose, made a public disclosure of Plaintiff's confidential private educational records to students, faculty, and staff inside and outside of UMASSD to wit the subject matters of Plaintiff's disclosure letter explaining his conviction and the Title IX investigation.

**469.**   Plaintiff's application and the disclosures thereon were part of a private matter and part of a contract between UMASSD and Plaintiff, and any information regarding his application or Title IX investigation was held confidential.

**470.**   Defendants with such dissemination communicated to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.

**471.**   The wrongful intrusion into Plaintiff's private activities was in such a manner as to outrage or to cause mental suffering, shame or humiliation to a person of ordinary sensibilities, since release of the sensitive and compromising information protected under FERPA is similar to the release of confidences in the doctor patient relationship protected under HIPPA.

**472.**   The facts publicized related to Plaintiff's application and subsequent admission served no concern of the public.

**473.**   A reasonable person would find the disclosure "highly offensive or highly objectionable." Plaintiff experienced outrage and emotional distress upon learning of the wrongful breaches of confidentiality.

**474.**   Defendants published the facts with actual malice as described herein.

**475.**   Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**476.**   Plaintiff's damages were the direct and proximate cause of Defendants' actions.

**477.**   As a result of the foregoing, Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

---

[97] Mass G.L. Chapter 214, Section 1B states: A person shall have a right against unreasonable, substantial or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages.

## COUNT XIV

### Malicious Prosecution And Abuse of Process as to UMASSD, Gomes, Helm, Cummings and Majewski in their Individual and Official Capacities

**478.** A Title IX disciplinary proceeding is an administrative quasi-judicial civil proceeding.

**479.** The foregoing allegations are incorporated herein by reference

**480.** Massachusetts Law allows claims of malicious prosecution and abuse of process related to a civil administrative matters.[98]  Cummings and Majewski initiated process of a disciplinary proceeding when they emailed Plaintiff on May 3, 2016, and compelled plaintiff to submit to the jurisdiction of UMASSD's authority, to retain counsel, to provide testimony, and to abide by the decisions of UMASSD officials.

**481.** Cummings and Majewski initiated the misconduct process under Policies for an ulterior or illegitimate purpose to wit to use as leverage in extortion and defamation and use as a predetermined means to expel Plaintiff or coerce him to withdraw.

**482.** Cummings, Helm, Gomes and Majewski actively participated in a disciplinary process per Handbook without probable cause having known that Plaintiff had adequately disclosed his convictions in his disclosure statement.  Additionally, Cummings, Helm, Gomes, and Majewski could not have reasonably believed that there was a chance that their claim may be held valid upon adjudication, or find Plaintiff responsible for any alleged misconduct.

**483.** Only upon learning that their claim, related to Plaintiff's insufficient disclosure statement had no merit, did they institute a Title IX claim under Protocol – as Plan B - to rid him from UMASSD.

**484.** Likewise Defendants had no probable cause as to their Title IX allegations, and lacked belief that Plaintiff could be found "responsible" for misconduct.  As proof to lack of probable cause and malice, Cummings stated that she would use the Title IX to cause Plaintiff to withdraw if he refused to voluntarily withdraw from school, and attempted to file false criminal charges against Plaintiff.

**485.** Also Defendants encouraged students to file false Title IX charges against Plaintiff when it was obvious no potential claims could succeed.

**486.** Defendants prosecuted the investigation with malice by using the process to first coerce Plaintiff into withdrawing from UMASSD, then using the basis of the claim (perjuring himself on his school admissions application) to defame Plaintiff.

---

[98] *Bliss v. Sanguinet*, CIVIL ACTION NO. 12-10123-RWZ, at *17 (D. Mass. Jun. 24, 2013) ("In *Cignetti v. Healy*, 967 F. Supp. 10 (D. Mass. 1997), the court found that "a reasonable argument can be made that a Civil Service hearing constitutes such 'process'" where the proceeding "compelled the parties to submit to the jurisdiction of the Civil Service Commission, to retain counsel, to provide testimony, and to abide by the decision")

**487.** Defendants used their special privilege to access Plaintiff's educational records protected under FERPA and UMASSD explicit policy, then distorted the truth of the information in the confidential records to defame Plaintiff.

**488.** Defendants acted primarily for a purpose other than succeeding on the merits of the claim; specifically Defendants sought to coerce Plaintiff into withdrawing, or cause those associated with SMAST to constructively exile him with the improper publicity of the investigation, thereby violating contractual and statutory requirements of confidentiality.

**489.** David Gomes conducted a supposed independent investigation that could find no facts to justify a finding of responsible of any misconduct under Policies or Protocol.

**490.** The original actions terminated in Plaintiff's favor in the finding of "not responsible."

**491.** Plaintiff suffered special damages when Defendants denied him his contractual right to name his unpaid school advisor, and but for the improper "No Contact" order that Cummings issued against Plaintiff, he would not have retained private counsel at great financial cost.

**492.** Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**493.** Plaintiff's damages were the direct and proximate cause of Defendants' actions.

**494.** As a result of the foregoing, Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

<u>**COUNT XV**</u>

<u>**Breach of Contract As to Defendant UMASSD**</u>

**495.** Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety without duplication.

**496.** At all times relevant herein Plaintiff developed and maintained a contract with UMASSD.

**497.** UMASSD's obligations are explicitly set forth in its contract with Plaintiff, and are further informed by Massachusetts case law infusing every contract with a "reasonable expectations" requirement and mandating that college and university disciplinary proceedings cannot be "arbitrary or capricious."

**498.** For all the reasons set forth above, UMASSD has materially breached its contracts with Plaintiff by failing to comply with its obligations, standards, policies, and procedures set forth in the policies and procedures noted above in the course of the Special Examiner's Process against Plaintiff, and by subjecting him to a blatantly arbitrary and capricious disciplinary proceeding.

**499.**   As a direct, proximate, and foreseeable consequence of UMASSD's numerous material breaches, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**500.**   As a result of the foregoing, Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT XVI

### Breach of the Implied Covenant of Good Faith and Fair Dealing As to Defendant UMASSD

**501.**   The foregoing allegations are incorporated herein by reference.

**502.**   Implicit in the implied contract between a university and its student under Massachusetts law is the requirement that the institution act in good faith in its dealing with its students; at the same time, the student must fulfill his end of the bargain by satisfying the university's academic requirements and complying with its procedures.[99]

**503.**   In addition to these contractual breaches, the Special Examiner's Process lacks the most essential elements of due process to safeguard the rights of the accused, and is systemically inequitable. Although the accuser knows his or her story before the investigation even begins, the accused is left in the dark concerning the facts, never knowing what the accuser and witnesses actually have said except as filtered through the Special Examiner. The accused is subjected to a secret investigation process that in Plaintiff's case was handled by the Special Examiner like a police interrogation of a suspect rather than an independent, impartial investigation.  Despite the fact that Plaintiff meticulously documented UMASSD officials these contractual breaches, as well as the fundamental unfairness of the process and irrationality and capriciousness of the decisions, inter alia to punish Plaintiff with interim sanctions, UMASSD did nothing to correct this flawed and unfair process and outcome.

**504.**   Instead of proceeding to a hearing at which both sides hear all of the evidence and have an equal opportunity to present their claims and defenses before an impartial tribunal, the Special Examiner's Process effectively ends with the interrogation, completely short circuiting due process by allowing the Interrogator to decide issues of credibility and serve as the de facto prosecutor, judge and jury.

**505.**   In Plaintiff's case, the University compounded the systemic lack of due process by failing to follow its own procedures, choosing which rights to deny Plaintiff based on which  procedure in either Handbook or Protocol that officials chose at the moment. In the end UMASSD officials complied with the stated procedures of neither.

---

[99] Doe v. Brandeis, 177 F. Supp. 3d 561 (D. Mass 2016)

**506.** The confusion and gaps in the two disciplinary procedures allowed UMASSD officials to usurp either, and in the end disciplined Plaintiff despite the fact he was found "not responsible" for any misconduct which goes against the basis of jurisprudence.

**507.** UMASSD and Majewski based the improper sanctions on the credibility attributed to statements of supposed complainants; hence Plaintiff's inability to face his accusers to contest such credibility is unfair and in bad faith.

**508.** Since Plaintiff's case, UMASSD has changed few of its deeply flawed procedures in the Special Examiner's Process, despite new OCR guidelines from the Trump administration.

**509.** As a direct, proximate, and foreseeable consequence of UMASSD's breach of the implied covenant of good faith and fair dealing, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**510.** As a result of the foregoing, Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT XVII

### Promissory Estoppel as to Defendants Buck and Webster in Individual/Official Capacities

**511.** The foregoing allegations are incorporated herein by reference.

**512.** Defendant Buck made a clear and unambiguous promise that he would serve as Plaintiff's sponsor and continue providing him guidance, corroboration and direction in completing his degree and pursuing his research interest.

**513.** Defendant Webster made a clear and unambiguous promise that the details of Plaintiff's disclosure statement would not be released, and neither the students, staff, nor faculty at SMAST would learn of the contents or nature of the subject matter included in his disclosure statement.

**514.** Both promisors made a promise which they individually should reasonably expect to induce action or forbearance of a definite and substantial character on the part of Plaintiff.

**515.** Both promises individually and jointly did induce such action or forbearance, in that Plaintiff sacrificed all other options and chose to apply his VA scholarship and matriculate at UMASSD.  But for the promises Plaintiff would have chosen an alternative educational program.

**516.** Buck breached his promise when he abruptly terminated all communication with Plaintiff and ceased any action in assisting Plaintiff pursue his career. As a proximate result Plaintiff can no longer pursue his research interests and the opportunity to apply his VA scholarship in this endeavor is destroyed.

517.    Webster breached his promise when he either shared educational information of Plaintiff, or allowed Cummings to disseminate information without acting to protect Plaintiff which has proximately caused Plaintiff damages.

518.    Upon information and belief Defendants intentionally concealed that either would breach their unambiguous promises if pressed by UMASSD for matters unrelated to admission/academic performance.

519.    Injustice can be avoided only by enforcement of the promise.

520.    As a direct, proximate, and foreseeable consequence of Buck's and Webster's failure to honor their promises, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

521.    As a result of the foregoing, Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

<u>**COUNT XVIII**</u>
**Intentional Infliction of Emotional Distress  As to Defendants Majewski, Gomes, Cummings,**
**Unnamed Professor, Buck, Fioravanti and Helm  in their Individual / Official Capacities**

522.    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

523.    During the investigation and adjudication process, Defendants exhibited extreme and outrageous conduct, beyond all possible bounds of decency, including but not limited to the following:

   i.    Defendants instituted bogus disciplinary proceedings and criminal investigations of Plaintiff to correct an "admissions error" and baselessly remove Plaintiff from UMASSD because Defendants contended his conviction disqualified his matriculation.

   ii.    Defendants criminally extorted Plaintiff, threatening to accuse him of crimes and threatening to destroy his reputation with colleagues, advisors, and faculty if he refused to withdraw from UMASSD on May 4th or soon thereafter.

   iii.    Defendants repeatedly and maliciously defamed Plaintiff accusing him of crimes and other defamatory conduct within UMASSD and outside UMASSD with whom Plaintiff had advantageous relations in Defendants' successful effort to deny Plaintiff's ability to pursue those educational opportunities.

   iv.    UMASSD maliciously and repeatedly disseminated Plaintiff's confidential educational and disciplinary records related to Title IX in their effort to destroy Plaintiff's pursuit of his graduate academic program while protecting privacy of all others involved.

   v.    Defendants imposed an interim suspension, without justification, banning him from campus, issuing him a DNC denying communication with anyone associated with UMASSD, and suspending him prior to meeting or speaking with Plaintiff, which precluded him from attending classes during his summer semester at UMASSD, and prevented him from receiving rehabilitative care for his hip surgery.

vi. Defendants publicly escorted Plaintiff off campus, prohibiting him from even clearing out his workspace or obtaining his property therein prior to any investigation being performed, despite the absence of any disciplinary history.

vii. Defendants treated Plaintiff as an adversary and prosecuted him criminally and administratively under a presumption of guilt, based on innate biases against male students with a conviction.

viii. Defendants pursued an investigation against Plaintiff despite the alleged "victim's" repeated declarations that he had not engaged in any prohibited conduct.

ix. Defendants refused to conduct equitable criminal and administrative investigations into Plaintiff's complaints while encouraging supposed victims and professors to file false reports.

x. Defendants utilized intimidation tactics and the threats of additional institutional action to prevent Plaintiff from speaking with anyone thus depriving Plaintiff of a full and fair opportunity to defend himself.

xi. The week after May 4th, Defendants directed SMAST staff to hold an all hands meetings and publicly disclose the nature and content of Plaintiff's interim suspension and Title IX investigation.

xii. Defendants' investigation far exceeded the scope of the alleged violations when they sought to elicit information wholly irrelevant to the conduct at issue for the sole purpose of embarrassment and to impugn Plaintiff character and reputation.

xiii. Defendants' failed to conduct a prompt and timely investigation; the nature and leading manner of the questions asked contributed to ongoing rumors, gossip, and ridicule directed at Plaintiff.

xiv. Defendants intentionally leaked the contents of Plaintiff's disclosure statement on his graduate school application for the purpose of harming his reputation and academic program.

xv. Defendants punished Plaintiff despite finding him not responsible for the alleged conduct, and in implementing "'appropriate interventions,' censored Plaintiff from speaking to other students, confined him to a workspace adjacent to the Dean's office, and kept Plaintiff from his normal routine in benefitting from his educational experience.

xvi. Defendants initiated baseless and false misconduct allegations and criminal complaints knowing Plaintiff was innocent.

**524.** Such extreme and outrageous conduct was either intentional or in reckless disregard to cause emotional distress to Plaintiff, and was effected with personal animus against Plaintiff.

**525.** As a direct result of the foregoing, Plaintiff has in fact suffered severe emotional distress with physical impact including panic attacks, headaches, insomnia, grinding of teeth and excessive wear that caused two molars to crack in half requiring removal, insomnia, weight loss, loss of appetite, PTSD flashbacks and symptomology from wrongfully being prosecuted, extreme depression, excessive alopecia, and his hair turned pure white.

**526.** Defendants' actions in attempting to compel Plaintiff's withdrawal from UMASSD by investigating and adjudicating the false allegations against Plaintiff were the actual and proximate cause of such distress.

**527.** Based on the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

## COUNT XIX

### Negligent Infliction of Emotional Distress as to Defendants UMASSD, Majewski, Cummings, and Helm in their Individual and Official Capacities

**528.**    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

**529.**    Based on the foregoing, Defendants have been liable of negligence toward Plaintiff during the initiation and prosecution of the disciplinary proceedings under Policies and Protocol as stated above.

**530.**    Plaintiff has suffered severe emotional distress.

**531.**    Defendants negligence has been the proximate and direct cause of Plaintiff's emotional distress.

**532.**    Plaintiff has suffered physical harm manifested by objective symptomology for which he received and continues receiving treatment.

**533.**    As a direct result of the foregoing, Plaintiff has in fact suffered severe emotional distress with physical impact including panic attacks, headaches, insomnia, grinding of teeth and excessive wear that caused two molars to crack in half requiring removal, insomnia, weight loss, loss of appetite, PTSD flashbacks and symptomology from wrongfully being prosecuted, extreme depression, excessive alopecia, and his hair turned pure white.

**534.**    A reasonable person would have suffered emotional distress under the circumstances of the case.

**535.**    Defendants' actions in attempting to compel Plaintiff's withdrawal from UMASSD by investigating and adjudicating the false allegations against Plaintiff were the actual and proximate cause of such distress.

**536.**    Based on the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial, plus prejudgment interest.

## COUNT XX

### Intentional Interference with Contractual Relations with Veterans Affairs[100]
### (Defendants Cummings, Buck, Gomes, Helm and Majewski in their Individual/Official Capacities)

**537.**    Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein;

**538.**    Plaintiff applied his vocational rehabilitation scholarship with U.S. Department of Veterans Affairs (VA) under  38 USC Ch. 31 - which fully funded tuition, books, stipend, medical insurance and other expenses for five years in pursuit of Ph.D. in Oceanography – at UMASSD.

**539.**    Plaintiff was contracted with the VA to complete the Ph.D. program satisfactorily within 5 years, to comply with school procedures, and maintain a B minus average.

---

[100] *Shafir v. Steele*, 431 Mass. 365, 369 (Mass. 2000) ("One who intentionally and improperly interferes with the performance of a contract (except a contract to marry) between another and a third person, <u>by preventing the other from performing the contract or causing his performance to be more expensive or burdensome</u>, is subject to liability to the other for the pecuniary loss resulting to him."). See Restatement (2nd) of Torts at § 766A.

540.     Plaintiff informed all advisors, professors, UMASSD admissions staff, and students that he attended UMASSD with a VA scholarship.

541.     Defendants knew Plaintiff was fully funded under a contract per 38 USC Ch. 31, which provided Plaintiff a fully-funded 5 year scholarship.

542.     Based on the foregoing, Defendants with intentional improper motive or means, actual malice and with personal animus, knowingly induced Plaintiff's inability to perform the contract or caused his performance to be more expensive or burdensome, while engendering a hostile learning environment in which he could not endure.

543.   As the direct result of Defendants improper and malicious actions, Plaintiff was compelled to receive a leave of absence, and lose the benefit of his VA contract.

544.   As a direct and proximate result of the above conduct, Plaintiff sustained damages, including, without limitation, reputational damage, emotional distress, loss of educational and career opportunities, economic injuries and other direct and consequential damages.

545.   Plaintiff further seeks punitive damages against Defendants Cummings, Buck, Gomes, Helm, and Unnamed Professor Majewski, in their individual capacities.

546.     As a result of the foregoing, Plaintiff is entitled to damages in the amount to be determined at trial plus prejudgment interest, attorneys fees, expenses, costs and disbursements.

## COUNT XXI
### Civil Conspiracy as to Defendants Cummings, Unnamed Professor, Buck, Gomes, Fioravanti, Helm and Majewski in their Individual/Official Capacities

547.     Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein; he alleges both possible causes of action for civil conspiracy under Massachusetts law.

548.     First, Plaintiff alleges an independent tort where Defendants acting in unison, had some peculiar power of coercion over the Plaintiff that they would not have had if they had been acting independently.[101]

549.     Based on the foregoing together Defendants, with mere force of numbers and the impact therefrom were able to destroy Plaintiff's academic program and chosen career path, which coerced his departure from UMASSD. By way of examples, without limitation were: (i) the tortious interference with Plaintiff's contract with VA and advantageous relations with external/internal researchers denying Plaintiff the ability to complete his academic program at UMASSD or corroborate outside UMASSD; (ii) the consummate destruction of Plaintiff's reputation through the all-hands SMAST meeting and malicious disclosure of

---

[101] *Fleming v. Dane*, 304 Mass. 46 (Mass. 1939)

confidential information that caused students, staff and faculty to shun Plaintiff; (iii) the lack of due process from the May 3rd email until the implementation of unprecedented "appropriate interventions" created a hostile learning environment and precluded Plaintiff's ability to continue benefitting from his educational experience; (iv) the withdrawal of Plaintiff's academic advisor denied Plaintiff's ability to continue his matriculated program in his research field; (v) the filing of false criminal charges painted Plaintiff as a perpetrator and dangerous student; (vi) the interim sanctions precluded Plaintiff from Defending himself in the investigation and in his reputation.

**550.**    The combined action of UMASSD officials, where through the power of combination pressure was created and  brought about different in kind from anything that could have been accomplished by separate individuals. Plaintiff could have successfully managed the proper adjudication of a legitimate misconduct or Title IX investigation, which found him not responsible and released him from culpability or allowed him to continue his academic program in good standing with an academic advisor. Plaintiff could have managed a legitimate interim suspension, narrowed in focus, that allowed him to defend his reputation as the need arose. Yet the combination of Defendants' actions overwhelmed Plaintiff and coerced him into submitting to the combined pressure to withdraw from UMASSD and sacrifice his career path.

**551.**    Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**552.**    Plaintiff's damages were the direct and proximate cause of Defendants' actions.

**553.**    As a result of the foregoing, Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

**554.**    As to the second type of civil conspiracy – assigning joint liability - Defendants developed a common concerted action to commit a tortious act where participants knew of the plan and its purpose, and took affirmative steps to encourage the achievement of the result.

**555.**    Based on information and belief, internal UMASSD email and communications exist that will sound that upon or shortly after Cummings' and Majewski's learning of the contents in Plaintiff's disclosure statement, Defendants entered into an agreement to cause Plaintiff harm, in general to force his withdrawal from UMASSD, and specifically as claimed in Counts I thru IV, VI, VII, IX, XIII, XIV, XVIII and XX, and acted in furtherance of that agreement.

**556.**    Upon information and belief Majewski and Cummings were the initial duo who concerted to initiate the bogus misconduct proceedings and issued the baseless interim sanctions; Gomes and Helm acquiesced to pressures and recommendations of Majewski and Cummings and denied Plaintiff any due process; the

Unnamed Professor was added to the mix - likely related to the cheating scandal that was never investigated - and with animus agreed to file bogus criminal charges; Buck granted Cummings' request in ceasing communication with Plaintiff; and Fioravanti agreed to assist in removing Plaintiff from UMASSD and to protect the interest of his co-Defendants.

**557.** By way of examples, without limitation were: (i) Majewski, Gomes, Helm and Gomes refused to provide Plaintiff notice and an opportunity to be heard among other due process violations; (ii) Majewski, Gomes and Cummings violated Plaintiff's confidentiality in disseminating private information to other schools, and via the all hands meeting at SMAST; (iii) Majewski and Cummings attempted to extort Plaintiff, then issued unwarranted interim sanctions on Plaintiff without cause; (iv) Despite Defendants' finding that Plaintiff was not responsible for misconduct, he was sanctioned and caused to suffer a hostile learning environment; (v) Unnamed Professor knowingly filed false criminal charges against Plaintiff; (vi) Fioravanti knowingly assigned a detective to investigate a baseless criminal allegation, then recused his entire Department from investigating a criminal complaint against Co-Defendants, unlawfully concealed the identity of the Unnamed Professor, and required Plaintiff to obtain escort before entering UMASSD property to speak to witnesses or Defendants; and (vii) Majewski, Cummings, Helm and Gomes intentionally violated nearly every protocol required in the disciplinary process.

**558.** As a result of the civil conspiracy Defendants are jointly and severally liable for Counts I thru IV, VI, VII, IX, XIII, XIV, XVIII and XX.

**559.** **Plaintiff asks the court to take judicial notice** that, despite his repeated FOIA requests for public records, UMASSD refuses to provide Plaintiff any documents related to this matter without cause.[102] Such action allows a reasonable person to plausibly infer that UMASSD is concealing behavior related to Plaintiff's claims, and gives greater weight to his allegations.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

## PRAYER FOR RELIEF

**WHEREFORE**, for the foregoing reasons, Plaintiff demands judgment against Defendants, jointly and severally, as follows:

Plaintiff requests that this Court enter judgment against Defendants jointly and severally on all counts of this complaint as described below in each count. Plaintiff further requests that this Court: (A)

---

[102] Exception - UMASSD Police offered redacted documents, but refused to provide the identity of Unnamed Professor. UMASSD Spokesman, John Hoey refused to offer any documents requested including Plaintiff's educational record in violation to FERPA.

Retain jurisdiction of this matter for the purpose of enforcing this Court's order; (B) Award to Plaintiff compensatory damages in an amount to be determined at trial; (C) Award reasonable costs and expenses, including attorney's fees, in accordance with 42 U.S.C. § 1988; (D) Grant such other and further relief as this Court deems equitable and just under the circumstances, AND:

(i)     on the first cause of action, against UMASSD, for **Violation of Title IX of the Education Amendments of 1972**, awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements to be determined at trial (herein for other relief claims known as "damages") and an injunction against UMASSD as a result of UMASSD's violation of Title IX to: (i) reverse the outcome and findings regarding unnamed complainant's complaint; (ii) expunge Plaintiff's disciplinary record; (iii) remove any record of Plaintiff's suspension from his education file; (iv) permanently destroy any record of any complaint; and (v) confer Plaintiff's degree by applying existing credit to the six credit hours remaining for receiving his degree or, in the alternative, allow Plaintiff to return to UMASSD at a time of his choosing in order to complete his degree without any conditions for readmission to the University or cost of tuition (herein known as "judgment");

(ii)    on the second cause of action against all Defendants for **Retaliation related to Title IX under under 42 U.S.C. § 1983**, awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, "damages" and punitive damages against Defendants Majewski and Cummings.

(iii)   on the third cause of action against all Defendants for **Violation of Constitutional Due Process under 42 U.S.C. § 198**3, awarding Plaintiff "damages" in an amount to be determined at trial, including, without limitation, "damages," "judgment" (as in (i)) and punitive damages against Defendants Majewski, Helm, Gomes, and Cummings.

(iv)    on the fourth cause of action against all Defendants for **42 U.S.C. § 1983 – Denial of First Amendment Rights/ First Amendment Free Speech Retaliation** awarding Plaintiff "damages" and punitive damages against Defendants, and declaration that that Defendants violated his rights.

(v)     on the fifth cause of action against UMASDD for **Protocol 2015 and Policies that are Unconstitutionally Overbroad**, a judgment declaring both policies unconstitutionally vague .

(vi)    on the sixth cause of action against named Defendants in Count six for **Defamation** awarding Plaintiff "damages" and punitive damages against Defendant Cummings.

(vii)   on the seventh cause of action Defendant Cummings for **Violation of Massachusetts Civil Rights Act (MCRA)** awarding Plaintiff "damages", and punitive damages against Cummings.

(viii)  on the eighth cause of action against Defendant Majewski for **aiding and abetting Violation of Massachusetts Civil Rights Act (MCRA)** awarding Plaintiff "damages" and punitive damages against Defendant Majewski.

(ix)     on the ninth cause of action against Defendants Majewski and Cummings for **Intentional Interference with Advantageous Relations** awarding Plaintiff "damages" and punitive damages against Defendant Majewski and Cummings.

(x)      on the tenth cause of action against Defendants UMASSD, Helm, Majewski and Cummings for **Negligence In Disclosing Confidential Information** awarding Plaintiff "damages."

(xi)     on the eleventh cause of action against UMASSD for **Negligence as to Establishing Reasonable Disciplinary Policy**, awarding Plaintiff "damages."

(xii)    on the twelfth cause of action against Defendants UMASSD, Majewski and Cummings for **Breach Of Fiduciary** awarding Plaintiff "damages."

(xiii)   on the thirteenth cause of action against Defendants UMASSD, Majewski and Cummings for **Invasion of Privacy/Disclosure Of Private Facts** awarding Plaintiff "damages."

(xiv)    on the fourteenth cause of action against Defendants UMASSD, Helm, Majewski and Cummings for **Malicious Prosecution And Abuse of Process** awarding Plaintiff "damages" and punitive damages against Defendants Majewski, Helm, Gomes and Cummings.

(xv)     on the fifteenth cause of action against Defendant UMASSD for **Breach of Contract** awarding Plaintiff "damages."

(xvi)    on the sixteenth cause of action against UMASSD for **Breach of the Implied Covenant of Good Faith and Fair Dealing** awarding Plaintiff "damages."

(xvii)   on the seventeenth cause of action against Defendants UMASSD, Buck and Webster for **Promissory Estoppel** awarding Plaintiff "damages."

(xviii)  on the eighteenth cause of action against named Defendants in Count eighteen for **Intentional Infliction of Emotional Distress,** a judgment awarding Plaintiff "damages" and punitive damages against Defendants Majewski, Helm, Gomes and Cummings.

(xix)    on the nineteenth cause of action against Defendants UMASSD, Majewski, Cummings, and Helm for **Negligent Infliction of Emotional Distress,** a judgment awarding Plaintiff "damages."

(xx)     on the twentieth cause of action against named Defendants for **Intentional Interference with Contractual Relations with Veterans Affairs,** a judgment awarding Plaintiff "damages."

(xxi)    on the twenty-first cause of action against named Defendants for **Civil Conspiracy,** a judgement awarding Plaintiff  "damages" and holding Defendants jointly and severally for counts named.

### Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11.  I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.


Date: May 7, 2019

Respectfully Submitted:          John Harnois, Pro Se

                                 By: /s/ John Harnois

                                 53 Child Street, Unit 669
                                 Warren, RI 02885
                                 doe.Plaintiff.123199@gmail.com
                                 (508) 333-1728