# UNITED STATES DISTRICT COURT

# DISTRICT OF MASSACHUSETTS

-------------------------------------------------------------------------X

**JOHN HARNOIS,**                                                       Civil Action No: 1:19-CV-10705
                                        **Plaintiff,**

-against-                                                               **3rd AMENDED COMPLAINT**

**UNIVERSITY OF MASSACHUSETTS AT DARTMOUTH;**
**PEYTON R. HELM in individual and official capacity;**
**CYNTHIA CUMMINGS, in individual and official capacity;**
**DEBORAH MAJEWSKI, in individual and official capacity;**
**SCOTT WEBSTER, in individual and official capacity;**
**DAVID GOMES, in individual and official capacity;**
**JOHN BUCK, in his individual and official capacity;**
**EMIL FIORAVANTI, in his individual and official capacity;**
**UNNAMED PROFESSOR, in his individual and official capacity;**
                                        **Defendants.**
-------------------------------------------------------------------------X

Plaintiff John Harnois (hereinafter referred to as "Plaintiff"), Pro Se, respectfully alleges:

## THE NATURE OF THIS ACTION

### *"Show me the man and I'll find you the crime"[1]*

**1.**   This constitutional due process, Title IX reverse discrimination and related state law claims suit is brought by Plaintiff John Harnois, Pro Se, a former male graduate student with a previously unblemished disciplinary record at the University Of Massachusetts At Dartmouth ("UMASSD"), who was constructively expelled.

**2.**   Plaintiff's dream to work in baleen whale conservation has been destroyed as the result of a bogus disciplinary case and investigation intended to force Plaintiff's withdrawal or his expulsion because he was a properly matriculated male student with a properly disclosed conviction from a decade prior.

**3.**   When Defendants learned in late April 2016 that Plaintiff had a criminal conviction, they commanded

---

[1] "I don't like criminal investigations to start on hoping that you have the target, maybe we'll find the crime, maybe we'll find the statute – and if we can't find the statute, we'll stretch the statute to fit the person…" "That sounds like Lavrentiy Beria [Joseph Stalin's secret police chief] I don't want to ever see that come to America." - Harvard Law School Professor Alan Dershowitz on Special Counsel Mueller's investigation of President Donald Trump - May 26, 2017.

him to attend a sham Conduct Conference with insufficient notice of the meeting and the charges. He was accused of vague undefined allegations related to creating a hostile learning environment and improperly disclosing his history in his admissions application. Defendants attempted to extort Plaintiff by threatening to disseminate his confidential educational record information, accuse him of a crime and destroy his reputation with his colleagues and advisors both within UMASSD and with outside research opportunities if he refused to withdraw from UMASSD.

**4.**     Plaintiff refused to acquiesce to Defendants' threats. Denying Plaintiff any due process, Defendants instituted unwarranted  punitive interim sanctions with a DO NOT TRESSPASS ORDER, a "Do Not Contact" order denying him communication with <u>anyone</u> associated with UMASSD, and suspended him without cause.

**5.**     Within two weeks, Defendants, as promised, maliciously and falsely accused Plaintiff of multiple crimes, intentionally promulgated sensitive confidential information, then defamed him with his colleagues at UMASSD and outside research opportunities.  These actions alone stigmatized Plaintiff and ruined his reputation in his pursuit of chosen academic field and profession.

**6.**     The baseless accusations of sexual misconduct and of other felonious crimes led to formal sanctions and change of Plaintiff's legal status despite a finding of not responsible for all misconduct allegations. Throughout the *Kafkaesque* disciplinary process that denied due process, Plaintiff was presumed guilty from the start, and subjected to gender-biased unfair treatment leading to an erroneous outcome of sanctions unsupported by the facts, by any school policy or by basic fairness. By way of examples, without limitation were Defendants': (i) failure to provide Plaintiff with proper, adequate and timely notice of the charges against him and the potential sanctions for such charges; (ii) failure to provide Plaintiff the opportunity to be heard; (iii) deliberate refusal to honor Plaintiff's right to have an advisor at his Conduct Conference or choice of his advisor at any time; (iv) failure to conduct a fair, thorough, and impartial investigation; (v) failure to address Plaintiff's repeated reported complaints (from himself and through his attorney) detailing violations of  due process, violations of school policies, and of sexual discrimination in the disciplinary process; (vi) intentional failure to adhere to UMASSD's own policies; (vii) abuse of discretion in the issuance of an unwarranted interim sanction; (viii) failure to provide the identity of any supposed accuser(s); (ix) failure to provide any shred of evidence against Plaintiff; (x) failure to provide any opportunity to confront the accuser, question the witnesses, present witnesses, or present a defense at a hearing; (x) failure to provide the Special Examiner's report to Plaintiff; (xi) imposing actual formal sanctions without justification after a finding of not responsible, causing Plaintiff to suffer a hostile learning environment, and summarily denying Plaintiff an appeal without ever providing a sufficient explanation or rationale to those decisions.

**7.**     Despite a finding of not responsible, Defendants still sanctioned Plaintiff. He received a formal warning

and they directed the Dean of SMAST to implement 'appropriate interventions.' The illegitimate sanctions censored Plaintiff from engaging other students, confined him to an isolated supervised workspace adjacent to the Dean's office, and denied Plaintiff's access to his normal routine in the graduate student work area, all which denied his benefitting from his contractual educational experience. Defendants amended his academic program without his consent from a Master's Thesis Program/Fastrack to Ph.D. to Master's Non-Thesis.

**8.**    Plaintiff found the UMASSD directed harassing environment on campus so hostile and toxic that he was compelled to seek a leave of absence. UMASSD constructively expelled Plaintiff from his education program, and caused him to lose 5 years of funding in pursuit of a Ph.D. in his chosen field.

**9.**    For these reasons, Plaintiff brings this action to obtain equitable, declaratory relief and legal damages, inter alia, for violations of Title IX of the Education Amendments of 1972, breach of contract and covenant of good faith/fair dealing, defamation, invasion of privacy, intentional/negligent infliction of emotional distress, civil conspiracy, Violation of 1st Amendment Right to Speech, and denial of due process.

## THE PARTIES

**10.**    Plaintiff, a natural person, citizen of the United States, is a resident of Rhode Island. He is a disabled veteran, who attended UMASSD under 38 U.S.C. section 3101, which authorized him 5 years of academic funding to pursue a Ph.D. in Oceanography.

**11.**    Defendant UNIVERSITY OF MASSACHUSETTS AT DARTMOUTH ("UMASSD") receives Federal funding and is a public body corporate and politic established, organized and authorized under and pursuant to the laws of Massachusetts, with the authority to sue, and be sued, and was at all times relevant herein, operating within the course and scope of its authority under color of state law and in receipt of federal funding under Title IX, 20 U.S.C. §§ 1681-1688. At all times material hereto, UMASSD acted by and through its agents, employees, and representatives who were acting in the course and scope of their respective agency or employment and/or in the promotion of UMASSD business, mission and/or affairs, under the color of law.

**12.**    Defendant Peyton Helm ("Helm") was the Interim Chancellor of UMASSD and is a resident of Oregon.

**13.**    Defendant Cynthia Cummings ("Cummings") was the Asst. Vice Chancellor for Student Affairs and is a resident of Massachusetts.

**14.**    Defendant Deborah A. Majewski ("Majewski") was the Associate Vice Chancellor, Title IX Coordinator, ADA and 504 Coordinator, Office of Diversity, Equity and Inclusion and is a resident of Massachusetts.

**15.**    Defendant Scott Webster ("Webster") was the Director Graduate Studies & Admissions and is a resident of Massachusetts.

**16.**    Defendant David Gomes ("Gomes") was the Deputy Director / Senior Investigator of Diversity, Equity

& Inclusion, and is a resident of Massachusetts.

**17.**   Defendant John Buck ("Buck"), was a tenured professor at UMASSD and is a resident of Massachusetts.

**18.**   Unnamed Professor ("Professor") was a professor at UMASSD and is a resident of Massachusetts.

**19.**   Defendant Emil Fioravanti ("Fioravanti") was the UMASSD Police Chief and is a resident of Massachusetts.

**20.**   All individual Defendants are being sued in their individual and official capacity.

**JURISDICTION AND VENUE**

**21.**   This Court has diversity, federal question and supplemental jurisdiction pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1332, and 28 U.S.C. 28 U.S.C. § 1367 because: (i) Plaintiff and each Defendant are citizens of different states and the amount in controversy exceeds $75,000, exclusive of costs and interest; (ii) the claims herein arise under federal law under Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq.; and (iii) the state law claims are so closely related to the federal law claims as to form the same case or controversy under Article III of the U.S. Constitution.

**22.**   This Court has personal jurisdiction over all Defendants, who conducted business within Massachusetts.

**23.**   Venue for this action properly lies in this district pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to the claim(s) occurred in this judicial district.

**FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS**

**I.**   **Plaintiff's Efforts to Apply to UMASSD**

**24.**   From April 2015 to his matriculation of January 20, 2016[2],  Plaintiff fully disclosed the facts surrounding his conviction of a  decade prior to Webster and his staff.

**25.**   In April of 2015, Plaintiff took a graduate acoustics class and accepted a summer internship with Professor James Miller at (URI) related to underwater acoustics of the Block Island Wind Farm. Miller recommended Plaintiff contact Defendant Buck.

**26.**   On June 1, 2015, Plaintiff requested Buck serve as his Ph.D. advisor. By July 1, 2015 Buck promised to sponsor Plaintiff's academic pursuit of a Ph.D. in Oceanography/Bioacoustics and help develop research projects for Plaintiff's Ph.D. dissertation. Buck further promised to introduce Plaintiff to specific scientists for Plaintiff's committee. From June 1, 2015 to May 4, 2016, Buck and Plaintiff exchanged over 150 texts,

---

[2] Despite many applicants of male students with convictions to UMASSD, Plaintiff was the first and only applicant who was accepted, and when Cummings and Majewski learned of same, they took extraordinary action to remove Plaintiff.

calls and emails regarding Plaintiff's Ph.D. pursuit and development of his committee, consulted weekly in Buck's office, and Buck provided Plaintiff a workspace in Buck's EE lab. Buck served officially and contractually as Plaintiff's advisor, and had a fiduciary responsibility with him.

**27.**   Plaintiff attended the 170th Meeting of the Acoustical Society of America in Jacksonville, FL from November 2 to 6, 2015, so Buck could introduce Plaintiff to Douglas Nowacek, Ph.D., Duke Nicholas School of the Environment, and Jennifer L. Miksis-Olds, Ph.D., Director, Center for Marine Science & Technology, at The Pennsylvania State University. Both met with Plaintiff, discussed detailed scientific corroboration and agreed to serve on Plaintiff's academic graduate committee, which constituted advantageous relations.

**28.**   In the fall (September) of 2015, Plaintiff took three classes at UMASSD in preparation of and to promote his application for matriculation to UMASSD graduate school. Professors of each fall class and Buck wrote Plaintiff's letters of recommendation.

## II.   Plaintiff's Performance at UMASSD and Development of Research Interest

**29.**   The parochial academic community of Plaintiff's research interest, an interest which he had been developing since 2012, consisted of bioacoustics scientists, who used drones to assess stress on baleen whales, including scientists from the Boston Aquarium, Woods Hole Oceanographic Institute (WHOI), URI, Duke Marine Lab, and Miksis-Olds' lab.

**30.**   From December 31, 2015 to January 20, 2016, Plaintiff and Senior Scientist Michael Moore, Ph.D., Director of Marine Mammal Center at WHOI developed a joint whale research project with Buck that would continue through the summer of 2016, which constituted an advantageous relationship.

**31.**   In February 2016, Buck arranged for Miksis-Olds to accept Plaintiff in a prestigious bioacoustics program scheduled for June 5-10, 2016, called SeaBASS, a biannual training program that recruited the best international talent in bioacoustics. Students accepted often leverage attendance into additional invitations to collaboration on research projects and grants.

**32.**   Throughout the Spring of 2016, Professor Nowacek recruited Plaintiff to apply to the Nicholas School of Marine Science at Duke, and lobbied for Plaintiff's acceptance into the 2016 summer classes and internship program at Duke Marine Lab.

**33.**   Leading into the Spring of 2016, Plaintiff had labored successfully to develop a viable graduate program, with the world's leading scientists in the realm of his academic and career pursuit and maintained a 4.0 GPA in all graduate courses.

## III.   Representations, Agreements, Covenants and Warranties of  Plaintiff and UMASSD

**34.**   Plaintiff told Webster he would not jeopardize  his academic career and VA scholarship if the graduate

admissions office could not guarantee absolute confidentiality of the disclosed conviction. Multiple times Webster made unambiguous promises that he, his staff and UMASSD staff would secure Plaintiff's confidential information in addition to restrictions under FERPA.

**35.** Buck likewise unambiguously promised that, as a term to Plaintiff's matriculating to UMASSD SMAST, he would serve as Plaintiff's advisor through his dissertation completion.

**36.** Solely based on Webster's promise to ensure Plaintiff's confidentiality of the information in his disclosure statement, and based on Buck's promise to advise Plaintiff in his Ph.D. pursuit, Plaintiff decided to apply his scholarship to and matriculate at UMASSD over all other programs under consideration to his detriment. But for these assurances, Plaintiff would have chosen matriculation elsewhere.

**37.** From when Plaintiff enrolled in classes in September 2015, to Plaintiff's matriculation to the UMASSD SMAST thesis Master's Degree program[3], a contractual relationship existed between Plaintiff and UMASSD bound by the terms of school online policies including: 1) UMASSD 2015-2016 Student Handbook (Handbook),[4] which includes Student Conduct Policies and Procedures, (Policies)[5]; 2) FERPA policy; 3) 2015 Sexual Violence Protocol (herein as "Protocol"), and 4) any and all statements of procedure or policy on UMASSD official websites at the times relevant.

**38.** Protocol, which was to govern sexual misconduct cases going forward, in fact competed and paralleled with Policies as related to sexual misconduct causing confusion for Defendants and Plaintiff on the implementation of the policy.

**39.** UMASSD Handbook states:[6] "The Student Handbook is the University's official notification of UMASSD resources, policies, regulations, and community standards.

**UMASSD Sexual Violence Protocol – 2015 (Herein as Protocol)**

**40.** In August 2015, UMASSD implemented Protocol under the Office of Diversity, Equity and Inclusion, and Student Affairs, which was specifically tailored to conform to directing guidelines in the Federal Dear Colleague Letter of (DCL) 2011.[7]

**41.** UMASSD utilizes an <u>Investigative Model</u>[8] for the resolution of complaints of sexual violence.

**42.** Per Protocol when notified of an incident of sexual violence, the Title IX Coordinator in the Office of Diversity, Equity and Inclusion <u>will review the available information and if necessary</u>, appoint a Title IX

---

[3] Plaintiff had applied to the Ph.D. program; Plaintiff, Buck and Steve Cadrin (Admissions Director of SMAST) agreed that Plaintiff would be considered on the FastTrack program for acceptance into the Ph.D. program once Plaintiff wrote a research proposal.

[4] https://www.umassd.edu/studentaffairs/studenthandbook/ (for 2016)

[5] https://www.umassd.edu/studentaffairs/departments/student-conduct-and-dispute-resolution/policies/ (for 2016)

[6] https://www.umassd.edu/studentaffairs/studenthandbook/ (for 2016).

[7] Definitions and procedures of Protocol directly mirror those "recommended" by OCR.

[8]     https://columbialawreview.org/content/the-old-college-trial-evaluating-the-investigative-model-for-adjudicating-claims- of-sexual-misconduct/

Investigator. Title IX Investigators receive annual training for this role.

**43.**   Using a single investigative model UMASSD Protocol deprives an accused of a hearing before an impartial panel and instead permits one unlicensed individual within the Title IX office, with undisclosed qualifications, potential conflicts of interests and experience to act as detective, prosecutor, judge and jury.

**44.**   This convergence of roles creates substantial conflicts of interest that allow a single individual to direct the ultimate outcome of the matter based his/her presumptions about the veracity of the allegations and influenced by innate beliefs about the roles of males and females in sexual situations, compounded by the preconceived notions of any male with a conviction.

**45.**   Moreover this investigative model deprives an accused student of a full and meaningful opportunity to be heard as he is denied the opportunity to present his defense before an impartial panel of decision makers, to cross examine his accuser (whether or not the reporting party is the alleged victim) and to challenge the evidence or witnesses who, per the Title IX Office, offered adverse testimony against him.

**46.**   Further, upon information and belief, UMASSD uses the trauma informed investigation model when investigating complaints, which teaches that trauma causes responses in victims that may be counterintuitive; for instance, continued contact with the perpetrator, delayed response to trauma, flat affect, or use of humor. It discusses that "survivors" do not act in any one way but responses can vary as there are a variety of coping mechanisms. Consequently, statements denying that any trauma occurred could be construed as a direct response to the trauma suffered.

**47.**   Like the regulation at issue in *DeJohn v. Temple University*, 537 F.3d 301 (3d Cir. 2008) and in *Saxe v. State Coll. Area School Dist.*, 240 F.3d 200 (3d Cir. 2001), definitions of sexual misconduct, sexual harassment, hostile environment, etc.. in Protocol and Policies at UMASSD, which mirror those in DeJohn and Saxe are facially overbroad and constitutionally vague and thus deny Plaintiff and any student adequate notice and opportunity to be heard in referencing them.

**48.**   Upon information and belief Investigator Gomes, Cummings and Majewski failed to receive proper training on the implementation of either Policies and/or Protocol and on proper training on the scope, definition and application on what constitutes sexual harassment and hostile learning environment sufficient to warrant a Title IX investigation or implement a constitutionally deficient procedure.

**49.**   Evidence suggests that Gomes, Majewski and Cummings incredulously hold that Plaintiff's statement – of simply conveying emotion about missing his children - equates to a hostile learning environment that warrants interim and final sanctions wildly different than the standard issued by the Supreme Court in *Davis v. Monroe County Bd. of Educ.*, 526 U.S. 629 (1999).[9]

---

[9] "Moreover, we conclude that such an action will lie only for harassment that is so severe, pervasive, and objectively offensive that it effectively bars the victim's access to an educational opportunity or benefit."

**50.**   Additionally, Majewski illustrated her ignorance of the process in Protocol and Procedures by repeatedly confusing the start of the disciplinary process, which began since the May 4th Conduct Conference.

**51.**   Protocol implies a hearing is guaranteed inasmuch as it states, "Both the reporting party and the respondent may appeal the outcome of a student conduct hearing if they attended the hearing." Such covenant reasonably implies that a student under investigation under Protocol should receive a hearing of some kind with reasonable fairness of due process, all which Plaintiff was denied.

## IV.   UMASSD Faced Intense Federal, UMASS, Local and Student Pressure to Comply with Title IX and to Ensure Another Male Student did not Re-traumatize UMASSD

### UMASSD was traumatized and suffered  pressure after housing the Boston Marathon Bomber

**52.**   On April 15, 2013, Dzhokhar Tsarnaev - a UMASSD student who lived on the third floor of the UMASSD Pine Dale dormitory – and his brother horrifically set off two pressure cooking bombs at the finish line of the Boston Marathon, killing and/or injuring more than 200 innocent people..

**53.**   On April 19, 2013, international media, assault army helicopters, federal agents, and armed police swat teams in tactical gear deluged UMASSD in search of Dzhokhar Tsarnaev.  All UMASSD students, staff, and employees were evacuated while police conducted their search from building to building. Many evacuated personnel and students reported being traumatized by the experience and expressed fear and a sense of lack of safety thereafter at UMASSD.

**54.**   The Boston Marathon Bombing gained international, national, regional and local media attention.

**55.**   On May 20, 2013 Chancellor Divina Grossman convened an independent task force to review the actions and procedures related to the Boston Marathon Bombing heightening the profile of UMASSD's involvement in the Marathon Bombing and the fact that a male student - associated with criminal activity - traumatized the entire UMASSD community.   The task force involved Cynthia Cummings in their investigation and further sensitized Cummings to male students with potential criminal associations.

**56.**   The national, regional and local reputation of UMASSD was severely tarnished because it housed and harbored an international terrorist without any sense of his malicious intentions.

**57.**   For the two years immediately following and related to the bombing, campus performance sharply declined including significant reductions in enrollment and private fund raising. On Thanksgiving 2015, the Boston Globe reported that Marty Meehan, UMASS President, would dismiss Grossman for declining campus performance.  In Grossman's retirement announcement, she referred to UMASSD's response to the Marathon Bombing as a professional achievement, but also implied that it was the proximate cause for the decline in enrollment and donations.

**58.**   Upon information and belief, Defendants are in possession of documents that similarly state that UMASSD was and is under pressure to preclude another high profile criminal association, would take any and all actions necessary against male students to ensure that crimes will not be associated with UMASSD, and extraordinary measures and policies against males were implemented but unpublished.

**National Institutional Pressure from "April 2011 Dear Colleague Letter"**

**59.**   On April 4, 2011, the Office for Civil Rights ("OCR") of the United States Department of Education issued a guidance letter to colleges and universities in the United States in receipt of federal funding which became widely known as the "Dear Colleague Letter" (the "DCL" or "2011 Dear Colleague Letter"). The DCL advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education Amendments of 1972, 20 U.S.C. §1681 *et seq.*and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence and address its effects."

**60.**   The DCL relied on faulty statistics in sounding a "call to action" for campuses nationwide—that "about 1 in 5 women are victims of completed or attempted sexual assault while in college." DCL, at p. 2.  The researchers behind this study subsequently invalidated that statistic as a misrepresentation of the conclusions of the study and warned that it was "inappropriate to use the 1-in-5 number as a baseline…when discussing our country's problem with rape and sexual assault." http://time.com/3633903/campus-rape-1-in-5-sexual-assault- Relying on these faulty numbers, the DCL minimized due process protections for the accused men by, among other things, eschewing any presumption of innocence, mandating a preponderance of the evidence standard, limiting cross-examination, and forbidding certain forms of alternate resolution.

**61.**   The Obama Administration, through the DOE and OCR, has treated the 2011 Dear Colleague Letter as binding on regulated parties for all practical purposes and thus has pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses. Catherine Lhamon, Assistant Secretary of the Department of Education ("DOE") in charge of its Office of Civil Rights ("OCR"), has delivered what has been treated as marching orders by colleges and universities.

**62.**   On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled: *Questions and Answers on Title IX and Sexual Violence ("Q&A")* which was aimed at addressing campus sexual misconduct policies, including the procedures colleges and universities "must" employ "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence." Q&A, at p. 12. The Q&A advised schools to adopt a trauma informed approach, advising, for example, that hearings should be "conducted in a manner that does not inflict additional trauma on the complainant." Id. at p. 31.

**63.**   In April 2014, the White House issued a report entitled "*Not Alone[10]*".  Like the 2011 Dear Colleague Letter, it  relied upon the faulty "1 in 5" statistic and focused on protecting women from sexual assault, "engaging men" and "if you see it happening, help her, don't blame her, speak up." *Id.* at p.2. The report also suggested that college and universities undergo "trauma informed training" because "victim's often  blame themselves; the associated trauma can leave their memories fragmented; and insensitive or judgmental questions can compound a victim's distress." The report included a warning that if the  OCR  found  that  a Title  IX  violation occurred, the "school risk[ed] losing federal funds" and that the DOJ shared  authority with  OCR for enforcing Title IX and may initiate an investigation or compliance review of schools. Further, if a voluntary resolution could not be reached, the DOJ could initiate litigation. The report contained no recommendation with respect to ensuring that the investigation and adjudication of sexual assault complaints be fair and impartial or that any resources be provided to males accused of sexual assault.

**64.**   In June 2014, Llhamon testified before the United States Senate that if OCR could not secure voluntary compliance with the DCL from a college or university, it would elect to initiate an administrative action to terminate federal funds or refer the case to the Department of Justice. She stated, "some schools are still failing their students by responding inadequately to sexual assaults on campus. For those schools, my office and this Administration have made it clear that the time for delay is over."

**65.**   In July 2014, Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter. "Do not think it's an empty threat," Lhamon warned. She went on to describe that enforcement mechanism  as part of a set of "very, very effective tools," adding "If a school refuses  to  comply with Title IX in any respect, I will enforce." Lhamon was quoted: "It's not surprising to me that we haven't gone to the last step... ; It means that so far the process has been working." Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," July 5, 2014 .

**66.**   On September 1, 2014 the Chronicle of Higher Education noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014. In the same article, the Chronicle noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no. That is because in heterosexual cases, colleges typically see the male student as the one

---

[10] http://changingourcampus.org/about-us/not-alone/

physically able to initiate sex, and therefore responsible for gaining the woman's consent." "Presumed Guilty: College men accused of rape say the scales are tipped against them," Chronicle of Higher Education, September 1, 2014.

**67.**   Robert Dana, Dean of Students at the University of Maine, echoed the sentiment that a fear of governmental intervention and withdrawal of funds could lead colleges to rush to judgment against male students in disciplinary proceedings. See Tovia Smith, Some Accused of Sexual Assault on Campus Say System Works Against Them, National Public Radio (Sept. 3, 2014), https://www.npr.org/2014/09/03/345312997/some-accused-of-campus-assault-say-the-systemworks-against-them. Dana told NPR, "[c]olleges and universities are getting very jittery about it."

**68.**   To support its enforcement of the DCL, the OCR hired hundreds of additional investigators. To date, OCR has conducted over five hundred investigations of colleges for the potential mishandling of complaints of sexual misconduct. See Title IX: Tracking Sexual Assault Investigations, Chronicle of Higher Education, https://projects.chronicle.com/titleix/ (last visited Dec. 18, 2018).

**69.**   The threat of revocation of federal funds—the ultimate penalty—was a powerful tool in motivating colleges, including UMASSD, to aggressively pursue and punish male students accused of sexual misconduct. In that regard, Anne Neal, of the American Council of Trustees and Alumni, observed: "There is a certain hysteria in the air on this topic, it's really a surreal situation, I think."  See Tovia Smith, How Campus Sexual Assaults Came to Command New Attention," National Public Radio (Aug. 12, 2014), https://www.npr.org/2014/08/12/339822696/how-campus-sexual-assaults-came-to-command       new-attention. Neal explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of defendants instead."

**70.**   On September 22, 2017, the OCR rescinded the DCL and put in place interim guidance (the "2017 Q&A"), while the current administration reviews and revises its practices regarding the adjudication of complaints of sexual misconduct on college campuses. See Dep't of Ed., Q&A on Campus Sexual Misconduct (Sept. 2017), https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

**71.**   The 2017 Q&A suggests that the policies and procedures in place at UMASSD at all times relevant to this lawsuit – which, on information and belief, were tailored in such a way as to comply with the 2011 DCL under threat of loss of federal funding – were unfair and, ultimately, out of step with the goal of gender equality in Title IX proceedings. Moreover, to the extent these policies did purport to provide a fair process to respondents, Defendants failed to honor them.

**DCL in relation to UMASSD and UMASSD's compliance under Federal/Media/Student pressure.**

**72.**   On May 1, 2014, the DOE issued a press release naming University of Massachusetts as one of the

initial 55 colleges and universities being investigated for violating Title IX. Llhamon stated that the schools were being named "in an effort to bring more transparency to our enforcement work and to foster better public awareness of civil rights." Per the press release, "All universities…receiving federal funds must comply with Title IX. Schools that violate the law and refuse to address the problems identified by OCR can lose federal funding or be referred to the U.S. Department of Justice for further action.

**73.**   University of Massachusetts System, maintains multiple campuses, is governed by a single 22- member Board of Trustees that represents various interests of the public at large, and functions as a legislative body dealing mainly with general policies governing the University. The events at one campus that threatens the Federal funding under Title IX influences the decisions of the University of Massachusetts System at large, especially when those events occur at the headquarters campus at Amherst.

**74.**   In response to pressure from OCR, DOJ, and the White House, educational institutions, like UMASS and UMASSD  have amended their policies to comply and have limited  procedural protections afforded to male students, like Plaintiff, in sexual misconduct cases.  Additionally UMASS and UMASSD officials have made  specific  comments   in response to and  illustrated sensitivity to the pressure of  OCR, DOJ and the White House.

**75.**   The Boston Globe on May 3, 2014 described the experience of Dana Bolger that garnered national attention.[11] Similar precipitating events caused policy changes at UMass Amherst, which influenced the decisions and policy of officials at all campuses (including UMASSD).

**76.**   That same day, UMass Amherst's Title IX Office announced it adopted a "survivor-centered" approach to misconduct investigations and hearings, under which all members of the University community are exhorted to "BELIEVE" and are instructed, "Don't Question. Don't Judge…Just Believe and Support."

**77.**   Shortly thereafter, the University created and funded The Men's and Masculinities Center, which claims that men who adhere to "more traditional constructions of masculinity" are "more inclined to engage in a range of unhealthy and risky behaviors including …sexual violence."

**78.**   Leaving no doubt it was bowing to outside pressure, UMass Amherst issued a public statement explaining that its "student conduct code has been revised…We've been very concerned with this; it's an issue here and across the Country." UMASSD officials, in responding to press reports regarding sexual violence against women, cited verbatim those very concerns as those of UMass Amherst officials.

**79.**   For UMASSD specifically there has been financial gain to open Title IX investigations and find against the accused. UMASSD's Center for Women, Gender, and Sexuality  (CWGS) received a three year, $300,000

---

[11] https://www.google.com/amp/s/www.bostonglobe.com/metro/2014/05/02/student-activism-white-house-pressure- elevated-sexual-assault-college-campuses-national-concern/JiMUJDdai4ub1mTuEREPaL/amp.html

grant from the U.S. Department of Justice's Office on Violence against Women ("OVW"). to "Reduce Sexual Assault, Domestic Violence, Dating Violence and Stalking on Campus, which the maximum amount ($300,000) which could be awarded to an individual institution.

**80.**   The federal description for the OVW grant, which was authorized by the Violence Against Women Act, 42 U.S.C. § 14045b, states "the Campus Program encourages a comprehensive coordinated community approach that enhances victim safety, provides services for victims and supports efforts to hold offenders accountable. The funding supports activities that develop and strengthen victim services and strategies to prevent, investigate, respond to and prosecute these crimes… Colleges and universities should demonstrate to every student that these crimes will not be tolerated, and that perpetrators will face serious consequences…." UMASSD was awarded a $300,000 OVW federal grant based upon their application supporting the foregoing criteria. (emphasis supplied)

**81.**   In July 2014, local news publications reported that the US Dept. of Education's Office of Civil Rights was investigating UMASSD's mishandling of sexual misconduct cases of female victims.[12, 13] The complaint being investigated focused on the improper response to sexual assault on a female student. In response to the investigation UMASSD officials were quoted and equated victims with female students, and committed to inter alia proactive prosecutions of males, such as in Plaintiff's case.  In assuming the accuracy of victims' (females) statements, male perpetrators' are assumed guilty.

**82.**   Circa August 2014, UMASSD acknowledged the DCL on the UMASSD Title IX website, and incorporated the explicit directive guidance into Title IX Investigative Procedures.[14]

**83.**   In August 2014, UMASSD was ordered to pay nearly $1.2 million after appealing a ruling of a discrimination complaint,[15] causing UMASSD to become hypersensitized to potentially similar suits by females filing Title IX discrimination complaints.

---

[12] https://cohasset.wickedlocal.com/article/20140730/NEWS/140739503

[13] *"UMass Dartmouth officials said they're not taking the investigation lightly…" "It's an important issue. We're going to do what we need to do to comply with the request," said David Milstone, UMass Dartmouth's Vice Chancellor for Student Affairs. "We're obviously going to do our best to strengthen our program." "Over the past several years, we have been proactive in enhancing our response to Title IX issues, and will approach this inquiry as an opportunity to further strengthen our policies and practices," UMass Dartmouth spokesman Plaintiff Hoey said in a statement. Milstone said, "UMass Dartmouth averages about four reported cases each year" and said that, "based on what we know about sexual violence," there is a discrepancy between the number of incidents of sexual violence that actually happen on campuses versus those that ultimately get reported. "Any time there is a complaint…, we have two responsibilities. One is to ensure safety of victim. The other is to make sure the community has a separation from the alleged perpetrator in this case," Milstone said. "We want to be careful to support the victim… We want to assume accuracy in what the victim is saying…"*

[14] On April 4, 2011, the U.S. Department of Education Office of Civil Rights released a *Dear Colleague Letter* providing guidance and reminding colleges and universities that accept federal funds of their responsibilities under Title IX of the Education Amendments of 1972 to address sexual harassment and assault. The Dear Colleague Letter is based on the OCR interpretation of the 2001 Revised Sexual Harassment Guidance and provides institutions with practical examples of how postsecondary institutions should comply with Title IX by proactive education and by taking action to end harassment, prevent recurrence and remedy the effects.

[15] https://www.heraldnews.com/article/20140805/NEWS/140808391

**84.**    In August 2014 local news publications reported continued pressure on UMASSD to increase steps to protect women from men,[16] in which UMASSD officials illustrated clear bias against males.[17] When the report stated ***"…U.S. Department of Education's Office of Postsecondary Education, the number of sexual assaults reported by  students between 2010-12 was 11,"*** Milstone's was quoted, "***if all crimes against women were reported, the number could be closer to 200 over the same span***." With this statement Milstone evidenced his and UMASSD's bias that men cannot and are not considered victims of sexual assaults. In the article, "*Milstone noted…sexual assaults are perpetrated by men*." "*The first thing we do when we get a report, we let the person who's accused know and put them on interim suspension status immediately so we can investigate*," "Milstone said. *"In most of the cases that have been brought forward, perpetrators have been found responsible and separated from campus. Research shows victims very seldom file a false claim. Why would somebody put themselves through that?"" So it's up to colleges to provide options and let survivors know, 'You're not alone. This shouldn't have happened.'"* David Milstone, UMASSD's Vice Chancellor for Student Affairs, (direct supervisor of Cummings) clearly responded that pursuant to the to the White House's "Not Alone" report, UMASSD would comply with the pressure to increase prosecutions of male students and given the mirrored wording of the "Not Alone" report and other incriminatory comments to the press, Milstone and UMASSD equated women as sexual victims requiring protection and males as sexual predators requiring discipline.

---

[16] https://www.metrowestdailynews.com/article/20140705/NEWS/140708394, https://newburyport.wickedlocal.com/article/20140705/NEWS/140708394

[17] "While victims' advocates are heartened by colleges' efforts to educate students on rights and accurately report incidents, many say campuses should take more action." "Take the University of Massachusetts Dartmouth as an example. According to the U.S. Department of Education's Office of Postsecondary Education, the number of sexual assaults reported by students between 2010-12 was 11. ***But David Milstone, the school's Vice Chancellor for Student Affairs, said he would guess if all crimes against women were reported, the number could be closer to 200 over the same span.*** Milstone is one of many officials on college campuses looking at how to address the ongoing problem on campuses nationwide. The issue has recently been placed under the microscope by President Barack Obama's administration — which, earlier in the year, appointed a task force to look into crimes against women — and the Department of Education, which recently announced changes to the Clery Act and what crimes will be reported that will go into effect as soon as November of this year. "When she sought help from college officials, Bolger said, they refused to pursue disciplinary action the perpetrator or offer her support. One dean advised her "to take a semester off, get a job at Starbucks … come back after he graduated." "This is not just an Amherst situation," she said. "Survivors are encouraged to take time off, while perpetrators are supported." "As a result of such campaigns, as well as increased pressure from Washington to improve the resources offered to survivors, campuses are changing. In addition to an expanded Clery Act, the Department of Education's Office of Civil Rights is using Title IX to look at how colleges respond to reports of on-campus sexual assaults. As of June 19, the office was investigating 64 college campuses over how they handled the reports. Seven of those 64 campuses are in Massachusetts: Amherst College, the University of Massachusetts Amherst, Boston University, Emerson College, Berklee College of Music, Harvard College and Harvard University Law School." "At UMass Dartmouth, students are learning about bystander intervention during the same orientation at which they learn about campus life and how to register for courses, Milstone said. The school has also hired a victims advocate." "Survivors like *Bolger say they are encouraged by the policy changes but that those changes need to be accompanied by action, such as campus officials issuing no- contact orders against perpetrators."* In Dartmouth, Milstone called the changes "an incredibly positive thing."

**85.**    In November 2014 local news publications reported that the U.S. Department of Education's Office of Civil Rights had opened and closed three investigations into the University of Massachusetts Dartmouth's handling of on-campus sexual assault complaints in recent years. "A fourth investigation into another complaint opened July 16 (2014) and is ongoing, according to a list of open investigations released Wednesday by the Department of Education." UMASSD spokesman Plaintiff Hoey stated, "sexual assault, including those occurring on college campuses, is still under-reported by victims."

**86.**    In October 2015 in response to Federal pressure, UMASSD announced creation of a campus Diversity & Inclusion Council - co-chaired by Assistant Vice Chancellor for Student Affairs Cynthia Cummings – the new panel would report directly to the Chancellor and make recommendations related to campus climate.[18] The council had a call to action stating: Growing diversity requires not tolerating violence, or intimidation of any kind. Defending diversity requires acknowledging and working against oppression and violence.

**87.**    On August 31, 2015, UMASSD implemented an amended Protocol 2015 in direct response to pressure stated herein, and in response to and consistent with fear of retaliation from OCR if measures were not stiffened to comply with DOE's DCL. Protocol broadened investigatory authority while removing the need to offer due process rights to male perpetrators, making it less burdensome to prosecute offenders. Upon information and belief changes to Protocol were made in haste to comply with the DCL.  For example the hearing referred to in ¶51, though explicitly referred to in Protocol, seems misplaced with either Protocol or Policy.

**88.**    For the month of April 2015, UMASSD's Center for Women, Gender & Sexuality (CWGS) organized a series of events in recognition of Sexual Assault Awareness Month. The goal of Sexual Assault Awareness Month "was to raise public awareness about sexual violence." In actuality the effect from the events pressured UMASSD to take any actions to protect females from male perpetrators and created a frenzy of paranoia regarding sexual assault on campus. Juli Parker, Ph.D., Assistant Dean of Students is the Director of CWGS and in sponsoring these events, she and the University engendered male bias in the Title IX process.[19]

---

[18] https://www.umassd.edu/news/2015/diversitycouncil.html

[19] Events included: **April 1** - Taking Down Rape Culture with keynote speaker: Laci Green. Green is an activist youtube celebrity who sensationalizes the acceptance of Rape Culture by universities nationwide, who refuse to investigate male perpetrators. "Victims don't cause rape — rapists do." "Green talked about the tolerance of rape culture. She gave many examples of universities which try to demean the issue, politicians who blame the victims and news broadcasters who trivialize the issue." Sponsored by CWGS; **April 2** -Take Back the Night - 7 pm Campus Center Quad – Consisted of a female only march throughout campus to symbolize women's individual walk through darkness and to demonstrate that women united can resist fear and violence. The effect was stressing the UMass Dartmouth perspective that only woman are victims and males are perpetrators. Sponsored by CWGS; **April 6, 13, 20, 22** -R.A.D. (Rape Aggression Defense) - Self- Defense Class for Women only to defend against male perpetrators– Again adding to bias that women are the sole victims of sexual harassment and violence and males are sole perpetrators; **April 7** - 5 (Dirty, Little) Secrets from the Science of Women's Sexuality: Keynote speaker: Emily Nagoski. Nagoski spoke on the sexual response of a woman's body when they are raped. Sponsored by CWGS; LOVE wtf Keynote speaker: Emily Nagoski. Nagoski spoke on when a male boyfriend sexually attacks a woman in a relationship, depicting men as unpredictable violent predators. Sponsored by CWGS; **April 8** - Safe Zone Training; **April 9** - Human Trafficking: Victims & Perpetrators: Keynote speaker: Donna Hughes. Hughes discussed women

**89.**   On April 15, 2015, <u>The Hunting Ground Film Screening</u> - sponsored by CWGS, and Department of Women's and Gender Studies - was shown to a packed crowd. Reviews of this movie are widespread[20] but the movie depicts in graphic detail that 1 in 5 woman who attend college will be raped, that serial rapist mostly commit the rapes, and implies men are serial predators on campus seeking to assault and rape women. The clear implication from the film is that Winston (one of the rapist depicted in the film) is a monster frequently preying on his victims by drugging them and was ultimately able to elude justice because Harvard does not take victims seriously; by implication in the film, all Universities do not take rape seriously.

**90.**   'The Torch' published in its April 14-21, 2016 edition an opinion written by Chancellor Helm: <u>Getting Real about Sexual Assault on Campus</u>. In his opinion he attempted to depict neutrality, but male bias was evident, and he acknowledged his sensitivity to and the pressure UMASSD felt under the Obama's Title IX demands to retain Federal funding, and from student pressures. "*The Obama administration and student activists are castigating colleges for not preventing sexual assault and not following up appropriately when it occurs...*"

**91.**   On March 15, 2016 Defendant Helm took up his duties at Interim Chancellor at UMASSD, where he was tasked with responsibilities inter alia compliance with the directives consistent with the DCL of 2011and ensuring UMASSD retained its Federal funding and ensuring another male student did not tarnish the school's reputation.

**92.**   Upon information and belief, Cummings, as Diversity & Inclusion Council chair, and Majewski briefed Helm on her position that Plaintiff should be removed from school as the result of being a male with a conviction and specific actions taken. Upon further belief, email and internal communications exist between Helm and Cummings or Majewski, related to the improper removal of Plaintiff, that will evidence Helm knew about the malfeasant conduct and facilitated it, approved it, condoned it, or turned a blind eye and acquiesced as to the pressures of Cummings, Majewski and from the OCR and DOJ.

**93.**   For the month of April 2016, CWGS organized a series of events in recognition of Sexual Assault Awareness Month[21] contemporaneously with allegations against Plaintiff.

---

trafficked as sex slaves with perpetrators as men who stalk and lure women mostly from others countries into the sex trafficking trade, but also discussed male predators on American campuses. Sponsored by Women & Gender Studies Department; **April 16** - Safe Zone Training; **April 22** - Walk to Class in Her Shoes (all day)and Relay in Her Shoes; **April 29** -Denim Day: Wear denim in solidarity for the Italian Supreme Court case where a rape conviction was overturned.
[20] (https://slate.com/human-interest/2015/02/the-hunting-ground-a-campus-rape-documentary-that-fails-to-provide-a-full- picture.html) (https://www.nytimes.com/2015/02/27/movies/review-the-hunting-ground-documentary-a-searing-look-at- campus-rape.html) (https://www.huffingtonpost.com/elizabeth-nicholas/why-critiques-of-the-camp_b_8607618.html)(https://reason.com/blog/2015/11/20/how-the-hunting-ground-spreads-lies-abou)
[21] Events included: April 5 - Marge Piercy Poetry Reading: Piercy's poetry tends to be highly personal free verse and often addresses the same concern with feminist and social issues; April 6 - Expressive Arts Therapy Workshop for Survivors of Sexual Violence with Ellen Landis; April 12 - Expressive Arts Therapy Workshop for Survivors of Sexual Violence with Megan O'Toole – LMHC, ATR; April 14 - Expressive Arts Therapy Workshop for Survivors of Sexual Violence with Maria Curran – Ph.D., LPCS; April 21 - Sexual Violence Survivor Art Show Opening *Speak Out*; April 26 - Expressive Arts Therapy

**94.**   On April 13, 2016, Keynote speaker Wagatwe Wanjuki gave her speech on '*The Power of Storytelling: Speaking Our Truth to End Rape Culture[22]*, [23] rallying students to protest UMASSD's Title IX efforts. This call to action, sponsored by UMASSD officials, put pressure on UMASSD to  prosecute male perpetrators, and if all else fails file complaints with Dept of Education (which could jeopardize Federal funding), engendered male bias temporally connected to the allegations against and investigation of Plaintiff.

**95.**   Encouraged by the aggressive stance by the Obama Administration against sexual violence, from 2013 through the conclusion of the UMASSD's investigation of Plaintiff and later, various activist "survivor groups" and their members demanded that UMASSD and the UMass System in general aggressively prosecute more male perpetrators including: Every Voice (http://www.everyvoicema.org/our-coalition.html); Jane Doe Inc. (https://nnedv.org/meet-jane-doe-inc-massachusetts-coalition-sexual- assault-domestic-violence/); Bay Area Rape Crisis Center (https://barcc.org); End Rape on Campus (https://endrapeoncampus.org); Surv Justice (https://survjustice.org); and KnowyourIX (https://www.knowyourix.org).

**96.**   Prior to pressure from DCL, the number of sexual assaults reported on UMASSD from 2010-2012 was 11. Consistent with UMASSD's effort to show Dept of Education that it was cracking down on male perpetrators, from 2014 to 2016 the number of reported/investigated acts considered sexual misconduct without cause or explanation spiked to 81[24] – nearly an 800% increase in response to the pressure to protect females.

**97.**   In the minds of administrators, officials and personnel investigating sexual misconduct at UMASSD, victims equal female complainants and perpetrators equal male aggressors, and sexual misconduct against females remains under reported; hence more males must be investigated.

**98.**   Upon information and belief all or nearly all male students accused of sexual misconduct from 2014-2016 were found responsible, and those found not responsible (like Plaintiff) were still sanctioned as though found responsible so to satisfy the demands of the DCL, Dept of Education,[25] and the fear of another Tsarnez.

---

Workshop for Survivors of Sexual Violence with The Women's Center, Inc.; April 27 - Denim Day; and April 28 - Sexual Violence Survivor Art Show Closing.

[22] https://dartmouth.theweektoday.com/node/22166?source=rss

[23] *Wanjuki is a feminist, social media strategist, vocal activist against campus sexual violence and spokesperson for new media activism. She spoke on her personal assault where the school took no action. She described her successful efforts to lobby the Obama administration with 180,000 signatures, calling for greater political pressure on local universities. She incited female students to rally and demand Umass Dartmouth to crack down on male rapists. "If I can influence the President of the United States, anyone can do anything," Wanjuki said. Wanjuki told the crowd that everyone can do their part to stop rape culture by debunking harmful myths about rape, speaking against harmful policies that further victimize survivors, and villainizing the rapists, not the victims. She recommended that female students, if they are not getting the support guaranteed by the Title, then they should file complaints with the Department of Education.*

[24] UMASSD 2016 Clery Report

[25] Only six of 81 were unfounded including Plaintiff.

**99.**     In early March 2019 Plaintiff filed FOIA requests with UMASSD[26]. Without cause and in violation of FERPA's mandated release requirements, MGL Ch. 66 and UMASSD policy STU-012 (FERPA), UMASSD has denied everything Plaintiff has requested, including Plaintiff's right to his own education records, all which implies cause for secrecy.

## V.     Cummings Maintains History of Bias Against Men, Especially Those Accused of Crimes

### Cummings offered an unprecedented bounty on male perpetrator's capture and prosecution

**100.**     On Nov. 2, 2006 Cynthia Cummings, then University of Delaware (UD) Associate Vice President for Campus Life, set a $10,000 bounty on the head of a male perpetrator to reward anyone who provides information leading to the arrest of the (male) perpetrator. Cummings said the University must address the growing fear that the area has become unsafe. "*It is very important that we all acknowledge that people's perceptions are their reality…If we have a perception that our campus is not safe, then in the reality of our students our campus is therefore not safe. We must acknowledge that, and we must address it and do everything we can to try to rectify the situations that we're facing right now."*[27] Cummings' bounty of $10,000 is an outlier of a normal response for a school official and indicates a personal male bias and ill- will against a male alleged of violence against women.[28] A reasonable person could plausibly infer, that Cummings meant, she would take <u>any and all actions</u> whatsoever to respond to the external and internal pressures, including wrongfully prosecuting any accused male.

### Cummings capriciously violated UD male's 1st Amendment right

**101.**     On April 20, 2007, Cummings suspended a male UD student (Mr. Murakowski) in relation to alleged improper use of University computer resources. Cummings charged Mr. Murakowski through the University's judicial system, and suspended him. On April 24th, 2007 Mr. Murkowski delivered a doctor's letter to Cummings, which stated in relevant part: "*Upon my review of his writings and his responses to me*

---

[26] Plaintiff sought inter alia: (1) A listing of all Title IX complaints investigated at UmassD, the nature of the complaint, detailed by gender of complaint and accused, and the outcomes of same from 2012 to December 2017; (2) Any and all documents related to the Title IX or misconduct investigation of Plaintiff during the spring and summer of 2016 to include but not limited to: interoffice emails and other communications between Cynthia Cummings, Deborah Majewski, Scott Webster and Graduate Admissions Staff, David Gomes, Campus Security, the staff at School of Marine Science and Technology; investigative reports/summaries/ and interviews, and any other documents thereby related; (3) Any communications or documents related to Dept of Education OCR investigations from 2012 to December 2017; (4) All letters, documents and communications related to TITLE IX procedures that changed as the response of the Dept of Education Dear Colleague Letter of 2011, and policy created by Umass Dartmouth Employees therefrom including hiring or organizational changes related to TITLE IX procedures since 2012, and (5) David Gomes', Cynthia Cummings' and Deborah Majewski's resume and training records as an investigator related to Title IX investigation from Jan 2012 to September 2016 inclusive, and (6) Plaintiff's educational records and application documents.
[27]  http://www1.udel.edu/PR/UDaily/2007/nov/reward110206.html
[28]   Despite Plaintiff's exhaustive google search, he could not find one other example of a University offering such a reward to catch and prosecute a male perpetrator.

*during the clinical assessment, I do not believe that this young man is a threat to himself or others.*"[29] Despite meeting Cummings's explicit requirements to return to his classes and dormitory room, Cummings denied the request, stating *"I don't care what that letter says, you may not return to class until I say so."* On September 5th, 2008 The Federal District Court of Delaware ruled that Cummings had violated Murakoski's 1st Amendment right. Cummings departed UD within weeks of the Court's decision. Pursuant to Plaintiff's discussion with Mr. Murakoswki, and based on belief and knowledge, Cummings was terminated therefor her discrimination.

### Cummings was Raised in Violence against her Family Perpetrated by Male Violence

**102.**   On June 1, 2016, Cummings described herself in an article entitled "I BELIEVE IN CAMPUS ACTIVISM" for the online magazine of UMASSD[30]. In the article she described herself as a protester and activist, who saw great violence in her upbringing brought upon her family by white males. "*We saw dogs and fire hoses turned on black people who marched for basic rights such as access to public facilities and voting rights.*" The frustration, anger, and sadness she developed as a youth, which continues as an adult, was caused by "being in an oppressed group controlled" by white males. "*While a student, I discovered feminism and worked for women's and gay rights. I joined the Lesbian Liberation Organization…I protested at events that objectified and demeaned women.*"

**103.**   Cummings remains emotionally damaged as an adult by the scars of her childhood, and unconsciously or intentionally seeks to settle scores with men, who in her opinion have harmed women. For decades Cummings has championed only women's causes that have been victimized by men. A school official, like Cummings, who has final decision authority over a disciplinary system that almost exclusively sanctions men, and who advocates for the exclusive benefit of one gender or sexual orientation at the complete exclusion of the male gender, carries an inherent bias against men for whom her efforts are bereft of support in a zero sum game related to bias. Cummings has a defined conflict of interest in her roles. In the YWCA 2018 Spring Newsletter, Cynthia Cummings bias toward women was discussed.[31]

---

[29]   Murakowski v. University of Delaware, Case 1:07-cv-00475-MPT.

[30]   https://umassdbelieves.com/2016/06/01/campus-activism-cynthia-cummings-student-affairs/

[31]   "*As Assistant Vice Chancellor for Student Affairs, Cynthia supervises a number of departments and functions, including those focused on diversity, equity, and inclusion, such as the Frederick Douglass Unity House, the Center for Women, Gender, and Sexuality…manages the Endeavor Leadership Scholars Program for women and students of color, serves as the Title IX Deputy Coordinator, and chairs the University's Diversity and Inclusion Council. Cynthia has dedicated her life to eliminating racism and empowering women, particularly those who identify as lesbian. For forty years, she has been an outspoken activist for feminism and LGBT rights. For six years, as chair of UMass Dartmouth's Diversity and Inclusion Council, Cynthia has led efforts to improve the campus climate for students of color, women, and members of the LGBT community. Cynthia lives in Dartmouth with her wife of 39 years, Mary Ann Hunsche.*"

**VI.**   **Defendant's Controversial Implementation Of Policies And Protocol Process**

**Initiation of Disciplinary Proceedings – Notification of Alleged Violation**

**104.**   On Tuesday, May 3, 2016 at 5:28:10 PM, Cummings sent Plaintiff a vague email (with a subject of "meeting") related to his disclosure statement on his admissions application[32]. He was directed to meet Cummings and Majewski at the Foster Admin Bldg. Room 323, May 4th, at 3:00 pm.[33]

**105.**   UMASSD, Majewski and/or Cummings violated Plaintiff's due process rights under the Fourteenth Amendment and/or rights under Policies and/or Protocol in part by providing inadequate notice. Cummings' email gave Plaintiff only 21 hours' notice, failed to notice or allege that Plaintiff violated the Code of Conduct or violations named in Protocol, failed to advise Plaintiff of his right to have an attorney or advisor present at the Procedural Review, failed to advise Plaintiff of the basis for any allegation, failed to imply any matter related to sexual misconduct or issue associated with a Title IX investigation, and failed to inform Plaintiff of the seriousness of the meeting, which he was required to attend.

**106.**   Cummings's email, a de facto Notification of Alleged Violation, triggered the Handbook disciplinary contractual procedure, and by procedure Cummings named herself as the "Conduct Conference Facilitator" with the general responsibility of overseeing Plaintiff's disciplinary proceedings.

**107.**   Based on information and belief, Cummings communicated with Webster and discerned that Webster fully vetted Plaintiff's disclosure statement required by UMASSD's application, and Webster informed Cummings of his and UMASSD's guarantee to secure Plaintiff's confidential information away from the staff, faculty and students at SMAST.

**108.**   Based on information and belief, Cummings, Majewski and other UMASSD Defendants exchanged emails stating that Plaintiff should not have matriculated and the admissions error needed to be corrected by removing Plaintiff from UMASSD by whatever means.

**109.**   Pursuant to Policies, "ALL complaints…of student misconduct will be referred to the Dept. of Public Safety, and the Office of Housing and Residential Education, or the Office of Student Conduct and Dispute Resolution (OSCDR)…" Cummings' and Majewski's in an ongoing effort to conceal their efforts, hijacked the process and failed to refer the matter as directed under Policies.

**110.**   Instead, Majewski, Gomes, Cummings and Helm intentionally conducted the secret process among

---

[32] Herein known as "Admissions Misconduct."

[33] Per Handbook, Notification of Alleged Violation - "A student shall be notified, via email to the student's UMass Dartmouth email address in a Conduct Conference Notification that the student is alleged to have violated the Code of Conduct. This notice will be sent by a Conduct Conference Facilitator…generally within 72 hours of the incident or complaint.   The notification shall include a request that the student attend a Conduct Conference, to be held no sooner than three (3) consecutive business days following date of the original notice…The Conduct Conference generally occurs within two weeks of the incident… Confirmation of delivery by the University's email server will be considered the confirmed delivery date and time of notification." Friday, May 6, 2016 was the soonest that any Conduct Conference could have occurred.

them improperly administering the already tilted procedure in favor of female students.

## Conduct Conference[34] In Office of Defendant Majewski with Defendant Cummings Present

**111.** On Wednesday, May 4, 2016, at 3 PM, Plaintiff attended the "meeting" with Majewski and Cummings.

**112.** The Conduct Conference was a sham and pretense to coerce Plaintiff into withdrawing from UMASDD. Majewski and Cummings came to the Conduct Conference having predetermined the Plaintiff's final guilt thereby holding a sham conference and denying Plaintiff his opportunity to be heard prior to deprivation of property and liberty interests.

**113.** Immediately upon Plaintiff's entering Foster Administration Building, Room 323, Cummings identified herself, and demanded Plaintiff's withdrawal from UMASSD. Cummings accused Plaintiff of his "fraudulently disclosing his history in his application." Cummings was hostile and dispositive in her judgment. Cummings did not detail the basis of her allegations.

**114.** Plaintiff denied the allegation, explaining that he fully disclosed his conviction to Webster as required per the graduate school admissions process, and that Webster accepted Plaintiff only after vetting him.

**115.** Plaintiff shared Webster's guarantee of confidentiality and that violation of it would inevitably create unbearable bias and would preclude Plaintiff from pursuing his research interest in Oceanography. Plaintiff detailed his fear if scientists in his field unnecessarily and prematurely learned of his disclosed history. Plaintiff admitted he might transfer to Duke Marine Lab under Professor Douglas Nowacek and would be taking summer classes at Duke.

**116.** Based on knowledge and belief, Plaintiff's disclosed history remained confidential prior, inasmuch as to those with SMAST/UMASSD, students, colleagues, and his academic advisors.

**117.** Cummings laughed at Plaintiff's statement, "Do you think you'll get accepted anywhere else?" Cummings stated that she informed other universities - URI and Woods Hole[35]- of Plaintiff's disclosed history, and she would soon broadcast it to others. Plaintiff inferred that Cummings threatened to further disseminate Plaintiff's history inter alia to other schools, and to his colleagues maliciously.

**118.** Majewski explained that the purpose of the meeting was to inform Plaintiff that he was being accused of violating the student code of conduct, that multiple and independent people – students and faculty - had recently filed formal complaints regarding Plaintiff's misconduct, which created a hostile learning

---

[34] Conduct Conference Procedures states: "At the Conduct Conference, the student has the opportunity to discuss the incident, review any reports regarding the matter, and review options for resolution of the complaint.  If the student wishes  to take responsibility for the alleged violation(s), the student is able to resolve the incident with the Conduct Conference Facilitator. The Conduct Conference Facilitator may present a recommendation for resolution based exclusively on the student's statement at the Conduct Conference and the written report. If the student does not take responsibility for the violation(s), the matter would be forwarded to an investigator for a full investigation."
[35] Woods Hole Oceanographic Institute

environment,[36] and that they were considering a Title IX investigation.

**119.**   Plaintiff denied the possibility of any such misconduct, requested to know the specific allegations, the identities of his accusers, and when the allegations were made. Majewski and Cummings refused to offer either. In so doing, UMASSD and/or Defendants violated Plaintiff's rights under due process, Title IX Protocol, and Policies.

**120.**   Cummings stated that some accusers had come forward as early as December 2015, but most were recent. Plaintiff asked, "People came forward with accusations of misconduct against me six months ago, and you are just now informing me of them[37]?" Cummings confirmed the reports of 6 months past.

**121.**   Given that UMASSD took no action on the 6-month old complaints, which per Protocol demanded immediate investigation, it is plausibly inferred UMASSD, Cummings and Majewski decided to investigate Plaintiff only upon learning of the subject on his application disclosure statement, and was unrelated to any supposed complaints vaguely referred to on May 4th or a Title IX investigation would have begun months earlier.

**122.**   Plaintiff protested; he claimed no one had filed any complaints, that the two officials were solely taking this action because he was a male student with a conviction, and they wanted him out.

**123.**   Neither Cummings nor Majewski denied Plaintiff's accusation; as such both offered a tacit confession as to their male bias, wherein under the circumstances an innocent or unbiased person would have denied it.

**124.**   In filing his verbal objections to disciplinary discrimination on sexual gender, he provided UMASSD officials adequate notice of his own Title IX complaint as a person under a protected status.

**125.**   Plaintiff was asked, "Are you refusing to leave the school voluntarily?"

**126.**   Plaintiff said, "Yes, Absolutely." Plaintiff again denied any misconduct, requested the list and nature of the allegations and identities of his accusers, so he could defend himself.

**127.**   Majewski told Plaintiff to read the Handbook, to look to the possible accusations that could trigger a code of conduct investigation, but offered nothing more as to the factual basis of the allegations.

**128.**   Majewski asked, "Have you ever caused someone to feel uncomfortable at school?

**129.**   Plaintiff stated that the only time he confronted students was to criticize ongoing and perennial cheating rings in Physical Oceanography and Biological Oceanography, the latter course which he had just completed with a final exam a few days earlier, and for which he intended to report the academic misconduct. He described the cheating in detail including how Professor Jefferson Turner allowed students to type their exams on their computers, which had answers prepared in advance to the perennial same questions; he named four students and asked Cummings to investigate.

**130.**   Upon information and belief Cummings never investigated the reported ubiquitous cheating scandals

---

[36] Violations of the Code of Conduct are processed under Policies and violations of sexual violence under Protocol.

at SMAST.

**131.**    Without identification of the alleged complainants against him, Plaintiff asked to file detailed complaints of ageism against certain students, and to report incidents of female students, who continued sharing explicit sex stories concerning both their undergraduate experiences and in current relationships.

**132.**    Cummings refused to hear any complaint, stating that if Plaintiff intended to pursue the filing of any complaint whatsoever that she would consider it retaliation, and retaliation would constitute a separate offense of misconduct and another Title IX violation.

**133.**    Plaintiff asked, "How can I retaliate against anyone when I have no clue as to my accuser's identity?" He asked, "If I was a female making a complaint against a male student wouldn't you investigate?

**134.**    Cummings noticeably did not reply, as such offered a tacit confession affirming her male bias.

**135.**    UMASSD and/or Defendants violated Plaintiff Due Process rights and/or rights under Title IX in part because it applied Protocol 2015 and Policies in a gender biased fashion. In denying Plaintiff's complaint of violations of both Policies and Protocol and even threatening retaliation to chill his filing ANY complaint – because he was a male – Majewski and Cummings discriminated against Plaintiff in pursuit of expelling him.

**136.**    Prior to the meeting, Cummings prepared and signed a letter dated May 4, 2016, which she allowed Plaintiff to read.[37] The letter disclosed Plaintiff's confidential educational record, falsely accused him of a crime, issued a Do Not Trespass Notice and Do Not Contact (DNC) directive, suspended him from school, and gave him inadequate notice of any potential charges that might warrant suspension or investigation of charges that he might face.

**137.**    Cummings copied Emil Fioravanti, the Chief of University Police; Tesfay Meressi, the Associate Provost for Graduate Studies, and Steve Lorenz, the Dean of SMAST. Prior to promulgation of this letter, none of these individuals knew that Plaintiff had a criminal past, and thus violated Plaintiff's confidentiality, and stigmatized Plaintiff.

**138.**    After Cummings and Majewski disseminated the letter, accusations related to his "Admissions Misconduct" disappeared, which showed neither Defendant had probable cause to initiate the Conduct

---

[37] It stated in relevant part: "*It has come to the attention of the UMass Dartmouth administration that you have a more extensive…history than you disclosed prior to being admitted to the Master's program in Marine Science[38]. In addition, members of the University community have expressed concerns about your behavior that is considered aggressive and hostile…Due to the serious nature of this matter, I am writing to inform you that, effective immediately, you are suspended from UMass Dartmouth, pending the resolution of the Title IX investigation for allegations of creating a hostile learning environment. During the period of suspension, you may not attend classes or be present on any of the UMass Dartmouth Campuses, including the two SMAST facilities, without my permission and with the escort of a Public Safety Officer…Additionally, you may not contact any UMass Dartmouth students or faculty/staff members, unless you have been instructed to do so as part of the Title IX investigation. No contact includes,, but is not limited to, the following forms of communication: in person , through a third party, by phone, by text, through social media or other electronic means…Any personal belongings that you have left at the SMAST facility in Fairhaven will be packed and mailed to you at the address above.*"

Conference related to student misconduct, nor pursued it further once the damage from promulgation of the stigmatizing letter was complete.

**139.**   Cummings issued Plaintiff a "NOTICE NOT TO TRESPASS[38]," which she required Plaintiff to sign. Cummings stressed that if Plaintiff stepped on UMASSD property then he would be criminally prosecuted. Plaintiff inferred her statement was more of a threat than a notice of fact.

**140.**   Plaintiff had significant personal property *"at the SMAST facility in Fairhaven"* including personal effects, his library of over 25 textbooks, academic notebooks and papers and a personal Mac computer that was never returned to Plaintiff, and which was denied him as the result of banning him from UMASSD property.

**141.**   Plaintiff felt intimidated; he inferred Cummings' coercion, that if he refused to withdraw from school, then she would ruin his ability to finish his degree at UMASSD, destroy his reputation, accuse him of a crime, deny his ability speak to anyone at UMASSD, and suspend him from school, an act that would likely destroy his ability to continue and pursue his choice of academic pursuit of an Oceanography career elsewhere.

**142.**   Plaintiff objected to the terms in both documents and argued they were baseless, that with both in place he could not effect a defense or question anyone, that he believed it was a sham investigation because he was a male student with a conviction, that he wanted to be able to speak to and choose as his advisor Professor Buck, because Plaintiff wanted to personally explain his disclosed history, and seek his advice on how to proceed[39].

**143.**   Cummings refused Plaintiff's choice as an advisor or any ability to have an advisor at the Conduct Conference. Plaintiff asked for a recommendation for an advisor. Cummings recommended a private attorney. In contrast the supposed female complainant(s) received assistance in finding a free school advisor per Policy/Protocol.

**144.**   Cummings told Plaintiff that if he agreed to withdraw from school then he would not undergo a Title IX investigation, that no one would learn of his disclosed history, and that she could likely ensure Plaintiff received excellent letters of recommendation to seek an education elsewhere.

---

[38] In accordance with Gen Laws of the Commonwealth of Massachusetts, Chapter 266 Section 120, you "John Harnois", …are hereby notified that you are forbidden to enter any lands or buildings owned or controlled by the Commonwealth of Massachusetts…This notice shall remain in effect…until 5/4/17…Any violation of this notice is a criminal offense and will be subject you to arrest at the time of violating this order. The Trespass Notice was in effect that morning at 1020 am - prior to the meeting

[39] Per Policy Right to an Advisor: A student, party to a matter of student conduct, may elect to be accompanied at all formal proceedings by an advisor of his choice. The advisor must be a member of the faculty, staff or student body of the University except that legal counsel may accompany a student, at the student's discretion, when a criminal charge arising from the matter is pending or is considered likely. Absence of a pending criminal charge or the bona fide likelihood thereof, the advisor must be drawn from within the University community. In matters involving a Title IX Investigation for Sexual Misconduct, both the accused student and the reporting party may have an advisor of their choice. If a student would like to have an advisor accompany her at their formal proceeding, but does not have someone in mind, the Director for Student Conduct and Dispute Resolution may be contacted to provide the name and contact information of volunteer advisors. Advisors are students, faculty, and staff who are well versed and trained in student conduct proceedings.

**145.**    Cummings demanded Plaintiff's resignation a second time; Plaintiff refused.

**146.**    In realizing Plaintiff would not leave UMASSD on his own accord, Cummings stated, "**If you won't leave, I'll get your kind with a Title IX investigation.**"

**147.**    A reasonable person could plausibly infer that Cummings meant "your kind" was any male student like Plaintiff, and meant "get…with a Title IX investigation" related to taking whatever action necessary to rid UMASSD of Plaintiff, including malfeasance.

**148.**    Cummings informed Plaintiff that each incidence of communicating with anyone associated with UMASSD would constitute a separate charge of student misconduct, and she repeated a trespass would constitute a separate criminal charge.

**149.**    Plaintiff inquired into the confidential nature of an investigation[40]. Majewski assured Plaintiff that no one would know of the Title IX proceeding or investigation, except the few who are <u>vital</u> part of the investigation. Majewski directed Plaintiff not to discuss the investigation with anyone except his advisor. Plaintiff left the meeting with neither any sense of the charges against him, nor of the identities of his accusers, despite his multiple requests for same.

**150.**    Majewski directed Plaintiff to inform her within the week if he decided to withdraw from UMASSD. In doing so she continued the implied and expressed threats at the Conduct Conference.

**151.**    Majewski and Cummings had already prejudged Plaintiff's absolute guilt prior to the investigator's appointment. Defendant Gomes was unable to prevent personal bias against Plaintiff since he worked directly subordinate to Majewski and was highly influenced by Cummings in daily operations; he depended upon both for future promotion prospects in the joint organizational department. As proof of said influence and loyalty, Gomes has since been promoted to Director of *Diversity Equity and Inclusion*.

**152.**    Cummings twice commanded Plaintiff's withdrawal (constructive expulsion) from school as the extreme and unwarranted sole resolution option in the Conduct Conference; Cummings and Majewski showed bias toward Plaintiff (because he was a male) having convicted him in their minds of any charge that

---

[40] **Policy** states section XI. **Student Conduct Records** The Office of Student Affairs shall maintain the following records pertaining to each disciplinary case: The original complaint; All documents, correspondence, forms, statements, etc., pertaining to the matter; A record of the decision including any finding, sanction, and any action recommended or taken…All case records and materials pertaining to a student conduct proceeding shall be kept secure away from public view. Except where confidentiality is further restricted by law, access to such case records or materials shall be limited to the accused student, and Administrative Officers of the University having direct involvement with the case. Access to student conduct case records by anyone other than those expressly named shall be by written authorization of the student in whose name the file is kept… **Protocol** explicitly states: **Responsibility of Confidentiality:** When a report of sexual assault is made, both the accused and the accuser, and all identified witnesses who are named in the investigation, will be notified of the university's expectation of confidentiality. Breaches of confidentiality or retaliation against: the person bringing the complaint; any person assisting with the investigation; or the person or individuals being charged with the complaint; will result in disciplinary review. The university will make all reasonable efforts to maintain the confidentiality of parties involved in sexual assault investigations.

could warrant permanent expulsion.

**153.**   In assigning such prejudice, Cummings, Majewski and Gomes infected all further proceedings with bias; all should have been disqualified from further participation in the disciplinary process since their participation denied Plaintiff an unbiased decision maker, and thus violated his due process.

**154.**   Contractually the Conduct Conference, as initiated and conducted in this case, continued the disciplinary process under Policies, under which Plaintiff should have been afforded rights, but was endlessly denied. Majewski and Cummings hereafter would choose carte blanche which procedures of each policy (Protocol and Policies) – that engendered their cause to expel Plaintiff. Investigator Gomes's role was to simply fulfill and endorse the decision of his superiors to eliminate Plaintiff from the University.

**155.**   Pursuant to Policies section IX, Cummings, who had charged and sanctioned Plaintiff for his "Admissions Misconduct" was required to appoint a trained investigator (not Special Title IX investigator) to review facts surrounding Cummings allegations of Plaintiff's "Admissions Misconduct."

**156.**   No investigator was ever assigned to review facts of the "Admissions Misconduct."

**157.**   Majewski initiated the Title IX investigation of Plaintiff without regard to sexual misconduct, which is contraindicative of the purpose of Protocol. Upon conclusion of the Conduct Conference, Plaintiff had not been accused of sexual misconduct and thus believed that the Conduct Conference was the beginning of the Title IX investigation, which he believed was the school normal disciplinary process.

**158.**   Per Protocol 2015 "sexual harassment" is defined in part as "*unwelcome conduct of a sexual nature. It includes unwelcome sexual advances, requests for sexual favors, and other verbal, nonverbal, or physical conduct of a sexual nature.*" At no time during the entire investigation are any stated or implied allegations against Plaintiff related to these descriptions of any type, and thus application of Title IX procedures based on creating a hostile environment from sexual harassment was discriminatory and capricious at its outset.

**159.**   Majewski and Cummings were required per Protocol to conduct a threshold determination, which under any reasonable standard, an investigation, based on the facts, could not justifiably ensue.

### SMAST Conducted an unprecedented "All Hands Meeting" to Exile Plaintiff

**160.**   In direct violation of its obligations with respect to Plaintiff's privacy and confidentiality in the Title IX process, Cummings and Majewski directed Steve Lorenz (within a few days of the Conduct Conference) to hold an unprecedented all hands meeting with compulsory attendance regarding Plaintiff. Attendees were informed that UMASSD had initiated a Title IX investigation against Plaintiff, he was enjoined from speaking to any student, faculty or staff associated with UMASSD,  Plaintiff was issued a "Do Not Trespass" order, denying him access to UMASSD property, and was suspended pending the investigation.

**161.**   Students, faculty and/or staff were directed to report to Cummings when/if any sightings of Plaintiff

were made on UMASSD property and/or if any contact was made by Plaintiff or by his proxy.

**162.**    Within a week of the Conduct Conference, students, faculty, and staff at SMAST knew that Plaintiff had a criminal history as the result of the all hands meeting and leaks from and innuendo related to the Title IX investigation and many had read the letter promulgated by Cummings.

**163.**    Cummings via Lorenz did not qualify her specific directive at the all-hands meeting, leaving the staff, faculty and students to conclude that they could not speak to Plaintiff. Moreover, the message implicated that Plaintiff was dangerous and unsafe.

**164.**    In light of Lorenz's and Cummings authority at UMASSD, this directive had the effect of a gag order that deterred potential communications between Plaintiff and possible witnesses, impeded Plaintiff from learning pertinent factual information, and hindered Plaintiff's preparation of his defense at a potential hearing.

**165.**    Upon information and belief, the leaks by Cummings and the Title IX investigation were intentional to harm him and interfere with Plaintiff's ability to return to his program of studies and research interest. In contrast the identity and confidentiality of the supposed female victim(s) were diligently protected.

### UMASSD and Individual Defendants Willfully Interfered with Plaintiff's Outside Educational Pursuits

**166.**    On May 9, 2016 Plaintiff received a letter attached to an email from Tom Schultz, Ph.D., Director, Marine Conservation Molecular Facility, Director of Undergraduate Studies, Duke University Marine Lab. It read: *Dear Mr. Harnois, Thank you for your application to the Duke University Marine Lab's summer program Unfortunately we are not able to offer you a space in our program this year. We appreciate your interest in the Duke University Marine Laboratory and we wish you all the best.*

**167.**    As a graduate student with a 4.0, and with the strong recommendation of fully tenured Professor Douglas Nowacek, Plaintiff's application to take undergraduate summer classes should have been a certainty.

**168.**    Plaintiff spoke to Tom Schulz telephonically on or about May 9, 2016, seeking an explanation to his rationale. Schulz referred to Plaintiff's Title IX investigation at UMASSD; he stated, "I can't allow you on the island. We have to keep our people safe. You should have informed Doug you had a conviction." When Plaintiff asked him if the UMASSD staff informed him of his conviction and Title IX investigation, he stated, "What do you think?"  Thereafter Douglas Nowacek refused to take Plaintiff's calls or respond to Plaintiff's electronic communications.

**169.**    In March 2019, Professor Laela Sayigh, Ph.D., Michael Moore, Ph.D., and James Miller, Ph.D., told Plaintiff that in 2016 Cummings told them that UMASSD had initiated a Title IX investigation because an admissions error had been made, that there were safety concerns from Plaintiff's criminal past, that Plaintiff lied on his application regarding his convictions, and that UMASSD hoped to correct it.

**Defendants Filed Bogus Criminal Complaints to Affect Investigation and Expel Plaintiff**

**170.**     On May 17, 2016 UMASSD Police filed a report stating that Cummings and a professor alleged that "somehow" Plaintiff logged into his computer a few days prior, which would have constituted a violation of Plaintiff's "Do Not Trespass Notice," and other crimes. Chief Fioravanti assigned a detective to conduct an extensive and prosecutorial investigation, ordered the computer confiscated for forensic evidence and provided it to Associate Director of Enterprise Systems for expert analysis.

**171.**     The investigation concluded that no evidence existed of Plaintiff's presence on UMASSD or SMAST property, including but not limited to the fact that: (i) no student, faculty member nor staff saw Plaintiff enter SMAST or any UMASSD property; (ii) building internal and/or external video surveillance failed to record his presence; (iii) Plaintiff's swipe card required to enter SMAST buildings failed to record his entrance; (iv) Plaintiff did not have the code to bypass the building's security upon entrance after hours; (v) no evidence existed of forced entering into the professor's office, and (vi) no forensic computer evidence existed as to Plaintiff's computer trespass. The investigation confirmed Plaintiff <u>never</u> stepped foot on UMASSD property from May 4 to early September 2016 unless escorted by UMASSD Police to meet Majewski and Cummings.

**172.**     Within days rampant rumors among students and staff of the false alleged crimes further stigmatized Plaintiff's ability to return to any program at SMAST.

**173.**     Upon information and belief, UMASSD emails and communication exist that indicate that Cummings and/or Majewski concerted with the unnamed professor to falsely accuse Plaintiff of a crime that would engender Plaintiff's expulsion from school, engender his defamation through rumor and accusation of crimes, engender his inability to continue his academic program if he returned after reinstatement, and engender his guilt in the Title IX investigation.

**174.**     On March 26, **2019** Fioravanti - a sworn police officer - refused to take Plaintiff's statement, and recused his entire department from assisting Plaintiff seeking to file felony extortion charges against Cummings and Majewski. Fioravanti justified his inability to conduct a fair and impartial investigation against the officials, because Majewski and Cummings were his "colleagues and friends".

**175.**     Upon information and belief, UMASSD Police denied Plaintiff from petitioning the government, i.e. attempting to file a criminal complaint because of the stigmatization of Plaintiff as the result of UMASSD's investigation and defamation of Plaintiff.

**176.**     Without cause Chief Fioravanti has repeatedly denied Plaintiff's request for the identity of the unnamed professor, whose name was improperly redacted in the police report. Upon information and belief, Defendants concerted to deny Plaintiff's ability to file a complaint against Majewski and Cummings, and to conceal the identity of the unnamed professor.

**177.**     Upon information and belief UMASSD Police Dept. has never recused itself when a female student

current or former student attempted to file a criminal complaint.

**UMASSD/Cummings/Majewski imposed punitive interim restrictions without due process**

**178.**   UMASSD, Cummings and Majewski's imposition of   punitive "interim restrictions" violated Plaintiff's due process rights and Title IX and caused tremendous suffering to Plaintiff. In suspending Plaintiff for the spring/summer term it must be considered a long term suspension (a *de facto temporary explusion)*.

**179.**   Plaintiff was barred from all classes, seminars and university sponsored programs, from participating in any UMASSD sponsored activities for the spring and summer that buttressed the start of the Fall semester, and from all UMASSD facilities which prevented him from receiving the medical treatment and rehabilitative care necessary for the recovery and preparation for his hip replacement surgery performed on June 6, 2016.

**180.**   Plaintiff's tuition in part was devoted to such events and restricting him from participating in those activities without notice, opportunity to be heard or proper hearing deprived Plaintiff of a liberty and property interest without due process.

**181.**   Defendants violated Plaintiff's due process in that Plaintiff's interim suspension and banning from school was in part or in whole related to his alleged violations of Protocol 2015; he was given no notice or basis of the allegations of same in Cummings' email of May 3, 2016 or at the Conduct Conference.

**182.**   Any consideration given to the "Meeting" of May 4th as to due process must be removed since the Conduct Conference was a sham. Majewski and Cummings had "fait accompli" already decided Plaintiff's fate, imposed the interim suspension, the do not contact persons associated with UMASSD directive, and the Do Not Trespass Notice prior[41] to the meeting at 3 PM on May 4th.  The interim sanctions, instituted without notice or opportunity to be heard, capriciously violated not only Plaintiff's civil rights under the U.S. and Massachusetts Constitution, but also UMASSD's policy on freedom of speech and freedom to associate[42]

**183.**   Handbook section XII states: *In cases of discipline arising from extraordinary or emergency conditions, the Chancellor or his/her designee <u>may</u> invoke the action of interim suspension of a student… who act, or refuse to act, if the result of said conduct is to interfere with the rights of others and is non-peaceful or is disruptive or said conduct constitutes a clear and present danger to the health, safety, or property of others.*

**184.**   The decisions to invoke interim sanctions against Plaintiff and every accused male student are capricious since Milstone directs UMASSD to invoke interim sanctions against every male student accused of sexual misconduct. Plaintiff was neither disruptive, nor non-peaceful, nor did Plaintiff's conduct constitute

---

[41] The Do Not Trespass was processed 10:49 am on May 4th by UMASSD Police.

[42] Student's rights to **Freedom of Association, Freedom of Inquiry and Expression**, **Freedom of Assembly**, **Freedom of Speech** as detailed under UMASSD Handbook 2015-2016.

a clear and present danger based on his actions while a student at UMASSD.  There was no basis for any such finding here as confirmed by the complete rebuttal and disappearance of the "Admissions Misconduct," and moreover evidenced by the innocuous questions that Gomes posed July 15th none of which imputed a physical threat, intimidation or harm to another student.

**185.**   Plaintiff's complaints about his interim restrictions were never addressed, thereby denying him his right to request an assessment per Policies. At no time did Majewski, Cummings or UMASDD review the status of the interim suspension to explain the sanction as "necessary and effective," thereby denying due process.

**186.**   Protocol explicitly states "When becoming aware of a complaint of sexual violence the University may take interim measures including but not limited to **restriction of communication with named individuals**; in Plaintiff's case he was restricted from communication with the entire population of every student, employee or staff member associated with UMASS.

**187.**   The purpose of a "Do Not Contact" (DNC) is to protect the victim, and at best prevent identified witnesses from being unduly influenced or retaliated against. In issuing a DNC as issued in this case, it shows capricious and deliberate indifference to Plaintiff's due process and Title IX rights and to his well-being. The DNC as invoked implies the investigation had no basis and UMASSD casted a wide net seeking any incriminatory evidence possible without Plaintiff's intervention.

**188.**   Interim restrictions are imposed to ensure equal access to educational programs and activities and protect the complainant as necessary. UMASS and Defendants, however, showed bias by never attempting to show that the interim restrictions placed on Plaintiff were necessary to protect the complainant or to ensure her (their) equal access to educational programs and activities. Defendants' deprivation of Plaintiff's rights through the interim restrictions was wholly intentional, and effectively barred him from participating in all school sponsored activities for 4 months, and denied him any ability to defend himself, and/or protect his reputation.

**189.**   Despite the fact that Plaintiff lacked any prior disciplinary history at UMASSD, Plaintiff was escorted off campus on May 4th, 2016.

**190.**   Upon information and belief, UMASSD has documents showing it has never invoked similar interim sanctions against female students accused of misconduct of any kind, but automatically imposes similar interim sanctions on all male students accused of misconduct.

**The Special Examiner's Closed-Door Investigation and Judgment of Plaintiff's Case.**

**191.**   On May 4, 2014, and for weeks thereafter, Plaintiff and his attorney repeatedly asked University officials to inform him of the allegations and factual bases for any charges against him. He had not been provided with anything more than "*members of the University community have expressed concerns about*

*your behavior that is considered aggressive and hostile."* Even the egregiously vague accusations failed to imply sexual misconduct necessary to invoke a Title IX investigation.

**192.**    On May 9, 2016 at 3:11 PM Plaintiff emailed Majewski stating: "I am not prepared to withdraw at this time. At your earliest convenience I would appreciate receiving a copy of any allegations so I may prepare my defense."

**193.**    On May 9, 2016 at 4:50 PM Majewski emailed Plaintiff acknowledging Plaintiff's decision not to resign and detailed Plaintiff's rights and matters regarding the Protocol process.[43] Majewski's email was the first notification of Plaintiff's rights in the process, but she denied Plaintiff's request to receive details of allegations upon which the investigation was based. UMASSD's issued DNC denied Plaintiff's choice of advisor and forced retention of private counsel.[44]

**194.**    In appointing David Gomes to serve as investigator, prosecutor, judge and jury of Plaintiff, UMASSD and/or Defendants violated Due Process concerns issued by U.S. Department of Justice's ("DOJ") Office in its May 9, 2013 findings.[45]

**195.**    On May 20, 2016 Attorney Baysan emailed Majewski announcing his retention by Plaintiff and objected to UMASSD's failure to provide Plaintiff any notice or basis of the charges against him.[46]

---

[43] *Plaintiff's decision not to resign; that the University will begin the Title IX investigation immediately, that The Office of Diversity, Equity and Inclusion will contact Plaintiff as soon as possible to schedule an interview as part of UMass Dartmouth's investigation into allegations that he may have engaged in misconduct, in violation of the University's Policies on Equal Opportunity, Discrimination, Harassment and Sexual Violence; that a face-to-face interview will be conducted with Plaintiff; the location of the interview,; that Plaintiff has the right to have an advocate present during the investigatory interview session; that participation in this interview is voluntary; that in the event Plaintiff declined to participate in this interview, the University will proceed with its investigation and will draw whatever reasonable inferences are necessary based on the evidence produced in case Plaintiff does not participate; that Plaintiff will be asked to provide information and respond to questions asked; that Plaintiff will be permitted to ask questions of the interviewer. Majewski added: UMass Dartmouth's resolution process is confidential, and we request your discretion in minimizing the sharing of information so as to respect the sensitivity of this matter for all parties, and that Plaintiff should be advised that he was still under the University's directive to have no contact with UMass Dartmouth students, faculty, or staff members while this complaint is being investigated. As such, you should have no communication with any students, faculty or staff members in person, through a third party, or by any electronic means, including telephone, e-mail, text, social media, etc.*
[44] William Gens Law Firm, Boston, MA.
[45] *". . . the dual role of [a university employee] in investigating [University of Montana] complaints and presenting the case on behalf of the University to the University Court creates a potential conflict that can deprive . . . an adequate, reliable, and impartial investigation. . . [therefore prohibiting] the same official playing these dual roles of investigator and 'prosecutor' . . . will ensure that individuals who play a role in . . . processing student complaints . . . do not have any actual or perceived conflicts of interest in the process."*
[46] *"Mr. Harnois attended a meeting with you on May 4 to discuss the pending allegations against him. In accordance with Titles VII and VIII of University of Massachusetts Dartmouth's (hereinafter "UMass Dartmouth") Student Conduct Policies and Procedures, a student who is facing any allegations is entitled to a conduct conference during which he is given "... the opportunity to discuss the incident, review any reports regarding the matter, and review his/her options for resolution of the complaint." It has come to our attention that during the conduct conference, Mr. Harnois was not and has not been afforded these rights and thus far he neither knows nor has a reason to know the basis of these allegations. ...Additionally, the letter of May 4, 2016 references Mr. Harnois disclosures regarding "the extent of his..history." Upon our review of his graduate school application questions and his responses, it is clear that Mr. Harnois was asked about... convictions and that he provided a detailed explanation of the charges that were brought against him ... for which he was convicted. Therefore, Mr.*

**196.**    On May 24, 2016 Majewski emailed Attorney Baysan detailing the rights of Plaintiff in prior cover.

**197.**    On May 25, 2016 Attorney Mehmet Baysan emailed Majewski seeking details of allegations.[47]

**198.**    In Majewski's response on May 27, 2016, she implied that the Student Conduct Procedure had not begun on May 4, 2016. Additionally, she stated that Plaintiff may have engaged in behaviors that violate any potential misconduct code whatsoever without offering specifics,[48] denying Plaintiff proper notice.

**199.**    Policies, Protocol and DCL require Title IX Coordinators and investigators to receive annual training on the procedures and requirements of Title IX. Majewski's responses illustrated her lack of training and confusion as to disciplinary process under Protocol and Policies. Further Majewski, Gomes and Cummings misunderstood and wrongly applied (from inadequate training) the ambiguous definition of "hostile learning environment" and "sexual harassment" as it relates to Protocol and Policies.

**200.**    On June 2, 2016 Attorney Baysan emailed Majewski to offer Plaintiff's signed release and to renew his objections and concerns regarding the ever changing landscape of potential allegations facing Plaintiff.[49]

---

*Harnois does not and cannot understand and determine the basis of these additional claims of non-disclosure that were referenced in the letter..."*

[47] *"Also, please kindly share with us any and all documents that are relevant to the underlying allegations so that Mr. Harnois understands and properly prepares for the interview and for the Title IX Investigation all together. As I mentioned in my previous email, he is entitled to this information and he should have been provided with the same during the Conduct Conference under Titles VII and VIII of UMass Dartmouth's Student Conduct Policies and Procedures."*

[48] *"In response to your second request, please understand that at this point in time the University is conducting a Title IX investigation based on allegations that Mr. Harnois may have engaged in behaviors that violate the student code of conduct and/or the University's Policies on Equal Opportunity, Discrimination, Harassment and Sexual Violence (see attached). Mr. Harnois will not be provided with any additional information prior to the Investigatory Interview...Also, please understand that at this time the Office of Diversity Equity and Inclusion is conducting a fact-finding review, and no decision has been made to initiate the Student Conduct Process. Therefore, we are not at the point of a Conduct... Conference. The purpose of the Investigatory Interview with Mr. Harnois is to provide him with an opportunity to respond to the allegations, to provide us with witnesses he believes we should speak with pertaining to this matter, and or any documentation he may have to substantiate his responses."*

[49] *In your last email, for the first time, you mentioned that the underlying allegations for the Title IX investigation may arise out of acts that violated your institution's policy against sexual violence...this comes as a complete surprise to us as the sexual nature of these allegations has not been previously shared with us or Mr. Harnois much less mentioned in either the initial suspension letter or in any other correspondence that originated from your institution thus far. This once again underlines my concerns regarding the lack of any substantive basis for these allegations, which is in direct violation of your institution's own rules and regulation. My reading of Title VIII of the Student Conduct Policies and Procedures in conjunction with Titles VII and IX contemplates giving any student who is accused of any violation of the student code "an opportunity to discuss the incident, review and reports regarding the matter, and review her options for resolution of the complaint." Considering your face to face meeting with Mr. Harnois on May 4 and your request for his voluntary withdrawal from your institution during this meeting, I am disappointed to see that Mr. Harnois is not receiving the full benefits of these rules that are designed to offer an accused student an opportunity to make an educated decision with regards to his/her position based upon his/her review of the evidence, or at the very least, the allegations that are pending against him/her. On the contrary, your institution's position has been mainly committed to making vague and broad allegations that seem to expand in every correspondence. This is clearly evident in your latest email as it referenced the following categories under which Mr. Harnois may have violated the school's policies: Equal opportunity, discrimination, harassment and sexual violence and code of conduct violations. These chapters would encompass most if not all of the violations that may be committed by a student. This not only places Mr. Harnois in a very difficult position but also directly contradicts UMass Dartmouth's own written policies. This holds true even if we assume, for the sake of analysis, that the allegations are of sexual nature, as alleging sexual violence does not take these proceedings outside the realm of these rules and regulations. With regards to the investigatory interview referenced in your latest email: The only procedural mechanism that allows your institution to proceed with such*

**201.** On June 7, 2016, Majewski emailed Plaintiff and his attorneys informing him of the general allegations of violations of Policies and Protocol.[50] The terms "*created an uncomfortable learning and work environment*" have been deemed unconstitutionally vague,[51] provided no basis of charges, precluded Plaintiff's ability to be heard, and in part denied Plaintiff due process.

**202.** In Attorney Baysan's July 13, 2016 email to Majewski, he detailed UMASSD's violations of their own policies, and due process and again requested details of allegations and/or the investigative report.[52]

**203.** In March 2019 (3 years after events), Plaintiff spoke with Ashley Weston ("Weston") and Liberty Schillp ("Schillp").[53] Weston stated that she had not filed a formal complaint against Plaintiff nor reported concerns, but only answered questions from the "Title IX office" – such as did Plaintiff ever cause you to

---

*an interview before holding a conduct conference would be under Title VII provided that the allegations are of sexual nature. Even if we assume that to be true, the student would still be afforded an opportunity to review the reports and allegations during this interview. However, on the contrary, your email describes this interview as an opportunity for Mr. Harnois to respond to the allegations, to provide the school with witnesses, and or any documentation he may have to substantiate his responses. This, then, begs the following question: How can Mr. Harnois or anyone else who is accused of violating the rules at UMass Dartmouth be expected to prepare his/her defense, find witnesses, locate documents, gather exculpatory evidence, and dispute inculpatory evidence without knowing what the allegations are? As you can understand, my client is growing impatient as he has already been penalized with the most serious sanction of immediate suspension from UMass Dartmouth without even being afforded an opportunity to understand the nature and the substance of these allegations…. However, I cannot advise my client to open himself to unknowns and allegations against which he cannot properly defend himself. Therefore, in light of the absence of any allegations of sexual violence in any of your or your institution's prior written or oral communications in this matter, and in review of the broad nature of your latest email, I would like to once again renew my request to have your institution afford Mr. Harnois an opportunity to review the allegations against him outlined in Title VII of the Student Conduct Policies and Procedures.*

[50] "*Specifically, it has been alleged that **you have engaged in behavior that has created an uncomfortable learning and work environment**…I remind you that these are merely allegations at this time, and the University wishes to afford you the opportunity to respond to these allegations*"

[51] *DeJohn v. Temple University*, 537 F.3d 301 (3d Cir. 2008)

[52] *With regards to your reference to bringing documents and information in support of Mr. Harnois's position to the July 15 meeting: As I have been reiterating since my first engagement in this matter, Mr. Harnois is not in a position to prepare for his defense as he has not been provided with any information regarding the underlying allegations. In my previous emails, I have diligently outlined our position and relayed to you that your office's actions have been in violation of your own school code. In case my points have been forgotten or neglected: Although you and other members of your office met with Mr. Harnois in person shortly after the notice of violation (in which you suggested that he should withdraw on his volition), during that meeting he was not provided with any information regarding these allegations. Nor was he provided with any documents, records, or any other items that would disclose to him the basis of these proceedings. This was in direct violation of Titles VII and IX of the Student Conduct Policies and Procedures. Secondly, each and every response to my requests for the disclosure of such information has been met with either vague statements or references to title headings that contain almost every possible conduct violation. This was evidenced by your reference to the section that governs harassment and sexual violence for the very first time in your June 7 email. We have always made it clear that Mr. Harnois is ready, able, and willing to cooperate with your office at his utmost for the amicable resolution of this matter. As such, we have always been in cooperation with your office and, within the boundaries of your institution's own rules and regulations, made numerous good faith attempts to learn the very basis of these allegations to properly and intelligently prepare our defense. However, thus far we have received nothing of that sort and, now, we are asked to bring documents and information that would either explain or dispute these allegations. As I mentioned in my prior emails, we have agreed to come to your office to learn about the underlying allegations for the first time. Therefore, please be advised that Mr. Harnois cannot be expected to dispute these allegations during this meeting let alone comment on them without properly hearing the facts and reviewing the documents in their support. I truly hope to accomplish these goals pursuant to your institution's own rules and regulations and not in direct violation of them.*

[53] Both were female students in Plaintiff's classes and graduate program.

feel uncomfortable. Weston was requested to file a formal complaint which she refused. Schillp was asked by "Title IX people" to explain her relationship with Plaintiff and develop a list of any actions by Plaintiff that could have possibly made her uncomfortable. Schillp told the Title IX people that she had nothing to tell them, nor was she interested in participating, that she wanted to be left alone. Instead, Schillp was asked to file a formal complaint, but she refused.

**204.**    Both stated that neither of them, nor anyone they knew, who were interviewed (regarding the Title IX investigation), filed a formal complaint nor reported Plaintiff of misconduct. They were told that they were being interviewed because an "admissions error had been made", that there were safety concerns from Plaintiff's past, and that UMASSD hoped to correct it through use of the Title IX investigation.

**205.**    UMASSD Title IX officials intentionally asked alleged complainants, who were in fact not complainants, to file bogus and false Title IX formal complaints against Plaintiff to buttress UMASSD's effort to expel Plaintiff. At the time of these requests, Title IX officials knew that Plaintiff's conduct could not raise to the level of a finding of "responsibility." This effort to encourage bogus complaints served as biased retaliation against Plaintiff as part of his participation in a Title IX investigation, and their effort to rid UMASSD of Plaintiff.

### Investigative Interview of Plaintiff

**206.**    On July 15, 2016 at 4 PM, Plaintiff and his Attorneys met with Cummings, Majewski and Gomes to conduct the investigative interview of Plaintiff pursuant to Conduct Procedure section V and IX.

**207.**    Plaintiff requested a copy of the investigative file including witness statements, identities of his accusers, opportunity to question his accusers; and a more defined sense of the specific allegations as to when, where, how or who, all which were denied, and about which Plaintiff voiced his objections. Plaintiff has never seen heretofore any evidence whatsoever related to the Title IX investigation or the investigation related to Plaintiff's "admissions misconduct."

**208.**    Gomes conducted a hostile investigative interview, similar to a cross-examination, which is not and cannot legally be considered "some kind of hearing" as required under due process. Instead of seeking an explanation from Plaintiff, or allowing him to defend given the basis of an allegation, Gomes sought to confirm the credibility of complainants while hiding the facts of any allegation, and thereby pursued a prosecutorial interview inconsistent with Title IX's intent.

**209.**    During the interview Gomes asked Plaintiff approximately 15-20 questions, which at worst implicated innocuous behavior, and refused Plaintiff's request to get a copy of the questions.

**210.**    The investigator (Gomes) refused to provide Plaintiff a single example or timeframe or even month or location of a specific alleged event, but instead referred to general, undefined, and baseless allegations, which failed to offer more information for any basis for a charge of creating a hostile learning environment, for example:

     i)     "Did you ever tell someone you missed your children?"

     ii)    "Did you ever deny helping someone with their homework?"

**211.**   Based on the vague questions asked, all which Plaintiff denied or could not answer for lack of specificity, Plaintiff was unable to discern the true nature of the allegations, or defend and explain, which denied Plaintiff the opportunity to be heard in the process.

**212.**   The investigator asked if Plaintiff had brought documents to support Plaintiff's testimony. Plaintiff replied that he had no idea what documents to bring because Majewski refused to provide him the factual basis of the accusations or the identity of the accusers.

**213.**   Gomes asked Plaintiff "Why do you think someone would make these allegations?" In response, Plaintiff expressed his incredulity as to the legitimacy of the investigation, alleged he had been prosecuted solely because he was a male with a conviction, and alleged no one stepped forward to make the allegations. Plaintiff asked if officials investigated the cheating scandals he reported or the ageism complaint or sexual harassment complaint he wanted to file?

**214.**   Neither Gomes, Majewski, nor Cummings denied Plaintiff's accusations that Plaintiff was prosecuted because he was a male student, nor commented on whether investigations were initiated based on his complaints.

**215.**   Plaintiff provided a list of witnesses that he wanted interviewed, including his professors at all times relevant (Geoffrey Cowles, Miles Sundermyer, and Richard Connor).

**216.**   Upon information and belief the investigator interviewed every female student in classes Plaintiff took seeking corroboration of general allegations or sought information for a new charge, which UMASSD could use against Plaintiff.

**217.**   Having been refused his accuser's identity(ies), or basis of any allegations, Plaintiff was forced to provide shotgun communications of _every_ email, text, and Facebook communication with all students and faculty members that might cover _any_ circumstance or situation. On July 29, 2016, on advice of counsel, Plaintiff via Counsel provided Majewski approximately 50 pages of friendly texts, emails and Facebook messages indicating a friendly and cordial relationship with all students and faculty  in his graduate program.

**218.**   Gomes failed to interview any of Plaintiff's witnesses during the investigation, and made no effort to obtain potentially exculpatory evidence, including highly relevant text messages between supposed complainants, or information about the reported and ubiquitous cheating scandals at SMAST, which Plaintiff reported and which gave any potential supposed victim(s) motive to prevaricate.

**219.**   Because no physical or video evidence existed, the investigation rested upon the credibility of witnesses.  Upon information and belief, Gomes neither included Plaintiff's denial of all accusations, nor Plaintiff's exculpatory evidence in the 50 pages of electronic communications, nor complainant(s)' motive to prevaricate regarding the cheating scandal when Gomes made his credibility assessment between the

Plaintiff's and complainant(s)' versions of events.

**220.**   Upon information and belief, neither Cummings nor Majewski ever spoke to any complainant to assist them in making a credibility assessment, which was critical to their decision to eventually sanction Plaintiff.

**221.**   Plaintiff was informed that if he was found responsible for creating a hostile learning environment, sanctions ranged from a warning to expulsion.

### Investigation Completion and Failure to Comply with Policies and Protocol

**222.**   Per Protocol and Procedures Section IX, Plaintiff and the supposed accuser(s) were due facts, findings, and recommendations to their UMASSD email account within 5 days of investigation completion.[54]

**223.**   Regardless of the procedure used (Policies or Protocol), and clearly both seem to have been used whenever convenient to Cummings and Majewski, Plaintiff never received a copy of the report from the investigator nor Coordinator of Student Conduct and Dispute Resolution per Policies or Protocol, nor opportunity to respond in writing to the findings within 5 days.[55]

**224.**   An Administrative Review Panel never reviewed the findings.[56]  Because there was never an Administrative Review Panel, Plaintiff never received a letter within 3 business days by the Director of Student Conduct and Dispute Resolution, and thereby Plaintiff was never offered the opportunity to appeal.[57]

**225.**   A student at UMASSD, who receives a sanction has the right to an appeal under certain criteria. Plaintiff was denied any appeal opportunity though he qualified for an appeal having been disciplined with

---

[54] **Student Conduct Procedures, Section IX** states: *"Once the investigation is completed, the investigator will write a report of the findings including 1) a summary of the facts 2) a finding of responsible or not responsible for each alleged violation with a rationale using the More Likely Than Not standard; 3) recommendations for sanctions where applicable. The report will be completed within 5 business days of the completion of the investigation and will be sent to the accused student and in cases of violence and/or sexual misconduct, to anyone victimized in the incident."* **Protocol** states: *"When the investigation is completed, the investigator will present his/her findings to the Title IX Coordinator. Upon approval of the Title IX Coordinator, the investigator will present his/her findings in writing via UMass Dartmouth email account to the reporting party, the respondent and the Coordinator of Student Conduct and Dispute Resolution. Both will be asked to submit in writing a response to the finding to the Coordinator of Student Conduct and Dispute Resolution."*

[55] Student Conduct Procedures, Section IX states: *Upon receipt of the investigator's findings, the accused student, and in cases of violence and/or sexual misconduct, the reporting party, and anyone victimized may within 5 business days submit a written response to the investigator's report to be included in the review of the findings by the Administrative Review Panel.*

[56] Student Conduct Procedures, Section IX states: *The investigator's report and any written responses will be reviewed within 5 business days by an Administrative Review Panel.*

[57] Student Conduct Procedures, Section IX states: *Following the review of the findings by the Administrative Review Panel, the accused student, the reporting party, and anyone victimized in this incident will be sent a decision letter within 3 business days by the Director of Student Conduct and Dispute Resolution or designee.  The accused student and in case of violence and/or sexual violence, the presenting party, and anyone victimized may accept the decision or submit an appeal if they feel that they can meet grounds for appeal as outlined in the appeal process.*

multiple sanctions.

**226.**	Upon information and belief, Majewski (with Cummings' influence) unilaterally determined Plaintiff's fate after receiving Gomes' squalid investigation results.[58] Moreover, Majewski and Cummings sheltered any decision away from prying eyes in their disappointed conclusion that regardless of their witch hunt of their violation of both school policies (Protocol and Policies) and violation of Plaintiff's due process rights, Majewski and Cummings could not scour any evidence of legitimate misconduct that was actually sanctionable under Policies nor Protocol.

## VII.	The University's Sanctions Plaintiff Despite Decision of Not Responsible for Misconduct

**227.**	Circa August 30, 2016 Majewski met with and informed Plaintiff and Attorney Baysan of the findings of the Title IX Proceeding.

**228.**	Plaintiff was told that he was found not responsible for violating Protocol or Policies, that he was being sanctioned with a warning in writing, that similar behavior would yield immediate harsh penalties, that he was directed to remain away from his accusers or any student associated with the investigation, and that Steve Lorenz needed to discuss with Plaintiff the changes in his academic program as a result of the Title IX investigation.

**229.**	Plaintiff requested, but was denied a copy of the investigative file/report and all documents used in the investigation. Plaintiff objected to any sanctions if he was found not responsible, that the process was a sham based on his gender, that he hadn't been informed of the identities of his accusers so how could he possibly stay away from them, that his program had been damaged enough by the investigation and that if he was found not responsible then he should be able to return to his academic program without restraint of any kind.

**230.**	Plaintiff was told there was no appeal rights and that the matter was considered now closed.

**231.**	Plaintiff was provided the decision of the Title IX proceeding in a signed letter by Majewski dated August 30, 2016. The relevant points of the decision included:

    **a.**	There was insufficient information to conclude that Plaintiff engaged in behavior which violated the University's Policies on Equal Opportunity. (This conclusion is inconsistent and at odds with the only two available conclusions of "responsible" or "not responsible")

    **b.**	Despite the conclusion, he was formally sanctioned with a warning[59] as though he was found

---

[58] Plaintiff was never actually told how or who made the final decision and the basis of facts used in the rational.

[59]	Student Conduct Procedures, Section 13, Sanctions, states: "Warning by the student conduct process, normally in writing, is intended to make the student aware of the possible consequences of individual or group actions." Sexual Violence Protocol, Possible Outcome section states: "Warning by a student conduct entity, normally in writing, is intended to make the student aware of the possible consequences of his/her actions. This sanction may be considered with prejudice

responsible for violating University Title IX Policies and thus the Code of Conduct.

**c.**   UMASSD recommended 'appropriate intervention' with Dean Steven Lorenz and Asst. Dean Michael Marino, SMAST, to "work with Plaintiff to complete his degree program, and to ensure the interactions in the academic environment are consistent with policies and expectations of the University."

**d.**   Without notifying Plaintiff of persons' identities who participated in the Title IX procedure, UMASSD threatened Plaintiff with retaliation charges if it appeared that he was retaliatory towards anyone he believed may have been involved in the investigatory process.

**232.**   Plaintiff was told there was no appeal rights and that the matter was considered now closed.

**233.**   Student Code of Conduct[60], and Student Conduct Procedure sections X and XI, bar a student from being sanctioned unless he was found responsible for having committed the misconduct.

**234.**   Inconsistent with the binary option of responsible or not responsible per Policies, the findings here were that "there was insufficient evidence to conclude that you engaged in behavior which violated the University's policies…" The finding was intentionally effected in violation to Protocol and Policies to engender a home remedy of punishment, and continued stigmatizing Plaintiff.

**235.**   Upon information and belief, UMASSD has never sanctioned a female student in either a similarly situated misconduct or Title IX proceeding after finding her not responsible for the misconduct, nor conducted a sham Title IX investigation against a female student, nor changed the nature and scope of female student's matriculated academic program after a finding of "not responsible" in any disciplinary proceeding, nor maliciously disseminated confidential educational and misconduct records as part of a Title Investigation against a female student.

**Unwarranted "Appropriate Interventions" Issued by Cummings and Majewski**

**236.**   In early September 2016 SMAST Dean Lorenz told Plaintiff that as a result of the investigation, Plaintiff lost his thesis advisor John Buck, who refused to return Plaintiff's calls, emails and texts; that Lorenz could act only as his administrative advisor, and that the school would need to change his matriculation to a non-thesis degree, a material legal status change from his matriculation for a masters with a research thesis / fastrack to Ph.D.

**237.**   Plaintiff objected to any "appropriate intervention," that he had been found innocent of any charges,

---

by a student conduct entity in future action only when the Warning is presented to the student in writing. This sanction shall be for any time period specified and shall remain a part of the student's record until graduation or termination of his/her association with the University, at which time the notations shall be removed.

[60]   Students found responsible for unacceptable conduct will be subject to the complete range of sanctions and penalties provided in the Student Conduct Policies and Procedures.

and that he believed he was singled out because he a male student with a conviction. In response Lorenz nearly quoted portions[61] of Majewski's letter signed August 30, 2016 in violation of confidentiality procedures defined in Policies, FERPA, and Protocol. Upon information and belief, Defendants leaked the Title IX findings  which continued stigmatizing Plaintiff.

**238.**   In implementing the 'appropriate intervention,' as directed by UMASSD executive authority, Lorenz confined Plaintiff to a work space beside Lorentz's office, directed him to travel directly from any classroom activity to his supervised workspace, denied Plaintiff entrance to and use of the work area and school assets at the AT&T building where Plaintiff prior had a work space and spent most of his time, and directed Plaintiff to neither engage nor speak to other students in his graduate program.

**239.**   In directing "appropriate intervention", Majewski and Cummings formally sanctioned Plaintiff further with loss of privilege[62] and no contact[63] with students at SMAST, which per Protocol are considered serious sanctions.  Plaintiff considered the sanctions and changes in his program as mandated directives of UMASSD, and any noncompliance would lead to new charges of code of conduct violations.

**240.**   Based on information and belief, Defendants never imposed any type of "appropriate intervention" or any homemade punishment on a female student found not responsible for misconduct, but imposed such sanctions on Plaintiff because he was a male student to show Dept' of Education that males are punished regardless of responsibility or the facts once accused of sexual misconduct.

**VIII.**   **Consequences and Actions Subsequent to Title IX Investigation**

**241.**   Buck, Michael Moore, James Miller, all of Plaintiff's contacts at Duke Marine Lab, and Jennifer Miksis-Olds ceased all future communications (related to his graduate degree) with Plaintiff during and following the investigation (Plaintiff contacted people related to this suit in March 2019.)

**242.**    Plaintiff was unable to attend and benefit from SeaBass and summer classes at Duke Marine Labs.

**243.**   As a proximate result of the sham investigation and unauthorized disclosures by Cummings, Majewski, and Gomes, and from the leaks of information in the Title IX investigation, no student attempted to nor spoke to nor had any academic or personal interactions with Plaintiff; only Professors Geoffrey Cowles, Miles Sundermyer spoke to Plaintiff outside of class.

**244.**   In August 2016, Plaintiff's emotional distress stemming from these matters resulted in panic attacks,

---

[61] References to getting too close to people during discussions, to "in your face behavior" and to overly personalized content in discussions.

[62] **Loss of Privilege** allows a student conduct entity to  restrict  the activity  of the  student while  she is on the University campus. The student may be prohibited from participating in non-academic or extra-curricular activities and/or from visiting certain specified areas of the University campus and/or from coming into contact with specified individuals while on campus. Loss of Privilege should be related to the offense, or serve to correct the result of the offense, or compensate in some relevant way the offended party(ies).

[63] **No contact** with a specific student, faculty, staff, or community ember, where all direct or indirect (via a third party on his behalf and with his/her knowledge) verbal, physical, and electronic forms of contact are prohibited.

headaches, insomnia, grinding of teeth and excessive wear that caused two molars to crack in half requiring removal, PTSD flashbacks and symptomology from wrongfully being prosecuted, extreme depression, excessive alopecia, and his hair turned pure white.

**245.**   Plaintiff enrolled in classes in the Fall of 2016, but he was exiled as a social outcast.

**246.**   Student Handbook and Sexual Violence Protocol's definitions of sexual harassment or sexual violence remained unconstitutionally vague. The nature and wording of the warning sanction was all encompassing, leaving Plaintiff a sense that any action he took or words he spoke could have been twisted and used against him. Plaintiff believed the policies and warning sanction as written would allow selective enforcement and provide UMASSD another opportunity to attempt expelling him.

**247.**   Given that UMASSD attempted to expel him for innocuous general behavior, inter alia missing his children, the policies as written were grossly ambiguous, which oppressed and chilled his speech and substantially interfered with Plaintiff's educational performance and opportunity to benefit from school services.

**248.**   Without interaction and communication with faculty and other students, Plaintiff could neither collaborate, seek guidance, nor benefit from his educational experience nor benefit from the educational services of his program contracted with UMASSD or use of his VA scholarship.

**249.**   Plaintiff withdrew from his Oceanography Policy class, because the class required classroom deliberation with other students, mostly females.

**250.**   Plaintiff's depression became overwhelming with regard to energy depletion and the time commitment with appointments to his psychologist and psychiatrist, which made it difficult to maintain his workload. It was repeatedly recommended that Plaintiff should become hospitalized for his emotional distress. His depression has worsened through date of filing unabated.

**251.**   Plaintiff completed classes that semester, but because his graduate program had been constructively destroyed by capricious and malicious efforts of UMASSD;  because of the psychological and emotional trauma Plaintiff suffered, he requested and received a Leave of Absence based on treatment provided between May 4, 2016 through December 2016 by a licensed psychologist Ph.D. Plaintiff continues to receive treatment for psychological and emotional trauma related to Defendants' conduct in his home state of Rhode Island.

**252.**   Plaintiff was constructively expelled by the actions of UMASSD, Gomes, Buck, Unnamed Professor, Cummings, Helm and Majewski, and as the result of being a male, he was excluded from participation in, and denied the benefits of, and subjected to discrimination during his graduate education program, any education program, or activity receiving Federal financial assistance.

**253.**   In Plaintiff's despair he moved away from family and friends and lived in solitude for 8 months

ashamed of being exiled from UMASSD.

## IX.    UMASSD Committed Numerous Material Breaches of Its Contractual Obligations

### Material Breaches Related to Protocol

**254.**    1st per Protocol officials can issue interim <u>"restriction of communication with named individuals."</u> In Plaintiff's case UMASSD and Cummings restricted Plaintiff's communication with every single person associated with UMASSD during his interim restriction.

**255.**    2nd per Protocol, "Upon approval of the Title IX Coordinator, the <u>investigator will present his/her findings in writing via UMass Dartmouth email account to the reporting party, the respondent</u> and the Coordinator of Student Conduct and Dispute Resolution. <u>Both will be asked to submit in writing a response to the finding to the Coordinator of Student Conduct and Dispute Resolution</u>." In Plaintiff's case, Gomes failed to present his findings via Plaintiff's email account or whatsoever, or to anyone else's email account. Plaintiff was never afforded the opportunity to submit a written response to the Coordinator of Student Conduct and Dispute Resolution.

**256.**    3rd per Protocol, "The <u>finding and written responses from the reporting party and respondent will be reviewed by an administrative review panel of two faculty/staff. The administrative review panel will make a decision whether to support to the finding of the investigation and if so, to determine appropriate sanctions.</u>" In Plaintiff's case neither finding nor responses were reviewed by an administrative panel. Nor did a panel decide whether to support to the finding nor determine sanctions.

**257.**    4th per Protocol, "<u>The administrative review panel will present their decision in writing to the reporting party and respondent via UMass Dartmouth email account. The decision letter will include information about submitting an appeal.</u> In Plaintiff's case, Plaintiff did not receive their decision in writing, nor receive information about submitting an appeal. UMASSD violated its own procedures requiring a 2-member panel to review the Special Investigator's findings and recommend to the final decision maker whether to accept or reject the findings. Instead UMASSD allowed the final decision maker to be the sole reviewer of the Special Examiner's findings, thereby eliminating a layer of independent oversight that might have prevented Plaintiff from suffering sanctions despite being found not responsible of misconduct.

**258.**    5th per Protocol, "<u>Both the reporting party and respondent may submit a letter of appeal within 5 business days of receiving the administrative review panel's decision to the Associate Vice Chancellor for Student Affairs.</u>" In Plaintiff's case, Majewski foreclosed his right to appeal.

**259.**    6th per Protocol, "<u>All complaints of sexual violence will be investigated promptly, thoroughly and impartially by a trained Title IX Investigator.</u>" In Plaintiff's case the investigation was infected with bias, partiality and with a forgone conclusion from the moment Cummings demanded Plaintiff's withdrawal on May 4th. Per Protocol, "Equitable rights will be provided to both the reporting party and respondent throughout the

investigation process." In Plaintiff's case Plaintiff's rights were repeatedly sacrificed in favor of victim's rights.

**260.**   7th per Protocol, "Both the respondent and reporting party have a right to an advisor of their choice throughout the process." In Plaintiff's case he was issued a DNC and denied his choice of advisor.

**261.**   8th per Protocol, "The respondent may request an assessment of interim restrictions with the Associate Vice Chancellor of Student Affairs or designee." Plaintiff was denied any opportunity to request an assessment.

**262.**   9th per Protocol states reasonable efforts will be made to maintain the confidentiality of parties involved in sexual assault investigations. In Plaintiff's case, UMASSD repeatedly and intentionally violated Plaintiff's privacy with the SMAST all-hands meeting and in ensuring "appropriate intervention."

**Material Breaches Related to Policies**

**263.**   10th in conducting a witch hunt with a sua sponte investigation, UMASSD violated express and implied covenants that UMASSD would not seek to reverse Plaintiff's matriculation with a baseless investigation.

**264.**   11th per Policies, section VII, The Notification of Alleged Violation "shall include a request that the student attend a Conduct Conference, to be held no sooner than three (3) consecutive business days following date of the original notice." In Plaintiff's case he was afforded 21 hours' notice following the delivery confirmation to attend a Conduct Conference.

**265.**   12th Policies state: "At the Conduct Conference, the student has the opportunity to discuss the incident, review any reports regarding the matter, and review her options for resolution of the complaint." In Plaintiff's case, on May 4th, his requests to review any reports were refused and he has never seen any documents related to his case except for the final finding report.

**266.**   13th under Policies, section IX, "The investigator will make all reasonable attempts to gather all relevant information…The accused student and the reporting party may submit questions to the investigator to be asked of others who may be interviewed. In Plaintiff's case Gomes neither interviewed Plaintiff's witnesses nor allowed nor offered Plaintiff the opportunity to submit questions to others

**267.**   14th Policies section V states: "A student, party to a matter of student conduct, may elect to be accompanied at all formal proceedings by an advisor of his choice. The advisor must be a member of the faculty, staff or student body of the University except that legal counsel may accompany a student, at the student's discretion, when a criminal charge arising from the matter is pending or is considered

likely." In Plaintiff's case, he was denied his choice of advisor of John Buck or any person associated with UMASS; at no time was there ever concern that this matter could possibly become criminal in nature.

**268.**   15th Per policies, section XII[64], UMASSD subjected Plaintiff to "emergency suspension immediately upon conclusion of the Conduct Conference on May 4th, even though by Plaintiff's demonstrable conduct, there was not the slightest indication that Plaintiff was a danger to the student body of UMASSD community, or intended to be disruptive in any form, especially given the specific innocuous nature of the questions posed to Plaintiff in his investigative interview.

**269.**   16th Because there was never an Administrative Review Panel, Plaintiff never received a letter within 3 business days by the Director of Student Conduct and Dispute Resolution, and thereby Plaintiff was never offered the opportunity to appeal,[65] regardless of the decision which included the explicit and implicit sanctions of the decision.

**270.**   17th Plaintiff requested a copy of the investigative file or report and all documents used in the investigation[66]. Majewski denied same, and Plaintiff repeatedly has been denied a copy of the student conduct records related to the Title IX and misconduct investigation of him.

**271.**   18,[th] Policies guarantees the confidentiality of student disciplinary records; in Plaintiff's case Majewski and Cummings disseminated the information maliciously.

**272.**   19th, Plaintiff was given a sanction inter alia of a warning despite being found not responsible. "Appropriate intervention" increased sanctions of lossed privileges and of not to contact nearly everyone at SMAST. In sanctioning Plaintiff after a finding him not responsible, UMASSD violated its Student Code of Conduct[67], sections X and XI, which state a student can only be sanctioned if he was found responsible for having committed the allegations against him.

**273.**   20th , UMASSD FERPA policy strictly prohibits unauthorized release or sharing of student educational records. The policy states that university officials with an education purpose can access records, but once

---

[64]   Handbook section XII states: *In cases of discipline arising from extraordinary or emergency conditions, the Chancellor or his/her designee may invoke the action of interim suspension of a student… who act, or refuse to act, if the result of said conduct is to interfere with the rights of others and is non-peaceful or is disruptive or said conduct constitutes a clear and present danger to the health, safety, or property of others.*

[65]   Student Conduct Procedures, Section IX states: *Following the review of the findings by the Administrative Review Panel, the accused student, the reporting party, and anyone victimized in this incident will be sent a decision letter within 3 business days by the Director of Student Conduct and Dispute Resolution or designee. The accused student and in case of violence and/or sexual violence, the presenting party,  and  anyone victimized  may  accept the decision or submit an appeal if they feel that they can meet grounds for appeal as outlined in the appeal process.*

[66]   **Student Conduct Records** section explicitly states: *"The Office of Student Affairs shall maintain the following records pertaining to each disciplinary case: The original complaint; All documents, correspondence, forms, statements, etc., pertaining to the matter, and a record of the decision including any finding, sanction, and any action recommended or taken. All case records and materials pertaining to a student conduct proceeding shall be kept secure away from public view. Except where confidentiality is further restricted by law, access to such case records or materials shall be limited to the accused student, and Administrative Officers of the University having direct involvement with the case."*

[67]   "Students found responsible for unacceptable conduct will be subject to the complete range of sanctions and penalties provided in the Student Conduct Policies and Procedures." There is no provision to sanction students found not responsible.

they have the information, they cannot share that information with a third party who did not (if they had authority to access), or worse could not access the information themselves. Cummings and Majeski violated Plaintiff's right of confidentiality when they promulgated the letter of May 4th and August 30th and verbally discussed his academic records with unauthorized personnel.

**274.**   21st, Plaintiff matriculated in the Master's Thesis Program, but after the Title IX proceeding UMASSD SMAST Dean amended his offering to a Master's Non-thesis degree without Plaintiff's consent.

## CAUSES OF ACTION
## COUNT I
## Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, *et seq.*
## As to Defendant UMASSD

**275.**   Plaintiff incorporates by reference each of the above paragraphs as if fully set forth herein.

**276.**   Title IX prohibits discrimination based on sex in education programs and activities receiving Federal financial assistance. 20 U.S.C. § 1681, *et seq.* "Discrimination" means "differential treatment" or "less favorable treatment." *Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174-75 (2005).

**277.**   Title IX applies to all public and private educational institutions that receive federal funds, including colleges and universities such as UMASSD.

**278.**   Because Title IX prohibits (under covered circumstances) subjecting a person to discrimination on account of sex, it is understood to 'bar  the imposition of university discipline where gender is a motivating factor in the decision to discipline.'

**279.**   Students attending public universities such as UMASSD, who have been accused of sexual misconduct, have a right to due process under Title IX. *See* U.S. Dep't of Education, Office for Civil Rights, *Revised Sexual Harassment Guidance: Harassment of Students by School Employees, Other Students, or Third Parties -- Title IX* (2001) at 22 (the "2001 OCR Guidance"); April 2011 Dear Colleague Letter at 12.

**280.**   Both the Department of Education and the Department of Justice have promulgated regulations under Title IX that require a school to "adopt and publish grievance procedures providing for the *prompt and equitable resolution* of student complaints alleging any action which would be prohibited by" Title IX or regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't of Justice) (*emphasis added* ). Such prohibited actions include all forms of sexual harassment, including sexual intercourse, sexual assault, and rape.

**281.**   The "prompt and equitable" procedures that a school must implement include, at a minimum:

    i.   "Notice . . . of the procedure, including where complaints may be filed";
    ii.   "Application of the procedure to complaints alleging [sexual] harassment...";
    iii.   "Adequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence";
    iv.   "Designated and reasonably prompt timeframes for the major stages of the complaint process";

v.   "Notice to the parties of the outcome of the complaint ......d at 20

**282.**   Title IX Coordinators should not have a conflict of interest. "For example, serving as Title IX coordinator and a disciplinary hearing board member may create a conflict of interest." April 2011 Dear Colleague Letter at 7; August 2015 Dear Colleague Letter at 2-3.[68]

**283.**   A school also has an obligation under Title IX to ensure that all employees involved in the investigation and adjudication process have "adequate training as to what conduct constitutes sexual harassment, which includes 'alleged sexual assaults.'"

**284.**   A complaint under Title IX, alleging that Plaintiff was subjected to discrimination on account of sex in the imposition of university discipline, is sufficient with respect to the element of discriminatory intent, like a complaint under Title VII, if it pleads specific facts that support a minimal plausible inference of such discrimination. Education Amendments of 1972 § 901, 20 U.S.C.A. § 1681(a); Civil Rights Act of 1964, § 701 et seq., 42 U.S.C.A. § 2000e et seq.

## Title IX Violations – Erroneous Outcome As To Defendant UMASSD

**285.**   Plaintiff incorporates by reference each of the above paragraphs as if fully set forth herein.

**286.**   To make an adequate erroneous outcome claim, Plaintiff must allege (1) facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding and (2) a particularized causal connection between the flawed outcome and gender bias. Plaintiff may show the first element, articulable doubt, by: (1) alleging particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses; (2) particularized strengths of the defense; or (3) alleging particular procedural flaws affecting the proof.

**287.**   In order to survive a motion to dismiss on this claim, Plaintiff must also allege facts showing "a 'particularized   causal connection between the flawed outcome and gender bias.'" "Such allegations might include, inter alia, statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender."

**288.**   UMASSD discriminated against Plaintiff and deprived him of the benefits of its education program on the basis of sex through its discriminatory, gender-biased Policies and Title IX Protocol, which intentionally subject male students like Plaintiff to "less favorable" treatment than their female accusers.

**289.**   Plaintiff was found "not responsible," an accurate finding, but conclusions that caused him to receive a warning sanction and sanctions of 'appropriate intervention' (a legal change of status) were erroneous and contrary to the weight of the evidence with gender bias as a motivating factor.

**290.**   Particular circumstances suggest that gender bias was a motivating factor behind the erroneous

---

[68] In Plaintiff's case, Majewski was Title IX coordinator and final authority since the independent panel was precluded.

findings and the decision to impose sanctions upon Plaintiff, despite a finding of 'not responsible.' These circumstances include, without limitation:

**i.**     UMASSD faced internal and external pressure to preclude another male student, associated with any type of criminal conduct, from potentially traumatizing UMASSD and from the devastating negative historical consequences from its involvement in the Boston Marathon Bombing.

**ii.**     Beginning in 2014 and through the time when supposed complaints were investigated, UMASSD was subject to immense federal, local, media, and campus pressures to: take measures to protect female victims of sexual assault; to adopt a trauma-informed approach to investigating sexual misconduct complaints; to tip the procedure in favor of women and against men and issue more severe sanctions to those males found responsible and not responsible for sexual misconduct. Such pressure included the previous OCR investigations, student outcry regarding compliance with the White House's *Not Alone report, and* the Public announcement that the OCR was investigating UMASSD for non-compliance with Title IX.

**iii.**     UMASSD faced stinging media criticism for handling of female students' sexual complaints and highlighted the pressure from OCR's investigation of UMASSD and the potential consequences of lost Federal funding.

**iv.**     In response to the pressure from OCR investigations and media pressures, university officials, specifically David Milstone, Defendant Hoey, and Interim Chancellor Helm were sensitive to and acknowledged the pressure from OCR, and committed to meeting <u>whatever</u> the demands of the Dept. of Education's DCL. UMASSD responded to the pressures with organizational and procedural changes to offer the perception of compliance with OCR and meet the demands of media and students.

**v.**     Newly appointed Interim Chancellor Helm suffered great pressure to satisfy OCR past and future potential investigations into Title IX compliance as directed in DCL and from the ongoing legacy of Tsarnez.

**vi.**     University officials responded to media complaints of UMASSD, regarding the inadequate handling of female complaints, by agreeing with the complaining female students, by equating females to victims, and by labelling males as predators. David Milstone, who has ultimate appeal authority in disciplinary matters, and John Hoey, espoused specific indications of male bias regarding Title IX procedures: Both claimed that sexual assaults against females were under-reported implying that the school must explore increased prosecutions of male students. Milstone specifically excluded the possibility that male students could be included as a potential victim in the statistic of 11 sexual assaults, thereby implying all perpetrators are males. After he implied that women were always victims, he claimed women victims must be protected, and the student community must be protected from the male perpetrator. Supporting (female) victims equates to the assumption that female accusers speak truthfully and male perpetrators are presumed guilty, which is inconsistent with a fair and impartial investigation.     By Milstone's automatically placing every male perpetrator on suspension, the school inherently places every male student at a disadvantage in the investigation proceedings over the female student, and violates specific directives under Policies, which states that interim suspensions should only occur under emergency conditions.

**vii.**     UMASSD acquiesced to federal government pressures to take a hard stance on sexual assault on campus and limit procedural protections, when in August 2015, UMASSD changed their Title IX investigation procedures directly in line with protocols detailed in the DCL and "Not Alone" report, which severely restricted due process rights of predominately male students.

**viii.**   UMASSD's decision-makers and its investigator were motivated to favor the accusing female over the accused male, so as to protect themselves and the University from accusations that they had failed to protect female students from sexual misconduct. UMASSD had taken this position because it was "heavily invested in protecting female accusers," "to avoid further scrutiny from OCR," and because it was "afraid of a further investigation from OCR and/or a Title IX lawsuit from DOJ." As a direct result, UMASSD sexual misconduct investigations of male students from to 2014 to 2016 **rose nearly 800%** in response to internal and external pressures.

**ix.**   UMASSD's policies and procedures, and specific statements from UMASSD pertinent officials are based on unfair and archaic gender stereotypes and assumptions that female complainants are invariably fragile "victims" and "survivors" deserving of support regardless of their credibility or the veracity of their claims, and accused male students are "hegemonic male[s]" prone to violence who are not deserving of comparable support.

**x.**   Pursuant to UMASSD custom in matters related to Title IX investigations, and in violation to Protocol and Policies, all male perpetrators in contrast to females, including Plaintiff were automatically banned and issued an interim suspension without evaluation as to the merits of same.

**xi.**   Throughout the proceeding UMASSD was on notice of, and remained deliberately indifferent to, the serious flaws in the investigation, the lack of equity and fairness, and the gender bias that infuses the process, but did not correct obvious malfeasance.

**xii.**   Upon information and belief Investigator Gomes received "trauma-informed investigation" training which perpetuated the idea that female victims of sexual assault and harassment should never be questioned, that trauma excuses all memory lapses and credibility issues and that complainants always tell the truth. This approach caused Gomes to overlook profound inconsistencies regarding motive and caused him to ignore victim(s) motive to prevaricate and to fabricate credibility issues in any victims account.

**xiii.**   Investigator Gomes was not an independent investigator inasmuch as he worked for and was dependent on Majewski and Cummings for future professional advancement and his performance reviews. Investigator Gomes failed to discover victim(s) motive to prevaricate, i.e. fabricate to protect themselves from the misconduct charges of an academic cheating scandal.

**xiv.**   Majewski has a conflict of interest in her role because part of her responsibilities was to ensure UMASSD's compliance with Title IX, and filed reports with the Chancellor ensuring overall compliance with OCR directives.  Additionally Majewski as Title IX Coordinator suffered the conflict of interest specifically detailed in the DCL when she served as Title IX coordinator, investigator, and assumed decision maker.

**xv.**   Majewski has a further conflict of interest in that she aided and abetted Cummings' extortion of Plaintiff in her office on May 4th when both attempted to coerce Plaintiff into withdrawing or face destruction of his reputation and publicly be accused of a crime. Majewski illustrated her conflict in refusing to provide Plaintiff details of the allegations which precluded Plaintiff from receiving an impartial investigation and opportunity to be heard.

**xvi.**   UMASSD grossly violated Plaintiff's protected confidentiality (because he was a male) on three different occasions as an effort to blight his reputation in the midst of the investigation while supposed victims privacy was secured. In contrast female student's privacy was protected.

**xvii.**   UMASSD presumed Plaintiff guilty from the outset when it prepared and signed a letter for an imposed interim suspension, prior to meeting or speaking with him, which precluded him from attending

classes or participate in UMASSD activities, legally banned him from UMASSD property, and issued a Plaintiff a DNC denying his ability to communicate with all persons associated with UMASSD, whereas victims were allowed to discuss the matter with whomever without punishment.

**xviii.** Upon information and belief, males invariably lose when charged with sexual harassment at UMASSD and when found "not responsible" male students still suffer some type of sanction proscribed by school policy.

**xix.** UMASSD officials presumed Plaintiff guilty from the outset when it decided to pursue an investigation against him after it could not compel his resignation through extortion. Majewski and Cummings directed an investigation calculated to lead to the foregone conclusion that Plaintiff was guilty of the misconduct alleged.

**xx.** Majewski and Cummings utilized intimidation tactics and the threat of additional institutional action against both Plaintiff and other students to prevent them from speaking with each other, speaking with potential witnesses, or speaking about this matter in any capacity, thus depriving Plaintiff of a full and fair opportunity to defend himself.

**xxi.** UMASSD officials refused to conduct an equitable investigation based on Plaintiff's complaints of academic misconduct, ageism discrimination, and sexual harassment; meanwhile UMASSD encouraged supposed victims to file false Title IX complaints related to Plaintiff.

**xxii.** Organizationally Cummings is directly subordinate to David Milstone, who espoused his male bias regarding Title IX above. Cummings' bias against males is indicated by (1) her history in placing a bounty on a male perpetrator's head; (2) in refusing to adhere to the very requirements she made for male student's return at UD; (3) in her lifetime advocations for female causes at the exclusion of and in opposition to male interests; (4) in demanding Plaintiff's withdrawal from school then stating she would get "his kind" in a Title IX investigation; (5) in threatening a retaliation claim against Plaintiff instead of looking into his complaints, which he stated at the Conduct Conference; (6) in participating in Plaintiff's sanction after he was found "not responsible;" (7) in encouraging supposed complainants to file false Title IX complaints; (8) in using the Title IX process for the purpose of correcting a supposed admissions error; (9) in improperly using Plaintiff's educational record to defame him, (10) in maliciously defaming him and purposely interfering with educational opportunities outside of UMASSD, (11) in "serving as the University's public voice against sexual assault" and (12) as stated publicly supporting women's advocacy groups during the timeframe in which accusations of Plaintiff were investigated.

**xxiii.** UMASSD deprived Plaintiff of a meaningful opportunity to be heard when it refused to provide him a factual basis to the allegations of sexual harassment, or the identities of his accusers.

**xxiv.** UMASSD deprived Plaintiff the opportunity to an impartial adjudication and opportunity to be heard when he was never provided a copy of the investigator's file nor was allowed to view any evidence used to consider his guilt or innocence; he was not allowed to ask/send victim(s) questions;

**xxv.** UMASSD did not attempt to contact or interview witnesses identified by Plaintiff whereas all female students who attended Plaintiff's classes were questioned as to Plaintiff's potential behavior to cause a hostile learning environment.

**xxvi.** UMASSD showed bias against Plaintiff by failing to follow disciplinary proceedings of both Protocol and Policies, and instead used the procedures of either that benefitted the investigation at the sacrifice of Plaintiff's due process rights designed to protect accused students; such actions caused Plaintiff disadvantages in disciplinary proceedings as compared to the alleged victim(s).

**xxvii.** UMASSD initiated and conducted an investigation informed by archaic stereotypes and innate biases that a male with any conviction or associated with criminal accusations (Marathon bomber), including Plaintiff, is predisposed to be aggressive, violent and hypermasculine, and deserves assumption of guilt despite no evidence.

**xxviii.**    UMASSD sanctioned Plaintiff despite a finding of not responsible.

**xxix.** In April of 2015 and 2016 UMASSD sponsored a student created hysteria around the issue of male rape culture, sexual assault and sexual harassment. Leading up to and at the precise time of Plaintiff's alleged harassment of students, UMASSD faced substantial criticism for allegedly looking the other way when female students complained of sexual assault as well as not actively prosecuting alleged male perpetrators.

**xxx.** UMASSD officials and UMASSD Police displayed bias against Plaintiff, a male student previously convicted of a crime, in both knowingly and falsely accusing Plaintiff of a crime and investigating bogus allegations against Plaintiff, while refusing to even consider accepting Plaintiff's statement related to potential criminal charges against University officials.

**291.**    The illegitimacy of the investigation to uncover some complaint worthy of Plaintiff's expulsion was evidenced in part when Plaintiff was found not responsible - despite Cummings's and Majewski's biases in predetermining Plaintiff's guilt.

**292.**    As a direct and proximate cause of the above conduct, Plaintiff sustained damages including, without limitation, Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages .

### Title IX Violation - Selective Enforcement As to Defendant UMASSD

**293.**    Plaintiff incorporates by reference each of the above paragraphs as if fully set forth herein.

**294.**    As described above, the Title IX selective enforcement theory asserts that, regardless of the student's guilt or innocence, the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender.

**295.**    As detailed herein, UMASSD violated Title IX's prohibition against selectively enforcing its policies on the basis of gender.

**296.**    Plaintiff has shown that a similarly-situated member of the opposite sex, in this case the unnamed victims and other female students facing disciplinary action or Title IX were treated more favorably than Plaintiff due to his gender.

**297.**    The foregoing, and the following show inferences of gender bias related to selective reinforcement, including without limitation the following:

   a. Upon information and belief,  no female student -  found not responsible -  has ever been sanctioned or received negative consequences related to an investigation. In Plaintiff's case sanctions issued after a

finding of not responsible denied him access to and enjoyment of his educational contract with UMASSD.

b. UMASSD protected victims' confidentiality but publicized Plaintiff's confidential information.

c. UMASSD has never conducted a sham investigation on a female student to correct an admissions error or remove her for a matter unrelated to the Title IX purpose.

d. Female students are not automatically issued an interim suspension with a "Do Not Trespass Notice" and universal DNC.

e. Plaintiff was denied his advisor of his choice and forced to retain private counsel, whereas female victims were granted the opportunity to choose their advisor.

f. In contrast to female student witnesses, Plaintiff's witnesses were never interviewed.

g. Plaintiff was warned that any complaint filed by him would face a retaliation misconduct charge, whereas, female students were intentionally encouraged to file false allegations against Plaintiff.

h. Cummings, Majewski and Gomes could not deny Plaintiff's allegations that the investigation was based on his gender thereby giving tacit confession of discrimination.

i. Cummings could not deny Plaintiff's allegation that if a female student attempted to file charges at a conduct hearing then the complaint would have been investigated, whereas Cummings considered Plaintiff's attempted accusations as retaliation.

**298.** University's conduct is so severe, pervasive, and objectively offensive that it is denying Plaintiff equal access to education that Title IX is designed to protect.

**299.** Upon information and belief, internal emails exist, which predetermined - prior to the Conduct Conference, then prior to adjudication - that Plaintiff was guilty of some misconduct, and given the depth of an investigation the misconduct could be identified, which could be used to expel him or force his departure.

**300.** Upon information and belief, UMASSD possesses communications and documents evidencing a predisposition to favor female students accused of Title IX violations or as supposed victims.

**301.** Upon information and belief, Defendant UMASSD's mishandling of supposed victim's Spring 2016 allegation was informed by institutional, media and student pressures as well as external pressure from the U.S. Department of Education, under the threat of rescission of federal funds.

**302.** Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male responsible for sexual misconduct and punished severely even if found not responsible.

**303.** As a direct and proximate cause of the above conduct, Plaintiff sustained harm and damages similar to those listed in ¶ 292.

## Title IX Violation – Deliberate Indifference / Hostile Environment - As to Defendant UMASSD

**304.** Though deliberate indifference claims usually relate to sexual harassment, the 1st Circuit Court has allowed claim of harassment based on gender discrimination in Title IX disciplinary actions.

**305.** Plaintiff incorporates by reference each of the above paragraphs as if fully set forth herein.

**306.** The harassment of Plaintiff in the disciplinary process – outside the scope of normal reasonable disciplinary procedures - was so severe, pervasive or objectively offensive that it could be said to deprive

Plaintiff of access to the educational opportunities or benefits provided by the school.

**307.**   Plaintiff was intentionally subjected to unfounded allegations and an unfair process due in part to OCR and his status as a male student with a properly disclosed and vetted criminal history.

**308.**   UMASSD had actual notice of the harassment. Plaintiff filed multiple complaints with UMASSD officials claiming the investigation was instituted solely because he was a male student with a criminal conviction, and knowledgeable officials had authority to intervene.

**309.**   UMASSD was deliberately indifferent to the harassment. Moreover since May 4th, when Cummings' and Majewski's efforts ranged from attempting to extort Plaintiff into withdrawing, to the repeated defamations, to the "all-hands meeting" at SMAST, to Plaintiff's punitive interim suspension, to false criminal allegations by UMASSD, to Plaintiff's final sanctions despite a finding of not responsible, UMASSD increased its pressure to compel Plaintiff's withdrawal from school by creating a hostile learning environment with 'reasonable intervention' whereby no reasonable person could endure the ongoing pervasive environment, which denied Plaintiff's ability to pursue his academic career.

**310.**   Plaintiff's educational experience was "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive [so as] to alter the conditions of the victim's educational environment.

**311.**   As a direct and proximate cause of the above conduct, Plaintiff sustained harm and damages similar to those listed in ¶ 292.

**312.**   As a result of UMASSD's violations of Title IX, which resulted in an unduly severe and unwarranted sanction, which continues to injure Plaintiff's reputation and right to continue his education, an injunction should issue directing UMASSD to (1) reverse the outcome and findings regarding the complaint; (2) expunge Plaintiff's disciplinary record and remove a grade of "F" he received in a course related to his constructive expulsion; (3) remove any negative sanction or action in Plaintiff's education record; (4) permanently destroy any record related to the complaint against Plaintiff; and (5) allow Plaintiff to return to UMASS at a campus and time of his choosing in order to complete the remaining credits remaining for receiving his Ph.D. degree without the imposition of tuition, fees, expenses or any conditions for readmission to the university.

**313.**   As a result of the foregoing in each Title IX violation claim, Plaintiff is entitled to damages in the amount to be determined at trial plus prejudgment interest, attorneys fees, expenses, costs and disbursements.

<u>**COUNT II**</u>

<u>**42 U.S.C. § 1983 Title IX: Retaliation for Opposing Title IX Process**</u>

<u>**(ALL DEFENDANTS in Individual and Official Capacities )**</u>

**314.**   Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth

herein in their entirety without duplication.

**315.**   A private right of action exists to remedy retaliation against an individual who complains about sex discrimination under Title IX. Title IX contains broad language prohibiting a funding recipient from intentionally subjecting any person to "discrimination" "on the basis of sex."

**316.**   Retaliation is, by definition, an intentional act and a form of "discrimination" because the complainant is subjected to differential treatment "on the basis of sex" in response to having made an allegation of sex discrimination.

**317.**   Plaintiff engaged in the protected activity of participating in and protesting a Title IX investigation, during which he asserted multiple complaints regarding the unfairness of UMASSD's prosecution of Plaintiff because of his gender.

**318.**   Specifically on May 4th, July 15th, August 30th, and circa September 7th Plaintiff complained that the Title IX investigation was initiated and conducted solely to pressure Plaintiff into withdrawing because he was a male student with a conviction.

**319.**   On May 4th Plaintiff complained about being issued a Do Not Trespass Notice, a DNC directive and being suspended unnecessarily. Additionally through his attorney, Plaintiff complained that he was being denied basic fairness and his due process rights in the prosecution of the Title IX investigation because of his gender.

**320.**   On August 30, 2016 and circa September 7, 2016, Plaintiff protested the unwarranted sanctions related to the Title IX investigation, stating that having been found not responsible for any misconduct, he should not be restricted or denied benefits or services related to his academic program. Additionally he complained regarding losing his advisor resulting from the Title IX investigation.

**321.**   Defendants knew Plaintiff was engaged in protected activity since Defendants conducted the Title IX investigation of Plaintiff; school officials received the Plaintiff's complaints that it was a witch hunt to compel him to withdraw solely because he was a male student with a conviction.

**322.**   UMASSD and individual Defendants thereafter subjected Plaintiff to adverse action, treatment or conditions because of his complaints of sexual discrimination in Title IX procedures including, without limitation, the following:

**i.**   Plaintiff was forced to sign a "Do Not Trespass Notice" denying him access to UMASSD under penalty of criminal arrest.

**ii.**   Plaintiff's property was unlawfully seized at SMAST AT&T building inasmuch as he was denied an opportunity to retrieve his property on May 4th and the property was never returned to him.

**iii.**   UMASSD issued Plaintiff an interim suspension from UMASSD from May 4th to August 30th .

**iv.**   UMASSD issued Plaintiff a "do not contact" directive on May 4th, denying him communication with all persons associated with UMASSD.

**v.**   UMASSD repeatedly and intentionally violated Plaintiff's confidentiality of his educational and

52

disciplinary records protected under FERPA, Policy and Protocol, in an attempted smear campaign, causing him to suffer a hostile learning environment, and causing him to receive treatment as a pariah precluding any opportunity for research collaboration.

**vi.**   UMASSD defamed Plaintiff to outside Universities, which destroyed his ability to corroborate with scientists at those locations.

**vii.**   UMASSD sanctioned Plaintiff and instituted "appropriate intervention" with SMAST staff, which denied Plaintiff benefit from his educational contract with UMASSD, even though Plaintiff was found not responsible for the alleged misconduct.

**viii.**   Plaintiff lost his graduate advisor – John Buck.

**ix.**   Plaintiff's academic program was downgraded to a non-thesis Master's.

**323.**   Though Defendants actions do not constitute typical sexual harassment under hostile environment or deliberate indifferent claims of Title IX violations, the actions of Defendants actions served to harass Plaintiff because of his gender.

**324.**   The harassing conduct of Defendants created a hostile environment sufficiently serious that it interfered with or limited Plaintiff's ability to participate in or benefit from his graduate school program. In UMASSD's retaliation, it purposely created a hostile learning environment so severe and perverse that neither Plaintiff nor a reasonable person could expect to endure under the circumstances, which constructively expelled Plaintiff, compelling him to seek a leave of absence.

**325.**   UMASSD had actual knowledge of the harassment based on Plaintiff's gender since they conducted the investigation, received notice of complaints, and instigated the continuous harassing actions that interfered with and altered Plaintiff's graduate program.

**326.**   UMASSD was deliberately indifferent or failed to take adequate remedial action; instead UMASSD increased pressure to compel Plaintiff to withdraw from his graduate program.

**327.**   The "materially adverse actions" were motivated in all or in part by Plaintiff's speech to remedy the baseless investigation and failures to comply with state and federal law, including but not limited to, Plaintiff's reports of harassment concerning UMASSD's attempt to compel his withdrawal using Title IX procedures - solely because he was a male student with a conviction.

**328.**   Retaliatory actions were causally related to the protected activity by temporal nexus, in substance, in purpose, and in the foregoing malice shown Plaintiff by UMASSD and its agents.

**329.**   Based on the foregoing UMASSD intentionally and maliciously retaliated against Plaintiff in response to his engaging in protected activity under Title IX, which caused Plaintiff approximate damages.

**330.**   As a direct and proximate cause of the above conduct, Plaintiff sustained harm and damages similar to those listed in ¶ 292.

**331.**   As a result of the foregoing, Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT III

### 42 U.S.C. § 1983 – Denial of Due Process Under Fourteenth Amendment

### (ALL DEFENDANTS in their Individual and Official Capacities)

**332.**   Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety without duplication.

**333.**   Defendants violated Plaintiff's procedural and substantive rights under the Due Process Clause and the Equal Protection Clause of the Fourteenth Amendment.

**334.**   The Due Process Clause of Fourteenth Amendment provides that a state shall not "deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. Questions of due process are considered using two steps: (1) whether there exists a liberty or property interest which has been interfered with by the state; and (2) "whether the procedures attendant upon that deprivation were constitutionally sufficient." A similar right is stated in the Fifth Amendment to the U.S. Constitution.

**335.**   Section 1983 of Title 42 of the U.S. Code provides in pertinent part:

*Every person who, under color of any statute, ordinance, regulation or custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress…*

**336.**   Pursuant to the Fourteenth Amendment to the United States Constitution, and 1st Circuit caselaw Plaintiff enjoyed a liberty and property interest in his contractual status as a student at UMASSD and in his continued pursuit of his graduate program education free of arbitrary and bad faith restrictions thereon that he had undertaken to receive and pursued as a student in good status.

**337.**   Plaintiff has a protected liberty and property interest in his good name, reputation, honor, and integrity, of which he cannot be deprived without due process.

**338.**   Plaintiff had a liberty interest in pursuit of his academic field of choice and career of choice.

**339.**   Plaintiff had a liberty and property interest in the continued use of his VA scholarship in support of his academic and career choice, and his graduate program as matriculated per his contract with UMASSD.

**340.**   Plaintiff had a liberty and property interest and right to petition the government.

**341.**   Prior to his discipline, Plaintiff was a student in good standing at UMASSD. His constitutionally protected interests in his continued enrollment and good standing at UMASSD and to be free from arbitrary discipline and reputational harm arises from the policies, courses of conduct, practices and understandings, established by UMASSD and from the express and implied contractual relationship between UMASSD and Plaintiff. A student who has been admitted to a university, and who has paid tuition to that university, has a protected property interest in continuing his education at that university, free of arbitrary discipline or

sanctions until he has completed his course of study in his matriculated and contracted degree program.

**342.**    Pursuant to the Fourteenth Amendment, Plaintiff also enjoyed a right to equal protection of the laws, i.e., to be treated like all persons to whom he is similarly situated.

**343.**    Consequently, when Plaintiff faced disciplinary action that included the possibility of suspension or dismissal if found responsible, UMASSD owed him Due Process as established by the Fourteenth Amendment to the United States Constitution and Massachusetts law.

**344.**    In the course of individual Defendants' and UMASSD's investigation and adjudication, they flagrantly violated clearly established rights under the Due Process clause of the Fourteenth Amendment through repeated acts of a gender biased tribunal and process that deprived Plaintiff of the minimal requirements of procedural fairness by, without limitation:

**i.**      Plaintiff was given inadequate notice; On May 4th Plaintiff was required to attend a Conduct Conference within 21 hours of receiving the Notice of Investigation or conclusions would be drawn.

**ii.**     The email of May 3rd failed to notice Plaintiff of basis of allegations, of potential sanctions or seriousness of the meeting or even if Plaintiff allegedly violated the code of conduct;

**iii.**    On May 4th Plaintiff was issued a "Do Not Trespass Notice without providing him a meaningful hearing or adequate notice nor establishing that he constituted an "imminent threat" that would warrant such an interim restriction;

**iv.**     On May 4th Plaintiff was directed <u>not to speak to anyone</u> associated with UMASSD precluding an opportunity to be heard and defend himself.

**v.**      The May 4th "meeting" was a sham because Cummings' and Majewski's decision to issue interim sanctions had already been made. As such Plaintiff was denied an opportunity to be heard at the May 4th Conduct Conference before an impartial decision maker.

**vi.**     <u>Majewski and Cummings predetermined Plaintiff's guilt</u> on May 4, 2016 as to any potential misconduct prior to assigning their employed investigator;

**vii.**    Gomes, Majewski, and Cummings failed to question victim(s) credibility and motivations to prevaricate regarding a graduate course cheating scandal reported by Plaintiff; Cummings and Majewski never spoke to victims in assessing credibility.

**viii.**   Defendants failed to provide Plaintiff with notice of the charges before the interview with Gomes in violation of due process and Protocol 2015.

**ix.**     <u>Failure to provide an impartial adjudicator at any stage of the proceedings</u>; Majewski, Gomes, and Cummings all maintained conflicts of interest creating bias in the process.

**x.**      <u>A school employed investigator was entrusted with responsibilities of detective, prosecutor, judge and jury in one person</u>;

**xi.**     Throughout the 4-month investigation, Plaintiff was continuously denied the opportunity to be heard in that <u>Gomes/Majewski/Cummings denied Plaintiff any details or basis of the charges or allegations or the identity of the complainants</u> (at the conduct conference or at the investigative review of Plaintiff) so he may be fully aware of the charges against him;

**xii.**    Majewski, Cummings, and Gomes <u>denied Plaintiff ANY and ALL access to evidence or see witness statements</u>;

xiii.  Plaintiff was repeatedly denied access to the Special Examiner's report despite multiple requests.

xiv.  Gomes/Majewski/Cummings failed to perform a thorough and impartial investigation of all evidence from all parties.

xv.  Plaintiff was provided no form of hearing.

xvi.  Plaintiff was not permitted to challenge the credibility or ask any questions of the supposed complainant(s) or any other witnesses, even though credibility determinations were critical to the Investigators' findings; Students accused of violations other than sexual misconduct were permitted to submit written questions to be asked of complainant.

xvii.  Plaintiff was denied an opportunity to record the interview or even see the questions of Gomes, and no record of the investigative interview was maintained.

xviii.  Impairment of right to call witnesses and present evidence; though Plaintiff submitted a list of exculpatory witnesses, none were interviewed;

xix.  Plaintiff was not entitled to an advisor of his choice per Protocol or Policies;

xx.  Plaintiff, despite being found not responsible, was sanctioned as though he was found responsible.

xxi.  Special Examiner's and Majewski's decision as to sanction Plaintiff was essentially final, with no appellate review— among other things, the decision that included sanctions - typical of a responsible finding - could not be overturned on any ground; Plaintiff was denied any right to appeal.

xxii.  The process itself was used to explore and find an action that could warrant expulsion instead of adjudicating self-reported allegations of sexual misconduct from actual victims.

xxiii.  Defendants' conduct evidenced arbitrary and/or irrational behavior which was not justified by any governmental interest.

xxiv.  Defendants violated Plaintiff's Due Process rights in part because Defendants' conduct was motivated by ill will, bad faith, and/or an intent to injure Plaintiff.

xxv.  Defendants were improperly trained on sexual harassment and disciplinary implementation.

xxvi.  UMASSD's constitutionally vague Protocol and Policies, related to sexual harassment and hostile environment, precluded Plaintiff from receiving proper notice and from opportunity to be heard.

**345.**  In the course of such investigation and adjudication, Defendants flagrantly violated Plaintiff's clearly established rights under the Due Process Clause of the Fourteenth Amendment through its deprivation of the minimum requirements of procedural and substantive fairness, including, but not limited to, his right to a fair investigation free of bias, his right to be heard by an impartial factfinder, and his right to cross examine witnesses and challenge witnesses.

**346.**  Under both federal and state law, Plaintiff was entitled to due process including proper notice and a meaningful opportunity to be heard, which were denied at various steps of the procedure. Defendants Cummings, Majewski, Gomes, and Helm violated Plaintiff's clearly established right to due process: when they willfully failed to give him adequate notice of the charges simply saying, *"Plaintiff" may have engaged in behaviors that violate the student code of conduct and/or the University's Policies on Equal Opportunity, Discrimination, Harassment and Sexual Violence" or "engaged in behavior that has created an*

*uncomfortable learning and work environment"*; when they imposed interim sanctions and when they issued a finding of what must be determined as "not responsible" but still imposed sanctions of warnings and "appropriate intervention"; when despite the fact that there appears to be no reporting party or "victim", there was no opportunity for him to question the witnesses against him including the non-percipient third-party reporter, or the supposed complainant; when he was afforded no hearing before an impartial panel of decision makers; when he was provided no opportunity to challenge the participation of any person involved in the process, and there was no attempt to collect exculpatory evidence or give due consideration to the alleged "reporting party" who if it were Ashley Weston or Liberty Schillp maintained Plaintiff did not engage in any conduct violative of UMASSD's policies.

**347.** The Investigators prosecuted Plaintiff under a presumption of guilt, and conducted an investigation designed to fit their narrative of what they believed a male with a conviction could do, despite clear evidence to the contrary.

**348.** Plaintiff had obeyed all institutional rules when he was wrongly interim suspended and ultimately constructively expelled from UMASSD.

**349.** Plaintiff was entitled to a process commensurate with the seriousness of the allegations and the potential discipline, sanctions and repercussions he was facing. The allegations in this case resulted in a sanction that will have lifelong ramifications for Plaintiff.

**350.** In their bias treatment of Plaintiff, Defendants made a distinction which "burdened a fundamental right, targeted a suspect class, or intentionally treated one differently from others similarly situated without any rational basis for the difference." That such different treatment he received was based on "purposeful or intentional" gender discrimination. The facts supporting bias in the Title IX claims above buttress Plaintiff's 1983 claim.

**351.** Defendants treated Plaintiff differently from others similarly situated when they instituted "appropriate intervention," failed to conduct equitable investigations against female students, and intentionally and egregiously violated Plaintiff's privacy of confidential information while securing the supposed victim(s)' privacy in the disciplinary proceeding and in general.

**352.** Defendants, as well as other agents, representatives, and employees of UMASSD, were acting under color of state law when they showed intentional, reckless, and outrageous disregard for Plaintiff's constitutional rights. Defendants Helm, Cummings, Majewski, and Gomes deprived Plaintiff of his liberty and property interests without affording him clearly established basic due process without good faith and thus are not afforded qualified immunity for their actions. Defendants all agreed to, approved and ratified this unconstitutional conduct.

**353.** Defendants violated the substantive component of the Due Process Clause because Defendants engaged in the arbitrary abuse of executive power so egregious that shocks the conscience of the public, and that it did not comport with traditional ideas of fair play and decency.

**354.** Defendants violated the substantive component when they: intentionally violated Plaintiff's confidentiality; issued a DNC with anyone associated with UMASSD; extorted Plaintiff into withdrawing; intentionally defamed Plaintiff to blight his reputation during the investigation; interfered with his educational opportunities outside of UMASSD; targeted him for personal and political reasons because of his conviction; brought unfounded charges of misconduct, conspiring with Unnamed Professor to concoct false criminal allegations against him, and sanctioned him after a finding of not responsible.

**355.** UMASSD deprived Plaintiff of the requisite due process because the University had a pecuniary interest in the outcome of the adjudication, and had decided that an admissions of a male with a prior conviction must be corrected through a sham disciplinary proceeding.

**356.** Defendants had actual or constructive knowledge that they were engaging in conduct creating a pervasive / unreasonable risk of deprivation of Plaintiff's clearly established rights under the Fourteenth Amendments to the United States Constitution.

**357.** Plaintiff had a liberty interest to pursue his academic degree of choice in support of his career of choice as an Oceanographer in a narrowly defined field. UMASSD and individual Defendants stigmatized Plaintiff by inflicting reputational harm by wrongfully branding him as a sex offender, criminal and by sanctioning him despite finding him not responsible for misconduct, which painted him as a student lingering under stigmatization.

**358.** The reputational harm inflicted by Defendants adversely impacted some right or status previously enjoyed by Plaintiff under substantive state or federal law.

**359.** Previously Plaintiff's legal status was as a student in good standing seeking a Thesis Master's degree on a fastrack to Ph.D., freely associated and freely spoke with students and colleagues in his chosen field, and enjoyed the right to petition the government, specifically to report a criminal complaint against University officials with UMASSD police.

**360.** Defendants actions changed Plaintiff's legal status, causing him to lose his legal relationship with John Buck his advisor, changed his degree to a Master's non-thesis with no opportunity to continue his academic program per his original matriculation, destroyed his advantageous relationships with outside research opportunities, forbid him to associate and collaborate with colleagues in his graduate program and denied his right to file a report of criminal complaint against Cummings and Majewski.

**361.** These actions impaired his right to occupational liberty by making it virtually impossible for him to academically prepare for and seek employment in his field of choice as an oceanographer specifically working with whales, and his right to petition the government, and abrogated the use of his VA scholarship to seek his Ph.D. in his chosen field.

**362.** Defendants are "the same party responsible for the alleged defamation and for the termination of a right or status previously enjoyed" by Plaintiff.

**363.**   Based on the foregoing, UMASSD and Defendants violated the rights and guarantees set forth in the Fourteenth Amendment of the United States Constitution during the investigation and adjudication of the Spring/Summer 2016 allegation. Accordingly, Defendants are liable under 42 U.S.C. § 1983 for violations of the Due Process Clause of the Fourteenth Amendment, and for all damages arising therefrom.

**364.**   As a direct and proximate cause of the above conduct, Plaintiff sustained harm and damages similar to those listed in ¶ 292.

**365.**   Plaintiff seeks punitive damages against Defendants Cummings, Majewski, Gomes and Helm in their individual capacities; he is entitled to damages in the amount to be determined at trial plus prejudgment interest, attorneys fees, expenses, costs and disbursements, and an injunction should issue directing UMASSD to (1) reverse the outcome and findings regarding the complaint; (2) expunge Plaintiff's disciplinary record and remove a grade of "F" he received in a course related to his constructive expulsion; (3) remove any negative sanction or action in Plaintiff's education record; (4) permanently destroy any record related to the complaint against Plaintiff; and (5) allow Plaintiff to return to UMASS at a campus and time of his choosing in order to complete the remaining credits and academic work for receiving his Ph.D. degree without the imposition of tuition, fees, expenses or any conditions for readmission to the university.

## COUNT IV
### 42 U.S.C. § 1983 – Denial of First Amendment Rights/Free Speech Retaliation
### (UMASSD, Helm, Cummings, Gomes, and Majewski in Individual/ Official Capacities)

**366.**   Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety without duplication.

**367.**   Pursuant to the First Amendment to the United States Constitution and UMASSD Rights of Students, Plaintiff enjoyed the right to speak freely to students in his graduate program prior to the initiation of and during disciplinary proceedings, to complain to UMASSD officials as to their discriminatory Title IX disciplinary practices, and to speak to fellow students and freely associate regarding what he considered discriminatory and unfair treatment by the University.

**368.**   In the absence of a specific showing of constitutionally valid reasons to regulate his speech, Plaintiff was entitled to freedom of expression of his views.

**369.**   UMASSD neither accused Plaintiff of using speech that could be considered true threats, nor lewd nor were shown to cause a material disruption to the university or was likely to do so.

**370.**   Plaintiff's 1st Amendment right to speak to members of UMASSD was violated via censorship in both his overbroad interim and final sanction, which forbid him to speak to anyone associated with UMASSD as to the former, and to students at SMAST as to the latter.

**371.**   Plaintiff undoubtedly engaged in protected speech activities – namely (1) Plaintiff engaged academic

and personal discussions with peers and instructors in the university setting and (2) all of Plaintiff's reports of gender discrimination related to his Title IX investigation, which made to Gomes, Lorentz, Cummings and Majewski directly and through his attorney.

**372.**    The second element of free speech retaliation, whether the "defendant's adverse action caused Plaintiff to suffer an injury - that would likely "chill a person of ordinary firmness from continuing to engage in that activity" - is not in dispute here. Defendants chilled and otherwise restricted Plaintiff's right to free speech by issuing a gag order not to speak to <u>any person associated with UMASSD</u> from May 4th, 2016 to August 30, 2016, directly or by proxy, under penalty of potential expulsion and then not to speak to SMAST students after August 30, 2016. Plaintiff's related injuries included without limitation: (i) Plaintiff was banned from UMASSD property and given an interim suspension and (ii) UMASSD officials intentionally violated Plaintiff's privacy regards to Title IX and educational records confidentiality; (iii) Plaintiff lost his advisor and suffered sanctions of "appropriate interventions" despite being found not responsible for misconduct and speaking to his colleagues and professors.

**373.**    The "materially adverse actions" or retaliatory actions were motivated in all or in part by Plaintiff's speech to address and remedy the baseless investigation and failures to comply with state and federal law, and were causally related to the protected activity in time with no delay, in substance, in purpose, and in the foregoing malice shown against Plaintiff by UMASSD and its agents.

**374.**    Based on the foregoing Defendants intentionally retaliated against Plaintiff in response to his engaging in constitutionally protected speech, which caused Plaintiff proximate damages. Accordingly, Defendants are liable under 42 U.S.C. § 1983 for violations of Plaintiff's rights under the First Amendment of free speech and association, and for all damages arising therefrom.

**375.**    As a direct and proximate cause of the above conduct, Plaintiff sustained harm and damages similar to those listed in ¶ 292.  Plaintiff is entitled to damages in the amount to be determined at trial plus prejudgment interest, attorneys fees, expenses, costs and disbursements, and seeks punitive damages against Defendants Cummings, Majewski, Gomes and Helm in their individual capacities.

## COUNT V
### Protocol 2015 and Policies are Unconstitutionally Overbroad As to Defendant UMASSD

**376.**    Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety without duplication.

**377.**    UMASSD as a state college is legally bound to respect the constitutional rights of its students.

**378.**    Because of the sexual harassment policy, the vague definitions of sexual harassment and hostile learning environment, and the manner in which UMASSD attempted to enforce it for innocuous behavior, Plaintiff subsequently felt inhibited in expressing his opinions in class concerning women, or even speaking

to women in general.

**379.**   Subsequent to the investigation Plaintiff enrolled in an Ocean Policy class, mostly with women requiring classroom deliberation. Plaintiff found every area of possible communication was implicated by the policy in Protocol, and if a female student disagreed with his opinion, then it could have been considered a hostile learning environment.

**380.**   That, in turn, caused him to be concerned that discussing his social, cultural, political, and/or religious views regarding these issues might be sanctionable by the University. As such Plaintiff suffered a chilling effect on his ability to exercise his constitutionally protected rights, and enjoy his civil rights.

**381.**   Plaintiff was compelled to withdraw from the class resulting from his inability to discuss matters that had been susceptible to selective application amounting to content-based or viewpoint discrimination. Like the regulation at issue in _DeJohn v. Temple University_, 537 F.3d 301 (3d Cir. 2008) and in Saxe v. State Coll. Area School Dist., 240 F.3d 200 (3d Cir. 2001), the policy as to definitions of sexual misconduct and sexual harassment in Protocol 2015 and Policies at UMASSD are facially overbroad.

**382.**   Protocol and Policies should be found unconstitutionally "overbroad" since there is a likelihood that the statute's very existence will inhibit free expression to a substantial extent, and deny a person notice and opportunity to be heard when having to reference them in a disciplinary proceeding.

**383.**   Plaintiff seeks declaratory judgment that Policies and Protocol 2015 as written are unconstitutionally vague and overbroad, and that under the circumstances, Majewski/Cummings/Gomes could not have justifiably initiated the investigation of Plaintiff, nor could Plaintiff have been given constitutionally sufficient notice nor opportunity to be heard given the vague nature of the governing policies.

## COUNT VI

## Defamation (Libel and Slander) as to Defendants Cummings, Majewski, Unnamed Professor and Gomes (in their Individual and Official Capacities)

**384.**   Plaintiff hereby incorporates and adopts each and every foregoing allegations as set forth herein.

**385.**   Immediately following Plaintiff's Conduct Conference, Cummings contacted staff at Duke Marine Lab, including, Tom Schultz and verbally advised them to reject Plaintiff's application, that Plaintiff was a threat to school safety under a Title IX investigation, that he had an extensive criminal history and lied on his application to UMASSD, and he would likely be expelled from UMASSD.

**386.**   Circa late April 2016 Cummings contacted staff at Marine Mammal Center at Woods Hole Oceanographic Institute, including, Michael Moore, staff at University of Rhode Island Graduate School of Oceanography, including, James Miller verbally advising them to discontinue their collaboration with Plaintiff, that Plaintiff was a threat under Title IX investigation, that he had an extensive criminal history and lied on his application to UMASSD and he would likely be expelled from UMASSD.

**387.**   On May 4, 2016, Cummings and Majewski promulgated the above written letter concerning Plaintiff, and therewith published false information accusing Plaintiff of fraudulently signing his application.

**388.**   Cummings and Majewski published the false and defamatory material with "'actual malice" --that is, with knowledge that it was false or with reckless disregard of whether it was false or not, and acted with a "high degree of awareness of [its] probable falsity" or, in other words, "entertained serious doubts as to the truth of the publication."

**389.**   Based on her communication with Webster prior to, and with Plaintiff at his Conduct Conference, Cummings knew the information was false; should have known the information was false; should have taken reasonable steps to verify the veracity, and had no justifiable reason nor legitimate educational purpose to believe that Plaintiff had failed to fully disclose his history as required in his application, which Plaintiff signed as true and accurate, that if he intentionally withheld information with deceitful intent, he would be liable for perjury.

**390.**   Cummings constructively and factually accused Plaintiff of violating Mass Gen Law Chapter 268, Section 1, perjury, by implying alleging he falsified and signed his school application under which Plaintiff swore under penalty of perjury. Additionally her letter indicates that Plaintiff was involved in behavior incompatible with the proper conduct of his business, trade or profession, which is also slander per se. Additionally Cummings accused Plaintiff of committing a host of unidentified crimes left to the imagine of the audience, thereby accusing him of a vast array of crimes, which is defamatory per se.

**391.**   Persons who read the promulgated subject letter understood the allegations thereon meant that Plaintiff committed perjury on his application.

**392.**   Unnamed Professor intentionally filed false criminal allegations against Plaintiff with actual malice. News of the filing of the false criminal allegations spread throughout SMAST, which in part caused Plaintiff to be shunned upon his return after his reinstatement.

**393.**   Cummings', Unnamed Professor, and Majewski's verbal and written statements and filing of false criminal allegations were defamatory in that they "may reasonably be read as discrediting Plaintiff in the minds of any considerable and respectable class of the community."

**394.**   That such accusations were false and defamatory per se which requires no proof of economic loss.

**395.**   Cummings and Majewski were acting within and outside the scope of their school responsibility in a "frolic and detour" on their own when defaming Plaintiff to Miller, Moore and Schultz and in publishing the subject letter.

**396.**   Defendants had no legitimate purpose to cause Plaintiff to lose his advantageous relationships or destroy Plaintiff's good reputation at SMAST and UMASSD in general.

**397.**   Cummings has ill-will toward men who are convicted, and ill-will against Plaintiff specifically. Their spite toward Plaintiff is illustrated: in Cummings' and Majewski's baseless and sua sponte witch hunt to find any

misconduct whatsoever which she could use to establish their predetermined conclusion that Plaintiff must be expelled from UMASSD; in Cumming's statement that Plaintiff would never find an institution that would accept him in Oceanography again, a result which her defamation made a fait accompli. Additionally, Cumming's illustrated her actual malice by illegally and willfully disclosing confidential information disclosed that was part of Plaintiff's protected educational record secured by FERPA, and by participating in false criminal accusations.

**398.**   Defendants' actions caused Plaintiff immediate outrage and severe emotional distress.

**399.**   As a direct and proximate cause of the foregoing conduct, Plaintiff sustained harm and damages similar to those listed in ¶ 292. Plaintiff is entitled to damages in the amount to be determined at trial plus prejudgment interest, attorneys fees, expenses, costs and disbursements. Plaintiff further seeks punitive damages against Defendants Cummings, and Majewski, and Unnamed Professor in their individual capacities.

## COUNT VII
### Violation of Massachusetts Civil Rights Act (MCRA) As to Defendants Cummings, Majewski, Gomes and Unnamed Professor in their Individual and Official Capacities

**400.**   The foregoing allegations are incorporated herein by reference.

**401.**   To establish a claim under MCRA, a Plaintiff must prove 1) Plaintiff was exercising a right or privilege protected by the Constitution or laws of the Commonwealth of Massachusetts or of the United States; 2) That the defendant either injured, intimidated, interfered with, oppressed or threatened the exercise or enjoyment of that legally protected right by Plaintiff, or attempted to do so; 3) That the defendant did so by such interference was by threats, intimidation, or coercion.

**402.**   Plaintiff had and enjoyed rights: secured by Title IX, to an education free of discrimination based on gender; secured by the Vth & XIVth Amendments to the US Constitution and by Articles I & X of the Massachusetts Declaration of Rights to continue enjoying his property right of his education at UMASSD and use of his Veterans Affairs scholarship under Chapter 31; property and liberty right to enjoy his personal and academic reputation; liberty interest to continue relationships and speak with colleagues and come and go at UMASSD; liberty interest to pursue his profession as an Oceanographer or University Professor.

**403.**   Civil rights asserted under MCRA are secured by the Constitutions of the Commonwealth and United States against individual as well as State action. A Plaintiff need not allege "State action" in order to make out a claim for relief against a private person under the civil rights statute, G. L. c. 12, Section 11I.

**404.**   The facts in this case resemble those in *Wodinsky v. Kettenbach*, 22 N.E.3d 960 (Mass. App. Ct. 2015). The primary difference is that Crossen and the Kettenbachs coerced, intimidated, and threatened the Wodinskys in an effort to force them out of their home, whereas the facts herein contain ample evidence in totality, from which a reasonable person could plausibly infer that Defendants coerced, intimidated and threatened Plaintiff in an effort to force Plaintiff to leave UMASSD outside of and in

violation of normal disciplinary procedures with animus, and otherwise interfere with his enjoyment of his foregoing stated civil rights.

**405.** By way of examples, without limitation were: (i) Cummings' and Majewski's instituting baseless misconduct and Title IX disciplinary proceedings in which procedures were not followed and Plaintiff's due process rights were intentionally violated; (ii) Cummings' and Majewski's attempts at extortion forcing his withdrawal; (iii) Cummings' and Majewski's repeated threats to and actual dissemination of confidential information in an effort to defame Plaintiff and thwart his ability to pursue his academic program at UMASSD; (iv) Unnamed Professor's filing of false criminal allegations of trespass; (v) Majewski's and Cummings forcing extreme and unwarranted interim sanctions on Plaintiff; and (vi) Cummings', Gomes, and Majewski's intentionally creating a hostile learning environment with "appropriate intervention" after finding him not responsible of any misconduct. The actions in total coerced his departure from UMASSD.

**406.** Plaintiff's scholarship contract with Veteran's Affairs under Chapter 31, in part, requires a Plaintiff to comply with the student Code of Conduct, and if Plaintiff was expelled for disciplinary reasons then he would be required to reimburse Veteran's Affairs for all expenses. However, if he withdrew and transferred elsewhere, then he would not face reimbursement. Cummings knew Plaintiff was on a VA Scholarship with such terms when she made her threats and commanded Plaintiff to withdraw or face expulsion, and when Defendants coerced Plaintiff to withdraw.

**407.** Cumming's threat of criminal prosecution of trespassing, and threat of accusing him of a crime, commanded Plaintiff's attention, since any criminal charge or violation of the good conduct clause of his unsupervised probation would cause a revocation warrant, and cause his immediate incarceration. Cummings and other Defendants knew Plaintiff was on unsupervised probation and used such information to leverage their coercion and intimidation.

**408.** Majewski was knew of her role of an overall illegal or tortious activity at the time she provided Cummings assistance in violating his rights under MCRA. Majewski witnessed Cummings twice command Plaintiff's withdrawal from school. In between, Cummings offered Plaintiff documents to read which implicated definite threats to compel Plaintiff to commit actions against his will to wit to sacrifice his property and liberty rights under MCRA. Majewski participated in Cummings' efforts to pressure Plaintiff into withdrawing from school against his will inter alia by providing Cummings the physical venue (her office).

**409.** Though Massachusetts has no civil remedy for extortion, Cummings threats to ruin Plaintiff's reputation and accuse him of crimes stood squarely in the center of Massachusetts criminal statute of extortion. Not only did Cummings threaten such action but followed through with her threats as a form of coercion.

**410.** Defendants were acting within the scope of their school responsibility and agent authority when

violating Plaintiff's Massachusetts Civil Rights. As an alternative Plaintiff pleads Defendant we acting outside the scope of her school responsibility and agent authority.

**411.** Based on the foregoing, Defendants maliciously violated Plaintiff's civil rights under MCRA using threats, coercion and intimidation.

**412.** Plaintiff has suffered harm similarly as stated in paragraph 330 above.

**413.** Plaintiff's damages were the direct and proximate cause of Defendants' actions.

**414.** Pursuant to M.G.L. c. 12 Mass. Civil Rights Act § 11I, Plaintiff seeks award of compensatory money damages, punitive damages, costs of the litigation and reasonable attorneys' fees.

## COUNT VIII

### Intentional Interference with 3rd Party Advantageous Relations as to Defendants Cummings and Majewski in their Individual/Official Capacities

**415.** The foregoing allegations are incorporated herein by reference.

**416.** Under Massachusetts law, to prevail on a claim of tortious interference with advantageous relations, a Plaintiff must establish that: (1) he had advantageous relations with a third party; (2) defendant knowingly induced the third party to break the advantageous relations; (3) defendant's interference, in addition to being intentional, was improper in motive or means; and (4) Plaintiff was harmed by defendant's actions.

**417.** Plaintiff had advantageous relations with advisors and scientists with whom he had developed relationships of a definite type and agreements to corroborate on scientific research and potentially join as a Ph.D. candidate including with: Michael Moore, Ph.D. and Woods Hole Oceanographic Institute; Douglas Nowacek, Ph.D. and Duke Marine Lab; John Buck, Ph.D; Jennifer L. Miksis-Olds, Ph.D., Director, Center for Marine Science & Technology at The Pennsylvania State University; and James Miller, Ph.D. and U.R.I.

**418.** The advantageous relations between an Ph.D. candidate and advisors are often considered a potential employment relationship since Ph.D. candidates receive stipends and grants under the academic advisor. Additionally the pursuit of a Ph.D. under leading scientists has a likelihood of well-paid employment as a consultant or professor.

**419.** Majewski and Cummings knew of the advantageous relationships which Plaintiff had with various scientists and Universities and the past, present and future corroborations, and Plaintiff's continued expectancy for advantageous relationships that would engender his research and career growth.

**420.** In their official capacity Majewski and Cummings, acted with actual malice, spiteful, malignant purpose or personal animus, unrelated to legitimate corporate interest of UMASSD, and knowingly induced Plaintiff's advantageous relationships to end.

**421.** Among other specific examples, Majewski and Cummings displayed actual malice unrelated to legitimate corporate interests by the following:

i.   In an effort to believed "correct an admissions error" Defendants concerted to compel Plaintiff's withdrawal from UMASSD through extortion.

ii.  Defendants concerted and individually violated Plaintiff's privacy of statutory confidential information on more than three occasions.

iii. Defendants concerted and individually contacted persons and institutions, outside of and unrelated to Plaintiff's matriculation with UMASSD, and maliciously defamed him spreading false allegations that Plaintiff fraudulently completing his applications and by spreading false innuendo regarding his Title IX investigation.

iv.  Defendants instituted and maintained two disciplinary proceedings with knowledge that neither had merit nor probable cause in an effort to coerce Plaintiff to withdraw from school because he was a male with a conviction.

v.   Defendants gathered Plaintiff's educational records, which contained his admissions disclosure statement, then twisted the contents therein to cast him in a false light of negative publicity.

vi.  Defendants sanctioned Plaintiff despite having found him not responsible with the intent to exile him from SMAST.

vii. Defendants concerted to damage Plaintiff's reputation by having criminal false charges filed against him with UMASSD Police when he "somehow" logged onto a professor's computer.

**422.**   Based on the foregoing, and in their individual capacity, Majewski and Cummings, with intentional improper motive or means, knowingly induced Plaintiff's advantageous relationships to end.

**423.**   As the direct result of Defendants improper and malicious actions, all of Plaintiff's aforementioned advantageous relationships terminated. Each institution and person refused to respond to Plaintiff's attempts at communication in writing, texts and calls.

**424.**   As a direct and proximate cause of the above conduct, Plaintiff sustained harm and damages similar to those listed in ¶ 292.  Plaintiff seeks award of compensatory money damages, punitive damages, costs of the litigation and reasonable attorneys' fees.

## COUNT IX

### Negligence In Disclosing Confidential Information As to Defendants UMASSD, Helm, Cummings, Gomes, Webster and Majewski in their Individual and Official Capacities

**425.**   The foregoing allegations are incorporated herein by reference.

**426.**   Family Educational Rights and Privacy Act of 1976: FERPA guarantees the privacy of a student's educational records. FERPA policy and guidelines at UMASSD for all times relevant was controlled by policy number STU-012 UMASSD FERPA Policy Statement.

**427.**   Disclosure of Educational Records to Others: FERPA and STU-012 restricts significantly the right of others to view a student's educational records. Exceptions include in relevant part: The student and individuals who are "officials" of the campus and university and who have a "legitimate educational interest" in the record or a "need to know" information in the record.

**428.**   Such officials can access records if performing a task  that includes each of the following: (a) It falls within the context of their assigned institutional duties or responsibilities; (b) It relates to the functioning of the office, position, or committee involved; (c) It relates to the education of the disciplining of the student; and (d) It is consistent with the purposes for which the information is  kept.

**429.**   Persons authorized to view or retain a student's educational records, as above, "may in no case transmit, share, or disclose the information to any third party." All third-party requests for information should be addressed to the Office of University  Records.

**430.**   UMASSD and its officers have a general duty to UMASSD students to protect student information under FERPA since the source of the duty exists in furthering existing social values and customs' and UMASSD voluntarily assumed a duty by accepting funds under a program administered by the U.S. Department of Education.

**431.**   UMASSD, Helm, Cummings and Majewski specifically owed Plaintiff a duty of reasonable care not to disclose sensitive and confidential records to third parties in violation to FERPA and STU-012.

**432.**   Cummings and Majewski accessed Plaintiff's educational records "under a legitimate educational interest" in conjunction with a disciplinary proceeding per policy STU-012. Inter alia they accessed Plaintiff's admissions application and criminal disclosure statement.

**433.**   Cummings, Majewski and UMASSD breached that duty of care in carelessly disseminating Plaintiff's student information to third parties, and knowing what the Defendants knew or should have known with foreseeability, would anticipate that harm of the general nature of that suffered was likely to result.

**434.**   As a direct and proximate cause of the Defendants' foreseeable conduct, Plaintiff sustained harm and damages similar to those listed in ¶ 292.  Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

**COUNT X**

**Breach Of Fiduciary In Disclosing Information Under FERPA / Protocol / Policies Defendants UMASSD, Helm, Cummings Gomes And Majewski in their Individual and Official Capacities**

**435.**   The foregoing allegations are incorporated herein by reference.

**436.**   Under Massachusetts Law, "A fiduciary relationship arises when one reposes faith, confidence, and trust in another's judgment and advice. Where a confidence has been betrayed by the party in the position of influence, this betrayal is actionable, and the origin of the confidence is immaterial.

**437.**   Plaintiff placed trust, faith and confidence in UMASSD, its officers and staff to protect his sensitive and confidential student information secured under FERPA / Protocol / Policies. Plaintiff had an established fiduciary relationship with UMASSD and its officers regarding the protection and proper handling of his confidential educational records.  As fiduciaries UMASSD, Cummings and Majewski owed Plaintiff a duty of

not to betray his confidences by disclosing and widely disseminating his student information to third parties in violation to FERPA and STU-012 / Protocol / Policies.

**438.**   Cummings and Majewski accessed Plaintiff's records "under a legitimate educational interest" in conjunction with a disciplinary proceeding, and were responsible for securing disciplinary records.

**439.**   Cummings, Majewski and UMASSD breached their fiduciary duty in violating Plaintiff's trust by carelessly and/or intentionally disseminating Plaintiff's student information to third parties.

**440.**   As a direct and proximate cause of the Defendants' foreseeable conduct, Plaintiff sustained harm and damages similar to those listed in ¶ 292.  Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT XI

## Invasion of Privacy[69] As to Defendants UMASSD, Helm, Gomes, Cummings and Majewski in their Individual and Official Capacities

**441.**   The foregoing allegations are incorporated herein by reference

**442.**   Defendants, without cause or institutional / corporate purpose, made a public disclosure of Plaintiff's confidential private educational records to students, faculty, and staff inside and outside of UMASSD to wit the subject matters of Plaintiff's disclosure letter explaining his conviction and the Title IX investigation.

**443.**   Plaintiff's application and the disclosures thereon were part of a private matter and part of a contract between UMASSD and Plaintiff, and any information regarding his application or Title IX investigation was held confidential.

**444.**   Defendants with such dissemination communicated to the public at large, or to so many persons that the matter must be regarded as substantially certain to become one of public knowledge.

**445.**   The wrongful intrusion into Plaintiff's private activities was in such a manner as to outrage or to cause mental suffering, shame or humiliation to a person of ordinary sensibilities, since release of the sensitive and compromising information protected under FERPA is similar to the release of confidences in the doctor patient relationship protected under HIPPA.

**446.**   The facts publicized related to Plaintiff's application and subsequent admission served no concern of the public.

**447.**   A reasonable person would find the disclosure "highly offensive or highly objectionable." Plaintiff experienced outrage and emotional distress upon learning of the wrongful breaches of confidentiality.

---

[69] Mass G.L. Chapter 214, Section 1B states: A person shall have a right against unreasonable, substantial or serious interference with his privacy. The superior court shall have jurisdiction in equity to enforce such right and in connection therewith to award damages.

**448.**   Defendants published the facts with actual malice as described herein.

**449.**   As a direct and proximate cause of the Defendants' foreseeable conduct, Plaintiff sustained harm and damages similar to those listed in ¶ 292.  Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT XII

## Malicious Prosecution And Abuse of Process as to UMASSD, Gomes, Helm, Cummings and Majewski in their Individual and Official Capacities

**450.**   The foregoing allegations are incorporated herein by reference

**451.**   A Title IX disciplinary proceeding is an administrative quasi-judicial civil proceeding.  Massachusetts Law allows claims of malicious prosecution and abuse of process related to a civil administrative matters.

**452.**   Cummings and Majewski initiated process of a disciplinary proceeding when they emailed Plaintiff on May 3, 2016, and compelled plaintiff to submit to the jurisdiction of UMASSD's authority, to retain counsel, to provide testimony, and to abide by the decisions of UMASSD officials.

**453.**   Cummings and Majewski initiated the misconduct process under Policies for an ulterior or illegitimate purpose to wit to use as leverage in extortion and defamation and use as a predetermined means to expel Plaintiff or coerce him to withdraw.

**454.**   Cummings, Helm, Gomes and Majewski actively participated in a disciplinary process per Handbook without probable cause having known that Plaintiff had adequately disclosed his convictions in his disclosure statement. Additionally, Cummings, Helm, Gomes, and Majewski could not have reasonably believed that there was a chance that their claim may be held valid upon adjudication, or find Plaintiff responsible for any alleged misconduct.

**455.**   Only upon learning that their claim, related to Plaintiff's insufficient disclosure statement had no merit, did they institute a Title IX claim under Protocol – as Plan B - to rid him from UMASSD.

**456.**   Likewise Defendants had no probable cause as to their Title IX allegations, and lacked belief that Plaintiff could be found "responsible" for misconduct. As proof to lack of probable cause and malice, Cummings stated that she would use the Title IX to cause Plaintiff to withdraw if he refused to voluntarily withdraw from school, and attempted to file false criminal charges against Plaintiff.

**457.**   Also Defendants encouraged students to file false Title IX charges against Plaintiff when it was obvious no potential claims could succeed.

**458.**   Defendants prosecuted the investigation with malice by using the process to first coerce Plaintiff into withdrawing from UMASSD, then using the basis of the claim (perjuring himself on his school admissions application) to defame Plaintiff.

**459.**   Defendants used their special privilege to access Plaintiff's educational records protected under

FERPA and UMASSD explicit policy, then distorted the truth of the information in the confidential records to defame Plaintiff.

**460.**    Defendants acted primarily for a purpose other than succeeding on the merits of the claim; specifically Defendants sought to coerce Plaintiff into withdrawing, or cause those associated with SMAST to constructively exile him with the improper publicity of the investigation, thereby violating contractual and statutory requirements of confidentiality.

**461.**    David Gomes conducted a supposed independent investigation that could find no facts to justify a finding of responsible of any misconduct under Policies or Protocol.

**462.**    The original actions terminated in Plaintiff's favor in the finding of "not responsible."

**463.**    As a direct and proximate cause of the Defendants' foreseeable conduct, Plaintiff sustained harm and damages similar to those listed in ¶ 292. Plaintiff suffered special damages when Defendants denied him his contractual right to name his unpaid school advisor, and but for the improper "No Contact" order that Cummings issued against Plaintiff, he would not have retained private counsel at great financial cost. Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT XIII
### Breach of Contract As to Defendant UMASSD

**464.**    Plaintiff incorporates the allegations contained in the foregoing paragraphs as though fully set forth herein in their entirety without duplication.

**465.**    At all times relevant herein Plaintiff developed and maintained a contract with UMASSD.

**466.**    UMASSD's obligations are explicitly set forth in its contract with Plaintiff, and are further informed by Massachusetts case law infusing every contract with a "reasonable expectations" requirement and mandating that college and university disciplinary proceedings cannot be "arbitrary or capricious."

**467.**    For all the reasons set forth above, UMASSD has materially breached its contracts with Plaintiff by failing to comply with its obligations, standards, policies, and procedures set forth in the policies and procedures noted above in the course of the Special Examiner's Process against Plaintiff, and by subjecting him to a blatantly arbitrary and capricious disciplinary proceeding.

**468.**    As a direct, proximate, and foreseeable consequence of UMASSD's numerous material breaches, Plaintiff sustained harm and damages similar to those listed in ¶ 292. Plaintiff suffered special damages when Defendants denied him his contractual right to name his unpaid school advisor, and but for the improper "No Contact" order that Cummings issued against Plaintiff, he would not have retained private counsel at great financial cost. Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT XIV

### Breach of the Implied Covenant of Good Faith and Fair Dealing As to UMASSD

**469.**   The foregoing allegations are incorporated herein by reference.

**470.**   Implicit in the implied contract between a university and its student under Massachusetts law is the requirement that the institution act in good faith in its dealing with its students; at the same time, the student must fulfill his end of the bargain by satisfying the university's academic requirements and complying with its procedures.

**471.**   In addition to these contractual breaches, the Special Examiner's Process lacks the most essential elements of due process to safeguard the rights of the accused, and is systemically inequitable. Although the accuser knows his or her story before the investigation even begins, the accused is left in the dark concerning the facts, never knowing what the accuser and witnesses actually have said except as filtered through the Special Examiner. The accused is subjected to a secret investigation process that in Plaintiff's case was handled by the Special Examiner like a police interrogation of a suspect rather than an independent, impartial investigation. Despite the fact that Plaintiff meticulously documented UMASSD officials these contractual breaches, as well as the fundamental unfairness of the process and irrationality and capriciousness of the decisions, inter alia to punish Plaintiff with interim sanctions, UMASSD did nothing to correct this flawed and unfair process and outcome.

**472.**   Instead of proceeding to a hearing at which both sides hear all of the evidence and have an equal opportunity to present their claims and defenses before an impartial tribunal, the Special Examiner's Process effectively ends with the interrogation, completely short circuiting due process by allowing the Interrogator to decide issues of credibility and serve as the de facto prosecutor, judge and jury.

**473.**   In Plaintiff's case, the University compounded the systemic lack of due process by failing to follow its own procedures, choosing which rights to deny Plaintiff based on which procedure in either Handbook or Protocol that officials chose at the moment. In the end UMASSD officials complied with the stated procedures of neither.

**474.**   The confusion and gaps in the two disciplinary procedures allowed UMASSD officials to usurp either, and in the end disciplined Plaintiff despite the fact he was found "not responsible" for any misconduct which goes against the basis of jurisprudence.

**475.**   UMASSD and Majewski based the improper sanctions on the credibility attributed to statements of supposed complainants; hence Plaintiff's inability to face his accusers to contest such credibility is unfair and in bad faith.

**476.**   Since Plaintiff's case, UMASSD has changed few of its deeply flawed procedures in the Special Examiner's Process, despite new OCR guidelines from the Trump administration.

**477.**     As a direct, proximate, and foreseeable consequence of UMASSD's breach of the implied covenant of good faith and fair dealing, Plaintiff sustained harm and damages similar to those listed in ¶ 292.  Plaintiff suffered special damages when he was compelled to retain private counsel.  Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT XV

## Promissory Estoppel as to Defendants Buck and Webster in Individual/Official Capacities

**478.**     The foregoing allegations are incorporated herein by reference.

**479.**     Defendant Buck made a clear and unambiguous promise that he would serve as Plaintiff's sponsor and continue providing him guidance, corroboration and direction in completing his degree and pursuing his research interest.

**480.**     Defendant Webster made a clear and unambiguous promise that the details of Plaintiff's disclosure statement would not be released, and neither the students, staff, nor faculty at SMAST would learn of the contents or nature of the subject matter included in his disclosure statement.

**481.**     Both promisors made a promise which they individually should reasonably expect to induce action or forbearance of a definite and substantial character on the part of Plaintiff.

**482.**     Both promises individually and jointly did induce such action or forbearance, in that Plaintiff sacrificed all other options and chose to apply his VA scholarship and matriculate at UMASSD. But for the promises Plaintiff would have chosen an alternative educational program.

**483.**     Buck breached his promise when he abruptly terminated all communication with Plaintiff and ceased any action in assisting Plaintiff pursue his career. As a proximate result Plaintiff can no longer pursue his research interests and the opportunity to apply his VA scholarship in this endeavor is destroyed.

**484.**     Webster breached his promise when he either shared educational information of Plaintiff, or allowed Cummings to disseminate information without acting to protect Plaintiff which has proximately caused Plaintiff damages.

**485.**     Upon information and belief Defendants intentionally concealed that either would breach their unambiguous promises if pressed by UMASSD for matters unrelated to admission/academic performance.

**486.**     Injustice can be avoided only by enforcement of the promise.

**487.**     As a direct, proximate, and foreseeable consequence of Buck's and Webster's failure to honor their promises, Plaintiff sustained harm and damages similar to those listed in ¶ 292, suffered special damages when he was compelled to retain private counsel.  Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT XVI

### Intentional Infliction of Emotional Distress As to Defendants Majewski, Gomes, Cummings, Unnamed Professor, Buck, Fioravanti and Helm in their Individual / Official Capacities

**488.** Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

**489.** During the investigation and adjudication process, Defendants exhibited extreme and outrageous conduct, beyond all possible bounds of decency, including but not limited to the following:

**i.** Defendants instituted bogus disciplinary proceedings and criminal investigations of Plaintiff to correct an "admissions error" and baselessly remove Plaintiff from UMASSD because Defendants contended his conviction disqualified his matriculation.

**ii.** Defendants criminally extorted Plaintiff, threatening to accuse him of crimes and threatening to destroy his reputation with colleagues, advisors, and faculty if he refused to withdraw from UMASSD on May 4th or soon thereafter.

**iii.** Defendants repeatedly and maliciously defamed Plaintiff accusing him of crimes and other defamatory conduct within UMASSD and outside UMASSD with whom Plaintiff had advantageous relations in Defendants' successful effort to deny Plaintiff's ability to pursue those educational opportunities.

**iv.** UMASSD maliciously and repeatedly disseminated Plaintiff's confidential educational and disciplinary records related to Title IX in their effort to destroy Plaintiff's pursuit of his graduate academic program while protecting privacy of all others involved.

**v.** Defendants imposed an interim suspension, without justification, banning him from campus, issuing him a DNC denying communication with anyone associated with UMASSD, and suspending him prior to meeting or speaking with Plaintiff, which precluded him from attending classes during his summer semester at UMASSD, and prevented him from receiving rehabilitative care for his hip surgery.

**vi.** Defendants publicly escorted Plaintiff off campus, prohibiting him from even clearing out his workspace or obtaining his property therein prior to any investigation being performed, despite the absence of any disciplinary history.

**vii.** Defendants treated Plaintiff as an adversary and prosecuted him criminally and administratively under a presumption of guilt, based on innate biases against male students with a conviction.

**viii.** Defendants pursued an investigation against Plaintiff despite the alleged "victim's" repeated declarations that he had not engaged in any prohibited conduct.

**ix.** Defendants refused to conduct equitable criminal and administrative investigations into Plaintiff's complaints while encouraging supposed victims and professors to file false reports.

**x.** Defendants utilized intimidation tactics and the threats of additional institutional action to prevent Plaintiff from speaking with anyone thus depriving Plaintiff of a full and fair opportunity to defend himself.

**xi.** The week after May 4th, Defendants directed SMAST staff to hold an all hands meetings and publicly disclose the nature and content of Plaintiff's interim suspension and Title IX investigation.

**xii.** Defendants' investigation far exceeded the scope of the alleged violations when they sought to elicit information wholly irrelevant to the conduct at issue for the sole purpose of embarrassment and to impugn Plaintiff character and reputation.

**xiii.** Defendants' failed to conduct a prompt and timely investigation; the nature and leading manner of

the questions asked contributed to ongoing rumors, gossip, and ridicule directed at Plaintiff.

**xiv.** Defendants intentionally leaked the contents of Plaintiff's disclosure statement on his graduate school application for the purpose of harming his reputation and academic program.

**xv.** Defendants punished Plaintiff despite finding him not responsible for the alleged conduct, and in implementing "'appropriate interventions,' censored Plaintiff from speaking to other students, confined him to a workspace adjacent to the Dean's office, and kept Plaintiff from his normal routine in benefitting from his educational experience.

**xvi.** Defendants initiated baseless and false misconduct allegations and criminal complaints knowing Plaintiff was innocent.

**490.** Such extreme and outrageous conduct was either intentional or in reckless disregard to cause emotional distress to Plaintiff, and was effected with personal animus against Plaintiff.

**491.** As a direct result of the foregoing, Plaintiff has in fact suffered severe emotional distress with physical impact including panic attacks, headaches, insomnia, grinding of teeth and excessive wear that caused two molars to crack in half requiring removal, insomnia, weight loss, loss of appetite, PTSD flashbacks and symptomology from wrongfully being prosecuted, extreme depression, excessive alopecia, and his hair turned pure white.

**492.** As a direct, proximate, and foreseeable consequence Plaintiff sustained harm and damages similar to those listed in ¶ 292. Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

## COUNT XVII

### Negligent Infliction of Emotional Distress as to Defendants UMASSD, Majewski, Cummings, and Helm in their Individual and Official Capacities

**493.** Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein.

**494.** Based on the foregoing, Defendants have been liable of negligence toward Plaintiff during the initiation and prosecution of the disciplinary proceedings under Policies and Protocol as stated above.

**495.** Plaintiff has suffered severe emotional distress.

**496.** Defendants negligence has been the proximate and direct cause of Plaintiff's emotional distress.

**497.** Plaintiff has suffered physical harm manifested by objective symptomology for which he received and continues receiving treatment.

**498.** As a direct result of the foregoing, Plaintiff has in fact suffered severe emotional distress with physical impact including panic attacks, headaches, insomnia, grinding of teeth and excessive wear that caused two molars to crack in half requiring removal, insomnia, weight loss, loss of appetite, PTSD flashbacks and symptomology from wrongfully being prosecuted, extreme depression, excessive alopecia, and his hair turned pure white.

**499.** A reasonable person would have suffered emotional distress under the circumstances of the case.

**500.**   As a direct, proximate, and foreseeable consequence of Defendants' actions, Plaintiff sustained harm and damages similar to those listed in ¶ 292.  Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs.

**COUNT XVIII**

**Intentional Interference with Contractual Relations with Veterans Affairs (Defendants Cummings, Buck, Gomes, Helm and Majewski in their Individual/Official Capacities)**

**501.**   Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein;

**502.**   Plaintiff applied his vocational rehabilitation contractual scholarship with U.S. Department of Veterans Affairs (VA) under 38 USC Ch. 31 - which fully funded tuition, books, stipend, medical insurance and other expenses for five years in pursuit of Ph.D. in Oceanography – at UMASSD.

**503.**   Plaintiff was contracted with the VA to complete the Ph.D. program satisfactorily within 5 years, to comply with school procedures, and maintain a B minus average.

**504.**   Plaintiff informed all advisors, professors, UMASSD admissions staff, and students that he attended UMASSD with a VA scholarship.

**505.**   Defendants knew Plaintiff was fully funded under a contract per 38 USC Ch. 31, which provided Plaintiff a fully-funded 5 year scholarship.

**506.**   Based on the foregoing, Defendants with intentional improper motive or means, actual malice and with personal animus, knowingly induced Plaintiff's inability to perform the contract or caused his performance to be more expensive or burdensome, while engendering a hostile learning environment in which he could not endure.

**507.**   As the direct result of Defendants improper and malicious actions, Plaintiff was compelled to receive a leave of absence, and lose the benefit of his VA contract.

**508.**   As a direct, proximate, and foreseeable consequences of Defendants' actions, Plaintiff sustained harm and damages similar to those listed in ¶ 292.  Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs. Plaintiff further seeks punitive damages against Defendants Cummings, Buck, Gomes, Helm, and Unnamed Professor Majewski, in their individual capacities.

## COUNT XIX

### Civil Conspiracy as to Defendants Cummings, Unnamed Professor, Buck, Gomes, Fioravanti, Helm and Majewski in their Individual/Official Capacities

**509.**  Plaintiff repeats and re-alleges each and every allegation hereinabove as if fully set forth herein; he alleges both possible causes of action for civil conspiracy under Massachusetts law.

**510.**  First, Plaintiff alleges an independent tort where Defendants acting in unison, had some peculiar power of coercion over the Plaintiff that they would not have had if they had been acting independently. Based on the foregoing together Defendants, with mere force of numbers and the impact therefrom were able to destroy Plaintiff's academic program and chosen career path, which coerced his departure from UMASSD. By way of examples, without limitation were: (i) the tortious interference with Plaintiff's contract with VA and advantageous relations with external/internal researchers denying Plaintiff the ability to complete his academic program at UMASSD or corroborate outside UMASSD; (ii) the consummate destruction of Plaintiff's reputation through the all-hands SMAST meeting and malicious disclosure of confidential information that caused students, staff and faculty to shun Plaintiff; (iii) the lack of due process from the May 3rd email until the implementation of unprecedented "appropriate interventions" created a hostile learning environment and precluded Plaintiff's ability to continue benefitting from his educational experience; (iv) the withdrawal of Plaintiff's academic advisor denied Plaintiff's ability to continue his matriculated program in his research field; (v) the filing of false criminal charges painted Plaintiff as a perpetrator and dangerous student; (vi) the interim sanctions precluded Plaintiff from Defending himself in the investigation and in his reputation.

**511.**  The combined action of UMASSD officials, where through the power of combination pressure was created and brought about different in kind from anything that could have been accomplished by separate individuals. Plaintiff could have successfully managed the proper adjudication of a legitimate misconduct or Title IX investigation, which found him not responsible and released him from culpability or allowed him to continue his academic program in good standing with an academic advisor. Plaintiff could have managed a legitimate interim suspension, narrowed in focus, that allowed him to defend his reputation as the need arose. Yet the combination of Defendants' actions overwhelmed Plaintiff and coerced him into submitting to the combined pressure to withdraw from UMASSD and sacrifice his career path.

**512.**  Plaintiff's academic and career prospects, earning potential, and reputation have been severely harmed. He has sustained significant damages, including but not limited to, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational and professional opportunities, loss of future career prospects, and other direct and consequential damages.

**513.**  As a direct, proximate, and foreseeable consequences of Defendants' actions, Plaintiff sustained harm and damages similar to those listed in ¶ 292.  Plaintiff is entitled to recover damages in an amount to be determined at trial, plus prejudgment interest and attorneys' fees and costs. Plaintiff further seeks punitive

damages against Defendants Cummings, Buck, Gomes, Helm, and Unnamed Professor Majewski, in their individual capacities.

**514.**   As to the second type of civil conspiracy – assigning joint liability - Defendants developed a common concerted action to commit a tortious act where participants knew of the plan and its purpose, and took affirmative steps to encourage the achievement of the result.

**515.**   Based on information and belief, internal UMASSD email and communications exist that will sound that upon or shortly after Cummings' and Majewski's learning of the contents in Plaintiff's disclosure statement, Defendants entered into an agreement to cause Plaintiff harm, in general to force his withdrawal from UMASSD, and specifically as claimed in Counts I thru IV, VI thru VIII, IX, XIII, XIV, XVIII and XX, and acted in furtherance of that agreement.

**516.**   Upon information and belief Majewski and Cummings were the initial duo who concerted to initiate the bogus misconduct proceedings and issued the baseless interim sanctions; Gomes and Helm acquiesced to pressures and recommendations of Majewski and Cummings and denied Plaintiff any due process; the Unnamed Professor was added to the mix - likely related to the cheating scandal that was never investigated - and with animus agreed to file bogus criminal charges; Buck granted Cummings' request in ceasing communication with Plaintiff; and Fioravanti agreed to assist in removing Plaintiff from UMASSD and to protect the interest of his co-Defendants.

**517.**   By way of examples, without limitation were: (i) Majewski, Gomes, Helm and Gomes refused to provide Plaintiff notice and an opportunity to be heard among other due process violations; (ii) Majewski, Gomes and Cummings violated Plaintiff's confidentiality in disseminating private information to other schools, and via the all hands meeting at SMAST; (iii) Majewski and Cummings attempted to extort Plaintiff, then issued unwarranted interim sanctions on Plaintiff without cause; (iv) Despite Defendants' finding that Plaintiff was not responsible for misconduct, he was sanctioned and caused to suffer a hostile learning environment; (v) Unnamed Professor knowingly filed false criminal charges against Plaintiff;(vi) Fioravanti knowingly assigned a detective to investigate a baseless criminal allegation, then recused his entire Department from investigating a criminal complaint against Co-Defendants, unlawfully concealed the identity of the Unnamed Professor, and required Plaintiff to obtain escort before entering UMASSD property to speak to witnesses or Defendants; and (vii) Majewski, Cummings, Helm and Gomes intentionally violated nearly every protocol required in the disciplinary process.

**518.**   As a result of the civil conspiracy Defendants are jointly and severally liable for Counts I thru IV, VI, VII, IX, XI, XII, XVI and XVIII.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

## PRAYER FOR RELIEF

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants, jointly and severally, individually and in official capacities as follows: Plaintiff requests that this Court enter judgment against Defendants jointly and severally on all counts of this complaint as described above in each count. Plaintiff further requests that this Court: (A) Retain jurisdiction of this matter for the purpose of enforcing this Court's order; (B) Award to Plaintiff compensatory and other damages in an amount to be determined at trial; (C) Award reasonable costs and expenses, including attorney's fees, in accordance with 42 U.S.C. § 1988; (D) Grant such other and further relief as this Court deems equitable and just AND:

Specifically against each named Defendant regarding any damages and/or injunctive relief for each of the following Counts cited in respective paragraphs: (1) **Count I** per ¶¶ 312, 313;  (2) **Count II per** ¶ 331 (punitive damages against Defendants Majewski and Cummings); (3) **Count III** per ¶ 365; (4) **Count IV** per ¶ 375; (5) **Count V** a judgment declaring both policies unconstitutionally vague per ¶383; (6) **Count VI** per ¶ 399; (7) **Count VII** per ¶ 414; (8) **Count VIII** per ¶ 424; (9) **Count IX** per ¶ 434; (10) **Count X** per ¶ 440; (11) **Count XI** per ¶ 449; (12) **Count XII** per ¶ 463; (13) **Count XIII** per ¶ 468; (14) **Count XIV** per ¶ 477; (15) **Count XV** per ¶ 487; (16) **Count XVI** per ¶ 492; (17) **Count XVII** per ¶ 500; (18) **Count XVIII** per ¶508, and (19) **Count XIX** per ¶¶ 513, 518.

## Certification and Closing

Under Federal Rule of Civil Procedure 11, by signing below, I certify to the best of my knowledge, information, and belief that this complaint: (1) is not being presented for an improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation; (2) is supported by existing law or by a non-frivolous argument for extending, modifying, or reversing existing law; (3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery; and (4) the complaint otherwise complies with the requirements of Rule 11. I agree to provide the Clerk's Office with any changes to my address where case-related papers may be served. I understand that my failure to keep a current address on file with the Clerk's Office may result in the dismissal of my case.

Date: July 17, 2019

Respectfully Submitted:          John Harnois, Pro Se

By: /s/ John Harnois

53 Child Street, Unit 669, Warren, RI 02885
Doe.John.123199@gmail.com; (508) 333-1728