UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 19-10705-RGS

JOHN HARNOIS

v.

UNIVERSITY OF MASSACHUSETTS AT DARTMOUTH, et al.

MEMORANDUM AND ORDER ON
DEFENDANTS' RULE 12(b)(6) MOTION TO DISMISS

October 28, 2019

STEARNS, D.J.

John Harnois, a former graduate student at the University of Massachusetts (UMass) Dartmouth, brought suit against UMass Dartmouth and a number of its employees[1] for the alleged mishandling of a Title IX investigation and inquiries into the truthfulness of his application for admission.  Having decided defendants' Rule 12(b)(1) motion, the court now

---

[1] Defendants include: then-Interim Chancellor of UMass Dartmouth Peyton R. Helm; Assistant Vice Chancellor for Student Affairs Cynthia Cummings; Assistant Vice Chancellor Deborah Majewski; Director of Graduate Studies and Admissions Scott Webster; then-Deputy Director, now Director, of Diversity and Inclusion David Gomes; UMass Dartmouth Professor John Buck; and UMass Dartmouth Chief of Police Emil Fioravanti. Harnois also indicates an intent to sue an unnamed UMass Dartmouth professor (Professor Doe).

turns to the related Rule 12(b)(6) motion.[2]

For the reasons explained below, defendants' Fed. R. Civ. P. 12(b)(6)

motion will be denied with respect to Counts I, II, III (procedural due process

---

[2] Claims that survived the Rule 12(b)(1) motion include: claims against UMass Dartmouth for violating Title IX (Counts I and II); claims against all defendants in their individual capacities for denying Harnois due process in violation of 42 U.S.C. § 1983 (Count III); claims against Helm, Cummings, Gomes, and Majewski in their individual capacities for violating Harnois's First Amendment rights in violation of 42 U.S.C. § 1983 (Count IV); a claim against UMass Dartmouth for imposing upon Harnois an unconstitutionally vague and overbroad Sexual Violence Protocol and Student Conduct Policies and Procedures (Count V); claims against Cummings, Majewski, Professor Doe, and Gomes in their individual capacities for defamation (Count VI); claims against Cummings, Majewski, Gomes, and Professor Doe in their individual capacities for violation of the Massachusetts Civil Rights Act (MCRA) (Count VII); claims against Cummings and Majewski in their individual capacities for intentional interference with advantageous third party relations (Count VIII); claims against Helm, Cummings, Gomes, and Majewski in their individual capacities for breach of fiduciary duty in disclosing confidential information (Count X); claims against Helm, Gomes, Cummings, and Majewski in their individual capacities for invasion of privacy (Count XI); claims against Gomes, Helm, Cummings, and Majewski in their individual capacities for malicious prosecution and abuse of process (Count XII); claims against Buck and Webster in their individual capacities for promissory estoppel (Count XV); claims against Majewski, Gomes, Cummings, Professor Doe, Buck, Fioravanti, and Helm in their individual capacities for intentional infliction of emotional distress (Count XVI); claims against Cummings, Buck, Gomes, Helm, and Majewski in their individual capacities for intentional interference with contractual relations (Count XVIII); and claims against Cummings, Professor Doe, Buck, Gomes, Fioravanti, Helm, and Majewski in their individual capacities for civil conspiracy (Count XIX). Harnois concedes that Count X is vulnerable to defendants' Rule 12(b)(6) motion. Dkt #56 at 29.

claims against Cummings, Majewski, Gomes, and Helm only), IV, VII (against Cummings and Majewski only), VI (against Cummings, Majewski, and Professor Doe only), Count VIII (against Cummings only), and XV (Webster only).  Defendants' Rule 12(b)(6) motion will be allowed as to all remaining claims.

## BACKGROUND

The essential facts, viewed in the light most favorable to plaintiff as the nonmoving party, are as follows.  Harnois is a disabled veteran, who enrolled at UMass Dartmouth to pursue a Ph.D. in Oceanography.

In April of 2015, after completing a graduate internship in underwater acoustics, Harnois was recommended to UMass Dartmouth Professor John Buck, who agreed to serve as his PhD supervisor.  Professor Buck also promised to help Harnois develop research projects for his dissertation.

Harnois has a prior criminal conviction which he had disclosed to the Director of Graduate Studies and Admissions, Scott Webster.  Webster assured Harnois that he and his staff would keep the conviction confidential. Assistant Vice Chancellor for Student Affairs Cynthia Cummings knew that Webster had reviewed Harnois's disclosure statement.

In September of 2015, Harnois enrolled in three classes at UMass Dartmouth as part of a Master's degree program.  Harnois joined the

Master's program with the understanding that he "would be considered on the FastTrak program for acceptance into the Ph.D. program once [he] wrote a research proposal." Third Am. Compl. (TAC) ¶ 37 n.3. His three course teachers, together with Professor Buck, recommended Harnois for the PhD program.

In December of 2015, Harnois developed a joint research project with Professor Buck and another senior scientist. In February of 2016, Professor Buck arranged for Harnois's admission to a prestigious bioacoustics summer program. During the Spring of 2016, Harnois was recruited by Duke University to apply to a summer internship at the Duke Marine Lab. In the Spring of 2016, Harnois maintained a 4.0 GPA in his graduate classes.

On May 3, 2016, Cummings ordered Harnois to attend a meeting to discuss the disclosure statement that Harnois provided on his application for admission. The following day, Harnois met with Cummings and Majewski. At the start of the meeting, Cummings accused Harnois of "fraudulently disclosing his history in his application." *Id.* ¶ 113. She demanded that Harnois withdraw from UMass Dartmouth. Cummings also told Harnois that several individuals "had recently filed formal complaints regarding [Harnois's] misconduct, which created a hostile learning environment, and that [UMass Dartmouth was] considering a Title IX investigation." *Id.* ¶ 118.

4

Harnois asked to be informed of the specifics of the allegations made against him, including when and by whom the allegations were made.  Cummings told him no more than that complaints about his conduct had been received as early as December of 2015.

During the meeting, Cummings demanded that Harnois sign a document acknowledging that if he were to remain on the UMass Dartmouth campus after the meeting, he would subject himself to arrest for criminal trespass.  Harnois objected and asked to speak with Professor Buck for advice.  Cummings rejected the request.

Cummings then told Harnois that if he withdrew voluntarily from UMass Dartmouth he would not be subjected to the Title IX investigation and his criminal history would be kept secret.  Cummings promised to ensure that Harnois would receive excellent letters of recommendation, to continue his education elsewhere.  When Harnois declined to withdraw, Cummings threatened to "get his kind."[3]  *Id.* ¶ 146.

UMass Dartmouth suspended Harnois effective immediately on May 4, 2016, citing a pending Title IX investigation and the allegation that Harnois had "a more extensive criminal history than [he] disclosed prior to

---

[3] More specifically, the Third Amended Complaint quotes Cummings as saying: "If you won't leave, I'll get your kind with a Title IX investigation." TAC ¶ 146.

being admitted to the Master's program in Marine Science." Dkt # 43-1 at 1 (incorporated by reference).  Cummings wrote a letter reporting Harnois's suspension, his criminal record, and that Harnois had been banned from the UMass Dartmouth campus without a police escort.  Cummings copied others on the letter, including the Dean of Harnois's degree program and three of her staff members who had no prior knowledge of Harnois's criminal record.

Following the suspension, Cummings and Majewski ordered Steve Lorenz, a dean at the UMass Dartmouth School for Marine Science and Technology (SMAST), "to hold an unprecedented all hands meeting with compulsory attendance regarding Plaintiff."  TAC ¶ 160.  The meeting participants were told of the Title IX investigation and the fact that Harnois had been banned from campus grounds.  In conveying this information, Lorenz intimated that students should avoid speaking with Harnois and should consider him dangerous.  Within a week of the "all hands" meeting, the entire faculty, staff, and students in Harnois's degree program were aware that he had a criminal record and was the subject of an impending Title IX investigation.

In the weeks that followed, Harnois attempted to learn the nature of the specific allegations made against him.  In response to a May 9, 2016 email asking Majewski for a written copy of the complaints, Majewski told Harnois

the Title IX investigation would begin immediately and informed Harnois of his procedural rights in anticipation of an investigatory interview session. Majewski said only that UMass Dartmouth was investigating alleged violations of the University's Policies on Equal Opportunity, Discrimination, Harassment, and Sexual Violence.  Harnois sought to have Professor Buck serve as his advisor during the Title IX investigation; Majewski rejected Harnois's request and suggested that he retain outside counsel.

On May 17, 2016, UMass Dartmouth Police filed a report based on information provided by Cummings and Professor Doe that Harnois had logged into his campus computer in violation of the "Do Not Trespass" order. During a subsequent investigation, a UMass Dartmouth police detective confiscated Harnois's computer to conduct a forensic examination.  The police failed to uncover any violation by Harnois of the no trespassing order.[4]

On May 20, 2016, Mehmet Baysan, Harnois's attorney, emailed Majewski raising the first of several objections to UMass Dartmouth's refusal to provide details of the allegations against Harnois.  On June 7, 2016, Majewski responded only that Harnois's behavior had created "an

---

[4] In March of 2019, UMass Dartmouth Chief of Police Fioravanti allegedly refused to assist Harnois in his effort to file felony extortion charges against Cummings and Majewski.  Fioravanti also refused to reveal the identity of Professor Doe.

uncomfortable learning and work environment" for his colleagues.  *Id.* ¶ 201 n.50.

During its investigation, UMass Dartmouth's Title IX office asked two female students in Harnois's graduate program to file complaints against Harnois but both refused to do so.  Eventually, the Title IX investigator contacted every female student in Harnois's classes in search of derogatory information.

On July 15, 2016, Harnois and Baysan met with Cummings, Majewski, and then-Deputy Director (now Director) of Diversity and Inclusion David Gomes, for an investigative interview.  Harnois was not informed of his accusers or the details of the allegations.  The interview was conducted in an adversarial manner with questions often so vague – for example, "did you ever deny helping someone with their homework" – that Harnois was unable to answer them.  *Id.* ¶ 210.  In total, Gomes asked Harnois approximately 15-20 questions, addressing generally "innocuous behavior."  *Id.* ¶ 209. Harnois's request for a written copy of the questions was denied.

As a result of his suspension from campus for the spring/summer term, Harnois was unable to attend classes, seminars, and university-sponsored programs.  Harnois also was unable to access academic books, notes, and a personal computer that had been seized by the investigators.  In August of

2016, Harnois began suffering from panic attacks, insomnia, headaches, depression, PTSD flashbacks, loss of hair and hair color, and grinding of teeth so severe that two molars cracked.

In a letter dated August 30, 2016, Majewski informed Harnois that the evidence was insufficient to support a finding that Harnois had violated UMass Dartmouth's Policies on Equal Opportunity, or Title IX. Nevertheless, Harnois was "sanctioned with a warning in writing." *Id.* ¶ 228. In addition, Harnois was informed that his studies would be restricted and that any repeat behavior would incur "immediate harsh penalties." *Id.*

Subsequently, Harnois was confined to a remote, supervised workspace; his engagements with other students became limited; and he was prevented from going about his day in the graduate student work area. Although Harnois enrolled in classes for the 2016 Fall semester, he felt exiled from the academic community.   In September of 2016, a SMAST dean informed Harnois that because of the investigation, Professor Buck would no longer serve as his thesis advisor.   The dean told Harnois that his matriculation status was being changed to that of a non-thesis degree candidate from that of a Master's student "with a research thesis/fasttrack to PhD." *Id.* ¶ 236.  Harnois withdrew from an oceanography course because the course required "classroom deliberation with other students, mostly

9

females." *Id.* ¶ 249.  He felt compelled to seek a leave of absence to receive psychological treatment because his on-campus work environment became "hostile and toxic." *Id.* ¶ 8.

Harnois filed this lawsuit on April 12, 2019 and filed a Third Amended Complaint on July 17, 2019.

## DISCUSSION

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  Two basic principles guide the court's analysis.  "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678.  "Second, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679.  A claim is facially plausible if its factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678.

**Counts I and II: Title IX violations**.  Harnois alleges that UMass Dartmouth violated Title IX of the Educational Amendments of 1972, 20 U.S.C. § 1681, *et seq.*  He separately alleges selective enforcement, erroneous outcome, deliberate indifference/hostile environment harassment, and Title

IX retaliation.

Title IX provides in pertinent part that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a).  Title IX provides for an implied private right of action for money damages, extending "only to claims against the educational institution itself."  *Frazier v. Fairhaven Sch. Comm.*, 276 F.3d 52, 65 (1st Cir. 2002).

The University of Massachusetts receives federal financial assistance; accordingly, UMass Dartmouth is liable to suit under Title IX.  *See Doe v. Univ. of Massachusetts-Amherst*, 2015 WL 4306521, at *6 (D. Mass. July 14, 2015).  Harnois asserts that he was a student pursuing a graduate degree at UMass Dartmouth; he thus alleges participation in an "education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681.

Selective enforcement.  To make out a selective enforcement claim, a plaintiff must allege facts sufficient to support a reasonable inference that "'the severity of the penalty and/or the decision to initiate the proceeding was affected by [Harnois's] gender,'" *Haidak v. Univ. of Massachusetts-Amherst*, 933 F.3d 56, 74 (1st Cir. 2019), quoting *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994), and – more specifically – that gender was a

"motivating factor."  *Haidak*, 933 F.3d at 74.[5]

Here, Harnois points to Cummings's alleged threat: "If you won't leave, I'll get your kind with a Title IX investigation."  TAC ¶ 146.  Harnois invites the inference that "your kind" referred to students with Harnois's characteristics, including his gender.  Harnois alleges also that funding pressures motivated UMass Dartmouth to open Title IX investigations against males specifically, a) because University leadership operated under a belief – as allegedly expressed publicly by UMass Dartmouth's Vice Chancellor for Student Affairs – that "sexual assaults are perpetrated [exclusively] by men," *id.* ¶ 84; b) because the U.S. Department of Education had named the University of Massachusetts as one of several colleges and universities under investigation for possible Title IX violations; and c) because news media, and institutional actors from other universities, recognized, as Harnois explains it, that "a fear of governmental intervention and withdrawal of funds could lead colleges to rush to judgment against male students."  *Id.* ¶ 67.  According to Harnois, "[t]he threat of revocation of federal funds – the ultimate penalty – was a powerful tool in motivating colleges, including [UMass Dartmouth], to aggressively pursue and punish

---

[5] The First Circuit has "never recognized a private right of action for disparate-impact discrimination under Title IX."  *Haidak*, 933 F.3d at 75.

male students accused of sexual misconduct." *Id.* ¶ 69.

Harnois also maintains that UMass Dartmouth's recent settlement of a costly gender discrimination lawsuit initiated by a female employee "hypersensitized" UMass Dartmouth to "suits by females filing Title IX discrimination complaints," *id.* ¶ 83, such that UMass Dartmouth was motivated to undertake preemptive and precipitous investigation of male students accused of Title IX misconduct. These allegations, collectively, if believed by a jury, are sufficient to support an inference that Harnois's gender was a "motivating factor" in the decision of UMass Dartmouth to initiate a baseless Title IX investigation.

<u>Erroneous outcome</u>. "To succeed on [an] erroneous outcome claim, [a plaintiff] must offer evidence (1) that would 'cast some articulable doubt on the accuracy of the outcome of the [Title IX] disciplinary proceeding' and (2) show 'gender bias was a motivating factor [behind the erroneous finding].'" *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 91 (1st Cir. 2018), quoting *Yusuf*, 35 F.3d at 715. Generally, to demonstrate the requisite articulable doubt in an erroneous outcome claim, a plaintiff:

> may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge. A complaint may also allege particular procedural flaws affecting the proof.

*Yusuf*, 35 F.3d at 715.   To demonstrate that gender bias was a motivating factor, a plaintiff may allege facts including, "*inter alia,* statements by members of the disciplinary tribunal, statements by pertinent university officials, or patterns of decision-making that also tend to show the influence of gender." *Yusuf*, 35 F.3d at 715.  Facts alleged must "tend to show that there was a causal connection between the outcome of [Harnois's] disciplinary proceedings and gender bias." *Trs. of Bos. Coll.*, 892 F.3d at 91.

Here, Harnois identifies several alleged procedural flaws corrosive of the proof in his case, including the official solicitation of baseless complaints from Harnois's female fellow students.  Harnois also alleges that during his Title IX investigation, Gomes did not interview any of Harnois's witnesses, and failed to consider potentially exculpatory evidence — such as, for instance, Harnois's discovery and reporting of an on-campus cheating scandal, which might have given several individuals a motive to disparage him.  Harnois points additionally to public statements by UMass Dartmouth officials, which he alleges demonstrate an inappropriate institutional bias towards an indiscriminate belief in the truth of Title IX complaints.  For instance, Harnois points to a UMass Dartmouth spokesperson's alleged statement that "[w]e want to assume accuracy in what the victim is saying." *Id.* ¶ 81 n.13.  Finally and most forcefully, Harnois asserts that he was

14

subjected to sanctions without any finding of a disciplinary violation. These alleged facts, taken alongside the allegations described in the court's review of Harnois's selective enforcement claim, *supra*, make out a plausible erroneous outcome claim.

<u>Deliberate indifference/hostile environment harassment</u>. To set out a "deliberate indifference" claim under Title IX, a plaintiff must allege facts to demonstrate that:

> (1) "he or she was subject to 'severe, pervasive, and objectively offensive' [harassment cognizable under Title IX]"; (2) "the harassment caused the plaintiff to be deprived of educational opportunities or benefits"; (3) the funding recipient was aware of such harassment; (4) the harassment occurred "in [the funding recipient's] programs or activities"; and (5) the funding recipient's response, or lack thereof, to the harassment was "clearly unreasonable."

*Doe v. Brown Univ.*, 896 F.3d 127, 130 (1st Cir. 2018), quoting *Porto v. Town of Tewksbury*, 488 F.3d 67, 72-73 (1st Cir. 2007).

Here, Harnois alleges that he was "intentionally subjected to unfounded allegations and an unfair process" because he was male, TAC ¶ 307; that he was deprived of an adequate "educational environment" as a result of "discriminatory intimidation, ridicule, and insult" stemming from "repeated defamations . . . the 'all-hands meeting' at SMAST . . . [his] punitive interim suspension . . . false criminal allegations by UMass Dartmouth . . . [and] final sanctions," *id.* ¶¶ 309, 310; that UMass Dartmouth "had actual

15

notice of the harassment" as a result of the complaints Harnois lodged with University officials; that the harassment occurred in the context of a University-imposed disciplinary process; and that UMass Dartmouth's response to the harassment was to impose restrictions which "no reasonable person could endure." *Id.* ¶ 309.  These alleged facts suffice to make out a claim for deliberate indifference/hostile environment harassment.

Title IX retaliation.  "[W]hen a funding recipient retaliates against a person *because* he complains of sex discrimination, this constitutes intentional 'discrimination' 'on the basis of sex,' in violation of Title IX*." Jackson v. Birmingham Bd. of Educ.*, 544 U.S. 167, 174 (2005).  "[A] plaintiff may establish a prima facie case for a Title IX retaliation claim by alleging facts sufficient to show that [he] engaged in activity protected by Title IX, that the alleged retaliator knew of the protected activity, that the alleged retaliator subsequently undertook some action disadvantageous to the actor, and that a retaliatory motive played a substantial part in prompting the adverse action." *Frazier*, 276 F.3d at 67.

Harnois alleges that after he became the subject of a Title IX investigation, he complained to UMass Dartmouth officials on four distinct occasions "that the Title IX investigation was initiated and conducted solely to pressure [Harnois] into withdrawing because he was a male student with

a [criminal] conviction." TAC ¶ 318. According to Harnois, because he complained, UMass Dartmouth took measures that "purposely created a hostile learning environment so severe and perverse that neither [Harnois] nor a reasonable person could expect to endure under the circumstances, which constructively expelled [Harnois], compelling him to seek a leave of absence." *Id.* ¶ 324. These measures included the "interventions" described above, the downgrading of Harnois's academic program to a non-thesis Master's degree, and an alleged "smear campaign" on campus that "caus[ed] him to receive treatment as a pariah precluding any opportunity for research collaboration." These allegations sketch out a plausible claim for Title IX retaliation.

**Counts III and IV: Denial of due process and First Amendment rights**. Proceeding under the federal Civil Rights Act, 42 U.S.C. § 1983, Harnois alleges violations of his procedural and substantive due process rights and First Amendment rights. To state a claim under section 1983, Harnois must plead a prima facie case showing that a person acting "under color of state law" deprived him of a "right[] secured by the Constitution or by federal law." *Santiago v. Puerto Rico*, 655 F.3d 61, 68 (1st Cir. 2011), quoting *Redondo–Borges v. U.S. Dep't of HUD*, 421 F.3d 1, 7 (1st Cir.2005). The University of Massachusetts "is a public institution

established under the laws of the Commonwealth of Massachusetts," *Ali v. Univ. of Massachusetts Medical Ctr.*, 140 F. Supp. 2d 107, 110 (D. Mass. 2001); *see also United States v. Univ. of Massachusetts, Worcester*, 812 F.3d 35, 40 (1st Cir. 2016), and as such it and its agents acting in their official capacities are immune from suit under the Eleventh Amendment.  Thus, to the extent that Harnois seeks damages, his claims lie against defendants – all UMass Dartmouth employees – only in their individual capacities. Harnois makes such claims against all defendants under Count III (due process), and defendants Helm, Cummings, Gomes, and Majewski under Count IV (denial of First Amendment Rights/free speech retaliation).[6]

Procedural Due Process.   "In order to establish a procedural due process claim under section 1983, a plaintiff 'must allege first that [he] has a property interest as defined by state law and, second, that the defendants, acting under color of state law, deprived [him] of that property interest without constitutionally adequate process.'" *Marrero-Gutierrez v. Molina*, 491 F.3d 1, 8 (1st Cir. 2007), quoting *PFZ Props., Inc. v. Rodriguez,* 928 F.2d 28, 30 (1st Cir. 1991).  Under First Circuit law, a public university student, such as Harnois, has a constitutionally protected property right in his or her

---

[6] In ruling on defendants' Rule 12(b)(1) motion, the court dismissed Harnois's claim against UMass Dartmouth under Count IV.  Dkt #52 at 10.

education.  *See Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 12 (1st Cir. 1988), citing *Goss v. Lopez,* 419 U.S. 565, 574-576 (1975) ("[A] student facing expulsion or suspension from a public educational institution is entitled to the protections of due process.").

Harnois alleges that he did not receive constitutionally adequate process, both with respect to his suspension from UMass Dartmouth and his treatment following termination of the Title IX investigation.  "Notice and an opportunity to be heard have traditionally and consistently been held to be the essential requisites of procedural due process."  *Gorman*, 837 F.2d at 12. "In the school disciplinary context, the opportunity to be heard requires '*some* kind of hearing.'"  *Haidak*, 933 F.3d at 66, quoting *Goss*, 419 U.S. at 579 (emphasis added).  "As a general rule [absent exigencies that may provide an exception], both notice and a hearing should precede a suspension."  *Haidak*, 933 F.3d at 72.

According to Harnois, Cummings's stayed practice was to place an accused student "immediately" on interim suspension pending an investigation.  TAC ¶ 84.  Harnois maintains that his summary suspension was unjustified by any exigency.  Harnois also alleges violations of his due process rights in the conduct of the Title IX investigation, notably the defendants' refusal to inform him of the specific charges.  Harnois further

claims that whether or not due process should have afforded him or his attorney the right to cross-examine the Title IX complainants, "Gomes, Majewski, and Cummings failed to question victim(s) credibility and motivations to prevaricate regarding a graduate course cheating scandal reported by [Harnois]." *Id.* ¶ 344. *See Haidak*, 933 F.3d at 72 (concluding that "due process in the university disciplinary setting requires 'some opportunity for real-time cross-examination, even if only through a hearing panel'").

Finally, Harnois avers that despite repeated requests he was never given a copy of the investigation report or given an opportunity to respond to the findings or conclusions, nor was he allowed to appeal the post-termination sanctions imposed by Cummings, which, which had the effect of "constructively expel[ing]" him. TAC ¶ 324. Although sketchy, the collective allegations of a denial of basic due process rights is disturbing enough to merit further development of the facts on discovery.[7]

---

[7] Although Harnois names all defendants under Count III, he does not plead facts to indicate that any defendants other than Cummings, Majewski, Gomes, and Helm had influence over the initiation or execution of the disciplinary process. Accordingly, the court will permit Harnois to maintain Count III against these defendants only. Defendants argue that they are in any event protected by qualified immunity. Dkt #41 at 7. "The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have

Substantive Due Process.  Harnois posits that defendants violated his substantive due process rights by engaging in "arbitrary and/or irrational behavior which was not justified by any governmental interest."  TAC ¶ 344. The First Circuit has held that for a substantive due process claim to be viable, "state action must *in and of itself* be egregiously unacceptable, outrageous, or conscience-shocking."  *Amsden v. Moran*, 904 F.2d 748, 754 (1st Cir. 1990); *see also*, *Connor B. ex rel. Vigurs v. Patrick*, 774 F.3d 45, 53 (1st Cir. 2014) (same).  The Supreme Court has recognized a substantive due process violation in but a few instances involving intimate matters of personal autonomy.  The facts alleged by Harnois do not remotely rise to that level.

Count 4: Denial of First Amendment Rights and Free Speech Retaliation.  Harnois contends that defendants Helm, Cummings, Gomes, and Majewski deprived him of his First Amendment rights by infringing on

---

known.'"  *Pearson v. Callahan*, 555 U.S. 223, 231 (2009), quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 818 (1982).  "It is not always possible to determine before any discovery has occurred whether a defendant is entitled to qualified immunity, and courts often evaluate qualified immunity defenses at the summary judgment stage."  *Giragosian v. Bettencourt*, 614 F.3d 25, 29 (1st Cir. 2010).  The court declines to decide the issue of qualified immunity at this stage, noting that defendants are free to assert qualified immunity after further development of the factual record.  Without a more comprehensive and balanced fleshing out of the facts, any decision on the issue of qualified immunity would be premature.

his right to speak freely with UMass Dartmouth faculty and students and by retaliating against him when he protested the restrictions.  As defendants have declined to address either allegation, *see* Dkt # 43 at 8 n.7, the court will deny the motion to dismiss Harnois's First Amendment claims.

**Count VII: Violation of the MCRA as to defendants Cummings, Majewski, Gomes, and Professor Doe**.  To set out a claim under the Massachusetts Civil Rights Act (MCRA), Mass. Gen. Laws ch. 12, § 11I, a plaintiff must allege facts to establish that:

> "(1) their exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by threats, intimidation, or coercion."

*Davis v. Rennie*, 264 F.3d 86, 111 (1st Cir. 2001), quoting *Swanset Dev. Corp. v. City of Taunton*, 423 Mass. 390, 395 (1996) (internal quotation marks omitted).   Whether a defendant's conduct amounted to "threats, intimidation, or coercion" for purposes of the MCRA is gauged by an objective "reasonable person" standard.  *Planned Parenthood League of Massachusetts, Inc. v. Blake*, 417 Mass. 467, 474-475 (1994).[8]

---

[8] "The MCRA is intended to provide a remedy coextensive with that of § 1983.   Violations of § 1983, however, are not per se violations of the MCRA."  *Maraj v. Massachusetts*, 836 F. Supp. 2d 17, 30 (D. Mass. 2011) (internal citation and quotations omitted).

For purposes of the MCRA,

> a "[t]hreat" . . . involves the intentional exertion of pressure to make another fearful or apprehensive of injury or harm. . . . 'Intimidation' involves putting in fear for the purpose of compelling or deterring conduct. . . . ["Coercion" involves] "the application to another of such force, either physical or moral, as to constrain [a person] to do against his will something he would not otherwise have done."

*Planned Parenthood League of Massachusetts, Inc.*, 417 Mass. at 474. While most cases decided under the MCRA involve a factual element of physical confrontation or force, this is not an absolute requirement. *See Buster v. George W. Moore, Inc.*, 438 Mass. 635, 648 (2003) ("[I]n certain circumstances, economic coercion, standing alone, may be actionable under the act."); *Kennie v. Natural Res. Dep't of Dennis*, 451 Mass. 754, 760, 763 (2008) (interference with protected property rights).

Harnois alleges that defendants "coerced, intimidated and threatened" him in attempting to force him to leave UMass Dartmouth, depriving him of his rights under Title IX, his constitutional due process rights, and his property right to continued public education. He asserts that Cummings and Majewski repeatedly threatened to disseminate confidential information about him and extort him to withdraw. He points to "extreme and unwarranted interim sanctions" and the "interventions" implemented at Cummings's and Majewski's direction. *Id.* ¶ 405. The allegations are

sufficient to overcome a motion to dismiss by Cummings and Majewski but in the absence of allegations sufficient to state an MCRA claim as to defendants Gomes and Professor Doe, the MCRA claim as to these two defendants will be dismissed.[9]

**Count V: UMass Dartmouth's Student Conduct Policies and Procedures and Sexual Violence Protocol**.   Harnois alleges that UMass Dartmouth's Student Conduct Policies and Procedures and Sexual Violence Protocol, as they existed in 2015, were constitutionally overbroad and seeks declaratory judgment to that effect.   Even if this were a recognizable claim under federal law (it is not), it is precluded by Eleventh Amendment considerations.

**Count VI: Defamation as to defendants Cummings, Majewski, Professor Doe, and Gomes**.   "A defamation action, which encompasses libel and slander, affords a remedy for damage to the reputation of the injured party."   *HipSaver, Inc. v. Kiel*, 464 Mass. 517, 522 (2013).   To set out a claim for defamation, a plaintiff must allege facts

---

[9] Public officials may claim immunity from suit under the state MCRA patterned after immunity under the federal civil rights statutes. *Duarte v. Healy*, 405 Mass. 43, 46-47 (1989); *Rodriques v. Furtado*, 410 Mass. 878, 881-882 (1991).  As noted, *supra*, the court declines to decide the issue of qualified immunity at this stage, noting that defendants are free to assert qualified immunity after further development of the factual record.

sufficient to infer that "the defendant was at fault for the publication of a false statement regarding the plaintiff, capable of damaging the plaintiff's reputation in the community, which either caused economic loss or is actionable without proof of economic loss." *White v. Blue Cross & Blue Shield of Mass., Inc.*, 442 Mass. 64, 66 (2004) (footnote omitted).

> The test is whether, in the circumstances, the writing discredits the plaintiff in the minds of any considerable and respectable class of the community.  A publication is defamatory when it tends to injure one's reputation in the community and to expose him to hatred, ridicule, and contempt, an imputation of crime or of bad character or an injury in one's office or business not being essential.

*Brauer v. Globe Newspaper Co.*, 351 Mass. 53, 55-56 (1966), quoting *Muchnick v. Post Pub. Co.*, 332 Mass. 304, 306 (1955).

An allegedly defamatory statement need not be an explicit assertion. "An insinuation may be as actionable as a direct statement." *Mabardi v. Boston Herald-Traveler Corp.*, 347 Mass. 411, 413 (1964), quoting *Thayer v. Worcester Post Co.*, 284 Mass. 160, 162 (1933).  "The existence of defamatory innuendo is a question of fact for a jury to consider." *Reilly v. Associated Press*, 59 Mass. App. Ct. 764, 774 (2003).  In Massachusetts, "private persons, as distinguished from public officials and public figures, may recover compensation on proof of negligent publication of a defamatory falsehood." *Stone v. Essex Cty. Newspapers, Inc.*, 367 Mass. 849, 858

(1975). In addition, "Massachusetts, by statute, allows a plaintiff to recover for a truthful defamatory statement if it was published in writing (or its equivalent) and with actual malice." *Barrows v. Wareham Fire Dist.*, 82 Mass. App. Ct. 623, 628 n.6 (2012), citing Mass. Gen. Laws ch. 231, § 92. "There is no requirement [that a defamatory] matter be communicated to a large or even substantial group of persons. It is enough that it is communicated to a single individual other than the one defamed." *Brauer*, 351 Mass. at 56 (internal quotation omitted).

Here, Harnois alleges that he learned from the director of the Marine Conservation Molecular Facility at the Duke University Marine Lab that defendant Cummings made at least two false statements about him to the Duke Marine Lab. According to Harnois, Cummings told Marine Lab staff that Harnois was a threat to school safety and that Harnois lied on his application to UMass Dartmouth about his criminal history. Harnois alleges that Duke denied him admission because of these statements, and that these statements damaged his reputation. Further, Harnois alleges that Cummings and Majewski promulgated a written letter to others in the UMass Dartmouth community falsely stating that Harnois fraudulently signed his application, harming his reputation. Finally, Harnois alleges that Cummings and Professor Doe intentionally filed a false report of criminal

26

conduct against Harnois with the UMass Dartmouth police department, "which in part caused [Harnois] to be shunned upon his return after his reinstatement." TAC ¶ 392.   The alleged facts state a claim of defamation against Cummings, Majewski, and Professor Doe in their individual capacities, but not defendant Gomes.

**Count VIII: Intentional interference with third party advantageous relations as to defendants Cummings and Majewski**.   Harnois alleges that he had present and prospective advantageous relations with his advisor John Buck and with scientists with whom he had agreed to collaborate on scientific research, including individuals at Duke Marine Lab, Woods Hole Oceanographic Institute, and the Center for Marine Science & Technology at the Pennsylvania State University.

> The tort of intentional interference with advantageous relations protects a plaintiff's present and future economic interests from wrongful interference. . . . To make a successful claim for intentional interference with advantageous relations, a plaintiff must prove that (1) he had an advantageous relationship with a third party (e.g., a present or prospective contract or employment relationship); (2) the defendant knowingly induced a breaking of the relationship; (3) the defendant's interference with the relationship, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.

*Blackstone v. Cashman*, 448 Mass. 255, 259-260 (2007).

Here, Harnois (1) alleges that he had advantageous professional relationships with several third parties; that Cummings (2) knowingly induced a breaking of these relationships by conveying false information about his character and status at UMass Dartmouth; that (3) Cummings did so intentionally and maliciously; and that (4) Harnois was harmed by Cummings's actions, because his advantageous relationships ended and former collaborators and prospective collaborators ceased communicating with Harnois.   These allegations state a claim against Cummings under Count VIII, but not as to Majewski against whom no competent facts are pled.

**Count XI: Invasion of privacy as to defendants Helm, Gomes, Cummings, and Majewski**.   Under Mass. Gen. Laws ch. 214, § 1B, "[a] person shall have a right against unreasonable, substantial or serious interference with his privacy."   "To sustain a claim for invasion of privacy, the invasion must be both unreasonable and substantial or serious."   *Nelson v. Salem State Coll.*, 446 Mass. 525, 536 (2006); *see also Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 382 (2005), quoting *Schlesinger v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 409 Mass. 514, 517-518 (1991) ("We have stated that, despite the disjunctive 'or,' the phrase 'unreasonable, substantial or serious' is inclusive, as § 1B 'obviously was not intended to

28

prohibit serious or substantial interferences which are reasonable or justified.'").  The Massachusetts Supreme Judicial Court "has interpreted § 1B to proscribe the required disclosure of facts about an individual that are of a highly personal or intimate nature when there exists no legitimate, countervailing interest." *Bratt v. Int'l Bus. Machines Corp.*, 392 Mass. 508, 518 (1984).  Viable cases usually involve the public disclosure of private facts and require proof of dissemination. *Ayash v. Dana-Farber Cancer Inst.*, 443 Mass. 367, 382 n.16 (2005).  As the Supreme Judicial Court has explained:

> As recognized in the Restatement (Second) of Torts, "[e]very individual has some phases of his life and his activities and some facts about himself that he does not expose to the public eye, but keeps entirely to himself or at most reveals only to his family or to close personal friends. . . . When these intimate details of his life are spread before the public gaze in a manner highly offensive to the ordinary reasonable [person], there is an actionable invasion of his privacy, unless the matter is one of legitimate public interest."

*Ayash*, 443 Mass. at 382 (2005), quoting Restatement (Second) of Torts § 652D comment b (1977).

Here, Harnois asserts that defendants Helm, Gomes, Cummings, and Majewski invaded his privacy by publicly disclosing his confidential educational records, including information about his criminal conviction and the Title IX investigation, to students, faculty, and staff both internally within UMass Dartmouth and externally.  However, the Title IX

investigation, led by employees of UMass Dartmouth and thus by definition involving other individuals, cannot itself be a fact about Harnois of an intimate or highly personal nature.   Similarly, Harnois's prior criminal conviction is not highly personal by dint of the fact that a criminal conviction is a matter of public record.   Accordingly, Harnois has not alleged facts sufficient to state a claim for invasion of privacy.

**Count XII: Malicious prosecution and abuse of process as to Gomes, Helm, Cummings, and Majewski.**   "To make out a claim for malicious prosecution, a plaintiff must prove: '(1) the institution of criminal process against the plaintiff with malice; and (2) without probable cause; and (3) the termination of the criminal proceeding in favor of the plaintiff.'" *Gutierrez v. Massachusetts Bay Transp. Auth.*, 437 Mass. 396, 405 (2002), quoting J.R. Nolan & L.J. Sartorio, Tort Law § 77, at 88 (2d ed. 1989). Separately, "[t]he tort of malicious abuse of process consists in [*sic*] the use of lawful process primarily for a purpose for which it is not designed." *Id.* "The elements of an abuse of process claim are that: '(1) 'process' was used; (2) for an ulterior or illegitimate purpose; (3) resulting in damage.'" *Gutierrez*, 437 Mass. at 407, quoting *Datacomm Interface, Inc. v. Computerworld, Inc.*, 396 Mass. 760, 775-776 (1986).   In Massachusetts, "cases recognizing abuse of process claims have been limited to three types

of process: writs of attachment, the process used to institute a civil action, and the process related to bringing criminal charges." *The Alpha Co., Inc. v. Kilduff*, 72 Mass. App. Ct. 104, 115 (2008); *see also Scholz v. Goudreau*, 901 F.3d 37, 49 (1st Cir. 2018) (citing to Massachusetts case law as "limiting abuse of process claims to writs of attachment, instituting a civil action, and the bringing of criminal charges").

Harnois alleges that defendants' initiation and execution of the Title IX investigation constitutes malicious prosecution and abuse of process. Because the Title IX investigation was not a criminal prosecution, a writ of attachment, or civil action in the courts – nor did the action involve administrative proceedings before an administrative law judge, *see Cignetti v. Healy*, 967 F. Supp. 10, 18 (D. Mass. 1997) – Harnois's claim fails as a matter of law.

**Count XV: Promissory estoppel as to defendants Buck and Webster.** "When a promise is enforceable in whole or in part by virtue of reliance, it is a 'contract,' and it is enforceable pursuant to a 'traditional contract theory' antedating the modern doctrine of consideration." *Rhode Island Hosp. Tr. Nat. Bank v. Varadian*, 419 Mass. 841, 849 (1995). "Circumstances that may give rise to an estoppel are (1) a representation intended to induce reliance on the part of a person to whom the

31

representation is made; (2) an act or omission by that person in reasonable reliance on the representation; and (3) detriment as a consequence of the act or omission." *Bongaards v. Millen*, 440 Mass. 10, 15 (2003). "'[A] promise made with an understood intention that it is not to be legally binding, but only expressive of a present intention, is not a contract.'" *Rhode Island Hosp. Tr. Nat.* Bank, 419 Mass. at 850, quoting *Kuzmeskus v. Pickup Motor Co.,* 330 Mass. 490, 493 (1953).

Here, Harnois alleges promissory estoppel as to defendants Buck and Webster. Harnois alleges that Buck (1) clearly and unambiguously promised Harnois that he would serve as Harnois's sponsor and continue to provide him with guidance and direction while Harnois pursued his academic interests, and that Webster "made a clear and unambiguous promise that the details of [Harnois's] disclosure statement would not be released, and neither the students, staff, nor faculty at SMAST would learn of the contents or nature of the subject matter included in his disclosure statement." TAC ¶ 480. Harnois asserts that in reliance on these promises, he (2) "sacrificed all other options and chose to apply his VA scholarship and matriculate at [UMass Dartmouth]. But for the promises [Harnois] would have chosen an alternative educational program." *Id.* ¶ 482. According to Harnois, Buck broke his promise "when he abruptly terminated all communication with

[Harnois] and ceased any action in assisting [Harnois] pursue his career," *id.* ¶ 483, and "Webster breached his promise when he either shared educational information [pertaining to Harnois], or allowed Cummings to disseminate information without acting to protect [Harnois]." *Id.* ¶ 484. Harnois claims that as a result of defendants' broken promises, he suffered damages to his career prospects, earning potential, and reputation, as well as the cost of attorneys' fees. The court views Buck's promise to Harnois as a classic statement of present intention, made in light of an implicit condition that was not within Buck's control: namely, that Harnois remain a student in good standing, and no reasonable jury could think differently. Accordingly, the court will dismiss the claim against Buck under this Count. On the other hand, whether Harnois reasonably relied on Webster's apparent authority to bind UMass Dartmouth with respect to disclosure of his criminal conviction is an issue of fact not to be decided on a motion to dismiss.

### Count XVI: Intentional infliction of emotional distress as to defendants Majewski, Gomes, Cummings, Professor Doe, Buck, Fioravanti, and Helm.

> To sustain a claim of intentional infliction of emotional distress, a plaintiff must show (1) that the defendant intended to cause, or should have known that his conduct would cause, emotional distress; (2) that the defendant's conduct was extreme and outrageous; (3) that the defendant's conduct caused the plaintiff's distress; and (4) that the plaintiff suffered severe

> distress.   To be considered extreme and outrageous, the defendant's conduct must be "beyond all [possible] bounds of decency and . . . utterly intolerable in a civilized community."

*Sena v. Commonwealth*, 417 Mass. 250, 263-264 (1994), quoting *Agis v. Howard Johnson Co.*, 371 Mass. 140, 145 (1976) (internal citation omitted).

While Harnois certainly alleges conduct that caused him distress, he does not allege conduct that was "beyond all possible bounds of decency" and "utterly intolerable in a civilized society."  Accordingly, Count XVI will be dismissed.

**Count XVIII: Intentional interference with contractual relations with the VA as to defendants Cummings, Buck, Gomes, Helm, and Majewski**.  Harnois asserts that defendants Cummings, Buck, Gomes, Helm, and Majewski tortuously interfered with his contractual relations with the VA.  Under Massachusetts law:

> To prevail on a claim of tortious interference with a contract, a plaintiff must establish that "(1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions."

*Psy-Ed Corp. v. Klein*, 459 Mass. 697, 715-716 (2011), quoting *G.S. Enters., Inc. v. Falmouth Marine, Inc.,* 410 Mass. 262, 272 (1991).

Here, Harnois asserts that he had a valid contract with VA, under which the VA agreed to fund five years of graduate education and Harnois agreed to comply with school procedures and maintain a B minus average.

Harnois alleges that defendants' actions induced his inability to perform the contract, and compelled Harnois to seek a leave of absence that caused him to lose benefits associated with his VA contract.  However, Harnois has not pled facts to support an inference that defendants knowingly induced the VA to break a contract with Harnois.  Accordingly, the court will dismiss Count XVIII.

**Count XIX: Civil conspiracy as to defendants Cummings, Professor Doe, Buck, Gomes, Fioravanti, Helm, and Majewski.** Massachusetts law recognizes two kinds of civil conspiracy claims.  *Kurker v. Hill*, 44 Mass. App. Ct. 184, 188 (1998).  Harnois alleges the type of civil conspiracy where "defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently."[10]  *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1563 (1st Cir. 1994), quoting *Jurgens v. Abraham*, 616 F. Supp. 1381, 1386 (D. Mass. 1985).  "To establish a civil conspiracy, a plaintiff must demonstrate that 'a combination of persons [acted] pursuant to an agreement to injure the plaintiff.'"  *Gutierrez*, 437 Mass. at 415, quoting J.R. Nolan & L.J. Sartorio

---

[10] The other type of civil conspiracy under Massachusetts law, which Harnois does not plead, "derives from 'concerted action,' whereby liability is imposed on one individual for the tort of another."  *Kurker v. Hill*, 44 Mass. App. Ct. 184, 188 (1998), citing *Aetna Cas. Sur. Co. v. P & B Autobody*, 43 F.3d 1546, 1564 (1st Cir. 1994).

at 136.  "Civil conspiracy is a very limited cause of action in Massachusetts."
*Jurgens*, 616 F. Supp. at 1386.

Here, Harnois alleges that defendants' actions gave rise to
"combination pressure" that was "different in kind from anything that could
have been accomplished by separate individuals."  TAC ¶ 511.  However,
Harnois does not plead facts sufficient to infer that defendants agreed to act
together with the express purpose of injuring him.  Accordingly, Count XIX
will be dismissed.

## ORDER

For the foregoing reasons, defendants' Rule 12(b)(6) motion is
<u>DENIED</u> with respect to Counts I, II, III (procedural due process claims
against Cummings, Majewski, Gomes, and Helm only), IV, VII (against
Cummings and Majewski only), VI (against Cummings, Majewski, and
Professor Doe only), Count VIII (against Cummings only), and XV (Webster
only), and otherwise is <u>ALLOWED</u>.


SO ORDERED.

/s/ Richard G. Stearns_____ _____
UNITED STATES DISTRICT JUDGE